**The Safarian Firm, APC,**
Harry A. Safarian, SB#204106
Email: hs@safarianfirm.com
Christina S. Karayan, SB# 225780
Email : ck@safarianfirm.com
Pierro H. Babaian, SB# 303
Email : pb@safarianfirm.com
3150 Montrose Avenue
La Crescenta, CA 91214-3688
Telephone:  818.334.8528
Facsimile:  818.334.8107

Attorneys for Plaintiffs
ANAHIT NAZARETYAN and GARNIK HAKOBYAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANAHIT NAZARETYAN AND GARNIK HAKOBYAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ALDEA COMMUNITY ASSOCIATION, a California non-profit mutual benefit corporation; JEROME BLACK, an individual; BETH CORBETT, an individual; DALE RODIN, an individual; and DOES 1 to 100,<br><br>Defendants. | Case No. 2:21-cv-03436-AB-E<br><br>**DECLARATION OF HARRY A. SAFARIAN AND EXHIBITS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PURSUANT TO RULES 12(B)(6) AND 8 OF FEDERAL RULES OF CIVIL PROCEDURE AND CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>*[Filed concurrently with Plaintiffs' Opposition; Objections to Evidence; and Objections to Request for Judicial Notice]*<br><br>Date:   March 11, 2022<br>Time:   10:00 a.m.<br><br>Judge:  Andre Birotte, Jr.<br><br>Trial Date:      None Set |

## <u>DECLARATION OF HARRY A. SAFARIAN</u>

I, Harry A. Safarian, declare and state as follows:

1.      I am attorney at law duly licensed to practice before this Court and all courts of the State of California, including the Central District of the United States District Court. I am the founding partner of The Safarian Firm, APC, counsel of record for Plaintiffs, Anahit Nazaretyan and Garnik Hakobyan. I also represent Tamara Nazaretyan in the California State Case, *Aldea Community Association v. Tamara Nazaretyan,* Los Angeles County Superior Court case number 19CHCV00398. I make this declaration of my own personal knowledge. If called upon to testify, I would and could competently testify to the facts herein.

2.      My office filed the instant action on April 21, 2021 with Defendants being served on or about May 27, 2021. Pursuant to Federal Rule of Civil Procedure 8 and Local Rule 8-3, the parties entered into a stipulation extending the time for Defendants to file either an answer or otherwise respond to the complaint by July 16, 2021.

3.      On July 16, 2021, instead of filing an answer or other response, Defendants filed an Application for Stay and Early Mediation pursuant to the Court's ADA Disability Access Litigation. [Doc No. 12] This is despite the fact this case is not about accommodations, but instead disability discrimination in housing based on failures to provide reasonable accommodations and to engage in the interactive process. Nonetheless, the matter was stayed.

4.      Following notice that the matter had proceeded to an unsuccessful mediation, on November 17, 2021, this Court issued an order vacating the stay and setting December 17, 2021 as the deadline for Defendants to respond to the complaint.

5.      Defendants claim to have notified me on November 3, 2021 that they intended to file an anti-SLAPP motion. No such notification was made. In fact, the parties attended mediation on November 3, 2021 and no discussions occurred between counsel.

6. On December 22, 2021, Ms. Wrighten left a message at my office asking that I contact her. I was out of the office at the time for the Holidays.

7. Upon my return to the office on December 27, 2021, I contacted Ms. Wrighten. At that time, she informed me she was calling to meet and confer regarding the anti-SLAPP that had already been filed by her office. I informed her that she had already filed the anti-SLAPP and failed to comply with the Rules of Court. I further indicated that her after-the-fact- attempt at meeting and conferring was an attempt to skirt the Rules and not a good faith attempt at actually meeting and conferring. That is, the "meet and confer" was simply form over substance.

8. Ms. Wrighten is correct that we spoke for an hour and a half. Much of the conversation related to the rejected filing, the fact the motion was now untimely, and the fact that her calling me after the filing was not a good faith attempt to meet and confer, which is what is required.

9. I also advised her that had she contacted me before the filing in a good faith attempt to meet and confer, I would have considered whether an amended pleading was appropriate, but I could not make any such determination over the phone without having a serious opportunity to consider her position.

10. It was clear from my discussion with Ms. Wrighten that the only reason she contacted me was because the anti-SLAPP motion was rejected and not because of any real desire to meet and confer.

11. Attached hereto as Exhibit "A" is a true and correct copy of a declaration executed by my client Tamara Nazaretyan setting forth the factual details about Garnik and her interactions with the HOA.

12. Attached hereto as Exhibit "B" is a true and correct copy of the deposition of Gayle Pinero, Person Most Qualified of Property Management Professionals, the property management company for the HOA. Ms. Pinero's deposition was taken on February 11, 2021 in the *Aldea Community Association v.*

*Tamara Nazaretyan* case. Relevant and cited portions of her testimony are highlighted.

13.     Attached hereto as Exhibit "C" is a true and correct copy of Board of Directors Meeting - Executive Session Meeting Minutes dated April 22, 2019 for the Aldea Community Association which were produced by the Aldea Community Association in verified discovery responses in the *Aldea Community Association v. Tamara Nazaretyan* case.

14.      Attached hereto as Exhibit "D" is a true and correct copy of Board of Directors Meeting - Executive Session Meeting Minutes dated May 8, 2019 for the Aldea Community Association which were produced the Aldea Community Association in verified discovery responses in the *Aldea Community Association v. Tamara Nazaretyan* case.

15.     Attached hereto as Exhibit "E" is a true and correct copy of a May 28, 2019 filing in the *Aldea Community Association v. Tamara Nazaretyan* case by my client while she was acting in *pro per*.

16.     Attached hereto as Exhibit "F" is a true and correct copy of a September 27, 2019 filing in the *Aldea Community Association v. Tamara Nazaretyan* case by my client while she was acting in *pro per*.

17.     Attached hereto as Exhibit "G" is a true and correct copy of email correspondence between myself and counsel for the Aldea Community Association showing that the Nazaretyan household access cards were not in fact activated until after the filing of this lawsuit.

18.     Attached hereto as Exhibit "H" is a true and correct copy of an email from PMP Management to Tamara Nazaretyan on June 14, 2021 regarding reactivation of her access cards along with an email dated June 29, 2021 wherein her card was activated.

1        I declare, under penalty of perjury under the laws of the State of California that

2  the foregoing is true and correct, and that this declaration was signed on February 18,

3  2022 in the County of Los Angeles, State of California.

4

5                                                                   .

6                                 Harry A. Safarian

DECLARATION OF HARRY A. SAFARIAN AND SUPPORTING EXHIBITS

# EXHIBIT "A"

**DECLARATION OF TAMARA NAZARETYAN**

I, Tamara Nazaretyan, declare and state as follows:

1. I am Defendant in the above referenced lawsuit. I make this declaration of my own personal knowledge. If called upon to testify, I would and could competently testify to the facts herein.

2. I own a condominium located in the Aldea Homeowners Association ("HOA") complex. I purchased it in May 2017. I am a member of the HOA and have paid the full monthly HOA dues during my ownership of the unit (which have increased periodically and are currently $462.70 per month). I have lived there since May 2017 with my son, Garnik Hakobyan, who is disabled, and with my mother, Anahit Nazaretyan.

3. My son was born April 9, 1995. He is disabled as he was diagnosed with schizoaffective disorder approximately nine years ago. I am Garnik's conservator, guardian, and caretaker. I stopped working at my job after the Garnik's April 11, 2019 incident so I could be his full-time caretaker. I am his Court-Ordered conservator.

4. Garnik's condition was managed well through medication for several years. He was hospitalized on March 22, 2019, at which time his doctors decided to modify the usage of his medication. Garnik did not respond well to the modification. According to his doctors, this resulted in a schizophrenic episode on April 11, 2019 where he experienced hallucinations. On that day, Garnik stabbed himself in the neck in an attempt to take his own life. While he was experiencing the April 11, 2019 episode, he attempted to enter his own home and believed he was locked out; he knocked on several doors trying to enter what he believed was his own home.

5. Garnik was taken to the hospital after the suicide attempt and the doctors saved his life. The doctors refined his medication. Specifically, they immediately stopped the Clozapine medication. Since then, his doctors have repeatedly confirmed that his disability is being controlled through medication. They have suggested, however, that Garnik utilize some of the amenities available in the HOA, such as the pool, and walk outside near his home.

6. Prior to the date of the April 11, 2019, Garnik had never before suffered an incident like the one he experienced on that day. Since April 11, 2019, Garnik has not suffered an incident

17

1     like the one he experienced on that day.

2   7.  Garnik's disability does not make him violent toward others and has not made him violent

3       towards others; instead, the disability tends to lead to self-harm when an episode is suffered.

4   8.  After the April 11, 2019 incident when my son tried to kill himself, Aldea Community

5       Association demanded I pay to clean my son's blood from the concrete areas of the common

6       area. I paid the money. I was then told that I must permanently exclude my son from our

7       home and the entire common areas of the Aldea Community Association. I was told that if I

8       refused, I would be sued and would owe hundreds of thousands of dollars in attorneys' fees,

9       and that my son would be ordered by a judge to be excluded from our home. Although I

10     explained to the HOA's lawyer, Steven Roseman, and the board, that I was a single mother,

11     that Garnik is disabled, and that I am his caretaker. I explained that what Plaintiff was

12     demanding would result in my son becoming homeless because he has no other place to go.

13     I provided medical records to the HOA show Garnik was disabled. I also told them Garnik

14     was not a "guest", and instead he lived with me.

15   9.  After the April 11, 2019 incident, the Board ordered me to appear at a hearing and demanded

16       I paid $1,740 to clean my son's blood from the common area from the suicide attempt. They

17       also demanded I prohibit Garnik from returning not only to the HOA's common areas, but to

18       the community as a whole, including my unit. At the time when they made the demands, I

19       was in the hospital with Garnik has he was recovering from his suicide attempt.

20  10. My building access cards/key fobs for my entire family (including me, my son, and my

21     mother) were blocked for all areas of the building, except for a single vehicle access gate.

22     I declare, under penalty of perjury under the laws of the State of California that the foregoing

23 is true and correct, and that this declaration was signed on December **14**, 2021 in the County of

24 Los Angeles, State of California.

25

26                            Tamara Nazaretyan

27

28

18

EXHIBIT "B"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT

(CHATSWORTH COURTHOUSE)

| | |
|---|---|
| ALDEA COMMUNITY ASSOCIATION, | ) |
| a California non-profit mutual | ) |
| benefit corporation, | ) |
| | ) |
|               Plaintiffs, | ) |
| | ) |
|         vs. | ) Case No. |
| | ) 19CHCV00398 |
| | ) |
| TAMARA NAZARETYAN, | ) |
| | ) |
|            Defendants. | ) |
| _____ | ) |


VOLUME I

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF GAYLE PINERO,

PERSON MOST QUALIFIED AT PMP MANAGEMENT


Date and Time:     Friday, February 11, 2021
                   10:05 a.m. - 10:40 a.m.

Location:          Remotely
                   (Via Videoconference)

Reported By:       Linda D. White
                   CSR No. 12009

Job No. 23154

1

**Page 2**

1   SUPERIOR COURT OF THE STATE OF CALIFORNIA
2   FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT
3   (CHATSWORTH COURTHOUSE)
4
5   ALDEA COMMUNITY ASSOCIATION,     )
    a California non-profit mutual   )
6   benefit corporation,             )
                                     )
7         Plaintiffs,                )
                                     )
8   vs.                 ) Case No.
                        ) 19CHCV00398
9   TAMARA NAZARETYAN,              )
                                     )
10        Defendants.    )
11   _____)
12
13
14        VOLUME I
15
16   VIDEOTAPED VIDEOCONFERENCE DEPOSITION
     OF GAYLE PINERO, PERSON MOST QUALIFIED AT PMP
17   MANAGEMENT, taken on behalf of Defendant, at
     21650 Oxnard Street, Suite 2000, Woodland Hills,
18   California, 10:05 a.m., Friday, February 11, 2022,
     before LINDA D. WHITE, Certified Shorthand Reporter
19   Number 12009 for the State of California, pursuant
     to Notice.
20
21
22
23
24
25

**Page 3**

1   APPEARANCE:
2
    For the Plaintiff:
3
    ROSEMAN LAW, APC
4   BY:  STEVEN A. ROSEMAN, ESQ.
    BY:  KARINA BABIKIAN, ESQ.
5   21650 Oxnard Street
    Suite 2000
6   Woodland Hills, California  91367
    818.380.6700
7   roseman@roseman.law
    babikian@roseman.law
8
9   For the Defendant:
10  THE SAFARIAN FIRM, A.P.C.
    BY:  HARRY A. SAFARIAN, ESQ.
11  BY:  CHRISTINA S. KARAYAN, ESQ.
    BY:  PIERRO H. BABAIAN, ESQ.
12  3150 Montrose Avenue
    Glendale, California  91214
13  818.334.8528
    hs@safarianfirm.com
14  ck@safarianfirm.com
    pb@safarianfirm.com
15
16  Also Present:
17  Daniel Bermudez, Videographer
18
19
20
21
22
23
24
25

**Page 4**

1        I N D E X
2
3   WITNESS                          PAGE
4   GAYLE PINERO
5     Examination by Mr. Safarian        6
6
7        EXHIBITS
8   Marked        Description       Page
9        (NONE)
10
11
12
            QUESTIONS WITNESS
13      INSTRUCTED NOT TO ANSWER
14          PAGE   LINE
15           30     16
16
17
18
19
20
21
22
23
24
25

**Page 5**

1        WOODLAND HILLS, CALIFORNIA
2   FRIDAY, FEBRUARY 11, 2022, 10:05 A.M.
3
4   THE VIDEOGRAPHER:  We are now on record.
5   Today's date is February 11th, 2022, and the time is
6   10:05 a.m.  This is the video deposition of Gayle
7   Pinero, testifying in the matter of Aldea Community
8   Association, et al, versus Tamara Nazaretyan.
9   The video operator is Daniel Bermudez,
10  representing Elite Court Reporting.  The court
11  reporter is Linda White.  Counsel, please introduce
12  yourself and state whom you represent, after which
13  the court reporter will swear in the deponent.
14  MR. SAFARIAN:  This is Harry Safarian, and I
15  represent the Defendant.
16  MR. BABAIAN:  Pierro Babaian for Defendant.
17  MS. KARAYAN:  Christina Karayan for Defendant.
18  MR. ROSEMAN:  Steven Roseman from Roseman Law,
19  for the Association, Plaintiff's counsel.
20  MS. BABIKIAN:  Karina Babikian for Plaintiff's
21  counsel as well.
22  ///
23  ///
24  ///
25  ///

GAYLE PINERO,
called as a witness on behalf of the Defendant, having
been first duly sworn, was examined and testified as
follows:

EXAMINATION
BY MR. SAFARIAN:
Q. Very good. Good morning. I see your name
listed as Gayle Pinero; is that correct?
A. That's correct.
MR. SAFARIAN: And for the record, G-A-Y-L-E;
last name, P-I-N-E-R-O.
BY MR. SAFARIAN:
Q. Ms. Pinero, let me welcome you to the
deposition. Thank you in advance for your time
today. Have you been deposed before?
A. No.
Q. You represented by counsel today?
A. Yes.
Q. Who is that?
A. Roseman Law.
Q. Okay. Very good. Let me --
MR. ROSEMAN: Let me be clear. I'm defending
this deposition, as the agent for Property
Management Professionals, which is the agent of the

6

homeowners association, the Plaintiff in this
action. The Notice is a PMQ, person most qualified,
for issues pursuant to the Notice.
BY MR. SAFARIAN:
Q. Thank you. Ms. Pinero, let me run through
some of the ground rules. I'm sure that Mr. Roseman
has given you some idea of what a deposition is
about. My depositions are a little bit different
than how most people conduct them.
The first thing I want you to understand
is: That with you leave here today I want you to
feel like you've been respected and treated nicely.
If there is anything I can do to make the process
more accommodating for you, please tell me. I know
that depositions can be stressful.
I'll been deposed many times myself. It is
a process that requires a lot of concentrations and
energy, and people get tired. So I will -- when you
leave here today, I want two goals to have
accomplished: The first goal, foremost, is for you
to feel like I gave you the ultimate respect and
were treated politely, fairly and professionally.
If there is anything I could do during the
proceeding to make sure that happens, I want you to
tell me. Okay?

7

A. Okay. Thank you.
Q. Of course, the second goal is to gain
information. This is a fact finding mission. This
is a case that's very important to a lot of
people -- to me, to my clients. I want to make sure
that I gather as much information I can to better
understand this case, and the association's position
and to better represent my client.
So I'll be asking a lot of questions. At
some point if you become fatigued, I need you to
tell me so we can take a break. I will be operating
under the presumption that I have your best
testimony, that you're feeling well, unless you tell
me otherwise. Is that okay?
A. That's okay.
Q. Okay. Thank you. I'm going to ask for
information that may go back several years. I don't
need an exact answer. If you don't have one, if you
need to provide your best estimation, let me know.
But by no means do I want you to guess or
speculation in response to any of my questions; is
that fair?
A. Yes.
Q. Okay. Very good. If you feel like you
have to guess or speculation, let me know. It's not

8

an endurance contest. It's not a memory contest.
We just want to know what you recall. The testimony
is under oath. I have no doubt you will be truthful
with me. I need to emphasize for the record that
it's the same oath you would take if you were
testifying in front of a judge and a jury. Do you
understand that?
A. I do.
Q. Okay. Very good. And the importance of my
emphasizing that is that you can't testify
truthfully if you're answering a question that is
vague or ambiguous to you. Please advise me if a
question I ask you is unclear, so that I will
rephrase it and make sure that it is well
understood, and clear before you answer.
If I use a term that you find ambiguous, or
for any reason the question is long or muddled, I
need you to speak up and let me know so that I can
correct it so that you can answer a question that
you understand fully. Okay?
A. Okay.
Q. At the end of the deposition, you're going
to get a booklet. The booklet will have question
and answer. It will read like a play. Everything
that was said today will be in that booklet. You

9

3 (Pages 6 to 9)

**Page 10:**

1  will have an opportunity -- it will be an electronic
2  booklet in this case.  Since Covid, we moved away
3  from physical booklets, but in any event, you will
4  read the transcript electronically.  You will have a
5  chance to make modifications to it.  I have to
6  caution you, as I do every witness, if you make a
7  modification that's of a material nature, it can
8  reflect badly upon you at trial, and cause people to
9  question your credibility.  For example, if I ask
10  you in an auto accident case, whether you had the
11  red light, and you testified at deposition that you
12  did not have the red light.  And at trial you
13  testified that you did have a red light, it could
14  cause someone to comment about whether you are a
15  credible witness, reliable witness, have memory
16  issues, or simply not being truthful, one place or
17  the other.  Do you follow?
18      A.  I do.
19      Q.  And I emphasize that, again, not because I
20  suspect you being anything but truthful, but because
21  I really want to make sure you understand my
22  questions.  I want to proceed at a pace that is
23  comfortable for you.  And I want to make sure that
24  your best testimony -- I'm not here to trick you.
25  I'm not here to play games.  I'm just here to get

**Page 11:**

1  the best testimony I can from you.
2      So Ms. Pinero, is that your birth name?
3      A.  Yes.
4      Q.  And where are you currently employed?
5      A.  PMP, Management Professionals.
6      Q.  And is PMP an acronym?
7      A.  Yes, it is.
8      Q.  And can you tell me what it stands for?
9      A.  Property Management Professionals.
10      Q.  Got it.  And where is its main office?
11      A.  Valencia, California.
12      Q.  Thank you.  Does it have other offices?
13      A.  Yes.  My office is actually in Thousand
14  Oaks.
15      Q.  Any other offices?
16      A.  There are offices in L.A. and out of state
17  in Texas and Arizona.
18      Q.  All right.  Very good.  How many employees
19  does PMP have?
20      A.  I do not know.
21      Q.  Do you have an estimation?
22      A.  Well over 100.
23      Q.  Thank you very much.
24      MR. ROSEMAN:  It's pretty noisy in the
25  background, Harry.  I don't know if that's from some

**Page 12:**

1  other -- it seems to be loud typing.  Does somebody
2  else hear it or is it just me?
3      MR. SAFARIAN:  I'm certainly typing --
4          (Interruption in the proceedings).
5      MR. SAFARIAN:  I will try -- the keyboard that I
6  was working for was quieter.  It seemed to -- let me
7  see if I can fix it.
8  BY MR. SAFARIAN:
9      Q.  Any way, who is at the very top of PMP?
10  The presidency or whatever title that person has,
11  who is that?
12      A.  That's Brad Watson.
13      Q.  And what is Mr. Watson's position?
14      A.  I honestly don't know what it's called.  I
15  would say president.
16      Q.  That's fine.  How long?
17      MR. ROSEMAN:  I want to caution you, Gayle,
18  don't guess or speculate.  If you don't know --
19      A.  Right.
20      MR. ROSEMAN:  Don't -- don't -- don't guess.
21      THE WITNESS:  Okay.  Thanks, Steve.
22  BY MR. SAFARIAN:
23      Q.  And how long have you been with PMP?
24      A.  11 months.
25      Q.  So I'm concerned about -- at the outset I

**Page 13:**

1  will share you with.  You understand this case
2  involves events that happened well over 11 months
3  ago?
4      A.  Yes.
5      Q.  This case involves events that happened
6  quite a while back.  Were you, in anyway, involved
7  in managing the Association property, prior to 11
8  months ago?
9      A.  No.
10      Q.  Do you know who at PMP was?
11      A.  I do not.
12      Q.  Have you undertaken any investigation to
13  make that determination?
14      A.  No.
15      Q.  Have you undertaken any investigation to
16  determine who the proper person, most qualified is
17  to testify to the issues that we're here about
18  today?
19      MR. ROSEMAN:  I'm going to object to make
20  something clear here, Harry.  The Deposition Notice
21  is the person most qualified.  Gayle is the person
22  most qualified to testify on behalf of PMP.  If
23  there was another manager who was previously there
24  and no longer with PMP, that's not the PMQ for that.
25      MR. SAFARIAN:  Mr. Roseman, that is a speaking

1 objection. And the problem with speaking objections
2 is the tend to coach the witness and give the
3 witnesses queues.
4     MR. ROSEMAN: I'm most coaching the witness.
5 I'm being clear so that you understand that she is
6 designated as the person most qualified. If there's
7 somebody else when we go through this deposition
8 that may be more qualified that works for PMP, we
9 will make sure they're available. But she's
10 designated as the PMQ for PMP.
11     MR. SAFARIAN: I guess I will figure that out as
12 I go along as to what her qualifications were. But
13 I would ask you to limit your Code objections. there
14 are 14 recognized Code objections in the Code of
15 Civil Procedure.
16     Anything outside of those 14 is constituted --
17 it constitutes a speaking objection. The local
18 rules for the Court wherein, prohibits speaking
19 objections. That kind of objection would not be
20 allowed if we were in front of a judge and a jury at
21 trial, for obvious reasons.
22     And so I'm going to ask you to please,
23 limit your objections to Code objections. I will
24 ask you to do that throughout the deposition. I
25 will not make speaking objections. And I will work

14

1     Q.  Who is that?
2     A.  Mikaela Collerd.
3     Q.  Can you spell that please -- of the name.
4     A.  M-I-K-A-E-L-A, Mikaela; last name,
5 C-O-L-L-E-R-D.
6     Q.  Thank you. And is Mikaela Collerd still
7 employed by PMP?
8     A.  She is.
9     Q.  What is her title?
10    A.  Community asset manager.
11    Q.  And what is a community asset manager?
12    A.  Basically, to property manager, manages the
13 portfolio communities or on-site or an individual
14 community.
15    Q.  Okay. So I understand the general parlance
16 of portfolio manager. And there is sometimes you
17 will have an on-site manager that lives at the
18 property.
19    In terms of PMP, can you give me the
20 various designations that exist?
21    A.  There is a CMCA, certified manager of
22 community association. AMS, association management
23 specialist. And PCAM, which is the highest national
24 designation for managing associations. It's also
25 for large scale managers as well.

16

1 these issues out with the witness.
2     I understand what a PMQ Notice is, and I
3 will make sure to be very careful about progressing
4 through it careful and respectfully the witness,
5 as I already have. So thank you.
6     MR. ROSEMAN: Just to clarify: That wasn't a
7 speaking objection. I was just clarifying for you.
8 The have right to speak, Harry. I'm defending this
9 deposition. I have the right to communicate. So
10 let me communicate too. I understand and thank you
11 for the edification on the Code of Civil Procedure.
12    All I'm doing is clarifying for you. It
13 wasn't's an objection, it was a clarification so you
14 understand the designation of the PMQ for this
15 deposition is who is designated by -- by PMP as the
16 person most qualified for this community.
17    It's not a speaking objection. It's a
18 clarification, in order to move this deposition
19 along so.
20    MR. SAFARIAN: I don't -- I don't need either,
21 but I will proceed. Thank you, Mr. Roseman.
22 BY MR. SAFARIAN:
23    Q.  Ms. Pinero, do you know who preceded you as
24 any PMP representative assigned to this property?
25    A.  Yes.

15

1     Q.  Within your company, you testified that you
2 got Ms. Collerd, who was a community asset manager,
3 correct?
4     A.  Yes.
5     Q.  And she still does that, correct?
6     A.  She does.
7     Q.  And how many properties are in her
8 portfolio?
9     A.  I don't know.
10    Q.  Do you have an estimation?
11    A.  I wouldn't want to estimate it. I'm really
12 not sure.
13    Q.  I don't want you to guess or speculate.
14 You said I don't want to estimate it. I'm entitled
15 to an estimation, if you can provide one. If you
16 cannot provide one, just let me know.
17    A.  I cannot.
18        (Interruption in the proceedings)
19 BY MR. SAFARIAN:
20    Q.  Is there an approximate or average number
21 of properties your community asset managers manage
22 or arrange? For example, the lowest you know is two
23 properties, the highest you know is 50 properties.
24    A.  The -- the lowest that I know of is one, if
25 you're on site. And highest, if your portfolio is

17

ELITE COURT REPORTING (949) 829-9222

1  seven.
2      Q.  Okay.  And this case she is not on-site and
3  has not been on-site for this property, correct?
4      A.  No.
5      Q.  Am I correct?
6      A.  Oh, yes.  Sorry.
7      Q.  Okay.  That's all right.  We had a double
8  negative.  I just want to clarify.
9          And are you aware of anyone from PMP ever
10 having been an on-site manager at this property?
11     A.  No.
12     Q.  Do you know why Ms. Collared stopped
13 managing this property?
14     A.  She went out on maternity leave.
15     Q.  Okay.  Is she back from maternity leave?
16     A.  She is.
17     Q.  Do you know why she did not resume her
18 responsibilities with this property?
19     A.  She moved out of state.
20     Q.  Okay.  And do you know what city she's in?
21     A.  She's in Arizona.
22     Q.  And she's still with PMP, correct?
23     A.  She is.
24     Q.  Thank you.  This incident concerns events
25 that go back to, I would say, the earlier part of

18

1  attorney counsel notes -- or attorney/client notes.
2  For example, if Mr. Roseman wrote to you some legal
3  advice or admonitions for the deposition, I don't
4  want to know about that.
5          But independent documentation were sent to
6  you, such as contract documents, photographs, things
7  like that, I would like you to let me know what
8  those are.  Can you identify them please?
9      MR. ROSEMAN:  I will represent to you, Counsel,
10 that we did send over the documents that were
11 produced responsive to your document requests.  In
12 addition to this, we forwarded you last week the
13 management agreement.  So we sent that, together
14 with the Deposition Notice, to Gayle.
15     MR. SAFARIAN:  Okay.  Mr. Roseman, I trust that
16 you're trying to be helpful, but I ask that you
17 please, allow the witness to answer the questions.
18 And I know that was not intended to in anyway to
19 obstruction the process, but I really do like to get
20 the answers first from the witness before we
21 clarify.
22     MR. ROSEMAN:  I understand, Counsel.  I'm
23 telling you now.  I have the right to make
24 clarifications and understandings as necessary for
25 the record.  So I'm going to request that you stop

20

1  2019.  So starting in 2019, was Ms. Collerd the
2  person who was managing this property for PMP?
3      A.  I don't know.
4      Q.  Okay.  Do you have any records available to
5  you as to who from PMP was managing this property in
6  2019?
7      A.  I don't have any record of it.
8      Q.  Did you become familiar with who was
9  managing the property in 2019?
10     A.  I have not.
11     Q.  Did you do any research or investigation
12 regarding the facts of this case?
13     A.  No.
14     Q.  Did you do research and investigation to
15 determine whether PMP engaged in any time of
16 interactive process with my clients, prior to today?
17     A.  Did I do any research?
18     Q.  Did you do any type of -- let me ask it
19 more broadly.
20         Did you do any type of research or
21 investigation at all, relating to the claim in this
22 case?
23     A.  I only reviewed what was sent over to me by
24 Roseman Law.
25     Q.  Okay.  I don't want to know about any

19

1  reprimanding me, whenever I state something for the
2  record.
3      I have standing obligations.  I've taken at
4  least one deposition before, maybe a few more.  I
5  have the right to clarify for you, as well as
6  explain to you what documents I sent over to her.
7  Because any questions regarding what I did, would be
8  attorney/client privilege.
9      So I'm just helping you to expedite your answers
10 in this resolution.  Otherwise, she can't answer it
11 because it's all attorney/client privileged
12 communications.
13     MR. SAFARIAN:  The nature of the documents
14 received is not privileged, Mr. Roseman.  But you
15 can raise the attorney/client privilege objection --
16     MR. ROSEMAN:  I'm not raising it.  I'm just
17 telling you what I sent over to her.  That's what
18 I'm explaining to you.  So go ahead.
19     MR. SAFARIAN:  I gave you the courtesy of
20 allowing you to finish, so I'm going to finish now
21 too.  The witness was asked a specific question
22 about what documents she was sent.  Before she could
23 respond to the question, you answered the question
24 for her.  That is not appropriate.
25         And I understand this is not your first

21

1  deposition, but this would also not the first time I
2  filed a motion for Protective Order, prohibiting
3  that from occurring.  We also had speaking
4  objections at the last deposition.  I don't like
5  speaking objections because they're not appropriate.
6     This case is significant to me.  I'm asking you
7  to please, conduct yourself according to the Code,
8  and make Code objections.  I will say this:  If it
9  occurs again, I may suspend the deposition and
10  proceed with Court relief.  I want the witness's
11  unadulted testimony.
12     I've been polite to the witness.  I'm going to
13  continue to be polite to the witness, but this is
14  her deposition, not yours.
15     MR. ROSEMAN:  I understand.  I'm the attorney
16  defending this depo.
17     MR. SAFARIAN:  The attorney -- as the attorney
18  defending the depo or attending trial, if I were to
19  ask Ms. Pinero what documents she received, you
20  would not be permitted to stand up and make those
21  comments.
22     The Court would reprimand you very aggressively,
23  I would imagine, if you did that in trial, we are
24  required to conduct ourselves in deposition, in the
25  same manner we would at trial.  So I ask you to

22

1  please do that.
2  BY MR. SAFARIAN:
3     Q.  Mr. Pinero --
4     MR. ROSEMAN:  Clarification, Counsel, just so
5  you know, the standard, as far as questioning is
6  likely to lead to discovery of admissible evidence
7  in depos.  In trial, it's a different standard so
8  I'm just doing this to move it along so you know
9  what documents --
10     MR. SAFARIAN:  I don't need your help.
11     MR. ROSEMAN:  Go ahead and ask --
12     (A discussion was held off the record)
13  BY MR. SAFARIAN:
14     Q.  Ms. Pinero, from your memory, can you
15  describe for me what documents you received?
16     A.  The documents were just a lot of legalese
17  for -- I'm assuming.  I don't want to assume.  I
18  don't even know what they -- what they really were.
19     Q.  Did you study them?
20     A.  No.
21     Q.  Did you undertake any effort to familiarize
22  yourself with this case?
23     A.  No.
24     Q.  Do you even know who my client is?
25     A.  I do.

23

1     Q.  How do you know who my client is?
2     A.  Sorry?
3     Q.  How do you know -- how do you know my
4  client?
5     A.  I know -- I know her name.
6     Q.  Aside from knowing my client's name, what
7  do you know about her?
8     A.  I know that there was an altercation with
9  her son.
10     Q.  How do you know that, aside from what
11  counsel told you?
12     A.  In speaking to board members.  That's about
13  it.
14     Q.  And was that in the last 11 months?
15     A.  Yes.
16     Q.  Okay.  Aside from speaking to board
17  members, have you spoken to -- let me ask this:
18  Have you spoken with my witnesses to any
19  altercations?
20     A.  No.
21     Q.  How long have you been a property --
22     (Clarification requested)
23  BY MR. SAFARIAN:
24     Q.  -- in the property management business?
25     A.  18 years.

24

1     Q.  Is PMP your first property management
2  employer?
3     A.  No.
4     Q.  So let me go back just briefly over some
5  easier things.  Were you raised in California?
6     A.  I was not.
7     Q.  Okay.  When did you move to California?
8     A.  In 2015.
9     Q.  And where did you attend high school?
10     A.  Manhattan, New York.
11     Q.  What year did you graduate?
12     A.  Oh, my goodness.  1987.
13     Q.  Pretty spectacular to be in Manhattan, I
14  think.  It's always -- almost always a spectacular
15  time, except for one time we all remember.  But in
16  any event, what school did you graduate from high
17  school?
18     A.  Cathedral High School.
19     Q.  And after Cathedral High School, what was
20  your next education, if any?
21     A.  Utica College in Utica, New York.
22     Q.  Would you spell Utica for me, please.
23     A.  Sorry?
24     Q.  Would you -- is Utica, U-T-I-C-A?
25     A.  U-T-I-C-A.

25

**Page 26**

1  Q.  And what years did you attend Utica?
2  A.  From 1988 to 1990.
3  Q.  And did you obtain any degrees or
4  certificates there?
5  A.  I did not.
6  Q.  Okay.  And what education, formal classroom
7  education did you have at any institution after
8  Utica College?
9  A.  Pertaining to what I do now, I did attend
10  CAI, which is the Community Associations Institute,
11  to get my designations for property management.
12  Q.  Putting aside the education relating -- let
13  me rephrase it.
14  I'm not looking for your education just
15  relating to property management, I'm looking for
16  your education generally.  So after Utica College,
17  did you to go to any further universities?  Get a
18  Master's degree?  Anything like that?
19  A.  I did not.
20  Q.  So the next -- is it fair to say, then, the
21  next formal education you received was attending the
22  Community Association Institution?
23  A.  Yes.
24  Q.  Are you a CPM?
25  A.  I am not.

26

**Page 27**

1  Q.  Do you know what a CPM is?
2  A.  No.
3  Q.  You know what a certified property manager
4  is?
5  A.  Yes.
6  Q.  Okay.  What designations do you hold in
7  property management?
8  A.  CMCA and an AMS.
9  Q.  Okay.  For me an EMS means you drive an
10  ambulance.  I figure that's probably not what you're
11  talking about, correct?
12  A.  No.
13  Q.  Okay.  What is an EMS [sic]?
14  A.  Associate management specialist.
15  Q.  Oh, you said AMS.
16  A.  Yes.  "A" not "E."
17  Q.  Got it.  I heard you wrong.  That's why I
18  was confused.  Thank you very much.
19  And in -- when did you join -- I forget if
20  you asked this, I don't think you did.
21  When did you join PMP?
22  A.  11 months ago.  March 2021.
23  Q.  Okay.  I know you began with this property
24  11 months.  That was also right when you started
25  with PMP was the same time, correct?

27

**Page 28**

1  A.  Correct.
2  Q.  How many other properties have you managed
3  in those 11 months?
4  A.  Four other properties.
5  Q.  Did you speak with Ms. Collerd concerning
6  this case?
7  A.  I did.
8  Q.  And what did you discuss with her?
9  A.  I just -- I questioned what had taken
10  place.  And she told me that there was an incident,
11  you know, unfortunately, with the owner's son.
12  Q.  What else?
13  A.  That was -- that was it.
14  Q.  Have you read the deposition of the person
15  that was involved in the incident with the owner's
16  son?
17  A.  No, I haven't.
18  Q.  Have you seen any excerpts or any documents
19  indicating to you that that person felt like she was
20  pressured to pursue a restraining order?
21  A.  Can you --
22  Q.  I'll withdraw -- I'll withdraw the
23  question.
24  A.  Okay.
25  Q.  Have you done anything to familiarize

28

**Page 29**

1  yourself with the testimony of the person who was
2  involved in the incident with, who you described as,
3  the owner's son?
4  A.  No.
5  Q.  Do you know the name of the owner's son?
6  A.  I do not.
7  Q.  Do you know his medical conditions?
8  A.  Do I know his --
9  Q.  Do you know about any of his medical
10  conditions?
11  A.  Oh, no, I don't.
12  Q.  Do you know what the unit owner -- the unit
13  owner is Tamara Nazaretyan, correct?
14  A.  Yes.
15  Q.  Do you know what -- who her mother is?
16  A.  I do not.
17  Q.  Is she -- they lived together?
18  (Clarification requested)
19  BY MR. SAFARIAN:
20  Q.  Do you know if they lived together.  Let me
21  with -- she said I don't.
22  Do you know who lives in Ms. Nazaretyan's
23  unit?
24  A.  No.
25  Q.  Aside from Ms. Nazaretyan, do you know that

29

8 (Pages 26 to 29)

**Page 30**

1  anyone else lives in the unit?
2      A.  I don't know.
3      Q.  In the last 11 months, have you done
4  anything to become familiar with the Nazaretyan
5  household?
6      A.  No.
7      Q.  In the last 11 months, have you done
8  anything to determine what types of accommodations
9  might be necessary, with regard to any disabilities,
10  to people who live in the Nazaretyan household?
11      A.  No.
12      Q.  In the last 11 months, have you learned
13  that Ms. Nazaretyan, or members of her family, are
14  making allegations of discrimination?
15      A.  No.
16      *Q    In the last 11 months, are you aware of
17  anyone within PMP undertaking any effort to engage
18  the Nazaretyan household, or anyone in the household
19  in any type of interactive process, relating to any
20  disabilities?
21      MR. ROSEMAN:  Objection.  I'm going to instruct
22  the witness.  I've given you leeway on this, Harry,
23  with regards to asking questions that are likely to
24  lead to discovery of admissible evidence.  This is
25  not likely to lead to discovery of admissible

**Page 31**

1  evidence in this case, which deals with an
2  injunction against an owner.
3      So I'll let her answer the question, but I'm
4  objecting, it's not likely to lead to discovery of
5  admissible evidence in this matter.  The question is
6  also vague and ambiguous.
7      MR. SAFARIAN:  All right.  Your objection can
8  stand.
9  BY MR. SAFARIAN:
10      Q.  Do you remember the question in your mind,
11  Ms. Pinero?
12      A.  No, I was going to ask for clarification,
13  actually.
14      MR. SAFARIAN:  All right.  First of all, let's
15  have Linda read it back, and then I will clarify it
16  for you.
17      (The requested testimony was read back)
18      THE WITNESS:  I'm not aware of anyone doing
19  that.
20  BY MR. SAFARIAN:
21      Q.  Does the term "interactive process" mean
22  anything to you, as a property manager?
23      A.  No.
24      Q.  Have you been trained on accommodating
25  people who live in the complex, who have -- or any

**Page 32**

1  complex -- who have disabilities?
2      A.  No.
3      Q.  Are you -- been trained at all on what to
4  do if you have an tenant that has any type of
5  special needs?  Or in terms of discrimination, any
6  type of discrimination -- let me start with a clear
7  question.
8      Do you receive any fair housing training?
9      A.  We do.
10      MR. ROSEMAN:  Objection.  Not likely to lead to
11  discovery of admissible evidence.  This has no
12  bearing on the underlying action.  This is an
13  injunction against an owner to get a restraining
14  order.
15      MR. SAFARIAN:  Mr. Roseman --
16      MR. ROSEMAN:  No, no, no.  Harry, I'm making
17  this --
18      MR. SAFARIAN:  You don't have to because I'm
19  suspending the deposition.
20      MR. ROSEMAN:  Harry --
21      MR. SAFARIAN:  I'm suspending the deposition.
22  I'm suspending the deposition.  Mr. Roseman, I'm
23  suspending the deposition.
24      MR. ROSEMAN:  Harry -- I have the right to state
25  for the record, I'm meet and conferring with you.

**Page 33**

1      MR. SAFARIAN:  Nope.  Suspend the deposition.
2      MR. ROSEMAN:  You cannot do that.  You have an
3  obligation to meet and confer.  And the record will
4  be very clear, I'm explaining to you.  I understand
5  that you have another lawsuit relating to a federal
6  action.  This case deals with an injunction against
7  an owner for actions of their invitees.
8      Explain to me why these question regarding her
9  compliance or understanding and knowledge, relating
10  to the issues you just asked questions of, are
11  likely to lead to discovery of admissible evidence?
12      If you explain it to me, you can go on with your
13  questioning.  I'm just meeting and conferring to get
14  clarification on this.  Would you explain.
15      MR. SAFARIAN:  No.  Here's why:  Because you
16  cannot ask the witness not to answer a question on
17  the grounds it is not calculated to lead to the
18  discovery of admissible evidence.  The only grounds
19  on which --
20      (Interruption in the proceedings)
21      MR. SAFARIAN:  The only grounds in which you can
22  instruct a witness not to answer a question, are
23  privacy and privileged.
24      MR. ROSEMAN:  I understand.
25      MR. SAFARIAN:  No, let me finish.  So I don't

1  owe you an obligation to meet and confer.  And I
2  find this meet and confer process as educating a
3  witness on facts that I don't want her educated on,
4  in the middle of a deposition, just like much of
5  your objections are.
6      You can have an objection, if the question is
7  not calculated.  I will give you a quick response.
8  The question here -- the allegation is:  That my
9  client created or allowed a nuisance to exist.  We
10 have someone who has a very serious disability at
11 the property.  That disability, the HOA is seeking
12 injunctive relief.
13     My question is:  If the HOA is entitled to
14 injunctive relief, what is the credible basis for
15 injunction relief, when the basis is a -- a
16 discriminatory claim, I see it as, and are -- are
17 argumentative.  You can't get injunctive relief to
18 prohibit somebody from existing, if they have a
19 disability.
20     So it goes directly to your client for
21 injunctive relief.  I'm not going to answer any more
22 questions about this.  Let me finish.  If you look
23 like you're ready to interrupt me, don't.  The next
24 time this happens, I'm suspending the deposition.  I
25 don't have any patient for this.

34

1  **is not allowed in-housing, correct?**
2      A.  Yes.
3      **Q.  Discrimination is not allowed in housing**
4  **against people of different races, correct?**
5      A.  Correct.
6      **Q.  It's not allowed against people who are**
7  **physically, you know, well?  For example, in an**
8  **wheelchair, correct?**
9          **(Clarification requested)**
10 BY MR. SAFARIAN:
11     **Q.  In a wheelchair, correct?**
12     A.  Correct.
13     MR. ROSEMAN:  Objection.  Calls for legal
14 conclusion.
15     MR. SAFARIAN:  I'm asking Ms. Pinero for your
16 training.  I'm not asking for you to recite to me
17 the law.  I'm asking for your understanding, as far
18 as what you were trained at.
19     MR. ROSEMAN:  You were reciting the law.  You're
20 not asking of her training.  You're telling her what
21 the law is.
22     MR. SAFARIAN:  Mr. Roseman, thank you.
23     This deposition is suspended.  We will move
24 immediately for a Court Order.
25     Everyone have a nice day.  It was nice to see

36

1      You did not produce the proper PMQ.  It's not
2  Ms. Pinero's fault, it's your fault.  I've had
3  enough shenanigans.  I'm going to move on and take
4  this deposition.  If you do this, I will stop this
5  proceeding and I will move immediately for the
6  appointment of a discovery referee at your expense.
7      MR. ROSEMAN:  Objection.  Call for a legal
8  opinion regarding the legal basis for this
9  injunction.
10     MR. SAFARIAN:  You're objecting to my meet and
11 confer?
12     MR. ROSEMAN:  No.  I'm -- you asked the legal
13 basis for the injunction, and I'm stating an
14 objection on the record.
15     MR. SAFARIAN:  No.
16     MR. ROSEMAN:  Further, I will clarify that the
17 PMK -- or the PMQ, is the PMQ produced for this
18 deposition.
19     MR. SAFARIAN:  All right.  Thank you.
20     Linda, I'm sorry for the crosstalk.  I will be
21 very careful not to engage in it further.
22 BY MR. SAFARIAN:
23     **Q.  I want to go back to what I discussed about**
24 **fair housing, right?**
25         **Ms. Pinero, you understand discrimination**

35

1  you all.  Ms. Pinero, I apology for these
2  proceedings.  They're highly unusual, but I cannot
3  continue a deposition when Mr. Roseman is continuing
4  to make speaking objections.
5      It was nice to see everybody.  Thank you.  This
6  concludes the deposition.  Daniel, you can read us
7  off.
8      THE VIDEOGRAPHER:  This concludes today's
9  deposition of Gayle Pinero, PMQ.  We are off the
10 record at 10:40 a.m.
11
12 (The deposition proceedings was suspended at 10:40 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

37

10  (Pages 34 to 37)

PENALTY OF PERJURY CERTIFICATE

I hereby declare I am the witness in the within matter, that I have read the foregoing transcript and know the contents thereof; that I declare that the same is true to my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare being aware of the penalties of perjury, that the foregoing answers are true and correct.

Executed on the _____ day of _____ 2022, at _____, California.

_____
GAYLE PINERO

38

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 14th day of February, 2022.

_____
LINDA D. WHITE, CSR NUMBER 12009

40

STATE OF CALIFORNIA       )
                          ) ss
COUNTY OF ORANGE          )
I, Linda D. White, do hereby certify;
That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of CSR Number 12009, which is in full force and effect and that I am authorized to administer oaths and affirmations;
That the foregoing deposition testimony of GAYLE PINERO remotely taken before me at the time and place herein set forth;
That prior to being examined, the witness named in the foregoing deposition was duly sworn or affirmed by me to testify the truth, the whole truth and nothing but the truth;
That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;
That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

39

11 (Pages 38 to 40)

EXHIBIT "C"

Aldea Community Association
Board of Directors Meeting
<u>Executive Session Meeting Minutes</u>
April 22, 2019

**CALL TO ORDER:**
The Executive Session Meeting of Aldea Community Association was held on April 22, 2019 at Porter Ranch Community School, 12450 N. Mason Avenue, Porter Ranch CA 91326. The meeting was called to order at 6:00PM.

**DIRECTORS PRESENT:**          Dale Rodin – President
                                                       Maya Zlotnik – Vice President
                                                       James Douglas Robins – Secretary/Treasurer
                                                       Jerome Black – Member at Large

**DIRECTORS ABSENT:**          One Vacant Position

**PROPERTY MANAGEMENT PROFESSIONALS REPRESENTATIVE**:
Frank Jauregui, Senior Community Asset Manager

**GUESTS OF THE BOARD OF DIRECTORS:**
11251 Paseo Del Cielo – Homeowner Tamara Nazaretyan
Roseman Law – Steve Roseman, Esq.
LAPD Devonshire Divisioin – Detective John Goslin
Archon Protection – Tim Langan

**SECRETARY'S REPORT:**
The Board of Directors reviewed the Executive Session minutes for March 25, 2019. A motion was made by Dale Rodin and seconded by Jerome Black to approve the executive minutes. Motion carried (M/S/C 4-0)

**REVIEW OF THIRD-PARTY CONTRACTS/PROPOSALS:**
██████████████ - The Board of Directors reviewed and discussed the emergency window repairs from water intrusion along with the Est. 2729 from HOA Specialist for $2,680.00. The Board had unanimously agreed that this was an emergency and approved the repairs by HOA Specialist via email dated April 3, 2019. A motion was made by Dale Rodin and seconded by Jerome Black to ratify that emergency approval and proceed with the necessary work for this unit address with the cost for this repair to be paid from reserve funds. Motion carried (M/S/C 4-0)

**LEGAL MATTERS/PERSONNEL MATTERS:**
<u>Granite Communications</u> - The Board of Directors reviewed and discussed the ongoing activity to pursue Granite Communications. ████████████████████████████████████
████████ No motion necessary.

ATT Disconnect Directives – The Board of Directors reviewed and discussed the status of the ATT account disconnect notices for the community. PMP Management provided report that Account ███████████ ˙eceived a reimbursement for $12,608.47 which notice was received on April 18, 2019 with an expected finalized receipt with 21-28 business days from said email notice. No motion necessary.

Fire Damage – ████████████████████ – The Board of Directors reviewed and discussed the claim adjuster report from Farmers Insurance Melissa Trickey. Additionally, provided was the proposal from Powell & Associates for the engineering work to provide a scope of work for ASR and Leonard Roofing to reconstruction and reinstall roofing components which was approved by Melissa Trickey to proceed with necessary work for these units. No motion necessary.

**DELINQUENCY REPORTS:**
The Board reviewed the Delinquency Tracker.

████████████████████████████ – The Board of Directors reviewed and discussed the current status of this file which is eligible for foreclosure action at this time. A motion was made by Dale Rodin and seconded by Jerome Black to approve the foreclosure action on this file. Approval of foreclosure action to be generally noted in Open Session. Motion carried (M/S/C 4-0)

**MEMBERS DISCIPLINE, HEARINGS & REQUESTS:**
The Board reviewed the Violation Report for April 2019.

**CALL TO HEARINGS:**
Call to Hearing – 11251 Paseo Del Cielo – April 11, 2019 Incident – The Board of Directors reviewed and discussed the actions committed by the Owner's invitee/son named Garnik Nazaretyan on the date of April 11, 2019 within the community. Mrs. Tamara Nazaretyan appeared before the board and provided medical information pertaining to Garnik Nazaretyan's management of his mental issues. Maya Zlotnik assisted Mrs. Nazaretyan with Russian to English translations. Attorney Steve Roseman gathered additional information from Mrs. Nazaretyan for the board to review. A motion was made to approve the option of filing an injunction by the Association against Mrs. Tamara Nazaretyan. A Call to Hearing will be created and sent to Mrs. Nazaretyan drafted by Roseman Law to meet onsite at the Roseman Law offices in Woodland Hills. Motion carried (M/S/C 4-0)

**PARKING VARIANCE REQUESTS:**
None Currently.

**FEE WAIVER REQUESTS:**
None Currently.

**MEETING ADJOURNMENT:**
With no further agenda items to discuss, the Executive Session was adjourned at 7:05 PM

_____                                    5/28/19
Board Member Signature                                      Date

EXHIBIT "D"

### Aldea Community Association
### Board of Directors Meeting
### Executive Session Meeting Minutes
### May 8, 2019

**CALL TO ORDER:**
The Executive Session Meeting of Aldea Community Association was held on May 8, 2019 at the Law Offices of Roseman Law Offices – 21650 W. Oxnard Street, Suite 2000, Woodland Hills CA 91367.  The meeting was called to order at 12:40 PM.

| | |
|---|---|
| **DIRECTORS PRESENT:** | Dale Rodin – President |
| | Maya Zlotnik – Vice President |
| | Jerome Black – Member at Large |
| | |
| **DIRECTORS ABSENT:** | James Douglas Robins – Secretary/Treasurer |
| | (Not able to attend due to work schedule conflict) |

**PROPERTY MANAGEMENT PROFESSIONALS REPRESENTATIVE:**
Frank Jauregui, Senior Community Asset Manager

**GUESTS OF THE BOARD OF DIRECTORS:**
Sean Allen, attorney – Roseman Law
Sophie Haimof, attorney – Roseman Law
Tamara Nazaretyan, Homeowner – 11251 Paseo Del Cielo

**LEGAL MATTERS/PERSONNEL MATTERS:**
Call to Hearing – 11251 Paseo Del Cielo – April 11, 2019 Incident: Board reviewed and discussed the violent, disruptive, frightening and offensive behavior with Homeowner Member Mrs. Tamara Nazaretyan pertaining to the incident that occurred on April 11, 2019 and the invitee residing at her home by the name of Garnik Hakobyan. This invitee was supposedly involved in these actions that included attempts at physical harm to individuals living inside of 11251 Paseo Del Cielo, property damage to the association common areas, supposed assault of a Homeowner Member by the name of Jennie Hai Hong Lien (20328 Paseo Del Campo) while in the common area and supposed self-inflicted wounds in an attempt to commit personal physical bodily harm to himself.

Mrs. Tamara Nazaretyan appeared by herself to discuss all these matters in person.  While at the meeting, she requested a translator be provided by the HOA who might be able to speak Armenian so that she might understand. Roseman Law had previously reached out to her via a direct phone call to ask if a translator would be needed at this meeting. At that time, she had not requested a translator. Board Member Maya Zlotnik contacted someone she knew via a phone call who was able to speak Armenian to Mrs. Tamara Nazaretyan to assist with any translation matters. Person on phone was not a professional translator. Mrs. Tamara Nazaretyan appeared to understand all that was being explained regarding this incident.

A motion was made by Dale Rodin and seconded by Jerome Black to approve and adopt the *Board of Directors Resolution to Declare Invitee a Nuisance* and to levy the following actions and fines against the account for Mrs. Tamara Nazaretyan, 11251 Paseo Del Cielo:

- Approval to prepare and file complaint against Owner for the breach of the Association's CC&R's, nuisance, and all other pertinent legal remedies in accordance to the Association's CC&R's and California Civil Code
- Approval to levy an individual special assessment of $1,740.00 to reimburse the Association for damages to the Association property
- Approval to deem the invitee, Mr. Garnik Hakobyan, an immediate risk to health and safety of the Association's residents and to prohibit Mrs. Tamara Nazaretyan, Mr. Garnik Hakoyan and other Owner invitee from accessing the Association's Common Area at any time.
- Approval to deactivate any access cards or key fobs that the Owner or Owner's invitees may use to enter the Common Area's Pool.
- Approval to levy a fine of $100.00 for this offense, and this amount shall be doubled at each subsequent instance where Owner's invitee is witnessed anywhere within the boundaries of the Association community.

Motion carried (M/S/C 3-0)

**MEETING ADJOURNMENT:**
With no further agenda items to discuss, the Executive Session was adjourned at 1:46 PM

_____                          5/28/19
Board Member Signature                           Date

EXHIBIT "E"

| SHORT TITLE: Tamara Nazaretyan | CASE NUMBER: 19CHCV0038 |
|---|---|

1  Tamara Nazaretyan

2  11251 Paseo Del Cielo, Northridge, CA 91326

3  818 536 4445

4

5  Attorneys for Plaintiff

6  ALDEA COMMUNITY ASSOCIATION

7

*FILED*
Superior Court of California
County of Los Angeles

MAY 2 8 2019

Sherri R. Carter, Executive Officer/Clerk
By _____ Kailin Keating _____, Deputy

8                    Superior Court of The State of California

9              FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

10

11  ALDEA COMMUNNITY ASSOCIATION, a            Case No. 19CHCV00398

12  California non-profit mutual benefit        Assign to Hon. Judge Melvin D. Sandvig

13  corporation                                 Dept. F47

14          Plaintiff,                          RESPONSE / OPPOSITION TO

15              vs                              TEMPORARY RESTRAINING ORDER

16  Tamara Nazaretyan, an individual            TO SHOW CAUSE RE:

17          Defendants                          PRELIMNARY INJUNCTION

18                                              Hearing Date : June 3, 2019

19                                              Time: 8:30 am

20                                              Dept: F47

21

22                    ORDER TO SHOW

23  Letter from medical doctor

24  Letter from Tamara Nazaretyan

25  Pictures

26  *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers):*

27  This page may be used with any Judicial Council form or any other paper filed with the court.

Page _____

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

CRC 201, 501

# TIGRAN I. GEVORKIAN, M.D.

*Psychiatry*
**222 W. Eulalia street suite 301**
**Glendale, CA 91204**
**Phone: (323) 644-7884; FAX: (323) 644-7888**

May 20. 2019

Re:   Garnik Hakobyan
DOB   04/09/1995

Garnik Hakobyan is a 24 years old male who suffers from Schizoaffective Disorder Bipolar type for which has been under my care for years and treated with neuroleptic medications.

Garnik's symptoms initially started with visual, auditory hallucinations and paranoia for which he was treated with different antipsychotic medications such as risperdal, zyprexa, abilify, intramuscular invega sustenna, seroquel, depakote and others

He has been hospitalized numerous times in psychiatric hospitals with exacerbation of psychotic symptoms and is currently once again hospitalized at mental unit of Northridge hospital.

Garnik never exhibited any aggressive behavior during my evaluations. He was always very respectful, polite and cooperative and I never observed Garnik to act in a hostile way toward anyone. Garnik has very close relationship with mother Tamara Nazaretyan who is very much involved in his care and after discharge will clearly benefit by going back to her house.

If any questions please do not hesitate to contact me at the telephone number above.

Sincerely yours,

5/20/19

Tigran I. Gevorkian, MD

To: Judge Melvin D. Sandvig

I, Tamara Nazaretyan, would like to ask you to spend a little of your time to read this letter to help you make a fair decision.

I am a single mother who works at the grocery store. My son, Garnik Hakobyan is very kind and used to be an excellent student at school. He worked at the same grocery store that I work now for about two years at the register. He drove an uber for a year and paid taxes.  He was always on time with attending his physicians and taking his prescribed medications. He never hurt anyone and he was never dangerous to others.

Every year during spring time his conditions gets worst and he goes through exacerbation of his illness. During those times, he tells me to take him to hospital to get help.  On 03.22.2019 he got admitted to Olive View Psychiatric Hospital. On 04.09.2019 Dr Hendrick said that he wants to surprise Garnik by discharging him since the next day was his birthday. He instructed me how to taper off of Clozapine drug. I asked them to taper it off at the hospital under their supervision, but he didn't agree. I took my son home and the doctor didn't provide any other medications except instructing to taper of clozapine.  He used to take few other medications to help him cope with his condition such as Risperdone, Mirtazapine, Cogentin and Ativan, but at that time he was discharged without any of those. On 04.11.2019 Garnik attempted to do a suicide because he didn't have proper medications to take and tapering off of clozapine at home was not a smart idea. This led to his violent behavior and wanted to take away his own life.

The day of the incident he was at home with my mother. He started hearing voices that were telling him to kill himself. He went to bathroom and broke the

To: Judge Melvin D. Sandvig

toilet. The water runs in the whole house. My mom run to help him and didn't see

that there was water on the floor because the floor was white. She fall on the floor

due to slippery floor from water and hit his head. Then my son run outside and was

having hallucinations. He thought he was seeing a Jesus in the neighbor's balcony

and that Jesus was calling him to go to him. He jumped into their balcony and

realized that there is no Jesus there. He didn't break anything in there. Then he cut

the wire of camera thinking that someone is following him through camera. Those

types of behavior are very common among people with Schizophrenia, Bipolar

disorder.

He left there and knocked  another neighbor's door by thinking it is his house since

all the houses are look alike. Then he sees another neighbor's garage door is open,

he enters there again by thinking it is his home's garage. Once he saw someone else

in the garage, he realizes that it is not his house he turns away and leaves. All the

garages are also look alike. Once he  was on the street, one of the neighbor was

driving her car too fast that hit my son. He fall and hit his forehead on the floor. He

has a scar and you can see it in the attached photos. The driver came off of her car,

wanted to help, but left without helping him.

After this incident the community would scare me with their different types

of notices, emails, and phone calls. The neighbor who hit my son with her car is

trying to do a restraining order against my son to make it seem like she is innocent.

People who have mental health issues should have rights to be in the society so that

they are not isolated and feel like animals who have to be away from people.

*Sincerely,*

05.28.19

Form **1040**   Department of the Treasury—Internal Revenue Service   (99)
**U.S. Individual Income Tax Return**   **2016**   OMB No. 1545-0074   IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2016, or other tax year beginning _____ , 2016, ending _____ , 20 ___   See separate instructions.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| GARNIK | HAKOBYAN | * * * – * * – 7205 |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.   Apt. no.
20227 SATICOY ST   421

▲ Make sure the SSN(s) above and on line 6c are correct.

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
Winnetka CA 91306

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.   ☐ You   ☐ Spouse

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|

**Filing Status**
Check only one box.

1. ☒ Single
2. ☐ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

6a ☒ **Yourself.** If someone can claim you as a dependent, **do not** check box 6a . . . . . . .
b ☐ **Spouse** . . . . . . . . . . . . . . . . . . . . . . . . . . .

| c Dependents: | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| (1) First name   Last name | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

d Total number of exemptions claimed . . . . . . . . . .

Boxes checked on 6a and 6b — **1**
No. of children on 6c who:
• lived with you
• did not live with you due to divorce or separation (see instructions)
Dependents on 6c not entered above
Add numbers on lines above ▶ **1**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| | | |
|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . | 7 |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . | 8a |
| b | Tax-exempt interest. **Do not** include on line 8a . . . | 8b |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . | 9a |
| b | Qualified dividends . . . . . . . . | 9b |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . . . . | 10 |
| 11 | Alimony received . . . . . . . . . . . . . . | 11 |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . | 12 | 346. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . | 14 |
| 15a | IRA distributions   15a | b Taxable amount . . . | 15b |
| 16a | Pensions and annuities   16a | b Taxable amount . . . | 16b |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . | 18 |
| 19 | Unemployment compensation . . . . . . . . . . . | 19 |
| 20a | Social security benefits   20a | b Taxable amount . . . | 20b |
| 21 | Other income. List type and amount | 21 |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 346. |

**Adjusted Gross Income**

| | | |
|---|---|---|
| 23 | Educator expenses . . . . . . . . | 23 |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 |
| 26 | Moving expenses. Attach Form 3903 . . . . . | 26 |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . | 28 |
| 29 | Self-employed health insurance deduction . . . | 29 |
| 30 | Penalty on early withdrawal of savings . . . . | 30 |
| 31a | Alimony paid   b Recipient's SSN ▶ _____ | 31a |
| 32 | IRA deduction . . . . . . . . . | 32 |
| 33 | Student loan interest deduction . . . . . | 33 |
| 34 | Tuition and fees. Attach Form 8917 . . . . . | 34 |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . | 36 |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . ▶ | 37 | 346. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.   BAA   REV 01/25/17 PRO   Form **1040** (2016)

# Olive View Psychiatric
## 14445 Olive View Drive
### Sylmar, CA 91342
### Patient Discharge Instructions

**PERSON INFORMATION**
**Name: HAKOBYAN, GARNIK**
**Current Date: 04/09/19 19:20:52**
**DOB: 04/09/1995 MRN: 100772223**

**Primary Care Provider:**
**Name:**
**Phone:**

**Date of Admission: 03/22/19 20:39:58**
**Date of Discharge:**

**HOSPITAL PHYSICIANS**
**Attending Physician: Hendrick, Victoria C**

**Discharge Diagnosis:Chronic schizoaffective disorder**

**Discharge Orders**

| Order Name | Order Details |
|---|---|
| Discharge Patient | 04/09/19 15:08:00 PDT |

**Medications**
**During the course of your visit, your medication list was updated with the most current information. The details of those changes are reflected below:**
**New Medications**

**LA CO OVMC OPD, 14445 Olive View Dr Sylmar, CA 913421437, (747) 210 - 3066**

**diazePAM (Valium 5 mg oral tablet)** 1 Tabs Oral Every 6 Hour Interval as needed anxiety. Refills: 0.
Last Dose:_____

**nicotine (nicotine 2 mg oral transmucosal gum)** 1 Each Chew Every 2 Hour Interval as needed nicotine withdrawal. Refills: 0.
Last Dose:_____

**Medications That Were Updated - Follow Current Instructions**

**LA CO OVMC OPD, 14445 Olive View Dr Sylmar, CA 913421437, (747) 210 - 3066**

Current **cloZAPine (cloZAPine 25 mg oral tablet)** 3 Tabs Oral once a day (in the morning). Refills:
0., On 4/10: take 50 mg in am, 75 mg in pm
On 4/12: reduce to 50 mg in am, 50 mg in pm
On 4/14: reduce to 25 mg in am, 50 mg in pm
On 4/16: reduce to 25 mg in am, 25 mg in pm
On 4/18: reduce to 25 mg in pm
On 4/20: Discontinue clozapine
Last Dose:_____
Current **cloZAPine (cloZAPine 25 mg oral tablet)** 3 Tabs Oral once a day (at bedtime). Refills: 0.,
On 4/10: take 50 mg in am, 75 mg in pm
On 4/12: reduce to 50 mg in am, 50 mg in pm
On 4/14: reduce to 25 mg in am, 50 mg in pm
On 4/16: reduce to 25 mg in am, 25 mg in pm
On 4/18: reduce to 25 mg in pm
On 4/20: Discontinue clozapine
Last Dose:_____

Current **diphenhydrAMINE (diphenhydrAMINE 25 mg oral capsule)** 1 capsules Oral Every 4
Hour Interval as needed extrapyramidal symptoms. Refills: 0.
Last Dose:_____

## No Longer Take the Following Medications

**LORazepam (Ativan 0.5 mg oral tablet)** 1 Tabs Oral 3 times a day.
Stop Taking Reason: Physician Request

**risperiDONE (risperiDONE 1 mg oral tablet, disintegrating)** 1 Tabs Oral once a day (at
bedtime).
Stop Taking Reason: Physician Request

## Follow-up Instructions

| With: | Address: | When: |
|---|---|---|
| Tobacco Cessation Counseling and Support | Telephone Only 1-800-784-8669 | 04/12/19 10:15:00 |

**Comments:**

1-800-784-8669 (1-800-QUIT-NOW)

*COPY*

# NOTICE OF CERTIFICATION FOR ADDITIONAL 30 DAYS INTENSIVE TREATMENT

The authorized agency providing 30-day intensive treatment in the County of Los Angeles has evaluated the condition of:

Name  Garnik Hakobyan

Address  11251 Paseo Del Cielo, Porter Ranch, CA 91326

Marital Status  Single          Date of Birth  4/9/95   Sex  M

We, the undersigned, allege that the above-named person is, as a result of a mental disorder or impairment by chronic alcoholism, **GRAVELY DISABLED** as defined in paragraph (1) of subdivision (h) of Section 5008 of the Welfare and Institutions Code or under section 5585.25 of the Welfare & Institutions Code.

The specific facts which form the basis for our opinion that the above-named person meets the classification indicated above are as follows:

Pt continues to endorse auditory and visual hallucinations, and display unpredictable and aggressive behavior. Mother unwilling to take pt back home in current state. Pt unable to provide a viable plan for self care at this time.

The above-named person has been informed of this evaluation, and has been advised of the need for, but has not been able or willing to accept treatment on a voluntary basis, or to accept referral to the following services:

Inpatient psychiatric treatment

We, therefore, certify the above-named person to receive intensive treatment related to the mental disorder or impairment by chronic alcoholism for no more than 30 days beginning this ___2___ day of ___April___ 20 _19_, in

the intensive treatment facility herein named  OVMC

4/2/19
Date

Signature _____

Signature _____

I hereby state that I delivered a copy of this notice this day to the above-named person and that I informed him or her that unless judicial review is requested, a certification review hearing will be held within four (4) days of the date on which the person is certified for a period of intensive treatment  and that an attorney or advocate will visit him or her to provide assistance in preparing for the hearing or to answer questions regarding his or her commitment or to provide other assistance  The court has been notified of this certification on this day.

Signature _____

**CONFIDENTIAL PATIENT INFORMATION**
California W&I Code Section 5328

Copies:  Person Certified-Personally delivered
Person's  Attorney/Advocate

# CERTIFICATION REVIEW HEARING

☑ **14-DAY**          ☐ **30-DAY**

**Person Certified** _GARNIK_    _HAGOBYAN_    **Holding Facility:** _Olive View_    **Ward:** _P&R_
First Name          MI          Last Name

**Date Certified:** _3/9/19_          **Basis:** ☐ **Danger to Others**    ☐ **Danger to Self**    ☑ **Gravely Disabled**

## CERTIFICATION REVIEW RECORD

**Hearing Date:** _3/22/19_          **Hearing Referee:** _Khosandian_
**Advocate:** _M.G._          **Patients' Rights Phone Number: 800-700-9996**
**Name and discipline of person presenting evidence supporting certification:** _D. Cardenas_
**Name(s) of person(s) participating in hearing at request of patient and/or advocate:** _____

The patient, after talking with the advocate, has decided to:
☑ **BE PRESENT AT THE CERTIFICATION REVIEW HEARING**

☐ **WAIVE HIS/HER PRESENCE AT THE HEARING WITH THE UNDERSTANDING THAT IT WILL BE HELD IN**

**HIS/HER ABSENCE. Reasons given for waiver:** _____

After considering all the evidence presented, the Hearing Referee finds that:

☑ **THERE _IS_ PROBABLE CAUSE TO BELIEVE THAT THE PERSON, AS A RESULT OF A MENTAL DISORDER IS:**
    ☐ **Danger To Others**    ☐ **Danger To Self**    ☑ **Gravely Disabled**    ☐ **Remains Gravely Disabled**
    The person ☐ **DOES** / ☑ **DOES NOT** request a judicial review by writ of habeas corpus.

☐ **THERE _IS NOT_ PROBABLE CAUSE TO BELIEVE THAT THE PERSON, AS A RESULT OF A MENTAL DISORDER**
    **IS: A DANGER TO SELF, A DANGER TO OTHERS OR GRAVELY DISABLED. THE PATIENT MUST BE**
    **RELEASED OR REMAIN AT THE FACILITY ON VOLUNTARY BASIS.**

**The specific information relied on and reason for the decision are as follows:**

_meds: Clozaril 100 am, 200 hs; benadryl 25 am, hs; lorazepam 0.5 tid_
_Dx: Schizophrenia_
_hx: bib mother; not eating/drinking @ 2 days; psychotic,_
_paranoid. SRN: features of catatonia, long lag between_
_Q's and answers; slow movements. @ mother: recently_
_add-on, broke window, the person appears talking to self;_
_came in on meds - but has an elopement risk due to possible_
_GDD intent (was on 3 anti-psychotics)_
_Apt: pt is cooperative, able to refer to mother, there is_
_no distraught. Writing a bag on ? intense values nature_
_"can I go home today?" "I sleep, study, eat good"_
_(pt: speech was very soft)_

**Signature of Hearing Referee:** _M. Khosandian_

Copy: Person Certified, Advocate, Hearing Referee, Treatment Record

LASC MHHR 001 Rev. 10/18
For Mandatory Use

_05/08/19_



**Olive View-UCLA**
M E D I C A L   C E N T E R

**Los Angeles County**
**Board of Supervisors**

**Hilda Solis**
First District

**Mark Ridley-Thomas**
Second District

**Sheila Kuehl**
Third District

**Janice Hahn**
Fourth District

**Kathryn Barger**
Fifth District

**Judith Maas, RN, NP**
Chief Executive Officer

**Rima Matevosian, MD**
Chief Medical Officer

**Bonnie Bilitch, RN**
Chief Nursing Officer

14445 Olive View Drive
Sylmar, CA 91343

Tel: (818) 364-1555

*To improve health*
*through leadership,*
*service and education*



Health Services
**www.ladhs.org**

April 9, 2019

To whom it may concern,

    Please note that Mr. Garnik Hakobyan was recently hospitalized at Olive View Medical Center for the treatment of a severe decompensation of schizophrenia. He is being discharged today following a nearly 3-week stay. He has improved significantly with the resumption of long-acting injectable paliperidone (Invega Sustenna) and the discontinuation of Clozapine. While on clozapine, he continued to experience hallucinations, delusions and agitation, in addition to multiple side effects, including excessive sedation and hypersalivation. Per some reports, he may have experienced a seizure while on this medication, prior to his admission to the inpatient unit. Once clozapine was tapered off and Invega Sustenna was re-initiated, he showed great improvement, returning to his baseline and no longer being impaired by hallucinations or delusions. He is tolerating Invega Sustenna very well and denies experiencing medication side effects. Invega Sustenna appears to be more effective and well-tolerated as compared to Clozapine.

    Please do not hesitate to contact me if I can provide any further information.

Sincerely,

Victoria Hendrick, M.D.
Attending Physician and Chief, Inpatient Psychiatry Service
Olive View Medical Center







06/03/19

Invoice: 145751 | Page: 1 | Retrieved Date: 04/24/2019



**PMP MANAGEMENT**

| Invoice Details | |
|---|---|
| **Invoice Number** | 145751 |
| **Invoice State** | Manager Approval |
| **Association** | Aldea Community Association |
| **Vendor** | |
| **Received Date** | 04/19/2019 |
| **Invoice Date** | 04/16/2019 |
| **Due Date** | |
| **Amount** | $ 900.00 |
| **Stub Notes:** | |
| **Internal Notes:** | |

| Invoice Coding | | | |
|---|---|---|---|
| **Code** | **Description** | **Type** | **Amount** |
| 07855 | Misc General and Admin | Expense | $900.00 |

| Invoice History |
|---|

**Updated By: Alan Oakes**

Date: 04/23/2019
Status: Manager Approval
Amount: $900.00

**Enter Data By: ABN Scan Team 21**

Date: 04/22/2019
Status: Unassigned
Amount: $900.00

**Enter Data By: Data Entry 19**

Date: 04/20/2019
Status: Data entry Exceptions Level 2
Amount: $900.00

**Enter Data By: Data Entry 81**

Date: 04/19/2019
Status: Data Entry Exception
Amount: $900.00

**Created By: Payables Service**

Date: 04/19/2019
Status: Pending Data Entry
Amount: $





990 W. Tenth Street, Azusa, CA  91702
phone 626.633.3500 * fax 626.633.3599

# Invoice

| Invoice Date | Customer | Invoice | Job No |
|---|---|---|---|
| 4/16/2019 | P1782 | 145751 | V-19-177026 |

| Claim No | PO |
|---|---|
| | |

**BILL TO:**

PMP Management Ventura County
100 East Thousand Oaks Bouleva
Suite # 220
Thousand Oaks,, CA 91360

Attn: Frank Jauregui

**PROJECT NAME:**

PMP Management Ventura County
11251 Paseo Del Cielo
Porter Ranch, CA 91326

info@alliance-enviro.com                    www.alliance-enviro.com                    TAX ID#: 95-4549377

| Description | Units | UOM | Unit Price | Amount |
|---|---|---|---|---|
| Biohazard remediation and disinfection application to walkway after a trauma scene had occurred. | | | | 900.00 |
| Any further questions please contact Robert McKeever | | | | |

Please reference job number when making your payment

| | |
|---|---|
| Amount Billed: | 900.00 |
| Total Tax: | 0.00 |
| Retainage Held: | 0.00 |
| Amount Due: | 900.00 |

Interest at the rate of 1-1/2% per month will be charged on all past due accounts. In the event of failure to pay any of the amount due in this invoice, all collection costs and/or attorney fees in the collection of any such amount will be paid by the customer.



HOA Specialists Construction Services Inc.
23638 Lyons Avenue #274
Newhall CA 91321
CSLB #1026722

# Estimate

| Date | Estimate # |
|---|---|
| 4/16/2019 | 2976 |

**Name / Address**

Aldea Community Association
c/o PMP
27220 Turnberry Lane Suite 150
Valencia Ca 91355

| Description | Hours | Rate | Total |
|---|---|---|---|
| 11251/11245 Paseo Del Cielo | | | |
| 1) Repair damaged stucco and paint wall complete. | 6 | 90.00 | 540.00 |
| Materials Tax Included. | | 300.00 | 300.00 |

| | | | Total | $840.00 |
|---|---|---|---|---|

| Phone # | Fax # | E-mail |
|---|---|---|
| 6612880090 | 6612881603 | services@hoaconservices.com |

Signature  4/22/19

EXHIBIT "F"

| SHORT TITLE:<br>— Tamara Nazaretyan | CASE NUMBER:<br>19CHCV0038 |
| --- | --- |

1    Tamara Nazaretyan

2    11251 Paseo Del Cielo, Northridge, CA 91326

3    818 536 4445

4

5    Attorneys for Plaintiff

6    ALDEA COMMUNITY ASSOCIATION

7

8             Superior Court of The State of California

9      FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

10

11    ALDEA COMMUNNITY ASSOCIATION, a      Case No. 19chcv00398

12    California non-profit mutual benefit         Assign to Hon. Judge Melvin D. Sandvig

13    corporation                                Dept. F47

14        Plaintiff,                     *RESPONSE OPPOSITION TO*

15            vs                        TEMPORARY RESTRAINING ORDER

16    Tamara Nazaretyan, an individual        TO SHOW CAUSE RE: PRELIMINARY

17         Defendants                  INJUNCTION

18                                     Hearing Date : October 15, 2019

19                                     Time: 8:30 am

20                                     Dept: F47

21

22                      ORDER TO SHOW

23

24    Letter from Tamara Nazaretyan

25

26    *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers)*:

27    This page may be used with any Judicial Council form or any other paper filed with the court.      Page _____

Form Approved by the<br>Judicial Council of California<br>MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

CRC 201, 501

I, Tamara Nazaretyan had a court date on September 13 with a Steven A. Roseman, who told me that I have to pay $40,000 and also said that on September 23 he will have a meeting with bord members to see if they can give me a discount so that they can close the case.

On September 23, I met with bord members  and said that I can pay $10,000 (payment plan) since I don't work and I have to be a caregiver to my son, I can't take a risk and go to work to pay off the amount. They were rude to me and told me they can't give me a discount and that I need to pay $38,000, If not we will go to court. They told me that I didn't close the case on time.  I told them before I hired my attorney  I asked them to close the case but they didn't let me to finish my words and told them they are not willing to talk about the past with me. At that time one of the bord members Maya said that yes, that happened.

On June 4, I called the bord member Maya and told her that I want to pay and close the case. She said ok, she will talk to Roseman. After 2 hours, she called me back and said that the Roseman will make an agreement, then will call me to meet.  I waited 5 days and no one called me back. Now they are saying I didn't agree to close the case on time.

On May 8, during one of the meeting I asked the bord members to drop the charges and I am willing to move out of my house with my son. They still didn't agree with that.

About 6 months already they have cancelled my access card that I use in the community and took away my rights from me. Me and my mom couldn't use the pool  are, couldn't exit the community because we couldn't come back.

About 6 months me and my mom live in a stress. We feel like we are separated from the community members. I am a single mother and they should not have done this to me.

10/21/19

POS-040

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO:<br>NAME: Ani Hakobyan<br>FIRM NAME:<br>STREET ADDRESS: 20227 Saticoy st<br>CITY: Winnetka                    STATE: CA      ZIP CODE: 91306<br>TELEPHONE NO.: 818 406 5888           FAX NO.:<br>E-MAIL ADDRESS: Hakobyanani10@yahoo.com<br>ATTORNEY FOR (name): In Pro Per | FOR COURT USE ONLY |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF<br>STREET ADDRESS: 9425 Penfield Ave<br>MAILING ADDRESS: 9425 Penfield Ave<br>CITY AND ZIP CODE: Chatsworth, CA 91311<br>BRANCH NAME: Civil | |

| | |
|---|---|
| Plaintiff/Petitioner: Aldea Community Assoication | CASE NUMBER:<br>19CHCV00398 |
| Defendant/Respondent: Tamara Nazaretyan | |
| **PROOF OF SERVICE—CIVIL**<br>**Check method of service (only one):**<br>☐ By Personal Service  ☑ By ~~Mail~~ *EMAIL*  ☐ By Overnight Delivery<br>☐ By Messenger Service  ☐ By Fax | JUDICIAL OFFICER:<br>MELVIN S. SANDVIG<br><br>DEPARTMENT:<br>F47 |

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   20227 Saticoy st, Winnetka CA 91306

3. ☐ The fax number from which I served the documents is *(complete if service was by fax)*:

4. On *(date):* 05-28-2019          I served the following **documents** *(specify):*
   Response Opposition to Temporary Restraining order to show cause re: Preliminary Injunction

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a. Name of person served: Steven A. Roseman, Paul S. Cooley, Farzad Rashedi

   b. ☐ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:

   c. ☑ *(Complete if service was by fax.)*

      Fax number where person was served:
      EMAILS ROSEMAN@ROSEMAN.LAW , COOLEY@ROSEMAN.LAW , RASHEDI@ROSEMAN.LA

      ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*

   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Form Approved for Optional Use<br>Judicial Council of California<br>POS-040 [Rev. March 15, 2010]

**PROOF OF SERVICE—CIVIL**
**(Proof of Service)**

Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5; Cal. Rules of Court, rule 2.306<br>www.courts.ca.gov

POS-040

| CASE NAME:<br>ALDEA COMMUNITY ASSOCIATION VS TAMARA NAZARETYAN | CASE NUMBER:<br>19CHCV00398 |
| --- | --- |

6. b. ☐ **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

   (1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

   (2) ☐ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

   I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state)*:

  c. ☐ **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d. ☐ **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e. ☐ **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

Ani Hakobyan
       (TYPE OR PRINT NAME OF DECLARANT)      ▶       (SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

☐ **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date)*:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 05-28-2019

Ani Hakobyan
       (NAME OF DECLARANT)      ▶       (SIGNATURE OF DECLARANT)

EXHIBIT "G"

| | |
|---|---|
| **From:** | Harry Safarian |
| **To:** | Karina Babikian |
| **Cc:** | Pierro Babaian; Christina Karayan; Steven Roseman; Patrick Malone; Joshua Nozar; Julie Ho; firm Emails |
| **Subject:** | RE: Aldea Community Association v. Nazaretyan - Depositions |
| **Date:** | Friday, June 11, 2021 10:51:51 AM |

FYI, Ms. Nazaretyan just checked, and the access cards still do not work, and have consistently not worked for over two years, and at no time until today has anyone on behalf of Aldea ever suggested they work, or would ever work. Please explain. Every minute Garnik is forced to remain in the home will cause further psychological damages. This is not how a person with a serious disability should be treated. Aldea and those who encouraged this disability discrimination should be ashamed.

**From:** Harry Safarian
**Sent:** Friday, June 11, 2021 10:31 AM
**To:** Karina Babikian <babikian@roseman.law>
**Cc:** Pierro Babaian <pb@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>; Steven Roseman <roseman@roseman.law>; Patrick Malone <malone@roseman.law>; Joshua Nozar <nozar@roseman.law>; Julie Ho <ho@roseman.law>; firm Emails <firm@roseman.law>
**Subject:** RE: Aldea Community Association v. Nazaretyan - Depositions

Please provide the date the access cards were "turned on," and any notice that was provided. We asked a couple of weeks ago to have them turned on and your firm declined.

**From:** Karina Babikian <babikian@roseman.law>
**Sent:** Friday, June 11, 2021 10:30 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Pierro Babaian <pb@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>; Steven Roseman <roseman@roseman.law>; Patrick Malone <malone@roseman.law>; Joshua Nozar <nozar@roseman.law>; Julie Ho <ho@roseman.law>; firm Emails <firm@roseman.law>
**Subject:** Re: Aldea Community Association v. Nazaretyan - Depositions

Hi Harry,

We are in receipt of your email and disagree with a number of your contentions but will not be addressing each and every one. Please note that your information is inaccurate and the Defendant's key card for access to common area amenities has been turned back on for some time.

This also confirms that you have yet to provide availability for your client's deposition. Please provide dates as soon as possible.

Thank you.

Karina Babikian, Esq.
Roseman Law, APC
**Corporate Office:** 21650 Oxnard Street, Suite 2000, Woodland Hills, CA 91367
**Orange County Office:** 9860 Research Drive, Suite 200, Irvine, CA 92618
**t:** 866.839.9400 | **f:** 818.380.6710 | **e:** babikian@roseman.law
**LA:** 818.380.6700 | **OC:** 949.339.2000 | **CV:** 760.760.2000 | **IE:** 951.430.2000 | **SD:** 619.494.2000
LOS ANGELES | ORANGE COUNTY | COACHELLA VALLEY | INLAND EMPIRE | SAN DIEGO | NEVADA

EXHIBIT "H"

| | |
|---|---|
| **From:** | Tamara Nazaretyan |
| **To:** | Pierro Babaian |
| **Subject:** | Fwd: Access Device Request: Pending Requirements - [#XN3987575] |
| **Date:** | Tuesday, June 29, 2021 1:57:47 PM |

Sent from my iPhone

Begin forwarded message:

> **From:** PMP Management | Ventura <care@pmpmanage.com>
> **Date:** June 14, 2021 at 1:04:47 PM PDT
> **To:** tamaranazaretyan@yahoo.com
> **Subject: Access Device Request: Pending Requirements - [#XN3987575]**

-

### Aldea Community Association
Access Device Request

Access Passes have been reactivated.

*Request Description:* Please reactivate the access pass for this owner as soon as possible.

Sincerely,

Nancy Patrick

PMP Management | Ventura on behalf of Aldea Community Association

Nothing contained in this message should be considered legal advice. This message, including any attachments, may include privileged, confidential, and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

| | |
|---|---|
| **From:** | Tamara Nazaretyan |
| **To:** | Pierro Babaian |
| **Subject:** | Fwd: - [#XN4130837] |
| **Date:** | Tuesday, June 29, 2021 3:15:10 PM |

Sent from my iPhone

Begin forwarded message:

> **From:** PMP Management | Ventura <care@pmpmanage.com>
> **Date:** June 29, 2021 at 3:13:04 PM PDT
> **To:** tamaranazaretyan@yahoo.com
> **Subject:** - [#XN4130837]

-

 

### Aldea Community Association

==Thank you for your message. Gayle Pinero a community manager activated your card device.==

Request Description:
*11251 Paseo Del Cielo*
*Gayle Pinero a community manager activated your card device.*

**Did you know?** Homeowners can manage their accounts online 24/7 on PMP GATEWAY. Setup payments, view balances, submit requests, and much more! To register or log in to your homeowner account now, click here.

Sincerely,

PMP Management | Ventura *On Behalf of Aldea Community Association*



Nothing contained in this message should be considered legal advice. This message, including any attachments, may include privileged, confidential, and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.