**The Safarian Firm, APC,**
Harry A. Safarian, SB#204106
Email: hs@safarianfirm.com
Christina S. Karayan, SB# 225780
Email : ck@safarianfirm.com
Pierro H. Babaian, SB# 303982
Email : pb@safarianfirm.com
3150 Montrose Avenue
La Crescenta, CA 91214-3688
Telephone:  818.334.8528
Facsimile: 818.334.8107

Attorneys for Plaintiffs
ANAHIT NAZARETYAN and GARNIK HAKOBYAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ANAHIT NAZARETYAN AND GARNIK HAKOBYAN,<br><br>Plaintiffs,<br><br>vs.<br><br>ALDEA COMMUNITY ASSOCIATION, a California non-profit mutual benefit corporation; JEROME BLACK, an individual; BETH CORBETT, an individual; DALE RODIN, an individual; and DOES 1 to 100,<br><br>Defendants. | Case No. 2:21-cv-03436-AB-E<br><br>**DECLARATION OF HARRY A. SAFARIAN AND EXHIBITS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PURSUANT TO RULES 12(B)(6) AND 8 OF FEDERAL RULES OF CIVIL PROCEDURE AND CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>*[Filed concurrently with Plaintiffs' Opposition; Objections to Evidence; and Objections to Request for Judicial Notice]*<br><br>Date:    December 16, 2022<br>Time:    10:00 a.m.<br><br>Judge:   Andre Birotte, Jr.<br><br>Trial Date:          September 12, 2023 |

## DECLARATION OF HARRY A. SAFARIAN

I, Harry A. Safarian, declare and state as follows:

1.      I am attorney at law duly licensed to practice before this Court and all courts of the State of California, including the Central District of the United States District Court. I am the founding partner of The Safarian Firm, APC, counsel of record for Plaintiffs, Anahit Nazaretyan and Garnik Hakobyan. I also represent Tamara Nazaretyan in the California State Case, *Aldea Community Association v. Tamara Nazaretyan,* Los Angeles County Superior Court case number 19CHCV00398. I make this declaration of my own personal knowledge. If called upon to testify, I would and could competently testify to the facts herein.

2.      Attached hereto as Exhibit "A" is a true and correct copy of a declaration executed by my client Tamara Nazaretyan setting forth the factual details about Garnik and her interactions with the HOA.

3.      Following the Court's ruling on Defendants' first anti-SLAPP motion, on July 8, 2022, my office inquired about a stipulation to dismiss this pending Federal Court action with a refiling in State Court. On July 13, 2022, Ms. Marie Wrighten, counsel for Defendants, indicated a willingness to enter into said stipulation. On July 14, 2022, a stipulation was sent to Ms. Wrighten for consideration. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "B." Receiving no response, the First Amended Complaint was filed.

4.      On July 20, 2022, Ms. Wrighten contacted my office and left a message inquiring as to whether a stipulation was still a possibility. As I was in trial, I emailed Ms. Wrighten and told her I was in trial but was available to discuss the issue after court.

5.      On July 21, 2022, Ms. Wrighten advised she could not agree to the stipulation and instead inquired about meeting and conferring pursuant to Rule 7-3. That same day, I responded to Ms. Wrighten that I was in trial and unavailable on the proposed date, and requested dates the following week. A true and correct copy of the

email correspondence regarding the July 20, 2022 and July 21, 2022 discussions is attached hereto as Exhibit "C."

6.     A week later, on July 27, 2022, Ms. Wrighten proposed August 3 or 4 as dates to meet and confer with a proposed responsive pleading deadline of August 15. I was in trial during this period of time. On August 3, 2022, Ms. Wrighten followed up. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "D."

7.     That same day, on August 3, 2022, I informed Ms. Wrighten that I was engaged in trial, but would be engaged through mid week the following week. I requested that in the interim, Ms. Wrighten forward a written position of the alleged deficiencies in the pleadings to make the meet and confer process more productive. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "E."

8.     Following this date, I heard nothing from Ms. Wrighten or her office regarding the responsive pleading or meet and confer. No letter was sent to my office pursuant to my request and no attempts were made at contacting Plaintiffs' counsel regarding a responsive pleading deadline.

9.     On September 20, 2022, after the filing deadlines for both a 12(b)(6) motion and anti-SLAPP motion had passed, Lillian Harwell, another attorney from Ms. Wrighten's office sent me an email inquiring about a meet and confer and an agreement on a responsive pleading deadline. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "F."

10.    On September 22, 2022, I responded advising that since I had not heard from counsel since August 3, 2022, I assumed an answer would be filed. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "G."

11.    Following my email, Ms. Wrighten contacted me to discuss Defendants' response to the first amended complaint. I advised that the responsive pleading was

DECLARATION OF HARRY A. SAFARIAN AND SUPPORTING EXHIBITS

overdue, that her office had failed to meet and confer with me in August as I had offered and had also failed to provide a written communication outlining the alleged deficiencies as I requested in July.

12.     On October 10, 2022, Ms. Wrighten wrote to me claiming I had failed to meet and confer with her regarding and requested to do so. She advised a responsive pleading would be filed in ***ten*** days. I immediately responded that Ms. Wrighten's email was a gross misrepresentation of our agreement and that an answer was appropriate. A true and correct copy of the email correspondence regarding these discussions is attached hereto as Exhibit "H."

13.     On October 14, 2022, Ms. Wrighten forwarded a meet and confer letter, to which I responded on October 21, 2022. True and correct copies of both letters are attached hereto as Exhibits "I" and "J," respectively.

14.     Ms. Wrighten's contention that a responsive pleading on the federal complaint was put on hold because of alleged settlement discussions is without any merit. While the HOA provided a written settlement offer in the State Case, the offer expired on its own terms on August 15, 2022. There have been no settlement discussions regarding the Federal matter since the settlement conference.

15.     While I did agree to provide Defendants an extension to file a responsive pleading, that offer was provided on August 3, 2022 and certainly was not an open extension of time to respond. Even Ms. Wrighten's own email of August 3, 2022, contemplated an extension through August 15, 2022, not October 21, 2022 (the date this motion was filed).

16.     Furthermore, my August 3, 2022 email advised that I was available the following week and requested written correspondence to make the meet and confer more productive. There was absolutely no response from Ms. Wrighten or her office following this email communication until more than six weeks later. Ms. Wrighten's assertion that I did not follow up with her after my trial is of no consequence. Defendants made not attempts to contact me and did not seek a stipulation or order

DECLARATION OF HARRY A. SAFARIAN AND SUPPORTING EXHIBITS

from the court extending their time to file a responsive pleading for a period of more than two weeks as required by the Rules of Court.

17.    Ms. Wrighten also does not explain why after the September 20, 2022 communication and September 22, 2022 discussion, she made no efforts to address the issue at all. She first reached out by email on October 10, 2022 grossly distorting the facts of what had transpired. She then on October 14, 2022 sent the long awaited meet and confer letter which simply reiterated the same position as before not addressing the additional allegations in the first amended complaint.

18.    Simply put, Defendants failed to comply with the rules of court, ignored their obligation to file a timely responsive pleading, failed to engage in a good faith meet and confer until well after their deadline had passed and now seek to blame Plaintiffs for this failure. The conduct is unfortunate, to say the least, and should not be rewarded.

19.    Attached hereto as Exhibit "K" is a true and correct copy of the deposition of Gayle Pinero, Person Most Qualified of Property Management Professionals, the property management company for the HOA. Ms. Pinero's deposition was taken on February 11, 2021 in the *Aldea Community Association v. Tamara Nazaretyan* case. Relevant and cited portions of her testimony are highlighted.

20.    Attached hereto as Exhibit "L" is a true and correct copy of the deposition of Sabrina French, an employee of Property Management Professionals. Ms. French's deposition was taken on June 30, 2022 in the *Aldea Community Association v. Tamara Nazaretyan* case. Relevant and cited portions of her testimony are highlighted.

21.    Attached hereto as Exhibit "M" is a true and correct copy of the deposition of Beth Corbett, a member of the Board of the Aldea Community Association. Ms. Corbett's deposition was taken on February 25, 2022 in the *Aldea*

*Community Association v. Tamara Nazaretyan* case. Relevant and cited portions of her testimony are highlighted.

22.   Attached hereto as Exhibit "N" is a true and correct copy of the deposition of Dale Rodin, a member of the Board of the Aldea Community Association. Mr. Rodin's deposition was taken on March 1, 2022 in the *Aldea Community Association v. Tamara Nazaretyan* case. Relevant and cited portions of her testimony are highlighted.

23.   Attached hereto as Exhibit "O" is a true and correct copy of Board of Directors Meeting - Executive Session Meeting Minutes dated April 22, 2019 for the Aldea Community Association which were produced by the Aldea Community Association in verified discovery responses in the *Aldea Community Association v. Tamara Nazaretyan* case.

24.    Attached hereto as Exhibit "P" is a true and correct copy of Board of Directors Meeting - Executive Session Meeting Minutes dated May 8, 2019 for the Aldea Community Association which were produced the Aldea Community Association in verified discovery responses in the *Aldea Community Association v. Tamara Nazaretyan* case.

25.   Attached hereto as Exhibit "Q" is a true and correct copy of a May 28, 2019 filing in the *Aldea Community Association v. Tamara Nazaretyan* case by my client while she was acting in *pro per*.

26.   Attached hereto as Exhibit "R" is a true and correct copy of a September 27, 2019 filing in the *Aldea Community Association v. Tamara Nazaretyan* case by my client while she was acting in *pro per*.

27.   Attached hereto as Exhibit "S" is a true and correct copy of email correspondence between myself and counsel for the Aldea Community Association showing that the Nazaretyan household access cards were not in fact activated until after the filing of this lawsuit.

28.     Attached hereto as Exhibit "T" is a true and correct copy of an email from PMP Management to Tamara Nazaretyan on June 14, 2021 regarding reactivation of her access cards along with an email dated June 29, 2021 wherein her card was activated.

29.     Attached hereto as Exhibit "U" is a true and correct copy of the declaration if Aram Touloumdjian executed on August 12, 2022.

I declare, under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was signed on November 25, 2022 in the County of Los Angeles, State of California.

_____.

Harry A. Safarian

DECLARATION OF HARRY A. SAFARIAN AND SUPPORTING EXHIBITS

# EXHIBIT "A"

## DECLARATION OF TAMARA NAZARETYAN

I, Tamara Nazaretyan, declare and state as follows:

1. I am Defendant in the above referenced lawsuit. I make this declaration of my own personal knowledge. If called upon to testify, I would and could competently testify to the facts herein.

2. I own a condominium located in the Aldea Homeowners Association ("HOA") complex. I purchased it in May 2017. I am a member of the HOA and have paid the full monthly HOA dues during my ownership of the unit (which have increased periodically and are currently $462.70 per month). I have lived there since May 2017 with my son, Garnik Hakobyan, who is disabled, and with my mother, Anahit Nazaretyan.

3. My son was born April 9, 1995. He is disabled as he was diagnosed with schizoaffective disorder approximately nine years ago. I am Garnik's conservator, guardian, and caretaker. I stopped working at my job after the Garnik's April 11, 2019 incident so I could be his full-time caretaker. I am his Court-Ordered conservator.

4. Garnik's condition was managed well through medication for several years. He was hospitalized on March 22, 2019, at which time his doctors decided to modify the usage of his medication. Garnik did not respond well to the modification. According to his doctors, this resulted in a schizophrenic episode on April 11, 2019 where he experienced hallucinations. On that day, Garnik stabbed himself in the neck in an attempt to take his own life. While he was experiencing the April 11, 2019 episode, he attempted to enter his own home and believed he was locked out; he knocked on several doors trying to enter what he believed was his own home.

5. Garnik was taken to the hospital after the suicide attempt and the doctors saved his life. The doctors refined his medication. Specifically, they immediately stopped the Clozapine medication. Since then, his doctors have repeatedly confirmed that his disability is being controlled through medication. They have suggested, however, that Garnik utilize some of the amenities available in the HOA, such as the pool, and walk outside near his home.

6. Prior to the date of the April 11, 2019, Garnik had never before suffered an incident like the one he experienced on that day. Since April 11, 2019, Garnik has not suffered an incident

17

1 like the one he experienced on that day.

2 7. Garnik's disability does not make him violent toward others and has not made him violent

3   towards others; instead, the disability tends to lead to self-harm when an episode is suffered.

4 8. After the April 11, 2019 incident when my son tried to kill himself, Aldea Community

5   Association demanded I pay to clean my son's blood from the concrete areas of the common

6   area. I paid the money. I was then told that I must permanently exclude my son from our

7   home and the entire common areas of the Aldea Community Association. I was told that if I

8   refused, I would be sued and would owe hundreds of thousands of dollars in attorneys' fees,

9   and that my son would be ordered by a judge to be excluded from our home. Although I

10   explained to the HOA's lawyer, Steven Roseman, and the board, that I was a single mother,

11   that Garnik is disabled, and that I am his caretaker. I explained that what Plaintiff was

12   demanding would result in my son becoming homeless because he has no other place to go.

13   I provided medical records to the HOA show Garnik was disabled. I also told them Garnik

14   was not a "guest", and instead he lived with me.

15 9. After the April 11, 2019 incident, the Board ordered me to appear at a hearing and demanded

16   I paid $1,740 to clean my son's blood from the common area from the suicide attempt. They

17   also demanded I prohibit Garnik from returning not only to the HOA's common areas, but to

18   the community as a whole, including my unit. At the time when they made the demands, I

19   was in the hospital with Garnik has he was recovering from his suicide attempt.

20 10. My building access cards/key fobs for my entire family (including me, my son, and my

21   mother) were blocked for all areas of the building, except for a single vehicle access gate.

22   I declare, under penalty of perjury under the laws of the State of California that the foregoing

23 is true and correct, and that this declaration was signed on December **14**, 2021 in the County of

24 Los Angeles, State of California.

25

26            

             Tamara Nazaretyan

27

28

MEMORANDUM OF POINTS AND AUTHORITIES

EXHIBIT "B"

| From: | Christina Karayan |
|---|---|
| To: | Harry Safarian; Wrighten, Marie; Pierro Babaian |
| Cc: | Harwell, Lillian |
| Subject: | RE: Anahit Nazaretyan, et al. v. Aldea Community Association; et al. - Claim 5011634213-1-1 |
| Date: | Thursday, July 14, 2022 1:22:00 PM |
| Attachments: | Stip re Dismissal.docx |
| | image001.png |

Hi Marie,

I hope your sister is doing well. Further to the communications below, attached please find a stipulation regarding dismissal for your consideration. I am sending in word format so feel free to redline...

Thank you

Christina

---

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Wednesday, July 13, 2022 6:28 AM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>; Pierro Babaian <pb@safarianfirm.com>
**Cc:** Christina Karayan <ck@safarianfirm.com>; Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>
**Subject:** RE: Anahit Nazaretyan, et al. v. Aldea Community Association; et al. - Claim 5011634213-1-1

Marie, I am deeply sorry to hear that your sister was in the hospital. We are glad to hear she will be okay, and wish her a strong and speedy recovery.

The court may dismiss the action itself and give us time to re-file in federal court, allowing the statute of limitations to relate back to the original filing date of the federal complaint. We are open to proceeding that route with the understanding there are no costs to be had in relation to the federal filing. Please advise of your thoughts regarding same.

Kind regards,

Harry A. Safarian
THE SAFARIAN FIRM, APC
3150 Montrose Avenue
Glendale, California 91214
818.334.8528
818.334.8107 Fax

This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited. If you are not the intended recipient, please notify THE SAFARIAN FIRM, APC immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

Circular 230 Disclosure: To assure compliance with Treasury Department rules governing tax practice, we hereby inform you that any advice contained herein (including in any attachment) (1) was not written or intended to be used, and cannot be used, by you or any taxpayer for the purpose of avoiding any penalties that may be imposed on you or any taxpayer and (2) may not be used or referred to by you or any other person in connection with promoting, marketing or recommending to another person any transaction or matter addressed herein.

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, July 13, 2022 4:51 AM
**To:** Pierro Babaian <pb@safarianfirm.com>
**Cc:** Harry Safarian <hs@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>; Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>
**Subject:** RE: Anahit Nazaretyan, et al. v. Aldea Community Association; et al. - Claim 5011634213-1-1

Hi Pierro:

Thank you for your email.  Apologies for the delayed response (my sister is in the hospital; she will be ok, but I have been out of pocket).

I agree that the Court believes this matter should be in state court.  But, I believe you will have to dismiss the federal court case and re-file a complaint in state court.  I don't believe that there is a mechanism for us to transfer it to state court.

Please let us know whether:

(1) you intend to dismiss the federal court case in lieu of filing an amended complaint on July 14, 2022 pursuant to the Court's order;
(2) you will file a separate state court case with a notice of related case; or
(3) you will seek leave to file a cross-complaint in the pending matter.

It bears mention that we submit that the claims will be subject to an anti-SLAPP motion in state court as well.

Either way, we would be willing to accept service of the new state court complaint.  Again, please just let us know how you will proceed.

Thank you again for your email and proposal.

Marie

**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com

**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Pierro Babaian <pb@safarianfirm.com>
**Sent:** Friday, July 8, 2022 10:12 AM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>; Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>
**Cc:** Harry Safarian <hs@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>
**Subject:** [EXT] Anahit Nazaretyan, et al. v. Aldea Community Association; et al. - Claim 5011634213-1-1

Dear Ms. Wrighten and Ms. Harwell,

Based on the Court's comments at prior hearings and the ruling on the anti-SLAPP, it appears the Court believes the matter should be in State Court. As such, we are writing to discuss a possible stipulation/proposed order transferring the matter to State Court. Please favor us with your opinion in this regard.

Thank you.

Kind Regards,

*Pierre H. Babaian*

The Safarian Firm, APC
3150 Montrose Avenue, Glendale, California 91214
D: 818.296.0814 | T: 818.334.8528 | F: 818.334.8107

This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited. If you are not the intended recipient, please notify The Safarian Firm immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

EXHIBIT "C"

| From: | Harry Safarian |
|---|---|
| To: | Wrighten, Marie |
| Cc: | Harwell, Lillian; Christina Karayan; Pierro Babaian |
| Subject: | Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion |
| Date: | Thursday, July 21, 2022 9:07:32 PM |
| Attachments: | Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png |

I cannot because I am in trial. Can you provide some dates for the week after next? I am happy to extend the responsive pleading deadline to accommodate a meet and confer.

Get Outlook for iOS

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Thursday, July 21, 2022 4:13:52 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

My apologies. As it turns out, we will not be able to agree to waive fees and costs. So, we will need to respond to the first amended complaint.

Are you available to meet and confer tomorrow, Friday, July 22, 2022, pursuant to Local Rule 7-3 as to our proposed 12(b)(6) motion and an anti-SLAPP motion?

Marie

Sent from my iPhone



**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com

**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 20, 2022, at 4:00 PM, Harry Safarian <hs@safarianfirm.com> wrote:

Hi, Marie and Lillian. I am in trial, and my availability is limited for the next couple of days. I am happy to confer with you at 4:30 if your have time. Assuming you are available, please try my cell at (818) 288-5198. Thanks.

**From:** Arlen Khachatourians <ak@safarianfirm.com>
**Sent:** Wednesday, July 20, 2022 3:18 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Subject:** RE: Nazaretyan case - OC called and is amenable to the stipulation re dismissal....

Marie Wrighten called (opposing counsel). she said she believes they will agree to a stip re dismissal as you proposed and wanted to know that if the stip was "still in play." (626)-722-7775

Best regards,

**Arlen Khachatourians**

Attorney

The Safarian Firm, APC

3150 Montrose Ave. | Glendale | California | 91214-3688

T: 818.875.9368| F: 818.334.8107 | AK@safarianfirm.com

**CONFIDENTIALITY NOTICE**: All information contained in this email, including any attachments, is intended only for the named recipients. All information may be confidential, privileged, attorney's work product, or exempt from disclosure under law. Use, dissemination, distribution, or copying of this communication, or any of its contents, is not authorized except by the named recipients. If you have received this electronic mail in error or are not one of the named recipients, please do not read any text other than the text of this notice, and do not open any attachments. Instead, please notify me by return email or phone, then delete the email and destroy any printouts of it, including attachments. Thank you for your cooperation.

EXHIBIT "D"

| | |
|---|---|
| **From:** | Wrighten, Marie |
| **To:** | Harry Safarian |
| **Cc:** | Harwell, Lillian; Christina Karayan; Pierro Babaian; Cantos, Sylvia |
| **Subject:** | RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion |
| **Date:** | Wednesday, August 3, 2022 3:34:57 AM |
| **Attachments:** | image001.png |
| | Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png |

Hi Harry:

Following up.  How about 11am on Thursday, August 4 to meet and confer on our proposed motions?

Marie

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, July 27, 2022 8:08 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Thank you, Harry.  August gets busy for me.  How about in the morning on August 3 or 4?  Then, can our responsive pleading be due on August 15?  (I am requesting to push that a little because I am out of town from August 11-14.)

Please let me know if either August 3 or 4 work for you – before 10 am on the 3rd or before noon on the 4th.

Thanks again.

Marie

**Marie L. Wrighten**
**Partner**
Los Angeles
213.580.3944 or x2133944

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Thursday, July 21, 2022 9:07 PM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** [EXT] Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

I cannot because I am in trial. Can you provide some dates for the week after next? I am happy to extend the responsive pleading deadline to accommodate a meet and confer.

Get Outlook for iOS

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Thursday, July 21, 2022 4:13:52 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

My apologies. As it turns out, we will not be able to agree to waive fees and costs. So, we will need to respond to the first amended complaint.

Are you available to meet and confer tomorrow, Friday, July 22, 2022, pursuant to Local Rule 7-3 as to our proposed 12(b)(6) motion and an anti-SLAPP motion?

Marie

Sent from my iPhone



**Marie L. Wrighten**
Partner
Marie.Wrighten@lewisbrisbois.com

**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 20, 2022, at 4:00 PM, Harry Safarian <hs@safarianfirm.com> wrote:

Hi, Marie and Lillian. I am in trial, and my availability is limited for the next couple of days. I am happy to confer with you at 4:30 if your have time. Assuming you are available, please try my cell at (818) 288-5198. Thanks.

---

**From:** Arlen Khachatourians <ak@safarianfirm.com>
**Sent:** Wednesday, July 20, 2022 3:18 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Subject:** RE: Nazaretyan case - OC called and is amenable to the stipulation re dismissal....

Marie Wrighten called (opposing counsel). she said she believes they will agree to a stip re dismissal as you proposed and wanted to know that if the stip was "still in play." (626)-722-7775

Best regards,

**Arlen Khachatourians**

Attorney

The Safarian Firm, APC

3150 Montrose Ave. | Glendale | California | 91214-3688

T: 818.875.9368| F: 818.334.8107 | AK@safarianfirm.com

**CONFIDENTIALITY NOTICE**: All information contained in this email, including any attachments, is intended only for the named recipients. All information may be confidential, privileged, attorney's work product, or exempt from disclosure under law. Use, dissemination, distribution, or copying of this communication, or any of its contents, is not authorized except by the named recipients. If you have received this electronic mail in error or are not one of the named recipients, please do not read any text other than the text of this notice, and do not open any attachments. Instead, please notify me by return email or phone, then delete the email and destroy any printouts of it, including attachments. Thank you for your cooperation.

EXHIBIT "E"

| | |
|---|---|
| **From:** | Harry Safarian |
| **To:** | Wrighten, Marie |
| **Cc:** | Harwell, Lillian; Christina Karayan; Pierro Babaian; Cantos, Sylvia |
| **Subject:** | RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion |
| **Date:** | Wednesday, August 3, 2022 7:53:10 AM |
| **Attachments:** | image001.png |

Hello, Marie. I am in trial. I am pleased to extend the responsive pleading deadline to give us more time to meet and confer. I will be engaged through at least mid-week next week.

Pending our meet and confer, I would appreciate your providing some guidance in writing supporting your position regarding the amended complaint and any vulnerabilities you believe exist. That would certainly make the process more productive.

Thank you.

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, August 3, 2022 3:35 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

Following up.  How about 11am on Thursday, August 4 to meet and confer on our proposed motions?

Marie

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, July 27, 2022 8:08 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Thank you, Harry.  August gets busy for me.  How about in the morning on August 3 or 4?  Then, can our responsive pleading be due on August 15?  (I am requesting to push that a little because I am out of town from August 11-14.)

Please let me know if either August 3 or 4 work for you – before 10 am on the 3rd or before noon on the 4th.

Thanks again.

Marie

**Marie L. Wrighten**
**Partner**
Los Angeles
213.580.3944 or x2133944

**From:** Harry Safarian <hs@safarianfirm.com>

**Sent:** Thursday, July 21, 2022 9:07 PM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** [EXT] Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

I cannot because I am in trial. Can you provide some dates for the week after next? I am happy to extend the responsive pleading deadline to accommodate a meet and confer.

Get Outlook for iOS

---

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Thursday, July 21, 2022 4:13:52 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

My apologies. As it turns out, we will not be able to agree to waive fees and costs. So, we will need to respond to the first amended complaint.

Are you available to meet and confer tomorrow, Friday, July 22, 2022, pursuant to Local Rule 7-3 as to our proposed 12(b)(6) motion and an anti-SLAPP motion?

Marie

Sent from my iPhone



**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com

**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 20, 2022, at 4:00 PM, Harry Safarian <hs@safarianfirm.com> wrote:

Hi, Marie and Lillian. I am in trial, and my availability is limited for the next couple of days. I am happy to confer with you at 4:30 if your have time. Assuming you are available, please try my cell at (818) 288-5198. Thanks.

**From:** Arlen Khachatourians <ak@safarianfirm.com>
**Sent:** Wednesday, July 20, 2022 3:18 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Subject:** RE: Nazaretyan case - OC called and is amenable to the stipulation re dismissal....

Marie Wrighten called (opposing counsel). she said she believes they will agree to a stip re dismissal as you proposed and wanted to know that if the stip was "still in play." (626)-722-7775

Best regards,

**Arlen Khachatourians**

Attorney

The Safarian Firm, APC

3150 Montrose Ave. | Glendale | California | 91214-3688

T: 818.875.9368| F: 818.334.8107 | AK@safarianfirm.com

**CONFIDENTIALITY NOTICE**: All information contained in this email, including any attachments, is intended only for the named recipients. All information may be confidential, privileged, attorney's work product, or exempt from disclosure under law. Use, dissemination, distribution, or copying of this communication, or any of its contents, is not authorized except by the named recipients. If you have received this electronic mail in error or are not one of the named recipients, please do not read any text other than the text of this notice, and do not open any attachments. Instead, please notify me by return email or phone, then delete the email and destroy any printouts of it, including attachments. Thank you for your cooperation.

EXHIBIT "F"

| | |
|---|---|
| **From:** | Harwell, Lillian |
| **To:** | Harry Safarian |
| **Cc:** | Wrighten, Marie; Christina Karayan; Pierro Babaian; Cantos, Sylvia |
| **Subject:** | RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion |
| **Date:** | Tuesday, September 20, 2022 7:42:38 PM |
| **Attachments:** | image001.png |
| | Logo_e6253148-26a1-47a9-b861-6ac0ff0bc3c4.png |

Hi Harry,

We hope your trial went well!

Circling back to this one. I do not see that we agreed to a date following your 8/3 email.  What are your thoughts on the responsive pleading deadline? We propose sending the formal meet and confer letter by 9/27 with the responsive pleading due 10/11 so we have 2 weeks to discuss before engaging in motion practice.

Looking forward to hearing from you.

Thanks!



**Lillian C. Harwell**
**Partner**
**Lillian.Harwell@lewisbrisbois.com**

**T: 213.680.5138 F: 213.250.7900**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Wednesday, August 3, 2022 7:53 AM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** [EXT] RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hello, Marie. I am in trial. I am pleased to extend the responsive pleading deadline to give us more time to meet and confer. I will be engaged through at least mid-week next week.

Pending our meet and confer, I would appreciate your providing some guidance in writing supporting your position regarding the amended complaint and any vulnerabilities you believe exist. That would certainly make the process more productive.

Thank you.

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, August 3, 2022 3:35 AM

**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

Following up.  How about 11am on Thursday, August 4 to meet and confer on our proposed motions?

Marie

---

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, July 27, 2022 8:08 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Thank you, Harry.  August gets busy for me.  How about in the morning on August 3 or 4?  Then, can our responsive pleading be due on August 15?  (I am requesting to push that a little because I am out of town from August 11-14.)

Please let me know if either August 3 or 4 work for you – before 10 am on the 3rd or before noon on the 4th.

Thanks again.

Marie

**Marie L. Wrighten**
**Partner**
Los Angeles
213.580.3944 or x2133944

---

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Thursday, July 21, 2022 9:07 PM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** [EXT] Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

I cannot because I am in trial. Can you provide some dates for the week after next? I am happy to extend the responsive pleading deadline to accommodate a meet and confer.

Get Outlook for iOS

---

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Thursday, July 21, 2022 4:13:52 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and

anti-SLAPP motion

Hi Harry:

My apologies. As it turns out, we will not be able to agree to waive fees and costs. So, we will need to respond to the first amended complaint.

Are you available to meet and confer tomorrow, Friday, July 22, 2022, pursuant to Local Rule 7-3 as to our proposed 12(b)(6) motion and an anti-SLAPP motion?

Marie

Sent from my iPhone



**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com

**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 20, 2022, at 4:00 PM, Harry Safarian <hs@safarianfirm.com> wrote:

Hi, Marie and Lillian. I am in trial, and my availability is limited for the next couple of days. I am happy to confer with you at 4:30 if your have time. Assuming you are available, please try my cell at (818) 288-5198. Thanks.

**From:** Arlen Khachatourians <ak@safarianfirm.com>
**Sent:** Wednesday, July 20, 2022 3:18 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Subject:** RE: Nazaretyan case - OC called and is amenable to the stipulation re dismissal....

Marie Wrighten called (opposing counsel). she said she believes they will agree to a stip re dismissal as you proposed and wanted to know that if the stip was "still in play." (626)-722-7775

Best regards,

**Arlen Khachatourians**

Attorney

The Safarian Firm, APC

3150 Montrose Ave. | Glendale | California | 91214-3688

T: 818.875.9368| F: 818.334.8107 | AK@safarianfirm.com


**CONFIDENTIALITY NOTICE**: All information contained in this email, including any attachments, is intended only for the named recipients. All information may be confidential, privileged, attorney's work product, or exempt from disclosure under law. Use, dissemination, distribution, or copying of this communication, or any of its contents, is not authorized except by the named recipients. If you have received this electronic mail in error or are not one of the named recipients, please do not read any text other than the text of this notice, and do not open any attachments. Instead, please notify me by return email or phone, then delete the email and destroy any printouts of it, including attachments. Thank you for your cooperation.

EXHIBIT "G"

| | |
|---|---|
| **From:** | Harry Safarian |
| **To:** | Harwell, Lillian |
| **Cc:** | Wrighten, Marie; Christina Karavan; Pierro Babaian; Cantos, Sylvia |
| **Subject:** | RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion |
| **Date:** | Thursday, September 22, 2022 8:55:41 AM |
| **Attachments:** | image001.png |

Hello, Lillian. Thanks for your email. I was out of pocket the last couple of days. Please call me when you can and let's discuss this matter. On August 3, I had requested of Marie a written meet and confer detailing any concerns about the complaint and have not heard back, so I assumed an answer would just be filed. In any event, I am happy to speak with you.


Harry A. Safarian

THE SAFARIAN FIRM, APC

3150 Montrose Avenue

Glendale, California 91214

818.334.8528

818.334.8107 Fax

This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited. If you are not the intended recipient, please notify THE SAFARIAN FIRM, APC immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

Circular 230 Disclosure: To assure compliance with Treasury Department rules governing tax practice, we hereby inform you that any advice contained herein (including in any attachment) (1) was not written or intended to be used, and cannot be used, by you or any taxpayer for the purpose of avoiding any penalties that may be imposed on you or any taxpayer and (2) may not be used or referred to by you or any other person in connection with promoting, marketing or recommending to another person any transaction or matter addressed herein.


**From:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>
**Sent:** Tuesday, September 20, 2022 7:42 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>; Christina Karavan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion


Hi Harry,

We hope your trial went well!

Circling back to this one. I do not see that we agreed to a date following your 8/3 email.  What are your thoughts on the responsive pleading deadline? We propose sending the formal meet and confer letter by 9/27 with the responsive pleading due 10/11 so we have 2 weeks to discuss before engaging in motion practice.

Looking forward to hearing from you.

Thanks!


**Lillian C. Harwell**
**Partner**



Lillian.Harwell@lewisbrisbois.com

**T: 213.680.5138 F: 213.250.7900**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Wednesday, August 3, 2022 7:53 AM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** [EXT] RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion


Hello, Marie. I am in trial. I am pleased to extend the responsive pleading deadline to give us more time to meet and confer. I will be engaged through at least mid-week next week.

Pending our meet and confer, I would appreciate your providing some guidance in writing supporting your position regarding the amended complaint and any vulnerabilities you believe exist. That would certainly make the process more productive.

Thank you.

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, August 3, 2022 3:35 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

Following up.  How about 11am on Thursday, August 4 to meet and confer on our proposed motions?

Marie

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Wednesday, July 27, 2022 8:08 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>; Cantos, Sylvia <Sylvia.Cantos@lewisbrisbois.com>
**Subject:** RE: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Thank you, Harry.  August gets busy for me.  How about in the morning on August 3 or 4?  Then, can our responsive pleading be due on August 15?  (I am requesting to push that a little because I am out of town from August 11-14.)

Please let me know if either August 3 or 4 work for you – before 10 am on the 3rd or before noon on the 4th.

Thanks again.

Marie

**Marie L. Wrighten**
**Partner**
Los Angeles
213.580.3944 or x2133944

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Thursday, July 21, 2022 9:07 PM
**To:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** [EXT] Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion


I cannot because I am in trial. Can you provide some dates for the week after next? I am happy to extend the responsive pleading deadline to accommodate a meet and confer.

Get Outlook for iOS

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Thursday, July 21, 2022 4:13:52 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>; Christina Karayan <ck@safarianfirm.com>; Pierro Babaian <pb@safarianfirm.com>
**Subject:** Re: Nazaretyan v Aldea et al. - Meet and Confer pursuant to Local Rule 7-3 re Defendants' 12(b)(6) motion and anti-SLAPP motion

Hi Harry:

My apologies. As it turns out, we will not be able to agree to waive fees and costs. So, we will need to respond to the first amended complaint.

Are you available to meet and confer tomorrow, Friday, July 22, 2022, pursuant to Local Rule 7-3 as to our proposed 12(b)(6) motion and an anti-SLAPP motion?

Marie

Sent from my iPhone

**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com



**T: 213.580.3944  F: 213.250.7900 M: 626.722.7775**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

On Jul 20, 2022, at 4:00 PM, Harry Safarian <hs@safarianfirm.com> wrote:


Hi, Marie and Lillian. I am in trial, and my availability is limited for the next couple of days. I am happy to confer with you at 4:30 if your have time. Assuming you are available, please try my cell at (818) 288-5198. Thanks.

---

**From:** Arlen Khachatourians <ak@safarianfirm.com>
**Sent:** Wednesday, July 20, 2022 3:18 PM
**To:** Harry Safarian <hs@safarianfirm.com>
**Subject:** RE: Nazaretyan case - OC called and is amenable to the stipulation re dismissal....


Marie Wrighten called (opposing counsel). she said she believes they will agree to a stip re dismissal as you proposed and wanted to know that if the stip was "still in play." (626)-722-7775


Best regards,


**Arlen Khachatourians**

Attorney

The Safarian Firm, APC

3150 Montrose Ave. | Glendale | California | 91214-3688

T: 818.875.9368| F: 818.334.8107 | AK@safarianfirm.com


**CONFIDENTIALITY NOTICE**: All information contained in this email, including any attachments, is intended only for the named recipients. All information may be confidential, privileged, attorney's work product, or exempt from disclosure under law. Use, dissemination, distribution, or copying of this communication, or any of its contents, is not authorized except by the named recipients. If you have received this electronic mail in error or are not one of the named recipients, please do not read any text other than the text of this notice, and do not open any attachments. Instead, please notify me by return email or phone, then delete the email and destroy any

printouts of it, including attachments. Thank you for your cooperation.

# EXHIBIT "H"

| From: | Harry Safarian |
|---|---|
| To: | Wrighten, Marie; Patrick Malone; Christina Karayan |
| Cc: | Julie Ho; Karina Babikian; Jacqueline Pagano; Steven Roseman; Teresa Agnew; Firm Emails; Pierro Babaian; Windham, Timothy; Harwell, Lillian |
| Subject: | RE: Aldea Community Association v. Nazaretyan |
| Date: | Monday, October 10, 2022 1:12:15 PM |
| Attachments: | image002.png |
| | image003.png |

Marie, your email grossly misstates our agreement. I wrote to you months ago asking you to put your meet and confer in writing, and told you I was briefly engaged and that we were to follow up months ago. Your firm went radio silent until a month ago, and then would communicate in fits and starts. The jurisdictional and statutory deadline on what a SLAPP motion has run. Please file your answer by Wednesday.

---

**From:** Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>
**Sent:** Monday, October 10, 2022 1:10 PM
**To:** Harry Safarian <hs@safarianfirm.com>; Patrick Malone <malone@roseman.law>; Christina Karayan <ck@safarianfirm.com>
**Cc:** Julie Ho <ho@roseman.law>; Karina Babikian <babikian@roseman.law>; Jacqueline Pagano <pagano@roseman.law>; Steven Roseman <roseman@roseman.law>; Teresa Agnew <agnew@roseman.law>; Firm Emails <firm@roseman.law>; Pierro Babaian <pb@safarianfirm.com>; Windham, Timothy <Timothy.Windham@lewisbrisbois.com>; Harwell, Lillian <Lillian.Harwell@lewisbrisbois.com>
**Subject:** RE: Aldea Community Association v. Nazaretyan

Harry:

I just wanted to respond briefly, as I am actually out of the office through Wednesday.

You still have not met and conferred with us on our proposed responsive pleading, as to which you happily gave us an extension of time to respond because of your trial schedule.  Furthermore, the parties were engaged in settlement discussions. You also proposed to refile the federal case in state court to address the judge's concerns and the core of the claims in the federal complaint, which you apparently decided not to do – not for substantive reasons, but because of your demand that we waive costs on the federal complaint (which we cannot do).

I can meet and confer with you on Thursday or Friday.  Please let me know of a good time for you.

Marie



**Marie L. Wrighten**
**Partner**
Marie.Wrighten@lewisbrisbois.com

**T:** 213.580.3944 **F:** 213.250.7900 **M:** 626.722.7775

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Harry Safarian <hs@safarianfirm.com>
**Sent:** Monday, October 10, 2022 10:19 AM
**To:** Patrick Malone <malone@roseman.law>; Christina Karayan <ck@safarianfirm.com>
**Cc:** Julie Ho <ho@roseman.law>; Karina Babikian <babikian@roseman.law>; Jacqueline Pagano <pagano@roseman.law>;

Steven Roseman <roseman@roseman.law>; Teresa Agnew <agnew@roseman.law>; Firm Emails <firm@roseman.law>;
Pierro Babaian <pb@safarianfirm.com>; Wrighten, Marie <Marie.Wrighten@lewisbrisbois.com>; Windham, Timothy
<Timothy.Windham@lewisbrisbois.com>; lilian.harwell@lewisbrisbois.com
**Subject:** [EXT] RE: Aldea Community Association v. Nazaretyan

Your suggestion we are making a "baseless" assertion is profoundly unfortunate. Your office locked
the door on our process server in the middle of the business day after he announced why he was
present. Your suggestion the allegations are "baseless" suggests insincerity on the part of our office,
which is disappointing.

Our efforts to move the case forward constructively  and achieve a semblance of cooperation and
civility are constantly met with this kind of conduct.

Aldea is in default in the federal proceeding. We have been patient in not entering a default. We
suggest Aldea file a responsive pleading no later than Wednesday this week. We cannot continue to
have the matter languish and will pursue entry of default if we do not have an answer on file by that
time.

Sincerely,

Harry A. Safarian
THE SAFARIAN FIRM, APC
3150 Montrose Avenue
Glendale, California 91214
818.334.8528
818.334.8107 Fax

This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination,
distribution or copying of this message or attachments without proper authorization is strictly prohibited. If you
are not the intended recipient, please notify THE SAFARIAN FIRM, APC immediately by telephone or by e-mail, and
permanently delete the original, and destroy all copies, of this message and all attachments.

Circular 230 Disclosure: To assure compliance with Treasury Department rules governing tax practice, we hereby
inform you that any advice contained herein (including in any attachment) (1) was not written or intended to be
used, and cannot be used, by you or any taxpayer for the purpose of avoiding any penalties that may be imposed on
you or any taxpayer and (2) may not be used or referred to by you or any other person in connection with
promoting, marketing or recommending to another person any transaction or matter addressed herein.

**From:** Patrick Malone <malone@roseman.law>
**Sent:** Monday, October 10, 2022 10:15 AM
**To:** Christina Karayan <ck@safarianfirm.com>
**Cc:** Julie Ho <ho@roseman.law>; Karina Babikian <babikian@roseman.law>; Jacqueline Pagano <pagano@roseman.law>;
Steven Roseman <roseman@roseman.law>; Teresa Agnew <agnew@roseman.law>; Firm Emails <firm@roseman.law>;
Pierro Babaian <pb@safarianfirm.com>; Harry Safarian <hs@safarianfirm.com>; Wrighten, Marie
<Marie.Wrighten@lewisbrisbois.com>; timothy.windham@lewisbrisbois.com; lilian.harwell@lewisbrisbois.com

**Subject:** Re: Aldea Community Association v. Nazaretyan

Your allegations of misconduct aside, which are literally baseless, we do not intend to argue that the papers weren't served by personal service on Friday, October 7th. Thank you.



Patrick Malone, Esq.
Roseman Law, APC
**Corporate Office:** 21650 Oxnard Street, Suite 2000, Woodland Hills, CA 91367
**t:** 866.839.9400 | **f:** 818.380.6710 | **e:** malone@roseman.law
**LA:** 818.380.6700 | **OC:** 949.339.2000 | **SD:** 619.494.2000| **CV:** 760.760.2000 | **IE:** 951.430.2000 | **NC:** 916.602.2000
LOS ANGELES | ORANGE COUNTY | SAN DIEGO | COACHELLA VALLEY | INLAND EMPIRE | CENTRAL COAST | NORTHERN CALIFORNIA| NEVADA

On Fri, Oct 7, 2022 at 5:17 PM Christina Karayan <ck@safarianfirm.com> wrote:

> Dear Counsel:
> Please find a link to our motion for summary judgment papers. Lewis Brisbois was hand served today at around 3 pm.
> https://drive.google.com/drive/folders/1SDv7ram6S9vCad8lti0eU9Oy0MaqZryb?usp=sharing
> Please note our messenger attempted service of the papers at Roseman Law, however, the receptionist refused to accept the papers indicating Mr. Roseman was not in the office. When our messenger stepped out to contact us in order to obtain further direction, your office locked the door and would not reopen it. Therefore, the papers were left at the door prior to 5:00 p.m.
> We are sending the papers via email as a courtesy but find the conduct and refusal to accept the papers highly inappropriate. We will be filing the proofs of service along with a declaration from our messenger advising the court of what occurred.
> Please confirm by Monday at noon that service was timely. Barring any such recognition, we intend to move for an ex parte order bringing your misconduct to the court's attention and seeking an order to circumvent the intended effect of this gamesmanship.
> Given the number of times your firm has been sanctioned, we find this conduct even more disturbing.
>
> Sincerely,
> Christina S. Karayan
> The Safarian Firm, APC
> 3150 Montrose Avenue
> Glendale, California 91214
> Tel: 818.334.8528
> Direct: 818.629.0249
> ck@safarianfirm.com
>
> This e-mail message and any attachments are confidential and may be attorney-client privileged. Dissemination, distribution or copying of this message or attachments without proper authorization is strictly prohibited. If you are not the intended recipient, please notify The Safarian Firm immediately by telephone or by e-mail, and permanently delete the original, and destroy all copies, of this message and all attachments.

Circular 230 Disclosure: To assure compliance with Treasury Department rules governing tax practice, we hereby inform you that any advice contained herein (including in any attachment) (1) was not written or intended to be used, and cannot be used, by you or any taxpayer for the purpose of avoiding any penalties that may be imposed on you or any taxpayer and (2) may not be used or referred to by you or any other person in connection with promoting, marketing or recommending to another person any transaction or matter addressed herein.

EXHIBIT "I"



Marie L. Wrighten
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Marie.Wrighten@lewisbrisbois.com
Direct: 213.580.3944

**LEWIS BRISBOIS BISGAARD & SMITH LLP**

October 14, 2022

File No. 38561.1001

**VIA ELECTRONIC MAIL ONLY**

Harry A. Safarian
THE SAFARIAN FIRM, A.P.C.
3150 Montrose Avenue
Glendale, California 91214
E-Mail: hs@safarianfirm.com

Re:    ***Nazaretyan v. Aldea Community Association et al. -
Central District of California Case No. 2:21-cv-03436-AB-Ex***

Dear Harry:

We have attempted to meet and confer with you several times telephonically pursuant to Local Rule ("L.R.") 7-3 regarding Defendants ALDEA COMMUNITY ASSOCIATION, JEROME BLACK, BETH CORBETT, and DALE RODIN (collectively, "the HOA" or "Defendants")  proposed anti-SLAPP motion under California Code of Civil Procedure ("CCP") section 425.16 and motion to dismiss pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6).  It bears mention that you had proposed a stipulation to dismiss the federal court complaint and re-file the claims in state court.  In addition, the parties in the state court action were also engaged in settlement discussions.  Your proposed stipulation and the settlement negotiations were ultimately unsuccessful.

In the meantime, you have repeatedly advised us that your calendar is full, and you were therefore not available to schedule a meet and confer by phone.  As you know, L.R. 7-3 denotes that counsel should meet and confer "preferably in person."  As such, courts often recommend that the parties meet and confer by telephone, if they are unable to meet in person.  There is no requirement that the parties meet and confer in writing.  Nonetheless, in a last ditch attempt to meet the requirements of L.R. 7-3, and notwithstanding your repeated refusal to meet and confer by telephone, this letter addresses the deficiencies in Plaintiffs' first amended complaint ("FAC") in an effort to obviate the need for Defendants' proposed anti-SLAPP and FRCP 12(b)(6) motions.

---

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA
MARYLAND • MASSACHUSETTS • MINNESOTA • MISSISSIPPI • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA
OHIO • OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA

4858-0805-2793.1

Harry A. Safarian
October 14, 2022
Page 2

Plaintiffs have not substantively amended their initial complaint, as to which the Court was, at a minimum, inclined to dismiss the seven state claims on Defendants' first anti-SLAPP motion.  The crux of Plaintiffs' FAC remains that Defendants discriminated against them on the basis of Garnik's disability by "restricting" their access from the common areas at the HOA.  Plaintiffs further continue to contend that "restricting" the grandmother's access to the common areas constitutes elder abuse.

It bears emphasis that Garnik's access to the common areas of the HOA is still prohibited by a court order.  Specifically, the HOA sought and obtained a preliminary injunction against Garnik's mother, Tamara Nazaretyan, after Garnik's violent attack on a woman in the community and concurrent aggressive conduct throughout the neighborhood, where he accosted other community members in their homes while he was covered in his own blood.  Consequently, the HOA took appropriate action to protect its members from Garnik.  That is, the HOA sought and obtained a preliminary injunction prohibiting Tamara from permitting Garnik to access the common areas of the HOA.  As you know, the preliminary injunction remains in place, and the state court case is ongoing.

It is axiomatic that the First Amendment and California Constitution grant to Defendants an absolute right to petition the court for redress of grievances.  Yet, contrary to those fundamental principles, the sole purpose of Plaintiffs' FAC in this case is to punish Defendants for exercising this right of petition, to wit, obtaining a preliminary injunction restricting Garnik's access to the common areas at the HOA.

There is no reasonable dispute that Defendants had a right to petition the court to seek the injunction. Indeed, the Court granted Defendants' request for a preliminary injunction, underscoring the protected virtue of their right to petition.

Patently, Plaintiffs' FAC is the embodiment of a "SLAPP" suit.  Ensuingly, this strategic lawsuit (to wit, Plaintiffs' claims to circumvent, chill and/or punish the HOA) against public participation (to wit, for the HOA petitioning the state court for redress of its grievances with Plaintiff) should be stricken under California Code of Civil Procedure section 425.16 (to wit, the "anti-SLAPP" statute) and Rules 12(b)(6) and 8 of the Federal Rules of Civil Procedure.

Defendants have satisfied the first prong of the anti-SLAPP statute by demonstrating that Plaintiff's FAC seeks to punish Defendants for exercising their right of petition.  Accordingly, the burden shifts to Plaintiffs to establish a probability of prevailing on the merits of their purported discrimination and elder abuse claims against Defendants.  Plaintiffs cannot meet this burden.  Clearly, Plaintiffs' claims in this case were crafted solely in response to Defendants' obtaining a preliminary injunction against Garnik, and there is no evidence to support them.  Furthermore, given that Garnik's access to the common areas

Harry A. Safarian
October 14, 2022
Page 3

was precipitated by his violent attack and then prohibited by a court order, Plaintiffs will not be able to satisfy this burden.

Under California Law, once the first prong of the anti-SLAPP statute has been satisfied, the burden shifts to the plaintiff to establish the probability of prevailing on the claims alleged. Plaintiffs will not be able to satisfy their burden for several reasons. First, Garnik's access to the common areas has been prohibited by court order since June 6, 2019.  In addition to the obvious liability issue (i.e., attempting to punish the HOA for obtaining a preliminary injunction), California's litigation privilege serves as an absolute bar to any claims that may arise out of Defendants' communicative acts in enforcing the CC&Rs and obtaining the preliminary injunction.  As a result, Plaintiffs will be unable to demonstrate that their FAC is legally sufficient and factually substantiated.

Moreover, there is and was no discrimination. The Board is obligated to enforce the CC&Rs, to take steps to ensure the safety of the HOA, and to mitigate known safety risks to other members of the community. Such measures are consequences to and protection against his prior violent conduct. Thus, they are not and cannot constitute discrimination as a matter of law.  *See, e.g., Despears v. Milwaukee County*, 63 F.3d 635, 637 (7th Cir. 1995).

Similarly, Plaintiffs' federal causes of action should be dismissed pursuant to FRCP 12(b)(6).  A motion to dismiss under FRCP12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).

However, "the tenet  that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); see also *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)).  Thus, a dismissal for failure to state a claim is permissible "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1041 (9th Cir.2010).

---

Harry A. Safarian
October 14, 2022
Page 4

Plaintiffs' disability discrimination claims fail as a matter of law. The crux of Plaintiffs' federal discrimination claims is that Defendants should not punish Garnik's due to a "one time event." Plaintiffs acknowledge how dangerous that event was but seek to excuse the incident as a "medication error." Even if it was, Garnik is responsible for his behavior.

In the FAC, Plaintiffs acknowledge that Garnik had a violent, terrifying outburst in the common areas. They submit that the HOA has discriminated against Garnik and failed to provide him reasonable accommodations for his disability. Again, the Board is obligated to enforce the CC&Rs, to take steps to ensure the safety of the HOA, and to mitigate known safety risks to other members of the community. Such measures are consequences to and protection against his prior violent conduct. Thus, they are not and cannot constitute discrimination as a matter of law. *See, e.g., Despears*, 63 F.3d at 637.

"The refusal to excuse, or even alleviate the punishment of, the disabled person who commits a crime under the influence as it were of his disability yet not compelled by it and so not excused by it in the eyes of the criminal law is not " 'discrimination'" against the disabled; it is a refusal to discriminate in their favor. It is true that the Americans with Disabilities Act and the Rehabilitation Act require the employer to make a reasonable accommodation of an employee's disability, but we do not think it is a reasonably required accommodation to overlook infractions of law." *Despears*, 63 F.3d at 637 (affirming the district court's grant of summary judgment for the defendants; citing *Leary v. Dalton*, 58 F.3d 748, 753-754 (1st Cir. 1995) ("even if Leary had given the Navy sufficient notice of his need for accommodation, the Act neither prevents employers from holding 'persons suffering from alcoholism . . . [to] reasonable rules of conduct,' nor protects alcoholics from the consequences of their own misconduct. … From our discussion above, it follows that Leary's disability was not a reason for his termination.").

Garnik's conduct cannot be overlooked. Defendants took appropriate action. Accordingly, Plaintiffs' FAC fails to allege elements of an ADA claim, including that Garnik was discriminated against based on his disability. *Weinrich v. L. A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

Additionally, Tamara Nazaretyan has declared that she is Garnik's conservator. If true, the conservatorship strips Garnik of all rights to act in his own capacity, meaning that he has no standing to pursue any claims alleged in the First Amended Complaint on his behalf. Please let us know when you are available to meet and confer regarding the existence and scope of the conservatorship.

/ / /
/ / /
/ / /

Harry A. Safarian
October 14, 2022
Page 5


**Accordingly, please advise whether you will agree to dismiss the federal court action no later than by close of business on October 20, 2022, or we will have no choice but to file the anti-SLAPP and FRCP 12(b)(6) motions on October 21, 2022.**


Very truly yours,


Marie L. Wrighten of
LEWIS BRISBOIS BISGAARD &
SMITH LLP

MLW
cc:   Timothy R. Windham, Lewis Brisbois
Lillian C. Harwell, Lewis Brisbois

EXHIBIT "J"



Writer's Direct Email
hs@safarianfirm.com

October 21, 2022

**<u>VIA ELECTRONIC MAIL</u>**

Marie L. Wrighten of
LEWIS BRISBOIS, et al.
633 West 5th Street, Suite 4000
Los Angeles, California 90071

  Re: *Nazaretyan v. Aldea Community Association et al.*
    Case No. 2:21-cv-03436-AB-Ex

Dear Ms. Wrighten:

  We are in receipt of your letter of October 14, 2022 purporting to "meet and confer" regarding a proposed anti-SLAPP and 12(b)(6) motion to our first amended complaint. Regrettably, the letter is replete with a series of factual inaccuracies and any filing besides an answer would be in bad faith and in violation of the law.

  First, your letter begins with the subject of our proposed stipulation to move this matter to state court. You neglect to mention that *you* rejected our proposal months ago. Now that the deadline to file a responsive pleading has passed by several months, you raise the issue as though our proposal had some kind of impact on the responsive pleading deadline. It did not. We regret that you would insinuate as much given your refusal to cooperate with a transfer—something the Court suggested.

  Second, you mention the parties were in settlement discussions. That is also not correct. We have not had settlement discussion since our settlement conference, which pre-dated the filing of the operative pleading by many months. At no time since the filing of the operative complaint have there been any offers made regarding settlement of this action.



THE SAFARIAN FIRM, APC

Marie Wrighten
LEWIS BRISBOIS, et al.
October 21, 2022
Page 2 of 3

Third, you claim that we "repeatedly" informed you we were too busy to meet and confer. This statement is also not correct. I emailed you *one time* that I was in trial, but did agree to meet and confer with you the following week. We also asked for you to provide authorities in writing—which you did not do until months after the deadline to respond passed. Moreover, I had several lengthy telephone calls from you, including on my personal cell phone, concerning these matters. In each call, you acknowledged you failed to timely file and were asking for a retroactive extension.

To be clear, I suggested we confer one week after your email, which was in the first week of August. You let the matter sit for months without following up, causing us to believe you agreed with what we told you at the outset: there is no basis for any challenge to the operative complaint.

Now, despite having acknowledged several times that the deadline to challenge the complaint has passed, you seem to take the position there is some kind of unwritten extension. That is not the law, nor is it part of any agreement. A filing of any type of challenge to the complaint at this point would be a flagrant violation of Rule 11 and 28 USC section 1927.

Fourth, your comments about the Court's prior reasoning on the anti-SLAPP issue and whether the Complaint has been "substantively amended" are incorrect. Regardless, your deadline to respond passed *months ago* and, therefore, an answer must be filed immediately.

Fifth, you take the position we "refused" to meet and confer with you. That is also false. Again, I spoke to you on the phone around a month ago and told you at that time that your position that the operative pleading was subject to challenge, in my view, was incorrect. Moreover, I offered in writing to confer with you by telephone on July 20, 2022 at 4:30 p.m., but that offer was not accepted. You proposed we talk in early-August, but no conversation ever took place, and no extension to respond was ever granted.

As you well know, an extension of more than two weeks must be by stipulation, and must be approved by the Court. No such stipulation was ever proffered, and no such order was ever issued. You allowed the matter to sit without activity literally for months. The deadline to respond has passed. We reserve our right to pursue sanctions under Rule 11 and 28 USC § 1927 if any pleading other than an answer is filed.

THE SAFARIAN FIRM, APC

Marie Wrighten
LEWIS BRISBOIS, et al.
October 21, 2022
Page 3 of 3

  Finally, please note that we have avoided taking your default as a courtesy. You take liberties placing blame on us for your delays. This is unfortunate as most firms in our position would have defaulted your clients months ago.

  Please file an answer without further delay.

    Sincerely,

    THE SAFARIAN FIRM, APC

    HARRY A. SAFARIAN
    CHRISTINA S. KARAYAN
    PIERRO H. BABAIAN

HAS:

# EXHIBIT "K"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT

(CHATSWORTH COURTHOUSE)

| | |
|---|---|
| ALDEA COMMUNITY ASSOCIATION, a California non-profit mutual benefit corporation, | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. ) 19CHCV00398 ) |
| TAMARA NAZARETYAN, | ) ) |
| Defendants. | ) ) |
| _____ | ) |

VOLUME I

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF GAYLE PINERO,

PERSON MOST QUALIFIED AT PMP MANAGEMENT

Date and Time:      Friday, February 11, 2021
                    10:05 a.m. - 10:40 a.m.

Location:           Remotely
                    (Via Videoconference)

Reported By:        Linda D. White
                    CSR No. 12009

Job No. 23154

1

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
2   FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT
3          (CHATSWORTH COURTHOUSE)
4
5   ALDEA COMMUNITY ASSOCIATION,    )
    a California non-profit mutual  )
6   benefit corporation,           )
                                    )
7          Plaintiffs,             )
                                    )
8     vs.                ) Case No.
                         ) 19CHCV00398
9                                   )
    TAMARA NAZARETYAN,              )
10                                  )
           Defendants.    )
11  _____)
12
13
14          VOLUME I
15
16      VIDEOTAPED VIDEOCONFERENCE DEPOSITION
    OF GAYLE PINERO, PERSON MOST QUALIFIED AT PMP
17  MANAGEMENT, taken on behalf of Defendant, at
    21650 Oxnard Street, Suite 2000, Woodland Hills,
18  California, 10:05 a.m., Friday, February 11, 2022,
    before LINDA D. WHITE, Certified Shorthand Reporter
19  Number 12009 for the State of California, pursuant
    to Notice.
20
21
22
23
24
25
                                                          2

---

1   APPEARANCE:
2
      For the Plaintiff:
3
      ROSEMAN LAW, APC
4     BY:  STEVEN A. ROSEMAN, ESQ.
      BY:  KARINA BABIKIAN, ESQ.
5     21650 Oxnard Street
      Suite 2000
6     Woodland Hills, California  91367
      818.380.6700
7     roseman@roseman.law
      babikian@roseman.law
8
9     For the Defendant:
10    THE SAFARIAN FIRM, A.P.C.
      BY:  HARRY A. SAFARIAN, ESQ.
11    BY:  CHRISTINA S. KARAYAN, ESQ.
      BY:  PIERRO H. BABAIAN, ESQ.
12    3150 Montrose Avenue
      Glendale, California  91214
13    818.334.8528
      hs@safarianfirm.com
14    ck@safarianfirm.com
      pb@safarianfirm.com
15
16    Also Present:
17      Daniel Bermudez, Videographer
18
19
20
21
22
23
24
25
                                                          3

---

1              I N D E X
2
3   WITNESS                              PAGE
4   GAYLE PINERO
5      Examination by Mr. Safarian        6
6
7              EXHIBITS
8   Marked           Description         Page
9               (NONE)
10
11
12
          QUESTIONS WITNESS
13     INSTRUCTED NOT TO ANSWER
14        PAGE   LINE
15         30     16
16
17
18
19
20
21
22
23
24
25
                                                          4

---

1         WOODLAND HILLS, CALIFORNIA
2     FRIDAY, FEBRUARY 11, 2022, 10:05 A.M.
3
4       THE VIDEOGRAPHER:  We are now on record.
5   Today's date is February 11th, 2022, and the time is
6   10:05 a.m.  This is the video deposition of Gayle
7   Pinero, testifying in the matter of Aldea Community
8   Association, et al, versus Tamara Nazaretyan.
9       The video operator is Daniel Bermudez,
10  representing Elite Court Reporting.  The court
11  reporter is Linda White.  Counsel, please introduce
12  yourself and state whom you represent, after which
13  the court reporter will swear in the deponent.
14      MR. SAFARIAN:  This is Harry Safarian, and I
15  represent the Defendant.
16      MR. BABAIAN:  Pierro Babaian for Defendant.
17      MS. KARAYAN:  Christina Karayan for Defendant.
18      MR. ROSEMAN:  Steven Roseman from Roseman Law,
19  for the Association, Plaintiff's counsel.
20      MS.BABIKIAN:  Karina Babikian for Plaintiff's
21  counsel as well.
22  ///
23  ///
24  ///
25  ///
                                                          5

2  (Pages 2 to 5)

GAYLE PINERO,
called as a witness on behalf of the Defendant, having
been first duly sworn, was examined and testified as
follows:

EXAMINATION
BY MR. SAFARIAN:
Q. Very good. Good morning. I see your name
listed as Gayle Pinero; is that correct?
A. That's correct.
MR. SAFARIAN: And for the record, G-A-Y-L-E;
last name, P-I-N-E-R-O.
BY MR. SAFARIAN:
Q. Ms. Pinero, let me welcome you to the
deposition. Thank you in advance for your time
today. Have you been deposed before?
A. No.
Q. You represented by counsel today?
A. Yes.
Q. Who is that?
A. Roseman Law.
Q. Okay. Very good. Let me --
MR. ROSEMAN: Let me be clear. I'm defending
this deposition, as the agent for Property
Management Professionals, which is the agent of the

6

homeowners association, the Plaintiff in this
action. The Notice is a PMQ, person most qualified,
for issues pursuant to the Notice.
BY MR. SAFARIAN:
Q. Thank you. Ms. Pinero, let me run through
some of the ground rules. I'm sure that Mr. Roseman
has given you some idea of what a deposition is
about. My depositions are a little bit different
than how most people conduct them.
The first thing I want you to understand
is: That with you leave here today I want you to
feel like you've been respected and treated nicely.
If there is anything I can do to make the process
more accommodating for you, please tell me. I know
that depositions can be stressful.
I'll been deposed many times myself. It is
a process that requires a lot of concentrations and
energy, and people get tired. So I will -- when you
leave here today, I want two goals to have
accomplished: The first goal, foremost, is for you
to feel like I gave you the ultimate respect and
were treated politely, fairly and professionally.
If there is anything I could do during the
proceeding to make sure that happens, I want you to
tell me. Okay?

7

A. Okay. Thank you.
Q. Of course, the second goal is to gain
information. This is a fact finding mission. This
is a case that's very important to a lot of
people -- to me, to my clients. I want to make sure
that I gather as much information I can to better
understand this case, and the association's position
and to better represent my client.
So I'll be asking a lot of questions. At
some point if you become fatigued, I need you to
tell me so we can take a break. I will be operating
under the presumption that I have your best
testimony, that you're feeling well, unless you tell
me otherwise. Is that okay?
A. That's okay.
Q. Okay. Thank you. I'm going to ask for
information that may go back several years. I don't
need an exact answer. If you don't have one, if you
need to provide your best estimation, let me know.
But by no means do I want you to guess or
speculation in response to any of my questions; is
that fair?
A. Yes.
Q. Okay. Very good. If you feel like you
have to guess or speculation, let me know. It's not

8

an endurance contest. It's not a memory contest.
We just want to know what you recall. The testimony
is under oath. I have no doubt you will be truthful
with me. I need to emphasize for the record that
it's the same oath you would take if you were
testifying in front of a judge and a jury. Do you
understand that?
A. I do.
Q. Okay. Very good. And the importance of my
emphasizing that is that you can't testify
truthfully if you're answering a question that is
vague or ambiguous to you. Please advise me if a
question I ask you is unclear, so that I will
rephrase it and make sure that it is well
understood, and clear before you answer.
If I use a term that you find ambiguous, or
for any reason the question is long or muddled, I
need you to speak up and let me know so that I can
correct it so that you can answer a question that
you understand fully. Okay?
A. Okay.
Q. At the end of the deposition, you're going
to get a booklet. The booklet will have question
and answer. It will read like a play. Everything
that was said today will be in that booklet. You

9

3 (Pages 6 to 9)

1  will have an opportunity -- it will be an electronic
2  booklet in this case. Since Covid, we moved away
3  from physical booklets, but in any event, you will
4  read the transcript electronically. You will have a
5  chance to make modifications to it. I have to
6  caution you, as I do every witness, if you make a
7  modification that's of a material nature, it can
8  reflect badly upon you at trial, and cause people to
9  question your credibility. For example, if I ask
10 you in an auto accident case, whether you had the
11 red light, and you testified at deposition that you
12 did not have the red light. And at trial you
13 testified that you did have a red light, it could
14 cause someone to comment about whether you are a
15 credible witness, reliable witness, have memory
16 issues, or simply not being truthful, one place or
17 the other. Do you follow?
18     A. I do.
19     Q. And I emphasize that, again, not because I
20 suspect you being anything but truthful, but because
21 I really want to make sure you understand my
22 questions. I want to proceed at a pace that is
23 comfortable for you. And I want to make sure that
24 your best testimony -- I'm not here to trick you.
25 I'm not here to play games. I'm just here to get

10

1  the best testimony I can from you.
2     So Ms. Pinero, is that your birth name?
3     A. Yes.
4     Q. And where are you currently employed?
5     A. PMP, Management Professionals.
6     Q. And is PMP an acronym?
7     A. Yes, it is.
8     Q. And can you tell me what it stands for?
9     A. Property Management Professionals.
10    Q. Got it. And where is its main office?
11    A. Valencia, California.
12    Q. Thank you. Does it have other offices?
13    A. Yes. My office is actually in Thousand
14 Oaks.
15    Q. Any other offices?
16    A. There are offices in L.A. and out of state
17 in Texas and Arizona.
18    Q. All right. Very good. How many employees
19 does PMP have?
20    A. I do not know.
21    Q. Do you have an estimation?
22    A. Well over 100.
23    Q. Thank you very much.
24    MR. ROSEMAN: It's pretty noisy in the
25 background, Harry. I don't know if that's from some

11

1  other -- it seems to be loud typing. Does somebody
2  else hear it or is it just me?
3     MR. SAFARIAN: I'm certainly typing --
4        (Interruption in the proceedings).
5     MR. SAFARIAN: I will try -- the keyboard that I
6  was working for was quieter. It seemed to -- let me
7  see if I can fix it.
8  BY MR. SAFARIAN:
9     Q. Any way, who is at the very top of PMP?
10 The presidency or whatever title that person has,
11 who is that?
12    A. That's Brad Watson.
13    Q. And what is Mr. Watson's position?
14    A. I honestly don't know what it's called. I
15 would say president.
16    Q. That's fine. How long?
17    MR. ROSEMAN: I want to caution you, Gayle,
18 don't guess or speculate. If you don't know --
19    A. Right.
20    MR. ROSEMAN: Don't -- don't -- don't guess.
21    THE WITNESS: Okay. Thanks, Steve.
22 BY MR. SAFARIAN:
23    Q. And how long have you been with PMP?
24    A. 11 months.
25    Q. So I'm concerned about -- at the outset I

12

1  will share you with. You understand this case
2  involves events that happened well over 11 months
3  ago?
4     A. Yes.
5     Q. This case involves events that happened
6  quite a while back. Were you, in anyway, involved
7  in managing the Association property, prior to 11
8  months ago?
9     A. No.
10    Q. Do you know who at PMP was?
11    A. I do not.
12    Q. Have you undertaken any investigation to
13 make that determination?
14    A. No.
15    Q. Have you undertaken any investigation to
16 determine who the proper person, most qualified is
17 to testify to the issues that we're here about
18 today?
19    MR. ROSEMAN: I'm going to object to make
20 something clear here, Harry. The Deposition Notice
21 is the person most qualified. Gayle is the person
22 most qualified to testify on behalf of PMP. If
23 there was another manager who was previously there
24 and no longer with PMP, that's not the PMQ for that.
25    MR. SAFARIAN: Mr. Roseman, that is a speaking

13

4 (Pages 10 to 13)

1 objection. And the problem with speaking objections
2 is the tend to coach the witness and give the
3 witnesses queues.
4      MR. ROSEMAN: I'm most coaching the witness.
5 I'm being clear so that you understand that she is
6 designated as the person most qualified. If there's
7 somebody else when we go through this deposition
8 that may be more qualified that works for PMP, we
9 will make sure they're available. But she's
10 designated as the PMQ for PMP.
11      MR. SAFARIAN: I guess I will figure that out as
12 I go along as to what her qualifications were. But
13 I would ask you to limit your Code objections. there
14 are 14 recognized Code objections in the Code of
15 Civil Procedure.
16      Anything outside of those 14 is constituted --
17 it constitutes a speaking objection. The local
18 rules for the Court wherein, prohibits speaking
19 objections. That kind of objection would not be
20 allowed if we were in front of a judge and a jury at
21 trial, for obvious reasons.
22      And so I'm going to ask you to please,
23 limit your objections to Code objections. I will
24 ask you to do that throughout the deposition. I
25 will not make speaking objections. And I will work

14

1      Q.  Who is that?
2      A.  Mikaela Collerd.
3      Q.  Can you spell that please -- of the name.
4      A.  M-I-K-A-E-L-A, Mikaela; last name,
5 C-O-L-L-E-R-D.
6      Q.  Thank you.  And is Mikaela Collerd still
7 employed by PMP?
8      A.  She is.
9      Q.  What is her title?
10      A.  Community asset manager.
11      Q.  And what is a community asset manager?
12      A.  Basically, to property manager, manages the
13 portfolio communities or on-site or an individual
14 community.
15      Q.  Okay.  So I understand the general parlance
16 of portfolio manager.  And there is sometimes you
17 will have an on-site manager that lives at the
18 property.
19      In terms of PMP, can you give me the
20 various designations that exist?
21      A.  There is a CMCA, certified manager of
22 community association.  AMS, association management
23 specialist.  And PCAM, which is the highest national
24 designation for managing associations.  It's also
25 for large scale managers as well.

16

1 these issues out with the witness.
2      I understand what a PMQ Notice is, and I
3 will make sure to be very careful about progressing
4 through it careful and respectfully the witness,
5 as I already have. So thank you.
6      MR. ROSEMAN: Just to clarify: That wasn't a
7 speaking objection. I was just clarifying for you.
8 The have right to speak, Harry. I'm defending this
9 deposition. I have the right to communicate. So
10 let me communicate too. I understand and thank you
11 for the edification on the Code of Civil Procedure.
12      All I'm doing is clarifying for you. It
13 wasn't's an objection, it was a clarification so you
14 understand the designation of the PMQ for this
15 deposition is who is designated by -- by PMP as the
16 person most qualified for this community.
17      It's not a speaking objection. It's a
18 clarification, in order to move this deposition
19 along so.
20      MR. SAFARIAN: I don't -- I don't need either,
21 but I will proceed. Thank you, Mr. Roseman.
22 BY MR. SAFARIAN:
23      Q.  Ms. Pinero, do you know who preceded you as
24 any PMP representative assigned to this property?
25      A.  Yes.

15

1      Q.  Within your company, you testified that you
2 got Ms. Collerd, who was a community asset manager,
3 correct?
4      A.  Yes.
5      Q.  And she still does that, correct?
6      A.  She does.
7      Q.  And how many properties are in her
8 portfolio?
9      A.  I don't know.
10      Q.  Do you have an estimation?
11      A.  I wouldn't want to estimate it. I'm really
12 not sure.
13      Q.  I don't want you to guess or speculate.
14 You said I don't want to estimate it.  I'm entitled
15 to an estimation, if you can provide one.  If you
16 cannot provide one, just let me know.
17      A.  I cannot.
18      (Interruption in the proceedings)
19 BY MR. SAFARIAN:
20      Q.  Is there an approximate or average number
21 of properties your community asset managers manage
22 or arrange?  For example, the lowest you know is two
23 properties, the highest you know is 50 properties.
24      A.  The -- the lowest that I know of is one, if
25 you're on site.  And highest, if your portfolio is

17

1 seven.
2   Q.  Okay.  And this case she is not on-site and
3 has not been on-site for this property, correct?
4   A.  No.
5   Q.  Am I correct?
6   A.  Oh, yes.  Sorry.
7   Q.  Okay.  That's all right.  We had a double
8 negative.  I just want to clarify.
9     And are you aware of anyone from PMP ever
10 having been an on-site manager at this property?
11   A.  No.
12   Q.  Do you know why Ms. Collared stopped
13 managing this property?
14   A.  She went out on maternity leave.
15   Q.  Okay.  Is she back from maternity leave?
16   A.  She is.
17   Q.  Do you know why she did not resume her
18 responsibilities with this property?
19   A.  She moved out of state.
20   Q.  Okay.  And do you know what city she's in?
21   A.  She's in Arizona.
22   Q.  And she's still with PMP, correct?
23   A.  She is.
24   Q.  Thank you.  This incident concerns events
25 that go back to, I would say, the earlier part of

18

1   attorney counsel notes -- or attorney/client notes.
2   For example, if Mr. Roseman wrote to you some legal
3   advice or admonitions for the deposition, I don't
4   want to know about that.
5     But independent documentation were sent to
6   you, such as contract documents, photographs, things
7   like that, I would like you to let me know what
8   those are.  Can you identify them please?
9   MR. ROSEMAN:  I will represent to you, Counsel,
10   that we did send over the documents that were
11   produced responsive to your document requests.  In
12   addition to this, we forwarded you last week the
13   management agreement.  So we sent that, together
14   with the Deposition Notice, to Gayle.
15   MR. SAFARIAN:  Okay.  Mr. Roseman, I trust that
16   you're trying to be helpful, but I ask that you
17   please, allow the witness to answer the questions.
18   And I know that was not intended to in anyway to
19   obstruction the process, but I really do like to get
20   the answers first from the witness before we
21   clarify.
22   MR. ROSEMAN:  I understand, Counsel.  I'm
23   telling you now.  I have the right to make
24   clarifications and understandings as necessary for
25   the record.  So I'm going to request that you stop

20

1 2019.  So starting in 2019, was Ms. Collerd the
2 person who was managing this property for PMP?
3   A.  I don't know.
4   Q.  Okay.  Do you have any records available to
5 you as to who from PMP was managing this property in
6 2019?
7   A.  I don't have any record of it.
8   Q.  Did you become familiar with who was
9 managing the property in 2019?
10   A.  I have not.
11   Q.  Did you do any research or investigation
12 regarding the facts of this case?
13   A.  No.
14   Q.  Did you do research and investigation to
15 determine whether PMP engaged in any time of
16 interactive process with my clients, prior to today?
17   A.  Did I do any research?
18   Q.  Did you do any type of -- let me ask it
19 more broadly.
20     Did you do any type of research or
21 investigation at all, relating to the claim in this
22 case?
23   A.  I only reviewed what was sent over to me by
24 Roseman Law.
25   Q.  Okay.  I don't want to know about any

19

1   reprimanding me, whenever I state something for the
2   record.
3     I have standing obligations.  I've taken at
4   least one deposition before, maybe a few more.  I
5   have the right to clarify for you, as well as
6   explain to you what documents I sent over to her.
7   Because any questions regarding what I did, would be
8   attorney/client privilege.
9     So I'm just helping you to expedite your answers
10   in this resolution.  Otherwise, she can't answer it
11   because it's all attorney/client privileged
12   communications.
13   MR. SAFARIAN:  The nature of the documents
14   received is not privileged, Mr. Roseman.  But you
15   can raise the attorney/client privilege objection --
16   MR. ROSEMAN:  I'm not raising it.  I'm just
17   telling you what I sent over to her.  That's what
18   I'm explaining to you.  So go ahead.
19   MR. SAFARIAN:  I gave you the courtesy of
20   allowing you to finish, so I'm going to finish now
21   too.  The witness was asked a specific question
22   about what documents she was sent.  Before she could
23   respond to the question, you answered the question
24   for her.  That is not appropriate.
25     And I understand this is not your first

21

6  (Pages 18 to 21)

1 deposition, but this would also not the first time I
2 filed a motion for Protective Order, prohibiting
3 that from occurring.  We also had speaking
4 objections at the last deposition.  I don't like
5 speaking objections because they're not appropriate.
6    This case is significant to me.  I'm asking you
7 to please, conduct yourself according to the Code,
8 and make Code objections.  I will say this:  If it
9 occurs again, I may suspend the deposition and
10 proceed with Court relief.  I want the witness's
11 unadulted testimony.
12    I've been polite to the witness.  I'm going to
13 continue to be polite to the witness, but this is
14 her deposition, not yours.
15    MR. ROSEMAN:  I understand.  I'm the attorney
16 defending this depo.
17    MR. SAFARIAN:  The attorney -- as the attorney
18 defending the depo or attending trial, if I were to
19 ask Ms. Pinero what documents she received, you
20 would not be permitted to stand up and make those
21 comments.
22    The Court would reprimand you very aggressively,
23 I would imagine, if you did that in trial, we are
24 required to conduct ourselves in deposition, in the
25 same manner we would at trial.  So I ask you to

22

1 please do that.
2 BY MR. SAFARIAN:
3    Q.  Mr. Pinero --
4    MR. ROSEMAN:  Clarification, Counsel, just so
5 you know, the standard, as far as questioning is
6 likely to lead to discovery of admissible evidence
7 in depos.  In trial, it's a different standard so
8 I'm just doing this to move it along so you know
9 what documents --
10    MR. SAFARIAN:  I don't need your help.
11    MR. ROSEMAN:  Go ahead and ask --
12    (A discussion was held off the record)
13 BY MR. SAFARIAN:
14    Q.  Ms. Pinero, from your memory, can you
15 describe for me what documents you received?
16    A.  The documents were just a lot of legalese
17 for -- I'm assuming.  I don't want to assume.  I
18 don't even know what they -- what they really were.
19    Q.  Did you study them?
20    A.  No.
21    Q.  Did you undertake any effort to familiarize
22 yourself with this case?
23    A.  No.
24    Q.  Do you even know who my client is?
25    A.  I do.

23

1    Q.  How do you know who my client is?
2    A.  Sorry?
3    Q.  How do you know -- how do you know my
4 client?
5    A.  I know -- I know her name.
6    Q.  Aside from knowing my client's name, what
7 do you know about her?
8    A.  I know that there was an altercation with
9 her son.
10    Q.  How do you know that, aside from what
11 counsel told you?
12    A.  In speaking to board members.  That's about
13 it.
14    Q.  And was that in the last 11 months?
15    A.  Yes.
16    Q.  Okay.  Aside from speaking to board
17 members, have you spoken to -- let me ask this:
18 Have you spoken with my witnesses to any
19 altercations?
20    A.  No.
21    Q.  How long have you been a property --
22    (Clarification requested)
23 BY MR. SAFARIAN:
24    Q.  -- in the property management business?
25    A.  18 years.

24

1    Q.  Is PMP your first property management
2 employer?
3    A.  No.
4    Q.  So let me go back just briefly over some
5 easier things.  Were you raised in California?
6    A.  I was not.
7    Q.  Okay.  When did you move to California?
8    A.  In 2015.
9    Q.  And where did you attend high school?
10    A.  Manhattan, New York.
11    Q.  What year did you graduate?
12    A.  Oh, my goodness.  1987.
13    Q.  Pretty spectacular to be in Manhattan, I
14 think.  It's always -- almost always a spectacular
15 time, except for one time we all remember.  But in
16 any event, what school did you graduate from high
17 school?
18    A.  Cathedral High School.
19    Q.  And after Cathedral High School, what was
20 your next education, if any?
21    A.  Utica College in Utica, New York.
22    Q.  Would you spell Utica for me, please.
23    A.  Sorry?
24    Q.  Would you -- is Utica, U-T-I-C-A?
25    A.  U-T-I-C-A.

25

1    Q.  And what years did you attend Utica?
2    A.  From 1988 to 1990.
3    Q.  And did you obtain any degrees or
4  certificates there?
5    A.  I did not.
6    Q.  Okay.  And what education, formal classroom
7  education did you have at any institution after
8  Utica College?
9    A.  Pertaining to what I do now, I did attend
10 CAI, which is the Community Associations Institute,
11 to get my designations for property management.
12   Q.  Putting aside the education relating -- let
13 me rephrase it.
14       I'm not looking for your education just
15 relating to property management, I'm looking for
16 your education generally.  So after Utica College,
17 did you to go to any further universities?  Get a
18 Master's degree?  Anything like that?
19   A.  I did not.
20   Q.  So the next -- is it fair to say, then, the
21 next formal education you received was attending the
22 Community Association Institution?
23   A.  Yes.
24   Q.  Are you a CPM?
25   A.  I am not.

26

1    Q.  Do you know what a CPM is?
2    A.  No.
3    Q.  You know what a certified property manager
4  is?
5    A.  Yes.
6    Q.  Okay.  What designations do you hold in
7  property management?
8    A.  CMCA and an AMS.
9    Q.  Okay.  For me an EMS means you drive an
10 ambulance.  I figure that's probably not what you're
11 talking about, correct?
12   A.  No.
13   Q.  Okay.  What is an EMS [sic]?
14   A.  Associate management specialist.
15   Q.  Oh, you said AMS.
16   A.  Yes.  "A" not "E."
17   Q.  Got it.  I heard you wrong.  That's why I
18 was confused.  Thank you very much.
19       And in -- when did you join -- I forget if
20 you asked this, I don't think you did.
21       When did you join PMP?
22   A.  11 months ago.  March 2021.
23   Q.  Okay.  I know you began with this property
24 11 months.  That was also right when you started
25 with PMP was the same time, correct?

27

1    A.  Correct.
2    Q.  How many other properties have you managed
3  in those 11 months?
4    A.  Four other properties.
5    Q.  Did you speak with Ms. Collerd concerning
6  this case?
7    A.  I did.
8    Q.  And what did you discuss with her?
9    A.  I just -- I questioned what had taken
10 place.  And she told me that there was an incident,
11 you know, unfortunately, with the owner's son.
12   Q.  What else?
13   A.  That was -- that was it.
14   Q.  Have you read the deposition of the person
15 that was involved in the incident with the owner's
16 son?
17   A.  No, I haven't.
18   Q.  Have you seen any excerpts or any documents
19 indicating to you that that person felt like she was
20 pressured to pursue a restraining order?
21   A.  Can you --
22   Q.  I'll withdraw -- I'll withdraw the
23 question.
24   A.  Okay.
25   Q.  Have you done anything to familiarize

28

1  yourself with the testimony of the person who was
2  involved in the incident with, who you described as,
3  the owner's son?
4    A.  No.
5    Q.  Do you know the name of the owner's son?
6    A.  I do not.
7    Q.  Do you know his medical conditions?
8    A.  Do I know his --
9    Q.  Do you know about any of his medical
10 conditions?
11   A.  Oh, no, I don't.
12   Q.  Do you know what the unit owner -- the unit
13 owner is Tamara Nazaretyan, correct?
14   A.  Yes.
15   Q.  Do you know what -- who her mother is?
16   A.  I do not.
17   Q.  Is she -- they lived together?
18       (Clarification requested)
19 BY MR. SAFARIAN:
20   Q.  Do you know if they lived together.  Let me
21 with -- she said I don't.
22       Do you know who lives in Ms. Nazaretyan's
23 unit?
24   A.  No.
25   Q.  Aside from Ms. Nazaretyan, do you know that

29

8  (Pages 26 to 29)

1  anyone else lives in the unit?
2      A.  I don't know.
3      Q.  In the last 11 months, have you done
4  anything to become familiar with the Nazaretyan
5  household?
6      A.  No.
7      Q.  In the last 11 months, have you done
8  anything to determine what types of accommodations
9  might be necessary, with regard to any disabilities,
10  to people who live in the Nazaretyan household?
11      A.  No.
12      Q.  In the last 11 months, have you learned
13  that Ms. Nazaretyan, or members of her family, are
14  making allegations of discrimination?
15      A.  No.
16  *Q     In the last 11 months, are you aware of
17  anyone within PMP undertaking any effort to engage
18  the Nazaretyan household, or anyone in the household
19  in any type of interactive process, relating to any
20  disabilities?
21      MR. ROSEMAN:  Objection.  I'm going to instruct
22  the witness.  I've given you leeway on this, Harry,
23  with regards to asking questions that are likely to
24  lead to discovery of admissible evidence.  This is
25  not likely to lead to discovery of admissible

30

1  complex -- who have disabilities?
2      A.  No.
3      Q.  Are you -- been trained at all on what to
4  do if you have an tenant that has any type of
5  special needs?  Or in terms of discrimination, any
6  type of discrimination -- let me start with a clear
7  question.
8          Do you receive any fair housing training?
9      A.  We do.
10      MR. ROSEMAN:  Objection.  Not likely to lead to
11  discovery of admissible evidence.  This has no
12  bearing on the underlying action.  This is an
13  injunction against an owner to get a restraining
14  order.
15      MR. SAFARIAN:  Mr. Roseman --
16      MR. ROSEMAN:  No, no, no.  Harry, I'm making
17  this --
18      MR. SAFARIAN:  You don't have to because I'm
19  suspending the deposition.
20      MR. ROSEMAN:  Harry --
21      MR. SAFARIAN:  I'm suspending the deposition.
22  I'm suspending the deposition.  Mr. Roseman, I'm
23  suspending the deposition.
24      MR. ROSEMAN:  Harry -- I have the right to state
25  for the record, I'm meet and conferring with you.

32

1  evidence in this case, which deals with an
2  injunction against an owner.
3      So I'll let her answer the question, but I'm
4  objecting, it's not likely to lead to discovery of
5  admissible evidence in this matter.  The question is
6  also vague and ambiguous.
7      MR. SAFARIAN:  All right.  Your objection can
8  stand.
9  BY MR. SAFARIAN:
10      Q.  Do you remember the question in your mind,
11  Ms. Pinero?
12      A.  No, I was going to ask for clarification,
13  actually.
14      MR. SAFARIAN:  All right.  First of all, let's
15  have Linda read it back, and then I will clarify it
16  for you.
17      (The requested testimony was read back)
18      THE WITNESS:  I'm not aware of anyone doing
19  that.
20  BY MR. SAFARIAN:
21      Q.  Does the term "interactive process" mean
22  anything to you, as a property manager?
23      A.  No.
24      Q.  Have you been trained on accommodating
25  people who live in the complex, who have -- or any

31

1      MR. SAFARIAN:  Nope.  Suspend the deposition.
2      MR. ROSEMAN:  You cannot do that.  You have an
3  obligation to meet and confer.  And the record will
4  be very clear, I'm explaining to you.  I understand
5  that you have another lawsuit relating to a federal
6  action.  This case deals with an injunction against
7  an owner for actions of their invitees.
8      Explain to me why these question regarding her
9  compliance or understanding and knowledge, relating
10  to the issues you just asked questions of, are
11  likely to lead to discovery of admissible evidence?
12      If you explain it to me, you can go on with your
13  questioning.  I'm just meeting and conferring to get
14  clarification on this.  Would you explain.
15      MR. SAFARIAN:  No.  Here's why:  Because you
16  cannot ask the witness not to answer a question on
17  the grounds it is not calculated to lead to the
18  discovery of admissible evidence.  The only grounds
19  on which --
20      (Interruption in the proceedings)
21      MR. SAFARIAN:  The only grounds in which you can
22  instruct a witness not to answer a question, are
23  privacy and privileged.
24      MR. ROSEMAN:  I understand.
25      MR. SAFARIAN:  No, let me finish.  So I don't

33

9  (Pages 30 to 33)

1 owe you an obligation to meet and confer.  And I
2 find this meet and confer process as educating a
3 witness on facts that I don't want her educated on,
4 in the middle of a deposition, just like much of
5 your objections are.
6     You can have an objection, if the question is
7 not calculated.  I will give you a quick response.
8 The question here -- the allegation is:  That my
9 client created or allowed a nuisance to exist.  We
10 have someone who has a very serious disability at
11 the property.  That disability, the HOA is seeking
12 injunctive relief.
13     My question is:  If the HOA is entitled to
14 injunctive relief, what is the credible basis for
15 injunction relief, when the basis is a -- a
16 discriminatory claim, I see it as, and are -- are
17 argumentative.  You can't get injunctive relief to
18 prohibit somebody from existing, if they have a
19 disability.
20     So it goes directly to your client for
21 injunctive relief.  I'm not going to answer any more
22 questions about this.  Let me finish.  If you look
23 like you're ready to interrupt me, don't.  The next
24 time this happens, I'm suspending the deposition.  I
25 don't have any patient for this.

                                                      34

1     is not allowed in-housing, correct?
2     A.  Yes.
3     Q.  Discrimination is not allowed in housing
4 against people of different races, correct?
5     A.  Correct.
6     Q.  It's not allowed against people who are
7 physically, you know, well?  For example, in an
8 wheelchair, correct?
9         (Clarification requested)
10 BY MR. SAFARIAN:
11     Q.  In a wheelchair, correct?
12     A.  Correct.
13     MR. ROSEMAN:  Objection.  Calls for legal
14 conclusion.
15     MR. SAFARIAN:  I'm asking Ms. Pinero for your
16 training.  I'm not asking for you to recite to me
17 the law.  I'm asking for your understanding, as far
18 as what you were trained at.
19     MR. ROSEMAN:  You were reciting the law.  You're
20 not asking of her training.  You're telling her what
21 the law is.
22     MR. SAFARIAN:  Mr. Roseman, thank you.
23     This deposition is suspended.  We will move
24 immediately for a Court Order.
25     Everyone have a nice day.  It was nice to see

                                                      36

1     You did not produce the proper PMQ.  It's not
2 Ms. Pinero's fault, it's your fault.  I've had
3 enough shenanigans.  I'm going to move on and take
4 this deposition.  If you do this, I will stop this
5 proceeding and I will move immediately for the
6 appointment of a discovery referee at your expense.
7     MR. ROSEMAN:  Objection.  Call for a legal
8 opinion regarding the legal basis for this
9 injunction.
10     MR. SAFARIAN:  You're objecting to my meet and
11 confer?
12     MR. ROSEMAN:  No.  I'm -- you asked the legal
13 basis for the injunction, and I'm stating an
14 objection on the record.
15     MR. SAFARIAN:  No.
16     MR. ROSEMAN:  Further, I will clarify that the
17 PMK -- or the PMQ, is the PMQ produced for this
18 deposition.
19     MR. SAFARIAN:  All right.  Thank you.
20     Linda, I'm sorry for the crosstalk.  I will be
21 very careful not to engage in it further.
22 BY MR. SAFARIAN:
23     Q.  I want to go back to what I discussed about
24 fair housing, right?
25         Ms. Pinero, you understand discrimination

                                                      35

1 you all.  Ms. Pinero, I apology for these
2 proceedings.  They're highly unusual, but I cannot
3 continue a deposition when Mr. Roseman is continuing
4 to make speaking objections.
5     It was nice to see everybody.  Thank you.  This
6 concludes the deposition.  Daniel, you can read us
7 off.
8     THE VIDEOGRAPHER:  This concludes today's
9 deposition of Gayle Pinero, PMQ.  We are off the
10 record at 10:40 a.m.
11
12 (The deposition proceedings was suspended at 10:40 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

                                                      37

PENALTY OF PERJURY CERTIFICATE

I hereby declare I am the witness in the within matter, that I have read the foregoing transcript and know the contents thereof; that I declare that the same is true to my knowledge, except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe them to be true.

I declare being aware of the penalties of perjury, that the foregoing answers are true and correct.

Executed on the _____day of_____ 2022, at_____, California.

_____
GAYLE PINERO

38

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 14th day of February, 2022.

_____
LINDA D. WHITE, CSR NUMBER 12009

40

STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF ORANGE         )
I, Linda D. White, do hereby certify;
That I am a duly qualified Certified Shorthand Reporter, in and for the State of California, holder of CSR Number 12009, which is in full force and effect and that I am authorized to administer oaths and affirmations;
That the foregoing deposition testimony of GAYLE PINERO remotely taken before me at the time and place herein set forth;
That prior to being examined, the witness named in the foregoing deposition was duly sworn or affirmed by me to testify the truth, the whole truth and nothing but the truth;
That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision;
That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

39

11 (Pages 38 to 40)

EXHIBIT "L"

I SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT
(CHATSWORTH COURTHOUSE)


ALDEA COMMUNITY ASSOCIATION, a          )
California non-profit mutual benefit )
corporation,                            )
                                        )
                 Plaintiff,             )
                                        )
     VS.                                ) Case No.
                                        ) 19CHCV00398
TAMARA NAZARETYAN,                      )
                                        )
                 Defendant.             )
_____)


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
SABRINA FRENCH


Date and Time:    Thursday, June 30, 2022
                  9:18 a.m. - 11:50 a.m.


Location:         Remotely
                  (Via Videoconference)


Reported by:      Jay M. Bullard
                  CSR #3455

Job No.    24177

1

1      I SUPERIOR COURT OF THE STATE OF CALIFORNIA
2    FOR THE COUNTY OF LOS ANGELES - NORTH VALLEY DISTRICT
3              (CHATSWORTH COURTHOUSE)
4
5
6   ALDEA COMMUNITY ASSOCIATION, a      )
    California non-profit mutual benefit )
7   corporation,                        )
                                        )
8              Plaintiff,               )
                                        )
9    VS.                      ) Case No.
                              ) 19CHCV00398
10  TAMARA NAZARETYAN,                  )
                                        )
11             Defendant.               )
    _____    )
12
13
14
15
16
17    Videotaped deposition of SABRINA FRENCH, taken
18  before Jay M. Bullard, Certified Shorthand Reporter,
19  Certificate No. 3455, commencing at 9:18 a.m., Thursday,
20  June 30, 2022 remotely via Zoom.
21
22
23
24
25

                                                    2

---

1
2   APPEARANCES OF COUNSEL VIA ZOOM:
3
4     For the Plaintiff:
5       ROSEMAN LAW, APC
        BY:  PATRICK MALONE, ESQ.
6       21650 Oxnard St., Ste. 2000
        Woodland Hills, California 91367
7       (818)839-9400
        malone@rosemanlaw.com
8
9
10
11    For the Defendant:
12      THE SAFARIAN FIRM, APC
        BY:  HARRY A. SAFARIAN, ESQ.
13          CHRISTINA S. KARAYAN, ESQ.
            PIERRO H. BABAIAN, ESQ.
14      3150 Montrose Ave.
        Glendale, California 91214
15      (818)334-8528
        hs@safarianfirm.com
16
17
18    Also present:
19      LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
        BY:  MARIE WRIGHTEN, ESQ.
20      633 W. 5th Street, Suite 4000
        Los Angeles, California 90071
21      (213) 850-3944
        marie.wrighten@lewisbrisbois.com
22
23
        Videographer:  Daniel Bermudez
24
25

                                                    3

---

1
2                 I N D E X
3
4   Witness: SABRINA FRENCH
5
6   EXAMINATION                          PAGE
7    BY MR. SAFARIAN                      21
8
9
10
11
12              E X H I B I T S
13
14  DEFENDANT'S EXHIBITS                  PAGE
15  1 - Notice of Deposition             54
16
17
18
19
20
21
22
23
24
25

                                                    4

---

1               Videotaped Deposition Via Zoom
2               Thursday, June 30, 2022; 9:18 a.m.
3
4       MR. SAFARIAN:  Let's go on the record.  This is
5   Harry Safarian.  We're on the record.  Marie Wrighten is
6   here.  Marie Wrighten is not counsel in this case.  She has
7   appeared at prior depositions.  She's been asked not to
8   appear.  We were given no notice that she would be here.
9   We were not given an opportunity to address to the court
10  whether she should be here.  She refuses to leave the
11  proceeding.  She was provided a link for the proceeding
12  without our permission.
13          We will move the court for a protective
14  order.  I tried to meet and confer.  She refuses to leave
15  the proceeding.  She's been asked several times prior to
16  the proceeding to leave, she is not leaving.  Mr. Malone
17  has been asked to have her leave.  The link was provided to
18  her without our permission.
19          We've had prior issues with Ms. Wrighten
20  making objections at depositions and causing problems, and
21  we've almost had to suspend other depositions.
22          I'm not going to proceed with this deposition
23  with Ms. Wrighten present.  It's not appropriate.  She is
24  not a party to this action.  She doesn't represent a party
25  to this action in the state case.  She has the privilege

                                                    5

1 now of disqualifying herself from the proceeding. We'll be
2 happy to send her a video of the proceeding and a copy of
3 the transcript, but we will not allow her to be present.
4        Mr. Malone, you have an opportunity now to
5 ask Ms. Wrighten to leave, and we can proceed with the
6 proceeding. We've had enough difficulty getting this
7 deposition set. This is your opportunity to allow us to go
8 forward and take this deposition. I am not going to allow
9 Mr. Wrighten to be here.
10       MR. MALONE: Unfortunately, Mr. Safarian, the cases,
11 although one is pending in federal court and one in state
12 court, directly impact one another. Ms. Wrighten
13 represents the Association in the federal case. You're
14 using, from my understanding -- at least from what you've
15 represented, you're using evidence gathered here to bolster
16 your federal claims. This is not to harass or interfere
17 with the proceeding. She is another attorney. She'll
18 behave professionally, I'm sure.
19       MR. SAFARIAN: She won't --
20       MR. MALONE: I would like to proceed with the
21 deposition. This deposition was not particularly hard to
22 set, I don't believe. I believe it was noticed and was
23 taken off because of the trial date. When the trial date
24 got continued, it was noticed. And, again, we've produced
25 her on ten days notice. We are ready to proceed.

6

1        All due respect, I disagree with your
2 position. I think that Ms. Wrighten can actually speak for
3 herself as to the impact on the federal case.
4        MR. SAFARIAN: The federal case is not here. They
5 have not been joined together. Ms. Wrighten has raised all
6 kinds of problems at prior depositions before.
7        I have no problem with a lawyer appearing and
8 observing if they sit by quietly and don't interfere.
9 Ms. Wrighten doesn't know how to do that. We have had this
10 problem before. I have no confidence that she is going to
11 respect the boundaries of this proceeding.
12       If I have a stipulation on the record that
13 she will turn her camera off, go on mute and do nothing but
14 listen, I'm okay with that. But now Ms. Wrighten seems to
15 think this is funny because she's laughing and smiling and
16 smirking. This is not an appropriate way to approach the
17 deposition.
18       I'm here, my colleagues are here. We're
19 ready to go forward, but I need an assurance that Ms.
20 Wrighten will turn off her camera and not interfere or in
21 any way signal responses to the witness or communicate at
22 all in this proceeding.
23       MS. WRIGHTEN: Marie Wrighten, a partner with Lewis
24 Brisbois. And Mr. Safarian has maligned me here, as he has
25 in the past, without any foundation or provocation from me.

7

1        MR. SAFARIAN: Ms. Wrighten, this is not your place.
2 You are not a party.
3        MS. WRIGHTEN: You just went on a --
4        MR. SAFARIAN: The question wasn't addressed to you.
5 Mr. Malone, will you, as the counsel in this case, agree
6 that Ms. Wrighten shall not communicate or have any other
7 participation in this deposition than to observe, yes
8 or no?
9        MS. WRIGHTEN: I'm going to make a record because
10 you just maligned me.
11       MR. SAFARIAN: This is this problem, Ms. Wrighten --
12       MS. WRIGHTEN: No. Because you're yelling, you're
13 yelling and talking over me.
14       Mr. Court Reporter, I hope that you are
15 getting this because he's being very rude.
16       MR. SAFARIAN: We're going to stop. Let's go off
17 the record.
18       MS. WRIGHTEN: No, we're not going off the record.
19       MR. SAFARIAN: This is the problem. You don't
20 decide whether we go off the record.
21       MS. WRIGHTEN: You have no respect -- you have no
22 respect for me. You have no respect for the court
23 reporter. You keep talking over me. You keep yelling.
24 You keep maligning me, and all I'm trying to do is make a
25 record on behalf of my client, the Aldea Community

8

1 Association, which I do represent. They are my client.
2 And in that case on the record before a federal judge you
3 have said that the state court -- that there are things
4 that are happening in the state court case that impact the
5 federal case and will bolster your Complaint. This was
6 your defense to my anti-SLAPP motion. So that the judge
7 then allowed you an opportunity, inappropriate and against
8 the law as it may be, to amend your Complaint based on your
9 allegations that you are going to bring things from the
10 state case, from depositions that you are getting in the
11 state case, you are going to bring that into your Complaint
12 in the federal case.
13       So, one, that does bring me -- like pulls me
14 right into this case. Two, you are sending depositions and
15 communicating with my client.
16       MR. SAFARIAN: No, I'm not.
17       MS. WRIGHTEN: With my client --
18       MR. SAFARIAN: No, I'm not.
19       MS. WRIGHTEN: -- without my permission knowing that
20 they're represented. So I won't get into the ethnics of
21 that.
22       MR. SAFARIAN: Where did you --
23       MS. WRIGHTEN: But you have communicated with the
24 adjustor --
25       MR. SAFARIAN: I have.

9

3 (Pages 6 to 9)

1        MS. WRIGHTEN:  -- on the federal case --
2        MR. SAFARIAN:  At his request.
3        MS. WRIGHTEN:  -- regularly, without -- knowing that
4    he's represented.
5        MR. SAFARIAN:  You don't represent the adjustor.
6        MS. WRIGHTEN:  Knowing that is fundamental law
7    school ethics, that that is a violation.  But all I'm
8    saying is that you have brought me into this action.  I
9    represent a party that has a pending action both in federal
10   court and in state court where you're involved.  And all
11   I'm doing is here on behalf of that client, because you are
12   going to be asking questions about, apparently -- you even
13   in the RFP asked for documents related to the federal court
14   case.  So that's the substantive issue.
15            Procedurally, the fact that you actually have
16   been called sexist on the record.
17       MR. SAFARIAN:  By you.
18       MS. WRIGHTEN:  By a client of mine as well.  And the
19   fact that you continue --
20       MR. SAFARIAN:  Okay.  This is getting ridiculous.
21       MS. WRIGHTEN:  -- and continue to still --
22       MR. SAFARIAN:  This is beyond the pale.  This is
23   ridiculous.
24       MS. WRIGHTEN:  You've asked me to be muted.  You
25   talk over me, and it is unprofessional and disrespectful.

10

1    And so I have no desire, no desire to actually do anything
2    or say anything that would be contrary to the interests of
3    my client or against my professional duty as a lawyer, but
4    the fact that you continue to literally tell me to mute
5    myself is really unprofessional.
6        MR. SAFARIAN:  Okay.  Don't --
7        MS. WRIGHTEN:  I don't have any plan -- I don't have
8    any plan to interrupt the deposition.  However, I do have a
9    client and a client's interest that I represent.  For the
10   record, I don't need to meet and confer with you, but if
11   there is something that I think should be on the record,
12   either as an objection or as a clarification, I have a duty
13   as an officer of the court to say that.
14       MR. SAFARIAN:  Then this deposition is suspended.
15   Thank you everybody.  We'll move for a protective order.
16       MS. WRIGHTEN:  So just to be --
17       MR. SAFARIAN:  Ms. Wrighten.
18       MS. WRIGHTEN:  Just to be -- I'm not -- No.  I'm an
19   officer of the court.  I am an officer of the court.
20       MR. SAFARIAN:  You are not a party to this case.
21       MS. WRIGHTEN:  I do get to talk.  I get to talk as a
22   lawyer.
23       MR. SAFARIAN:  You've talked over me enough.
24       MS. WRIGHTEN:  I get to talk as a lawyer.  I get to
25   talk as a person.

11

1        MR. SAFARIAN:  We are 25 minutes into when the
2    deposition was supposed to start.
3        MS. WRIGHTEN:  I'm not going to continue let you be
4    so -- just ram, sort of ram yourself all over me for no
5    reason, when all I'm doing is you said we're done.  And I
6    just wanted to say everybody here is saying that we are
7    here and that we're going to be professional, but you're
8    the one, you're the one, even though you've injected the
9    federal case into this case, and even though literally I
10   represent -- why you try to draw a line when I actually
11   represent the party here.  And now he's gone off camera, to
12   continue to be unprofessional.  Everybody's here ready to
13   go.  There's a court reporter and a videographer and
14   lawyers ready to go, and Mr. Safarian is taking issue with
15   me in representing the client that's on the federal case
16   and in the state case.
17       MR. SAFARIAN:  I asked for a commitment that
18   Ms. Wrighten would not speak or participate in a proceeding
19   to which she is not counsel.  Whatever her observations or
20   beliefs as to what is necessary for her client, we were not
21   informed of her presence today.  She has caused incredible
22   problems at prior proceedings.  We're now 25 minutes into
23   when this deposition was supposed to have been started.
24   This is at least the second time this deposition has been
25   set, and I'm not going to allow further obstruction of a

12

1    proceeding.
2            Aldea Community has one lawyer that's
3    entitled to speak on its behalf at a deposition, not two.
4    There is a separate case.  Whatever Ms. Wrighten's
5    observations are about my strategies doesn't matter.  The
6    plaintiffs in that other case are not plaintiffs in this
7    case.  There is a common defendant.  Until that has
8    happened, she has no standing, and even if that happens,
9    Aldea Community has Mr. Malone here on its behalf.
10           I've given you the opportunity to be present,
11   Ms. Wrighten, to go mute and dark and observe the
12   proceeding as a courtesy.  Instead, you've spent the last
13   25 minutes calling me a sexist and making all kinds of
14   inflammatory allegations that are not before me or this
15   proceeding.  I'm here to take a deposition.
16           If you would like to attend, I'm giving you
17   one last opportunity to go mute, dark and observe.  You
18   have no standing to appear.  Do you want that opportunity
19   or do you want me to suspend the deposition?  Those are the
20   only two choices.
21       MS. WRIGHTEN:  I'm going to go off camera.  I have
22   no intention on speaking.  However --
23       MR. SAFARIAN:  No, there's no however.
24       MS. WRIGHTEN:  There is.
25       MR. SAFARIAN:  There is no however.

13

1    MS. WRIGHTEN:  You make this proclamation that
2  somehow I have been obstructive and yet you are the one
3  demonstrating that you are the one who actually is
4  obstructive.  You are the one who continues to talk over
5  me.  "However," I said it, it has a comma.  There is no
6  period after that, and you have to jump in, you have to.
7        So all I'm saying -- and the fact is that I
8  could come into court and represent -- I don't know where
9  you found this dictate that, as a lawyer representing a
10  client, I can't be there on their behalf at any legal
11  proceeding?  That is just contrary to all jurisprudence.
12    MR. SAFARIAN:  These proceedings are suspended.
13    MS. WRIGHTEN:  The fact that I could go into court
14  on behalf of that client and maybe then have to defer to
15  another lawyer who is also present, yes, that's true.  But
16  two lawyers, three, four, five lawyers often appear in a
17  court in proceedings on behalf of the same client --
18    MR. SAFARIAN:  Ms. Wrighten.
19    MS. WRIGHTEN:  -- all the time.
20    MR. SAFARIAN:  Ms. Wrighten.
21    MS. WRIGHTEN:  All the time.
22    MR. SAFARIAN:  Ms. Wrighten.
23    MS. WRIGHTEN:  One, what you're saying -- and he
24  goes off camera.  He goes off camera.  It's like he's
25  putting his hand in my face, like I'm not listening to you.

14

1  I don't have to respect you.  That's what Mr. Safarian
2  does.  So let's see who is actually the person who is
3  disrespectful and obstructive.
4        I do not have any plans at all on objecting
5  or speaking at this -- at this deposition.  However, Harry
6  is setting it up such that if I found that I had a reason
7  to put something on the record, that he would say that I'm
8  violating some random rule that he set in place, and that's
9  all I'm saying is that if there is something that I need to
10  note about the federal case, that I will do that on the
11  record, that's it.
12        Mr. Safarian is still off camera and ignoring
13  me.
14    MR. MALONE:  For the record, I believe we can
15  proceed here amicably.  Ms. Wrighten has an interest in
16  being here, it is as simple as that.
17    MR. SAFARIAN:  We're done.  We're done, Mr. Malone.
18  I asked Ms. Wrighten to commit to not comment or
19  participate in the record.  She has no standing to do so.
20  She refuses to do so.
21    MS. WRIGHTEN:  No.  I did.  I said I wouldn't.
22    MR. SAFARIAN:  Now, you're speaking over me.
23    MS. WRIGHTEN:  Yeah, I'm talking over you because
24  you misquoted me, and that's not true.
25    MR. SAFARIAN:  Ms. Wrighten.

15

1    MS. WRIGHTEN:  I want to make sure --
2    MR. SAFARIAN:  Ms. Wrighten, I'm speaking with
3  Mr. Malone.
4    MS. WRIGHTEN:  I want to make sure that it's on the
5  record, Mr. Court Reporter, that I said I'm going to turn
6  off my camera.  I'm going to go mute.  I have no intentions
7  on objecting or speaking here.  However, I do reserve the
8  right, as an officer of the court representing a party
9  here -- a party that is in a related action in federal
10  court based on Mr. Safarian's allegations himself on the
11  record in federal court, and apparently in our request
12  here, based on those allegations, I represent the Aldea
13  Community Association, and if, if somehow something comes
14  up that bears on the federal case here, I would just like
15  to reserve the right to put something on the record.
16  That's it.
17    MR. SAFARIAN:  I will agree that you can take a
18  break before the end of the deposition and state whatever
19  you want through Mr. Malone after a break, period.  If you
20  want to make some kind of statement on the record, you can
21  do so through Mr. Malone.  You will have a right to take a
22  break and you can make your statement.  You are not going
23  to say anything further on this record, unless you into
24  court -- Ms. Wrighten, this is not funny.  This is not
25  funny to me.

16

1    MS. WRIGHTEN:  No.  It's funny because you are so
2  unprofessional.  How you say to me, as an officer of the
3  court, that I have to speak through another man on this
4  deposition is so insulting that the best thing I can do is
5  laugh.  That's the best thing that I can do.  So all I said
6  was I reserved the right to speak on behalf of my client if
7  I find a reason to do so.
8    MR. SAFARIAN:  And I'm giving you --
9    MS. WRIGHTEN:  And you said no, let the man talk for
10  you.  That's what you said, Harry.  And no, the only thing
11  that I could do is laugh at that because it's so sexist and
12  so unprofessional, that all I can do is laugh at it.
13    MR. SAFARIAN:  Mr. Malone, is there a female
14  attorney in your firm that Ms. Wrighten can speak through?
15  Because this has nothing to do with gender, Ms. Wrighten.
16    MS. WRIGHTEN:  Okay.
17    MR. SAFARIAN:  You can make those allegations if you
18  want.  You've done it before.  You regularly turn to the
19  gender card or the race card, and that's fine.  This has
20  nothing to do with that, but if you want to fall back on
21  that, that's your call.
22        I'm here to take a deposition.  I'm giving
23  you an opportunity to state whatever you want at the
24  conclusion.  During the deposition, I won't be interrupted.
25  I respect the witness's time, and I want to get started.

17

1  I'm asking you now to go on mute and dark, and I'm going to
2  proceed with the proceeding.
3      MS. WRIGHTEN:  And I'm going to make sure that it is
4  on the record that I don't ever, ever use the race or
5  gender card, because I don't have to, because I --
6      MR. SAFARIAN:  You have plenty of times.
7      MS. WRIGHTEN:  -- absolutely have the pedigree and
8  the experience to be here, notwithstanding -- actually, in
9  addition to the fact that I am an African American woman.
10 So I don't play that card.  But you treat me in a certain
11 way, and that's what's gone on the record in several
12 depositions, that you treat me in a certain way that is
13 apparent, and the only reason that you could do that is
14 because I am an African American woman.
15      So the fact that you continue to do it today,
16 thank you for underscoring it, thank you for allowing it to
17 be on the record, and I'm going to call you out, sir, I am
18 going to call you out every single time and twice on
19 Sunday.
20      So I agreed to -- again, you don't --
21      MR. SAFARIAN:  Ms. Wrighten.
22      MS. WRIGHTEN:  Your requirements are contrary to
23 jurisprudence --
24      MR. SAFARIAN:  Oh, God.
25      MS. WRIGHTEN:  -- and procedural law, we all know

18

1  that.  I stated examples that are completely antithetical
2  to what -- the paradigm that you're setting up here.  But,
3  because I came into this knowing that no, I had no
4  intention on speaking.  No.  I am here because you put it
5  into the record in the argument on the hearing on the
6  anti-SLAPP motion in the federal case, that's what you did.
7  And now he's walking away because he can't handle it.
8      So, again, I'm happy to go off camera.  I'm
9  happy to mute, and I will only -- I only reserve the right
10 to put something on record if I think it speaks to my
11 client's interest in the federal case.
12      MR. MALONE:  For the record, I believe that's an
13 appropriate compromise.  We want to proceed.  Ms. French
14 wants to proceed.  We're here.  We're ready.  This wasn't
15 meant as an underhanded move of any sort.  This is a matter
16 of the cases impacting one another, especially --
17      MR. SAFARIAN:  Mr. Malone, I don't need your
18 speaking narrative about why she's here.  She has no
19 business being here.  You could have given me the courtesy
20 of a heads-up, and we could have gone into court, because
21 you know this has been an issue.  And you've seen yourself
22 now what Ms. Wrighten does at these proceedings.
23      I'm not going to go any further.  It's done.
24 I don't want to hear from her again.  If she wants to put
25 something on the record through you or some other lawyer in

19

1  your firm, whether they be black, white, Latino, I don't
2  care.  I want to proceed with my deposition.
3      I will be moving for a protective order after
4  today to exclude her from further proceedings, unless we
5  can reach an agreement on that.
6      I apologize to Ms. French.  It should have
7  never started this way.  This is the only case I've ever
8  had in my career, 20-plus years, where this happened.  I'm
9  going to go in, and we're going to swear the witness on the
10 record.
11      THE REPORTER:  Do we want the video, Mr. Safarian?
12      MR. SAFARIAN:  Yes, please.
13      THE VIDEOGRAPHER:  Just a moment.  I will get
14 started.  We are now on the record.  Today's date is June
15 30th, 2022.  And the time is 9:36 a.m. Pacific Time.  This
16 is the video deposition of Sabrina French testifying in the
17 matter of Aldea Community Association vs. Tamara Nazaretyan
18 pending in the Superior Court of the State of California
19 for the County of Los Angeles, North Valley District.
20      The video operator is Daniel Bermudez
21 representing Elite Court Reporting.  The court reporter is
22 Jay Bullard.
23      Counsels, please introduce yourselves and
24 state whom you represent, after which the court reporter
25 will swear in the deponent.

20

1      MR. SAFARIAN:  Go ahead, Mr. Malone.
2      MR. MALONE:  Patrick Malone for the Plaintiff Aldea
3  Community Association, and in a limited scope for
4  Ms. French here today at her deposition.
5      MR. SAFARIAN:  Good morning.  I'm Harry Safarian.  I
6  represent the Defendant Tamara Nazaretyan.  Also present
7  with me today are my partners, Christina Karayan and Pierro
8  Babaian.
9      THE REPORTER:  Ms. French, would you raise your
10 right hand, please.
11      Sabrina French,
12 having been duly sworn, was examined and testified as
13 follows:
14      EXAMINATION
15 BY MR. SAFARIAN:
16   Q   Good morning, Ms. French.  I'm going to
17 apologize to you in advance or not so much in advance, but
18 for what you just heard.  That is highly unusual in a legal
19 proceeding.  I assure you that you will be treated
20 respectfully and politely today, notwithstanding what just
21 transpired, which is irregular and unusual.
22      I'm going to begin by giving you some of the
23 basic admonitions.  I want to take the deposition in a
24 manner that allows you to provide me with your best
25 testimony, your freshest recollection and your most

21

6 (Pages 18 to 21)

1  detailed recollection of events.
2          During the deposition, you'll be testifying
3  under oath, so it's important that you only answer
4  questions that you understand fully and completely.  If I
5  ask you a question, and you don't understand it, feel
6  comfortable to please let me know, and I will rephrase the
7  question for you.
8          I'm going to ask you for specific events.
9  You may not recall exact dates, times, measurements, et
10  cetera.  If you have to estimate, that's completely fine.
11  Don't feel pressured to give me an exact response if you
12  can't provide one.
13          If you need to estimate, let me know, but if
14  you have to guess, stop and let me know that you don't have
15  enough information and you'd be testifying just out of pure
16  speculation.  Is that fair?
17  A    Yes.
18  Q    Thank you very much.  And you've been doing a
19  very nice job waiting for me to finish my commentary before
20  you begin responding.  I will extend you that same
21  courtesy.  It will make the job of the court reporter much
22  easier.  Thank you for doing that.
23          You'll be asked to answer questions only in
24  audible words.  For example, if you nod or shake your head,
25  it won't go on the transcript.  Although we've got a video

22

1  today, we have to protect the integrity of the transcript
2  as best we can.
3          If at any point in the deposition you don't
4  feel like you are able to give me your best testimony or
5  are feeling unwell, would you promise to please let me
6  know?
7  A    Yes.
8  Q    Thank you very much.  And if you need a
9  break, you need to get a glass of water, use the restroom,
10  whatever the case may be, just say the word, we'll be glad
11  to accommodate you.  Okay?
12  A    Okay.
13  Q    Thank you.  When did you first learn you
14  would be deposed in this case?
15  A    I would not know the exact date.  I'd have to
16  look.
17  Q    What's your best estimation?
18  A    For this date, it was I would say last week,
19  ten days ago, something like that.
20  Q    Okay.  And in preparation for your
21  deposition, did you speak with anybody within the property
22  management company to discuss the proceeding?
23  A    No.
24  Q    And aside from your lawyers, did you speak
25  with anybody regarding this proceeding?

23

1  A    No.
2  MR. MALONE:  Object to the extent it calls for
3  communications with her spouse as well, Mr. Safarian.
4  MR. SAFARIAN:  That's fine.
5  MR. MALONE:  But please answer.
6  THE WITNESS:  No.
7  Q BY MR. SAFARIAN:  And I'm not asking for the
8  substance of communications.  I'm just asking if there were
9  communications.
10          Have you reviewed any documentation in
11  preparation for this proceeding?
12  A    Yes.
13  Q    Okay.  And just in general terms without
14  conveying any attorney-client communications, what did you
15  review?
16  A    Responses, the responses that were provided.
17  MR. MALONE:  Mr. Safarian, I just need to interject.
18  We prepared responses to the request for production of
19  documents, responses and objections that came.  They should
20  have been served, but there was a clerical error, so they
21  will be served any minute now.  I was just in contact with
22  my paralegal.  She's referring to reviewing those responses
23  in order to verify them.
24  MR. SAFARIAN:  I appreciate that.  Let me -- if you
25  would, Mr. Malone, get that information from her, and if

24

1  she is very --
2  MR. MALONE:  Absolutely, yeah.
3  Q BY MR. SAFARIAN:  And did you produce any
4  documents in relationship to any document requests you were
5  served with?
6  A    No.
7  Q    Did you search for any documents?
8  A    I looked, but I did not have any.
9  Q    And when you say "I looked, but I did not
10  have any," did you look within your own records or PMP's
11  records as well?
12  A    My own records.
13  Q    Did you look within PMP's records at all for
14  any documents?
15  A    I was just asked what I had, so no.
16  Q    And when you say, "I was asked what I had,"
17  are you referring to what counsel said or are you referring
18  to -- let me strike that.
19          Did you actually look at the requests
20  themselves that called for document production?
21  A    I looked for the documents that were asked of
22  me.
23  Q    In the requests that our office had served?
24  A    Yes.
25  Q    Thank you.  Bear with me one second.  I just

25

7  (Pages 22 to 25)

1  need to find something.
2        Okay.  I'll get back to that in a second.
3  Just give me a second.
4        Okay.  I'm not trying to be prying into your
5  personal information, but I'm going to ask for some
6  background, which is pretty normal.
7        Is Sabrina French your full name?
8     A    Sabrina Ann French.
9     Q    Have you used any other names over the course
10 of your life?
11    A    Yes.
12    Q    And what are the names?
13    A    Sabrina Badalich.
14    Q    Would you spell the former last name, please.
15    A    B, as in boy, a-d, as in David, a-l-i-c-h.
16    Q    Thank you very much.  And when did you change
17 your name to French?
18    A    It would be back in 2014.  I don't know the
19 exact month that it was legally changed.  I was married in
20 2013.
21    Q    Thank you very much.  And what's your date of
22 birth please?
23    A    8-9-88.
24    Q    Did you say 1988?
25    A    Um-hmm.

26

1     Q    Thank you very much.
2           And where were you born?
3     A    Where was I born?  Was that the question?
4  Sorry.
5     Q    Yes, please.
6     A    Burbank, California.
7     Q    Did you go to high school in Burbank?
8     A    I did not.  I went to high school in Simi
9  Valley.
10    Q    And is that where you were raised?
11    A    Yes.
12    Q    After high school did you have any college
13 training or education?
14    A    Culinary degree.
15    Q    At La Cordon Bleu, correct?
16    A    That's correct.
17    Q    And what year did you complete La Cordon
18 Bleu?
19    A    2008, 2009.
20    Q    Any other education or training after high
21 school besides Cordon Bleu?
22    A    Some college.
23    Q    And where did you attend?
24    A    Moorpark and then there is a college in the
25 valley, and I can't remember the name off the top of my

27

1  head.
2     Q    It would probably be either Pierce or Los
3  Angeles College.
4     A    Pierce.  There it is.  Sorry, Pierce.
5     Q    That's okay.  And no certificates or degrees
6  from those schools?
7     A    No.
8     Q    Thank you.  Okay.  Any other education or
9  training that we have not already covered outside of what
10 you would have had on the job?
11    A    No.
12    Q    I know you have a few designations, a CMCA.
13 Can you describe for me what a CMCA is?
14    A    Certified management.  CMCA, AMS, and PCAM.
15    Q    CMCA, is that a certified manager of
16 community association or something like that?
17    A    Correct.
18    Q    What did you have to do to get that
19 association -- or designation, I should say?
20    A    Classes and testing.
21    Q    How many hours of classes?
22    A    It's about 72 hours of a class and then five
23 weeks of studying and a test or an exam.
24    Q    And what is the general subject matter?  Is
25 it community association management?

28

1     A    Yes.
2     Q    Okay.  I guess the name speaks for itself,
3  right?
4     A    Right.
5     Q    And when did you attain that designation?
6     A    I would not know the exact date off the top
7  of my head.
8     Q    Just an estimate would be fine, then.
9     A    I'd say eight years ago, roughly.
10    Q    Very good.  Thank you.
11          And was that something that you obtained
12 through your employer, PMP Management?
13    A    Yes.
14    Q    By the way, where are you currently?
15    A    At my Thousand Oaks office.
16    Q    Is anyone else with you in your office?
17    A    No, not in my direct office.
18    Q    Okay.  Tell me what an AMS is, please.
19    A    I don't remember what it stands for, but it
20 is the next step in designation for community management.
21 I believe it's association management specialist is
22 particularly what it stands for, if I can remember
23 correctly.
24    Q    Very good.  And when did you obtain that?
25    A    Shortly after the CMCA, so I would say eight

29

8  (Pages 26 to 29)

1 years ago.
2     **Q**    **And how many hours did that require?**
3     A    Two classes, so roughly maybe 15 to 20 hours.
4     **Q**    **And then also around eight years ago and also**
5 **through PMP, correct?**
6     A    Correct.
7     **Q**    **Thank you.  And what about PCAM?**
8     A    Professional Community Association Manager.
9 it Is the highest designation, received it about three
10 years ago.  You have to write a case study on it, so there
11 were a lot of hours.  I would not be able to estimate how
12 many hours were put into that.
13     **Q**    **And that was also through PMP, correct?**
14     A    Yes.
15     **Q**    **Do you have any other licenses such as a**
16 **broker's license, realtor's license or anything like that?**
17     A    No.
18     **Q**    **Okay.  When did you join PMP?**
19     A    September 3rd, 2013.
20     **Q**    **And have you been with PMP consistently**
21 **since?**
22     A    Other than maternity leave, yes.
23     **Q**    **And when did you first begin working in the**
24 **area of common interest development?**
25     A    Roughly 2008.

30

1     **Q**    **In what capacity?**
2     A    As an assistant manager.
3     **Q**    **For what company?**
4     A    Lordon Management.
5     **Q**    **L-o-r-d-o-n?**
6     A    That's correct.
7     **Q**    **I think we've represented them before, but I**
8 **don't -- it's probably been before our time.**
9     **And as an assistant manager for Lordon, what**
10 **were your general responsibilities?**
11     A    Clerical, answering phones, violation
12 letters, emails, the basic clerical, admin.
13     **Q**    **All right.  And then when you moved on to**
14 **PMP, what did your role begin as?**
15     A    I left Lordon as manager and I transferred
16 over to PMP as community manager.
17     **Q**    **In 2013?**
18     A    Correct.
19     **Q**    **And when you transferred to PMP as a**
20 **community manager in 2013, when -- or was the Aldea**
21 **Community property within your portfolio at that time?**
22     A    No, it was not in my direct portfolio, and I
23 do not know if it was with PMP at that time.  I wouldn't be
24 able to recall that.
25     **Q**    **All right.  And when did you first become**

31

1 acquainted with Aldea?
2     MR. MALONE:  Vague.
3     Q BY MR. SAFARIAN:  You may answer.
4     A    What do you mean -- I mean, I guess
5 acquainted.  Know of or --
6     **Q**    **Let's start with professionally.  In your**
7 **professional capacity, what was your first contact**
8 **experience with Aldea?**
9     MR. MALONE:  Assumes facts.  You can go ahead.
10 Remember, unless I tell you not to answer, Sabrina, you can
11 feel free to answer.
12     THE WITNESS:  Yeah, I'm just trying to think.  If I
13 were to estimate, maybe 2017, 2018, and that's me
14 estimating of knowing the community.
15     Q BY MR. SAFARIAN:  Okay.  And prior to 2017 or
16 2018, had you ever been on the property?
17     A    No.
18     **Q**    **Can you recall when the first time you would**
19 **have -- approximately what year you would have stepped foot**
20 **on the property?**
21     A    I have never stepped foot on Aldea's
22 property.
23     **Q**    **Have you ever attended any board meetings?**
24     A    Yes.
25     **Q**    **And when was the first time you attended a**

32

1 board meeting for Aldea?
2     A    Maybe 2019, 2020, but it would be virtually.
3     **Q**    **Was my client, Ms. Nazaretyan, discussed at**
4 **any board meetings you attended?**
5     MR. MALONE:  I'm going to object on the basis of
6 attorney-client privilege to the extent that any
7 discussions discussing Ms. Nazaretyan or this incident
8 you're not to divulge if they took place in the presence of
9 counsel.  So anything outside the presence of counsel.
10     Q BY MR. SAFARIAN:  Well, unless it was open to the
11 community generally.  So unless -- if it was a closed
12 meeting with just the board members and counsel, I don't
13 want to know about that.  But if there was any meeting you
14 attended that was not a closed meeting with just the board
15 and counsel, I just want to know whether you ever were a
16 party to any discussions or heard any discussions regarding
17 my client, Ms. Nazaretyan?
18     A    I don't recall.
19     **Q**    **Have you ever seen my client before?**
20     A    No, I don't believe so.
21     **Q**    **Have you ever seen her son Garnik?**
22     A    I do not believe so.
23     **Q**    **Has anybody at any time brought to your**
24 **attention any concerns about my client or any member of her**
25 **household?**

33

1    MR. MALONE:  Again, the attorney-client privilege to
2  the extent it was brought by counsel.
3    Q BY MR. SAFARIAN:  I want you to know every
4  question I ask includes sort of a quiet admonition that I
5  don't want to know anything that your lawyers and you
6  privately discussed.  So if I do ask you a question, and it
7  was only an attorney-client communication, please do tell
8  me, because I don't want to intrude upon the
9  attorney-client communication.
10    So, with that said, I'll reask the question.
11  Has anyone ever raised concerns to you about Ms. Nazaretyan
12  or any member of her household?
13    MR. MALONE:  It's vague.
14    THE WITNESS:  I don't know if I can answer that
15  question.  I mean, the board has obviously had concerns.
16  The manager at the time I believe had concerns, but that
17  was just discussion within our office.
18    Q BY MR. SAFARIAN:  Okay.  Who raised discussion
19  within your office?
20    MR. MALONE:  Vague.
21    Q BY MR. SAFARIAN:  Well, you said the manager or
22  someone within your office discussed my client, correct?
23    A    That's correct.
24    Q    Who was that?
25    A    I believe at the time it was Frank Jauregui.

34

1    Q    Can you spell that, please?
2    A    Without looking it up, I cannot spell it.
3    Q    Can you say that again slowly.  I'll try to
4  get it phonetically.
5    A    Jauregui.  I know it starts with a J-a-r.
6    Q    Is he still with PMP?
7    A    He is not.
8    Q    And what do you recall Mr. -- I'll call him
9  Frank.  What do you call Mr. Frank saying?
10    MR. MALONE:  Narrative.
11    THE WITNESS:  The concerns regarding the
12  association.
13    Q BY MR. SAFARIAN:  What specifically, please?
14    A    I don't recall the exact communication.
15    Q    Do you recall generally the communication?
16    A    Just the concerns and the circumstances that
17  presented themselves.
18    Q    What concerns and circumstances, please?
19    A    The safety of the community.
20    Q    What specifically about the safety of the
21  community was raised, please?
22    A    That's all I remember.  That's the general
23  aspect of the conversation.
24    Q    Okay.  You've given me the general aspect.
25  In your own best words, what did he say?

35

1    MR. MALONE:  Vague, calls for a narrative, asked and
2  answered.
3    THE WITNESS:  I honestly would not be able to
4  speculate further.  I just remember there being a
5  conversation.  I don't remember the actual verbiage.
6    Q BY MR. SAFARIAN:  Can you recall the substance of
7  any verbiage?
8    A    Just the safety of the community and how to
9  handle it, that was it.
10    Q    What specifically was their safety concern?
11    MR. MALONE:  Asked and answered.
12    THE WITNESS:  Other homeowners' well-being.  I
13  really don't know.  That was the conversation back when the
14  situation occurred.
15    Q BY MR. SAFARIAN:  And other than that
16  conversation, have you been privy to any conversation where
17  the safety of the community or my clients were discussed?
18    MR. MALONE:  Vague.
19    THE WITNESS:  I do not recall, no.
20    Q BY MR. SAFARIAN:  All right.  Have you now related
21  to me every discussion you recall ever being party to or
22  hearing about that concerned my clients?
23    MR. MALONE:  Vague.
24    THE WITNESS:  To my knowledge, yes.
25    Q BY MR. SAFARIAN:  Have you ever been asked to

36

1  participate in any sort of process whereby there was any
2  investigation or discussion into the physical or mental
3  health of any member of the Nazaretyan household?
4    MR. MALONE:  Vague and compound.
5    THE WITNESS:  I don't really understand the
6  question, to be honest.
7    MR. SAFARIAN:  I'll rephrase the question.
8    Q    Has anyone ever asked you to participate or
9  have you ever heard of any -- let me start over with a
10  different question.
11    Are you aware of any dialogue ever taking
12  place whereby the HOA, either directly or through PMP,
13  investigated in any way the mental well-being of Garnik
14  Nazaretyan?
15    MR. MALONE:  Same objection as vague, compound,
16  lacks foundation, and calls for legal conclusion.  Go
17  ahead.
18    THE WITNESS:  Not to my knowledge, no.
19    Q BY MR. SAFARIAN:  Are you aware through any
20  source, except your lawyers, of any conduct by Garnik
21  Nazaretyan at the Aldea property?
22    MR. MALONE:  Vague, same objections, lacks
23  foundation.
24    THE WITNESS:  What do you mean by conduct?
25    Q BY MR. SAFARIAN:  Any conduct, whether it's

37

10  (Pages 34 to 37)

1 driving a car, riding a bicycle, or bothering a neighbor,
2 whatever it is. Has anybody ever mentioned to you in any
3 way anything that Garnik has done at that property?
4     MR. MALONE: Vague, overbroad, lacks foundation.
5     THE WITNESS: No.
6     Q BY MR. SAFARIAN: If you saw Garnik in a lineup,
7 do you think you can pull him out?
8     A   No.
9     **Q   Do you know anything about his mental health?**
10    MR. MALONE: Vague, lacks foundation, calls for a
11 medical expert opinion.
12    THE WITNESS: I have no confirmation about his
13 medical health, no.
14    Q BY MR. SAFARIAN: Do you know anything about his
15 health at all?
16    MR. MALONE: Same objections.
17    THE WITNESS: No.
18    Q BY MR. SAFARIAN: Do you know, aside from what
19 your lawyers have told you, of any conflicts Garnik has had
20 with anybody at the property?
21    A   No.
22    **Q   Sorry?**
23    A   No.
24    **Q   Are you aware of anybody within the ACA**
25 **Community -- let me make it more narrow.**

38

1     **Are you aware of any -- at any time the**
2 **board, directly or through PMP, ever trying to accommodate**
3 **any type of disability that Garnik has had?**
4     MR. MALONE: Calls for a legal conclusion, lacks
5 foundation, vague, compound, calls for an expert opinion.
6     THE WITNESS: Not to my knowledge.
7     Q BY MR. SAFARIAN: One of the requests that you
8 were asked to produce was all written communications,
9 including texts, email messaging, and letters, with any
10 person or entity regarding this lawsuit. Did you look
11 anywhere -- that's the first request -- within PMP for such
12 items?
13    A   I looked in my files as requested and did not
14 have any.
15    **Q   Okay. Our request did not limit your request**
16 **to your files. Our request was to PMP, and you're an agent**
17 **of PMP. So, aside from looking at all the files, did you**
18 **look for any records?**
19    MR. MALONE: I just have to interject on the record
20 that the requests were limited to Ms. French -- in our
21 estimation, were limited to Ms. French in her individual
22 capacity.
23    MR. SAFARIAN: And that's not the case because --
24 that's not how we see it. It says, "Management employees"
25 under -- so it says -- let me start over. "First Amended

39

1 Notice of Deposition of PMP Management employees" -- as an
2 agent of PMP, and that's certainly not how this was
3 intended, but I guess that's something we'll have to
4 address later, but you did review all 16 document requests
5 that were included in your deposition notice?
6     A   Yes.
7     **Q   Number 16 is an example. I'm going to pull**
8 **it up. It says, "Produce all management manuals, policies,**
9 **procedures, rules, or regulations implemented for the Aldea**
10 **Community Association." Did you look for any of those?**
11    A   In my own files, and I don't have any for me.
12    **Q   Okay. But Aldea obviously or at least PMP**
13 **will have management manuals and policies, correct?**
14    A   Correct.
15    **Q   And those were accessible to you, correct?**
16    A   Correct.
17    **Q   But you didn't produce those because they**
18 **were not in your personal files?**
19    A   That's correct.
20    MR. MALONE: Asked and answered. Take a beat,
21 Sabrina, please.
22    Q BY MR. SAFARIAN: Same with a lot of these. For
23 example, number 15 says, "Produce all documents reflecting
24 HOA dues paid or discounted for" and then it has our
25 client's address. That would have been within PMP's files,

40

1 but not your personal files, so you did not pursue those
2 because they were not in your personal files, correct?
3     MR. MALONE: It calls for speculation and it's asked
4 and answered.
5     THE WITNESS: Correct.
6     Q BY MR. SAFARIAN: Similarly, number 13, it says,
7 "All documents that reference the April 11, 2019 incident
8 that occurred involving Garnik Hakobyan at the Aldea
9 Community Association." You have nothing in your files,
10 your personal files, and you did not look at the PMP files,
11 agreed?
12    MR. MALONE: Asked and answered. It's the same for
13 all of them.
14    MR. SAFARIAN: Well, that's up to her, Mr. Malone,
15 but you've now offered your testimony in place of her's
16 several times. I'm going to ask you to just please make
17 code objections, if you would. Would that be all right,
18 Mr. Malone?
19    MR. MALONE: Mr. Safarian, I'm trying to move this
20 along as expeditiously as possible for the witness. She's
21 eight-and-a-half months pregnant. I'm trying to just --
22    MR. SAFARIAN: I just can't --
23    MR. MALONE: -- make an objection to explain my code
24 exhibits. So yes, I understand. I understand. I'm not
25 particularly narrative. I'm not going to go off on

41

11 (Pages 38 to 41)

ELITE COURT REPORTING (949) 829-9222

1 diatribes. I apologize if you feel that I am.
2    MR. SAFARIAN: I just want code objections, if you
3 wouldn't mind, please. It's important to me. I'd ask --
4 and I would do the same for your clients if they were
5 deposed. Strike that. If you depose my clients, I would
6 do the same. I would extend you the same professional.
7 It's an obligation.
8    **Q   So, succinctly stated, you only looked at**
9 **your own files. In terms of your own files, what do you --**
10 **do you have a file cabinet that has your personal files for**
11 **PMP work?**
12    A   I do.
13    **Q   And how many bankers boxes would you say your**
14 **own files cabinet would fill?**
15    MR. MALONE: Incomplete hypothetical.
16    THE WITNESS: I mean, they're mostly electronic.
17    Q BY MR. SAFARIAN: Do you have an electronic file
18 regarding the Aldea Community?
19    A   I do not.
20    **Q   So you have no files regarding Aldea,**
21 **correct?**
22    A   Correct.
23    MR. MALONE: Misstates testimony. Take a beat.
24    Q BY MR. SAFARIAN: Since you have no files
25 regarding Aldea, what would you have been looking at to see

42

1 if you have responsive documents?
2    A   Emails, correspondence.
3    **Q   And do you have a policy regarding**
4 **preservation of your emails? For example, some people keep**
5 **emails for a certain number of years and delete past emails**
6 **or store them in a separate location.**
7    MR. MALONE: Incomplete hypothetical.
8    Q BY MR. SAFARIAN: You can answer.
9    A   I believe our company has a policy, but I'm
10 not sure of the extent of the timeframe that it is
11 implemented.
12    **Q   Now, do you manage your own emails as far as**
13 **a preservation policy is concerned, or is there an IT**
14 **person or someone else that does it?**
15    MR. MALONE: Vague, calls for speculation, lacks
16 foundation.
17    THE WITNESS: I save emails in certain folders when
18 I feel they are necessary, and we also have an IT company
19 that manages our email server, I guess you would say.
20    Q BY MR. SAFARIAN: Have you ever, to your
21 knowledge, received a single email regarding Garnik
22 Hakobyan outside of from lawyers?
23    A   I believe I have from the previous manager.
24    **Q   Where are those emails?**
25    A   I do not have them anymore.

43

1    **Q   And what happened to them?**
2    MR. MALONE: Calls for speculation.
3    Q BY MR. SAFARIAN: I'm sorry, I didn't hear your
4 response.
5    A   They were from years ago. I do not have
6 them.
7    **Q   Do you recall what they said?**
8    A   It was the conversation of concern regarding
9 the Association's safety that we discussed earlier.
10    **Q   So are you aware that soon after the incident**
11 **that brings us here for this litigation, this lawsuit was**
12 **filed by the Aldea Community Association?**
13    A   I did not have information on that.
14    **Q   So, soon after this incident, there are**
15 **emails from a manager to you; is that correct?**
16    MR. MALONE: Misstates testimony.
17    THE WITNESS: Correct.
18    Q BY MR. SAFARIAN: Is that correct?
19    A   Yeah.
20    **Q   How many emails?**
21    A   If I were to estimate, one.
22    **Q   So, over the course of these last several**
23 **years since the incident -- in fact, since my clients moved**
24 **into the property -- I think my clients moved in around the**
25 **time you became associated with managing the property. It**

44

1 was around 2017 or so.
2    MR. MALONE: Misstates testimony.
3    MR. SAFARIAN: I'm not done with my question.
4    MR. MALONE: Apologies.
5    MR. SAFARIAN: That's okay.
6    **Q   You testified you first became**
7 **acquainted or involved with Aldea in 2017 or 2018, correct?**
8    A   That I became knowledgeable of the community.
9 I was not acquainted with directly.
10    **Q   Okay. When did you first have a job**
11 **responsibility with regard to Aldea?**
12    A   I became a supervisor of the division roughly
13 around 2019.
14    **Q   And what does that entail? Are you -- for**
15 **example, are you a portfolio manager?**
16    A   No. I oversee the managers within the
17 division.
18    **Q   And who was the manager that was most**
19 **directly responsible for this property in 2019?**
20    A   I believe it was Frank Jauregui, and that's
21 an estimate. I don't remember when he left.
22    **Q   And then after Frank who took over?**
23    MR. MALONE: Calls for speculation. Go ahead.
24    THE WITNESS: I believe it was Mikaela.
25    Q BY MR. SAFARIAN: Would you spell that, please.

45

12  (Pages 42 to 45)

| | |
|---|---|
| 1  A M-i-k-a-e-l-a. | 1  A Correct. |

A M-i-k-a-e-l-a.
Q **Her last name, please.**
A Collerd, C-o-l-l-e-r-d.
Q **Is she still with PMP?**
A She is.
Q **What's her current position?**
A Regional training manager and transition coordinator.
Q **And approximately what period of time was Mikaela Collerd responsible for overseeing the Aldea Community?**
MR. MALONE:  Calls for speculation.
THE WITNESS:  I would be guessing.
Q BY MR. SAFARIAN:  What's your best estimate?
A Maybe a year.
Q **And what year would that have been?**
A I'd be guessing.
Q **It was after Frank left, correct?**
A That is my belief, yes.
Q **Was there anyone between Frank and Mikaela Collerd that you can think of that managed Aldea?**
A I don't recall.
Q **Okay.  It's your best understanding or it's your recollection that from Frank it went on to Ms. Collerd, correct?**

46

A Correct.
Q **Was there a gap between them?**
MR. MALONE:  Asked and answered.
THE WITNESS:  No, I don't believe so.
Q BY MR. SAFARIAN:  Okay.  So Frank gave notice before he'd be leaving and before there was sort of a smooth handoff?  In other words, there was not a month or two-month period where PMP was not having someone assigned to the property, correct?
MR. MALONE:  It's vague.
THE WITNESS:  I don't believe so.
Q BY MR. SAFARIAN:  So my statement was correct?
A That's correct.
Q **Thank you.  And then after Ms. Collerd, who managed the property?**
MR. MALONE:  Calls for speculation.  Excuse me.
THE WITNESS:  Sorry, I'm just trying to think if I -- I don't know.  I don't know if there was anyone between Mikaela and the current manager.
Q BY MR. SAFARIAN:  Who's the current manager?
A Gail Pinero.
Q **Okay.  So the three managers you are aware of that were involved were Frank, Mikaela Collerd, and then Gail Pinero, correct?**
A That's correct.

47

Q **Okay.  And you've never been to the property, correct?**
A No.
Q **So my statement was correct?**
A Yes, that's correct.
Q **Have you ever interviewed Frank regarding anything germane to this lawsuit such as my clients or the subject incident?**
MR. MALONE:  Asked and answered, vague.
THE WITNESS:  No.
Q BY MR. SAFARIAN:  Have you ever interviewed Mikaela Collerd regarding this incident or the lawsuit?
MR. MALONE:  Same objections.
THE WITNESS:  No.
Q BY MR. SAFARIAN:  Have you ever interviews Ms. Pinero regarding this incident or lawsuit?
MR. MALONE:  Same objections and lacks foundation.
THE WITNESS:  No.
Q BY MR. SAFARIAN:  Have you done any investigation on your own of any type regarding the incident that we're here about today?
MR. MALONE:  Vague, lacks foundation.
THE WITNESS:  No.
Q BY MR. SAFARIAN:  Have you given anyone any instructions on how to address any concerns raised about my

48

client?
MR. MALONE:  Same objections, calls for a legal conclusion.
THE WITNESS:  I have made recommendation that the attorney be involved.
Q BY MR. SAFARIAN:  I understand.  But have you given the board members or anybody who works day-to-day at the property or lives at the property on how to address these concerns involving my client?
MR. MALONE:  Same objections, asked and answered.
THE WITNESS:  No.
Q BY MR. SAFARIAN:  Is it a fair statement that -- by the way, what was your official title -- currently what is your official title as to Aldea?
MR. MALONE:  Vague, assumes facts, lacks foundation.
THE WITNESS:  My title for the company is Vice President of Division for Ventura County.
Q BY MR. SAFARIAN:  And this is -- this property is part of the Ventura County division that you're vice president of, correct?
A That is correct.
Q **And is there anybody that is above you under whose purview this property would also fall?**
MR. MALONE:  Vague.
THE WITNESS:  I do have a supervisor that is above

49

13  (Pages 46 to 49)

1 me, yes.
2     Q BY MR. SAFARIAN:  Who's that?
3     A    Brandon Grosh.
4     **Q    Would you spell Grosh, please.**
5     A    G-r-o-s-h.
6     **Q    Have you ever discussed this incident with**
7 **Mr. Grosh?**
8     MR. MALONE:  Asked and answered.
9     THE WITNESS:  I don't believe so, no.
10     Q BY MR. SAFARIAN:  Have you ever discussed Garnik
11 or anyone in the Nazaretyan household with anyone above you
12 within PMP?
13     MR. MALONE:  Asked and answered.
14     THE WITNESS:  No.
15     Q BY MR. SAFARIAN:  Is it a fair statement that the
16 only discussion you recall ever having regarding anyone
17 within the Nazaretyan household was one discussion where
18 Frank conveyed a concern the details of which you don't
19 recall?
20     MR. MALONE:  Asked and answered, lacks foundation.
21     THE WITNESS:  That -- yes.
22     Q BY MR. SAFARIAN:  And is it fair to say that the
23 only writings you recall seeing was one email that's from
24 several years back and you don't know what happened to that
25 email?

50

1     MR. MALONE:  Same objections.
2     THE WITNESS:  Yes.
3     Q BY MR. SAFARIAN:  All right.  And is it fair to
4 say that the only thing you've done so far with regard to
5 addressing any concerns raised about Garnik or the
6 community as it relates to Garnik was suggest counsel be
7 involved?
8     MR. MALONE:  Foundation, asked and answered,
9 argumentative.
10     THE WITNESS:  Yes.
11     Q BY MR. SAFARIAN:  Have you communicated with any
12 law enforcement?
13     MR. MALONE:  I'm just going to interpose.  Her
14 husband is a sheriff.  So to the extent that there's a
15 crossover there, please be advised of that, Sabrina.
16     Q BY MR. SAFARIAN:  I'm not going to ask you any
17 personal communications between your husband.  But has
18 this -- has this issue even come up between you and your
19 husband, aside from the fact you're being deposed?
20     A    No.  Just the fact that I had a meeting this
21 morning, that I'm being deposed.
22     **Q    Okay.  Very good.  Thank you.  By the way,**
23 **we've been going for about an hour.  I know we had a very,**
24 **very rough start, and I apologize for that.  Are you**
25 **comfortable going forward or do you want to get a restroom**

51

1 **break going or anything like that?**
2     A    I'm okay right now.  Thank you.
3     **Q    Okay.  I didn't realize until Mr. Malone**
4 **mentioned that you're expecting.  So, first and foremost,**
5 **congratulations.  I'm very happy for you.**
6     A    Thank you.
7     **Q    I've got three of them.  Time goes very fast,**
8 **so enjoy it.  But if there's anything you need me to do to**
9 **accommodate you today, please say the word.  Okay?**
10     A    Thank you.
11     **Q    Thank you.**
12     MR. SAFARIAN:  Mr. Safarian, before you start going
13 again, I can go another 10 or 15 minutes, then I'd like a
14 bathroom break, actually.
15     MR. SAFARIAN:  I don't want you to hold it if you
16 feel like it's coming on.
17     MR. MALONE:  I'd appreciate a bathroom break, then,
18 yes.
19     MR. SAFARIAN:  Fine.  Why don't we come back -- is
20 10:20 acceptable?
21     MR. MALONE:  Yes, 10:20 is acceptable.
22     MR. SAFARIAN:  Thank you.
23     MR. MALONE:  Okay.
24     THE VIDEOGRAPHER:  We are off the record at 10:15
25 a.m.

52

1         (Break taken)
2     THE VIDEOGRAPHER:  We are on the record at 10:23
3 a.m.
4     Q BY MR. SAFARIAN:  Ms. French, I just want to
5 confirm that you have seen this document that I have up on
6 the screen.  It's called a First Amended Notice of
7 Deposition of PMP Management Employees and Requests for
8 Production of Documents.  And it lists you as the deponent
9 for today at 9:00 a.m.  Do you see that?
10     A    Yes.
11     **Q    Very good.  And we've also got some other PMP**
12 **employees, including Mikaela Collerd July 12 at 10:00 a.m.**
13 **Do you see that?**
14     A    Yes.
15     **Q    You've seen this before, correct?**
16     A    Yes.
17     **Q    And you said you first saw it about ten days**
18 **ago?**
19     MR. MALONE:  Misstates testimony.  Go ahead.
20     THE WITNESS:  Yes, I believe roughly around that
21 time.
22     Q BY MR. SAFARIAN:  And did you read it from the
23 first page all the way through the last page?
24     A    Yes.
25     **Q    And you -- in looking at this -- I'm going to**

53

1  stop the screen share.  We're going to mark this as Exhibit
2  1.
3     (Defendant's Exhibit 1 was marked for identification)
4     Q BY MR. SAFARIAN:  You understood that some
5  documents had to be produced, correct?
6     MR. MALONE:  Misstates testimony.
7     THE WITNESS:  Yes.
8     Q BY MR. SAFARIAN:  And your review for documents
9  was limited only to your own personal files, correct?
10    A    That is correct.
11    Q    And pretty soon after this incident happened,
12  it was your suggestion to get legal counsel involved,
13  correct?
14    MR. MALONE:  Assumes facts, lacks foundation,
15  misstates prior testimony.
16    Q BY MR. SAFARIAN:  Am I correct?
17    MR. MALONE:  Vague.
18    THE WITNESS:  Yes.
19    Q BY MR. SAFARIAN:  And although you got legal
20  counsel involved -- well, after getting legal counsel
21  involved, did you undertake any efforts to protect or
22  preserve any evidence that might be related to this case?
23    MR. MALONE:  Lacks foundation, vague, calls for
24  legal conclusion.
25    Q BY MR. SAFARIAN:  You may answer.

54

1     A    I was not in receipt of any documents or
2  evidence.
3     Q    I understand you were not in receipt of any,
4  but as somebody who is within PMP, did you undertake any
5  efforts to make sure any evidence concerning this incident
6  or related to the litigation that you recommended hiring
7  counsel for was protected or preserved?
8     MR. MALONE:  Asked and answered, calls for a legal
9  conclusion, vague.
10    Q BY MR. SAFARIAN:  You may answer.
11    A    I don't know how to answer it because I
12  wouldn't have been able to.
13    Q    Well, for example, did you reach out to the
14  board and say we've hired counsel.  Any writings that are
15  prepared or other evidence prepared should be preserved so
16  that they can be used in litigation?
17    MR. MALONE:  Incomplete hypothetical, same
18  objections.
19    THE WITNESS:  I was not involved.
20    MR. MALONE:  Misstates testimony.
21    Q BY MR. SAFARIAN:  Is it a true statement that you
22  did not reach out to the board and ask them to preserve any
23  evidence relating to this case?
24    MR. MALONE:  Same objection, lacks foundation.
25    THE WITNESS:  That's true -- that's correct.

55

1     Q BY MR. SAFARIAN:  Is it a true statement that you
2  did not contact anyone within PMP and ask them to preserve
3  any evidence regarding this case?
4     MR. MALONE:  Calls for a legal conclusion, same
5  objections as before, lacks foundation, asked and answered,
6  vague.
7     THE WITNESS:  I do not recall, no.
8     Q BY MR. SAFARIAN:  So, as you sit here now, is it a
9  true statement that you have no recollection of ever asking
10  anyone to protect or preserve any evidence regarding this
11  case?
12    MR. MALONE:  Same objections and it is
13  argumentative.
14    THE WITNESS:  Only recommendation was to contact
15  legal.
16    Q BY MR. SAFARIAN:  Okay.  So, just to be clear, the
17  only recommendation you've ever made in this case was to
18  contact lawyers, correct?
19    A    That is correct.
20    MR. MALONE:  Same objections.  Hold on one second,
21  Sabrina.  Wait a beat.  Same objections.
22    Q BY MR. SAFARIAN:  Was it ever brought to your
23  attention that my client -- well, was it ever brought to
24  your attention that Ms. Nazaretyan lives in a household
25  with other individuals?

56

1     MR. MALONE:  Vague.
2     THE WITNESS:  No.
3     Q BY MR. SAFARIAN:  Was it ever brought to your
4  attention that Ms. Nazaretyan had a disabled son?
5     MR. MALONE:  Vague, assumes facts, lacks foundation,
6  calls for a legal conclusion and a medical opinion.
7     Q BY MR. SAFARIAN:  You may answer.
8     A    I'm not sure how to answer that question.
9  No.
10    Q    Was anything ever said to you about the
11  health of Garnik Nazaretyan?
12    MR. MALONE:  Same objections.  And remember the
13  attorney-client privilege stands, Sabrina.
14    THE WITNESS:  No.
15    Q BY MR. SAFARIAN:  Did you ever inquire of the
16  board or anyone else in any respect as it relates to any
17  member of the Nazaretyan household?
18    MR. MALONE:  Same objections and vague.
19    THE WITNESS:  No.
20    Q BY MR. SAFARIAN:  Are you aware of anybody ever
21  undertaking any investigation regarding Garnik's health?
22    MR. MALONE:  Same objections, calls for expert
23  opinion and a legal conclusion as well.
24    THE WITNESS:  No.
25    Q BY MR. SAFARIAN:  Are you aware of anyone ever

57

1 engaging in any type of interactive process to address any
2 health issues that Garnik Nazaretyan might have had?
3     MR. MALONE:  Same objections, emphasizing legal
4 conclusion, expert medical opinion.
5     THE WITNESS:  No.
6     Q BY MR. SAFARIAN:  Are you aware of anybody acting
7 within PMP or the HOA recommending the hiring of anybody
8 with any expertise within the area of mental health?
9     MR. MALONE:  Same objections and also compound and
10 disjointed and vague.
11     THE WITNESS:  No.
12     Q BY MR. SAFARIAN:  Are you aware of anyone within
13 the HOA that has any expertise in the area of mental
14 health?
15     MR. MALONE:  Same objections.
16     THE WITNESS:  No.
17     Q BY MR. SAFARIAN:  Are you aware of anyone within
18 PMP having any expertise in the area of mental health?
19     MR. MALONE:  Same objections.
20     THE WITNESS:  No.
21     Q BY MR. SAFARIAN:  With regard to some of the
22 documents that we've asked for, such as management manuals,
23 policies, procedures, rules, regulations, are those sort of
24 things kept electronically within PMP?
25     MR. MALONE:  Lacks foundation, speculative, vague.

58

1     THE WITNESS:  Some are, yes.
2     Q BY MR. SAFARIAN:  In terms of those kinds of
3 documents, what things are available electronically?
4     MR. MALONE:  Same objections.
5     THE WITNESS:  Their rules and regulations, the
6 governing documents.  I don't remember the rest of the list
7 that you had.
8     Q BY MR. SAFARIAN:  Do you have any manuals on how
9 the properties are to be managed?
10     MR. MALONE:  Vague.
11     THE WITNESS:  Not manuals.  Sorry.  Not manuals.
12     Q BY MR. SAFARIAN:  Any writings that discuss how
13 the properties are to be managed?
14     A     Just the association governing documents.
15     Q     For example, does PMP have any guidelines on
16 how its own employees or representatives are to conduct
17 themselves as it relates to property management?
18     MR. MALONE:  Can you repeat the question, Harry?  I
19 didn't catch it all.  For some reason, it glitched out.
20     MR. SAFARIAN:  No problem.
21     MR. MALONE:  Thank you.
22     Q BY MR. SAFARIAN:  For example, does PMP have any
23 writings that discuss in any way how its own personnel are
24 to handle property management?
25     MR. MALONE:  Vague, compound, asked and answered.

59

1     THE WITNESS:  We have an employee handbook.
2     Q BY MR. SAFARIAN:  Does the employee handbook
3 discuss how to address things such as conflict within the
4 HOA community?
5     MR. MALONE:  Vague, calls for speculation.
6     THE WITNESS:  I don't believe so.
7     Q BY MR. SAFARIAN:  Does it discuss how a community
8 manager or persons involved in community management are to
9 do their jobs?
10     MR. MALONE:  Same objection and vague.
11     THE WITNESS:  No.
12     Q BY MR. SAFARIAN:  Do you have any writings that
13 discuss policies and procedures regarding maintaining
14 electronic communication?
15     MR. MALONE:  Same objections, asked and answered.
16     THE WITNESS:  No.
17     Q BY MR. SAFARIAN:  Have you communicated with any
18 witnesses to the incident involving Garnik that we're here
19 about today?
20     MR. MALONE:  Asked and answered, vague.
21     THE WITNESS:  No.
22     MR. MALONE:  Calls for a legal conclusion.
23     Q BY MR. SAFARIAN:  I think the answer was no, But
24 there was some crosstalk.  Was your answer no to that
25 question, Ms. French?

60

1     A     No.  Yes, it was no.
2     Q     Okay.  Thank you.  I guess it's two nos and a
3 yes, so the nos prevail, right?
4         Have you seen any evidence in any form as it
5 relates to Garnik's conduct at any time?
6     MR. MALONE:  Same objections, calls for a legal
7 conclusion, vague, overbroad.
8     THE WITNESS:  Can you reframe the question?  I don't
9 really understand.
10     Q BY MR. SAFARIAN:  Sure.  You understand there's
11 some allegations that Garnik did some things at this
12 property that the HOA found objectionable, correct?
13     A     Yes.
14     Q     So have you seen with your own eyes or heard
15 with your ears any of -- any evidence relating to those
16 events?
17     MR. MALONE:  Same objections, calls for speculation,
18 calls for legal conclusion.
19     THE WITNESS:  No.
20     Q BY MR. SAFARIAN:  Has anyone summarized for you,
21 aside from your lawyers, what transpired?
22     MR. MALONE:  Asked and answered, vague.
23     THE WITNESS:  Yes.
24     Q BY MR. SAFARIAN:  Who is that?
25     A     Frank Jauregui.

61

16 (Pages 58 to 61)

1  Q    Are you aware where Frank got his information
2  from?
3       MR. MALONE:  Calls for speculation, lacks
4  foundation.
5       THE WITNESS:  I do not know.
6       Q BY MR. SAFARIAN:  And was Frank's communication to
7  you the one email?
8       MR. MALONE:  Misstates prior testimony.
9       MR. SAFARIAN:  I'm not stating her testimony.
10 I'm asking her in the form of a question was Frank's
11 communication to you regarding that one email?
12      A    No.
13      MR. MALONE:  Vague.
14      Q BY MR. SAFARIAN:  Was it verbal?
15      A    Yes.
16      Q    And can you tell me in your own best words
17 what Frank said?
18      MR. MALONE:  Calls for a narrative, lacks
19 foundation.
20      THE WITNESS:  That a situation or altercation
21 occurred on the property.  There was blood involved, and it
22 did end up out in the common area.  That's the ultimate
23 conversation.
24      Q BY MR. SAFARIAN:  Anything else that you learned
25 about this?

                                                        62

1       MR. MALONE:  Calls for a narrative.
2       THE WITNESS:  I don't recall.
3       Q BY MR. SAFARIAN:  Okay.  So, at the time that you
4  suggested that legal counsel get involved, the information
5  you had was that there was a situation or altercation on
6  the property, there was blood involved, and it ended up in
7  the common area; is that correct?
8       A    That's correct.
9       Q    Do you recall learning anything else before
10 getting legal counsel involved?
11      MR. MALONE:  Asked and answered, misstates prior
12 testimony.
13      Q BY MR. SAFARIAN:  You may answer.
14      A    No.
15      Q    Do you recall any subsequent events ever
16 happening since the one incident?
17      MR. MALONE:  Vague, calls for a legal conclusion,
18 lacks foundation.
19      Q BY MR. SAFARIAN:  You may answer the question,
20 Ms. French.
21      A    No.
22      Q    Okay.  Do you recall any incidents prior to
23 the one incident that we're here about today that you
24 mentioned involving Garnik at the HOA community?
25      MR. MALONE:  Same objections.

                                                        63

1       THE WITNESS:  No.
2       Q BY MR. SAFARIAN:  Is it a fair statement that the
3  only incident you have ever heard of or that has ever been
4  brought to your attention regarding Garnik is the one
5  incident?
6       MR. MALONE:  Misstates prior testimony, calls for a
7  legal conclusion, is vague.
8       THE WITNESS:  Yes, this is the only incident that
9  I've heard of.
10      Q BY MR. SAFARIAN:  Okay.  You've never been to the
11 property, I understand, but are you aware of how residents
12 or occupants of the HOA community access various areas of
13 the building using keys or access cards?
14      MR. MALONE:  Vague.
15      THE WITNESS:  I know that there is access devices to
16 enter the common area and the community, yes.
17      Q BY MR. SAFARIAN:  And how do you know that
18 information?
19      MR. MALONE:  Calls for speculation.
20      THE WITNESS:  Because I am aware that it is a gated
21 community.
22      Q BY MR. SAFARIAN:  And aside from knowing that it
23 is a gated community, do you have any information regarding
24 the details of access?
25      MR. MALONE:  Vague.

                                                        64

1       THE WITNESS:  What details?
2       Q BY MR. SAFARIAN:  Well, for example, some gated
3  communities you need access cards or keys to get into the
4  community itself, and then once you're in, you can go
5  pretty much anywhere in the common areas.  And others
6  require access cards to get into certain areas within the
7  common area, such as a gym, a sauna, a recreation room.
8       So I guess my question to you is stated
9  simply:  You're aware that access devices or cards or keys
10 are used to get into the common area, correct?
11      MR. MALONE:  Vague.
12      THE WITNESS:  That's correct.
13      Q BY MR. SAFARIAN:  Once you get in -- think of it
14 as a big circle, right, with a bunch of circles inside and
15 different common area features.  Once you get in, are there
16 other areas within the common areas that you're aware of
17 that requires access cards or keys to access?
18      BY MR. MALONE:  Incomplete hypothetical, vague.
19      THE WITNESS:  To the best of my knowledge, I do
20 believe there are other areas that require access.
21      Q BY MR. SAFARIAN:  And what are those, please?
22      MR. MALONE:  Calls for a narrative.
23      THE WITNESS:  I believe they have a pool or a
24 recreational facility.
25      Q BY MR. SAFARIAN:  Any other information you can

                                                        65

                                        17 (Pages 62 to 65)

---

1  offer on that?
2      MR. MALONE:  Narrative, vague, lacks foundation.
3      THE WITNESS:  No.
4      Q BY MR. SAFARIAN:  And did you have any
5  Involvement -- let me strike that.
6      Has anyone ever discussed with you activating
7  or deactivating any cards or devices for the Nazaretyan
8  household?
9      MR. MALONE:  Lacks foundation, calls for a legal
10  conclusion, assumes facts not in evidence.
11      THE WITNESS:  Not with me, correct.
12      Q BY MR. SAFARIAN:  Have you heard of any
13  conversations outside of counsel?
14      MR. MALONE:  Same objections.
15      THE WITNESS:  Not to my knowledge.
16      Q BY MR. SAFARIAN:  For example, did you ever hear
17  that the Nazaretyan household had their access to the
18  community terminated or suspended using their access cards,
19  just to get into the complex, did you ever learn that?
20      MR. MALONE:  Asked and answered, lacks foundation,
21  calls for speculation and assumes facts.
22      THE WITNESS:  Not to my knowledge.
23      Q BY MR. SAFARIAN:  Okay.  Did anyone ever consult
24  you as it relates to the activation or deactivation of the
25  Nazaretyan household access to any part of the community?

66

---

1      MR. MALONE:  Same objections, asked and answered.
2      THE WITNESS:  I don't recall ever being consulted,
3  no.
4      Q BY MR. SAFARIAN:  Do you know who would have the
5  authority to determine whether there should be activation
6  or deactivation of an access card for the Nazaretyan member?
7      MR. MALONE:  Same objections and also calls for a
8  legal conclusion.
9      THE WITNESS:  Yes, the board of directors.
10      Q BY MR. SAFARIAN:  You're aware that from time to
11  time certain access to common area features might be
12  terminated if a member does not pay HOA dues?  Have you
13  heard that happening before?  Not in this case
14  specifically, but generally?
15      MR. MALONE:  Incomplete hypothetical, lacks
16  foundation, calls for a legal conclusion.
17      Q BY MR. SAFARIAN:  I didn't hear --
18      A  Yes, I have.  I've heard of that before.
19      Q  Have you ever heard of the Nazaretyan
20  household ever missing a single HOA dues payment?
21      MR. MALONE:  Same objections.
22      THE WITNESS:  I do not know if they have ever
23  missed.
24      Q BY MR. SAFARIAN:  Aside from this one
25  information -- this one incident that you heard secondhand

67

---

1  about from Frank, are you aware of anyone in the Nazaretyan
2  household ever doing anything, even in the slightest way,
3  bother another person within the community?
4      MR. MALONE:  Lacks foundation, calls for
5  speculation, calls for a legal conclusion, asked and
6  answered.
7      THE WITNESS:  No.
8      Q BY MR. SAFARIAN:  Did you ever call anyone or
9  email anyone to obtain more facts regarding the incident
10  that we're here about today?
11      MR. MALONE:  Asked and answered, lacks foundation.
12      THE WITNESS:  No.
13      Q BY MR. SAFARIAN:  The email that Frank sent you,
14  what efforts did you make to search for it?
15      MR. MALONE:  Calls for a narrative.
16      THE WITNESS:  I went through my Outlook and my files
17  to see if it was saved and tried to retrieve it.
18      Q BY MR. SAFARIAN:  What search efforts -- what
19  search methods did you use?
20      MR. MALONE:  Calls for expert opinion and asked and
21  answered.
22      THE WITNESS:  I searched through Outlook.
23      Q BY MR. SAFARIAN:  Yeah, sometimes people will
24  engage in certain types of search methods, for example,
25  they'll serve by date, they'll search by sender, they'll

68

---

1  search by recipient.
2      A  Oh.
3      Q  They'll use key words to search.
4  Specifically can you tell me what you did in any of those
5  regards?
6      MR. MALONE:  Compound.
7      THE WITNESS:  From sender, address, and name.
8      Q BY MR. SAFARIAN:  You searched using sender,
9  address, and name?
10      A  Correct.
11      Q  Any other methods that you used?
12      A  No.
13      Q  Okay.  Very good.  And did you find any
14  emails from Frank?
15      A  No.
16      Q  So each and every email that Frank had ever
17  sent you or that you had ever sent Frank was gone?
18      MR. MALONE:  Misstates testimony.
19      Q BY MR. SAFARIAN:  Well, let me rephrase that.  You
20  had over time sent and received emails from Frank, correct?
21      A  Yeah.
22      Q  And Frank for a period of time was
23  responsible for the Aldea Community Association, correct?
24      A  Yeah.
25      Q  Was Frank responsible for the Aldea Community

69

18 (Pages 66 to 69)

ELITE COURT REPORTING (949) 829-9222

1    Association at the time of this incident?
2        MR. MALONE:  Calls for speculation, asked and
3    answered.
4        THE WITNESS:  Yes.
5        MR. MALONE:  Calls for a legal conclusion.
6    Q BY MR. SAFARIAN:  Did you say yes?
7        A    Yes.
8        Q    And when you went back to look for emails and
9    other writings in response to our document requests, you
10   observed that each and every email that you had ever sent
11   Frank or that Frank had ever sent you was no longer
12   available to you, correct?
13       A    For this situation.
14       Q    Okay.  Did you have emails from other
15   situations?
16       MR. MALONE:  Vague.
17       Q BY MR. SAFARIAN:  Well, let me rephrase that.  Did
18   you find any emails that you sent Frank or Frank sent you
19   when you went to do your search in response to our document
20   requests?
21       A    I guess I'm not understanding the question.
22   Frank had many communities.
23       Q    Okay.  I guess the simple way of framing it
24   is:  When you went back to look for emails from Frank's
25   email address or using Frank's name, did any emails come

70

1    up?
2        A    Yes.
3        Q    Okay.  So you had some emails that went back
4    to the time that Frank worked within the company, correct?
5        A    Yes.
6        Q    And Frank left the company approximately
7    when?
8        A    I do not have that date.  He was terminated.
9        Q    Okay.  And can you approximate when he was
10   terminated?
11       A    No.
12       Q    Can you tell me whether it was prior to
13   COVID?
14       A    Yes.
15       MR. MALONE:  You can estimate.
16       Q BY MR. SAFARIAN:  You spoke over each other.
17   Ms. French, was Frank terminated prior to COVID becoming a
18   thing?
19       A    Yes.
20       Q    Okay.  So I know that COVID, the lockdown
21   happened early 2020.  You would agree with me that he was
22   terminated before early 2020, correct?
23       A    Yes, I believe so.
24       Q    Okay.  Now, how far before early 2020 you
25   couldn't estimate, correct?

71

1        A    That's correct.
2        Q    Okay.  But you have in your email records
3    emails from Frank that go back several years, including
4    before COVID, correct?
5        A    Yes.
6        MR. MALONE:  Vague.
7        Q BY MR. SAFARIAN:  But you do not have any emails
8    from Frank regarding Aldea; is that correct?
9        MR. MALONE:  Vague, calls for a legal conclusion.
10       THE WITNESS:  Regarding this situation.
11       Q BY MR. SAFARIAN:  Okay.  So you have -- can you
12   estimate how many emails you saw from Frank when you went
13   to go do your search, whether it was in the dozens or
14   hundreds?
15       A    No.
16       Q    You searched within the last ten days,
17   correct?
18       A    Yes.
19       Q    And within the last ten days when you went to
20   go look by sender, you saw that emails populated when you
21   looked up Frank's email address, correct?
22       A    Yes.
23       Q    And it wasn't one email.  It was multiple
24   emails, correct?
25       A    Yes.

72

1        Q    Can you estimate whether it was more than 50?
2        A    I did not count, so no, I cannot estimate
3    that.
4        Q    Okay.  Just go looking back in your mind's
5    eye when you saw these emails populating on your screen,
6    can you tell me whether it was more than 50 or less than
7    50?
8        MR. MALONE:  Asked and answered.
9        THE WITNESS:  No, I cannot.
10       Q BY MR. SAFARIAN:  Would you agree with me that it
11   was at least ten?
12       MR. MALONE:  Asked and answered.
13       THE WITNESS:  I guess an estimate could be ten.  I
14   did not count.
15       Q BY MR. SAFARIAN:  Okay.  So you had emails from
16   Frank, but the one email that relates to this incident was
17   not preserved, agreed?
18       MR. MALONE:  Misstates -- misstates testimony and
19   calls for an expert opinion.
20       Q BY MR. SAFARIAN:  You may answer.
21       MR. MALONE:  It's vague.
22       THE WITNESS:  Not that I could locate, correct.
23       Q BY MR. SAFARIAN:  Can you -- do you have any
24   information as to why you have emails from Frank from
25   several years back, but you don't have the one email that

73

1  relates to this incident?
2      MR. MALONE:  Calls for a narrative, vague,
3  argumentative, lacks foundation.
4      THE WITNESS:  I have many files, as discussed
5  earlier, that have been saved with Frank's name, so when
6  you search his name, it comes up out of every file.
7      Q BY MR. SAFARIAN:  I understand.  But I guess my
8  question is:  Some were saved and some were deleted.  Is
9  there a reason why the email here was deleted and not
10 saved?
11     MR. MALONE:  Assumes facts.  It assumes facts, it
12 lacks foundation.
13     Q BY MR. SAFARIAN:  You may answer.
14     A    I don't know if it was deleted or archived
15 from our company IT.  I just know what I've researched.
16     **Q    Okay.  Well, the particular incident here was**
17 **a few years ago, and you have emails from a few years ago.**
18         **When you went to look for your emails, did**
19 **you go to the company IT and ask them to see if they could**
20 **find this particular email?**
21     MR. MALONE:  Asked and answered, argumentative.
22     THE WITNESS:  No.
23     Q BY MR. SAFARIAN:  But you knew that there was an
24 email at the time you were doing your search, correct,
25 because you remembered it?

74

1      MR. MALONE:  Misstates testimony, asked and
2  answered, argumentative.
3      Q BY MR. SAFARIAN:  You may answer.
4      A    I recall there being an email, yes.
5      **Q    So when you recalled there being an email,**
6  **and you knew you were coming here for this deposition**
7  **proceeding, and you knew you had to produce documents, did**
8  **you reach out to anybody to help you locate the one email**
9  **-- the one and only email you received regarding this**
10 **incident?**
11     MR. MALONE:  Asked and answered, argumentative.
12     THE WITNESS:  No.
13     Q BY MR. SAFARIAN:  Okay.  Did anyone tell you that
14 the Nazaretyan household's access cards at any point in
15 time were treated differently than other members of the
16 community?
17     MR. MALONE:  Vague, assumes facts, lacks foundation,
18 calls for a legal conclusion, asked and answered.
19     THE WITNESS:  No.
20     Q BY MR. SAFARIAN:  Aside from this case, and I'm
21 not presuming you know or don't know anything about what
22 happened to the Nazaretyan access cards, but have you ever
23 heard of a member of the HOA having their access cards
24 terminated such that they could not walk into the community
25 using their access cards?

75

1      MR. MALONE:  Incomplete hypothetical, lacks
2  foundation, assumes facts, vague.
3      THE WITNESS:  This is for the Aldea community or in
4  general?
5      Q BY MR. SAFARIAN:  Any community ever in the
6  history of your many years of management have you ever
7  heard of an incident where members of the community who
8  lived at the community had their access cards denied such
9  that they could not come in through the front door and go
10 to their homes?
11     A    Yes.
12     MR. MALONE:  Same objections.  Sorry.  Please take a
13 beat, Sabrina.
14     Q BY MR. SAFARIAN:  You may answer.
15     A    Yes.
16     **Q    Under what circumstances has that occurred?**
17     MR. MALONE:  Calls for a narrative.
18     THE WITNESS:  Violation infraction, not paying your
19 dues, rules and regulations being broken.
20     Q BY MR. SAFARIAN:  So, in this case, are you
21 aware -- do you have any information of the Nazaretyan
22 household not paying dues?
23     MR. MALONE:  Asked and answered, calls for a legal
24 conclusion.
25     THE WITNESS:  No.

76

1      Q BY MR. SAFARIAN:  Aside from the one incident that
2  Frank reported, are you aware of any type of infraction or
3  misconduct by the Nazaretyan household?
4      MR. MALONE:  Asked and answered, calls for a legal
5  conclusion.
6      THE WITNESS:  Not to my knowledge.
7      Q BY MR. SAFARIAN:  Have you ever had reason as a
8  professional manager of HOA communities to become involved
9  in helping accommodate a person with disabilities?
10     MR. MALONE:  Calls for a legal conclusion,
11 incomplete hypothetical, calls for a narrative, lacks
12 foundation.
13     THE WITNESS:  Yes.
14     Q BY MR. SAFARIAN:  And how many times can you
15 estimate that has happened?
16     A    I'm estimating, maybe a handful.
17     **Q    Five or so?**
18     A    Yes, that I know were actual requests for
19 disabilities.
20     **Q    So what kinds of disabilities?  Can you give**
21 **me some examples?**
22     MR. MALONE:  Calls for a narrative, calls for a
23 medical expert opinion and a legal conclusion.
24     THE WITNESS:  Age, physical.
25     Q BY MR. SAFARIAN:  Like somebody in a wheelchair?

77

ELITE COURT REPORTING (949) 829-9222

1   A   Yeah.
2   Q   And as a community association manager,
3   you've been trained to understand that disabilities come in
4   all various forms, correct?
5       MR. MALONE:  Vague, incomplete hypothetical.
6       THE WITNESS:  That is correct.
7       Q BY MR. SAFARIAN:  For example, someone might be
8   blind, deaf or not be able to walk, those are all
9   disabilities that you've been taught exist, correct?
10      MR. MALONE:  Same objections, calls for a medical
11  expert opinion and a legal conclusion.
12      THE WITNESS:  That's correct.
13      Q BY MR. SAFARIAN:  And you also understand that
14  there are mental disabilities at times, correct?
15      MR. MALONE:  Vague, and the other objections
16  previously stated.
17      THE WITNESS:  That is correct.
18      Q BY MR. SAFARIAN:  And in the case of people who
19  have these physical disabilities, have you engaged in some
20  type of an interactive process where you discussed the
21  disability and how the person could be accommodated?
22      MR. MALONE:  That's vague and calls for a legal
23  conclusion and calls for an expert medical opinion.
24      Q BY MR. SAFARIAN:  You may answer.
25      A   Can you rephrase the question.

78

1   Q   Sure.  In cases where people have -- you've
2   been involved or heard of in your experience as an HOA
3   professional, when someone has presented with a request to
4   accommodate a disability, you've been involved in that
5   process of listening to the issue and helping to address
6   it, correct?
7       MR. MALONE:  Same objections, it's an incomplete
8   hypothetical and it lacks foundation.
9       THE WITNESS:  That's correct.
10      Q BY MR. SAFARIAN:  Can you tell me some of the
11  things that you've done in that regard, like, you know, did
12  you sit down and talk with someone?  Did you talk to a
13  doctor?  Did you go to a meeting?  Those kinds of things.
14  Can you tell me -- let me rephrase this or start over.
15          When someone presents with a disability,
16  that's something you consider very serious, correct?
17      MR. MALONE:  Vague, calls for a medical expert
18  opinion.
19      THE WITNESS:  That's correct.
20      MR. MALONE:  Legal conclusion.
21      Q BY MR. SAFARIAN:  You give it great importance,
22  correct?
23      MR. MALONE:  Same objections.
24      THE WITNESS:  That's correct.
25      Q BY MR. SAFARIAN:  And as an HOA community manager,

79

1   you understand that that requires you to listen and
2   understand what the person is experiencing and needs,
3   correct?
4       MR. MALONE:  Same objections, including legal
5   conclusion.
6       THE WITNESS:  That's correct.
7       Q BY MR. SAFARIAN:  So there's a process where you
8   listen and you learn about the person and their needs,
9   correct?
10      MR. MALONE:  Same objections.
11      THE WITNESS:  That's correct.
12      Q BY MR. SAFARIAN:  And there's a process where you
13  undertake your own investigation to determine how to
14  address the person's needs, correct?
15      MR. MALONE:  Same objections.
16      THE WITNESS:  That's correct.
17      Q BY MR. SAFARIAN:  So, in this particular case, are
18  you aware of anyone undertaking any process whereby
19  Garnik's needs, given his condition, were listened to or
20  investigated by anyone?
21      MR. MALONE:  Same objections, lacks foundation,
22  calls for a medical expert opinion and a legal conclusion,
23  and calls for speculation, incomplete hypothetical and
24  lacks foundation.
25      THE WITNESS:  I would be guessing at that question.

80

1   Q BY MR. SAFARIAN:  Is it a fair statement that, as
2   you sit here now, you have no information that anyone
3   undertook any type of an effort to understand Garnik's
4   disability or special needs?
5       MR. MALONE:  Same objections, misstates testimony.
6       THE WITNESS:  I cannot answer that question.
7       Q BY MR. SAFARIAN:  I'm not asking you to tell me
8   what was done.  I'm asking for you to tell me do you have
9   any information personally, so I'm asking about what you
10  know.  Do you, Sabrina French, is all I'm asking about, not
11  some other person.  So let me ask the question again.
12          Do you personally have any information if
13  anything was ever done to learn about or accommodate
14  Garnik's special needs or disabilities?
15      MR. MALONE:  Same objection and vague.
16      THE WITNESS:  No.
17      Q BY MR. SAFARIAN:  And i want you to know I'm not
18  faulting you for that.  I know a lot of this information
19  wasn't brought to you.  I'm just asking questions to help
20  understand.  This is -- you know, I see that a lot of
21  things were perhaps not shared with you, so I don't want
22  you to think that this is me being critical of you at all.
23  I just have to ask these things.
24          We've been going for about 40 minutes.  Why
25  don't we take a five minute break.  I'm going to try to

81

21 (Pages 78 to 81)

1  finish up by noon, Ms. French, and get you out of here.  If
2  there is anything I can do to make this process more
3  efficient and convenient for you, would you please tell me.
4      A    Yeah.
5      **Q    Okay.  I want you to know there were sparks**
6  **at the beginning.  They were not directed towards you.**
7  **It's very, very uncharacteristic of a deposition.  When you**
8  **leave here today, I want you to feel like as though I**
9  **treated you respectfully and politely.  And if I ever do**
10 **anything in the deposition that makes you feel otherwise,**
11 **would you please let me know?**
12     A    Yes.
13     MR. SAFARIAN:  Thank you so much.
14     MR. MALONE:  We're off?
15     THE VIDEOGRAPHER:  We are off the record at 10:59
16 a.m.
17     MR. MALONE:  Thank you.
18         (Break taken)
19     THE VIDEOGRAPHER:  We are on the record at 11:10
20 a.m.
21     Q BY MR. SAFARIAN:  Ms. French, do you know by name
22 any of the current board members?
23     A    A few I would say.
24     **Q    Can you list them for me?**
25     A    Maribel.

82

1      **Q    Do you know her last name?**
2      A    Not off the top of my head.
3      **Q    Do you know when she was elected to the**
4  **board?**
5      A    Within the last few months.
6      **Q    Okay.  Anybody else?**
7      A    Dan.  I do not know his last name.
8      **Q    Is he also a recent admittee to the board?**
9      A    Yes.
10     **Q    Okay.**
11     A    Jerome.
12     **Q    Okay.  He's been on the board for a while,**
13 **correct?**
14     A    He has been on the board different times.
15 There's been breaks in between, from my understanding.
16     **Q    That's Jerome Black, correct?**
17     A    Correct.
18     **Q    And is he currently on the board?**
19     A    Yes.
20     **Q    Okay.**
21     A    And I believe -- there's two more, but the
22 only one I can recollect is Ty, T-y.
23     **Q    And he's also a recent board member, correct?**
24     A    Yes.
25     **Q    Okay.  And have you discussed the particular**

83

1  **circumstances of this case with any of these board members?**
2      MR. MALONE:  Vague.
3      Q BY MR. SAFARIAN:  You may answer.
4      A    No.
5      **Q    Have you discussed the circumstances of this**
6  **case with any of the prior board members who you've not**
7  **listed?**
8      MR. MALONE:  Vague.
9      Q BY MR. SAFARIAN:  You may answer.
10     A    I don't believe so.
11     **Q    Has any board member reached out to you for**
12 **advice?**
13     MR. MALONE:  Vague.
14     Q BY MR. SAFARIAN:  Regarding this incident.
15     A    No.
16     **Q    And you understand that your company provides**
17 **a professional management service that -- well, I'll**
18 **withdraw that.**
19         **Without revealing the substance of any**
20 **meetings, can you tell me how many meetings you have**
21 **attended -- well, strike that.**
22         **Is it a fair statement that you've never**
23 **attended any board meetings where this incident was**
24 **discussed?**
25     MR. MALONE:  Vague, asked and answered.

84

1      Q BY MR. SAFARIAN:  You may answer.
2      A    Yes, that's a fair statement.
3      **Q    I'm going to go back to the situation of the**
4  **community access cards being deactivated.  What's the**
5  **longest period of time you've been aware of an access card**
6  **being deactivated for an infraction?**
7      MR. MALONE:  Vague, incomplete hypothetical, calls
8  for a legal conclusion.  You can answer, though.
9      THE WITNESS:  I would not -- I don't know of an end
10 date, to my knowledge.
11     Q BY MR. SAFARIAN:  Is there anybody within PMP who
12 will investigate to determine whether there is -- well,
13 strike that.
14         If it's brought to your attention as a
15 community manager that someone within a community is asking
16 for an accommodation because of a disability, is there a
17 process that PMP will engage in?
18     MR. MALONE:  Calls for speculation, calls for a
19 legal conclusion, asked and answered, and lacks foundation.
20     THE WITNESS:  Yes, depending on the request.
21     Q BY MR. SAFARIAN:  Can you give me some examples?
22     MR. MALONE:  Calls for a narrative and same
23 objections.
24     THE WITNESS:  We ask for written documentation of
25 the request, and then we provide that written documentation

85

22  (Pages 82 to 85)

1  to the board of directors for their review at a board
2  meeting.  Depending on that review, we then would recommend
3  that the attorney be involved if it's something the board
4  is unable to answer.
5      Q BY MR. SAFARIAN:  Let's say hypothetically the
6  person presenting the documentation speaks limited English
7  and the documents are disorganized.  Do you see that, as a
8  professional community association manager, as grounds to
9  turn away the documents and reject them?
10      MR. MALONE:  These are incomplete hypotheticals and
11  call for a legal conclusion.
12      Q BY MR. SAFARIAN:  You may answer.
13      A    I don't believe so.  We would ask for more
14  substantial information to be able to present on their
15  behalf.
16      **Q    Okay.  So if somebody comes to the board and**
17  **the board member determines that the documents are, quote,**
18  **"disjointed," that's the board member's word, would you**
19  **support the board member turning away the documents and not**
20  **reviewing them?**
21      MR. MALONE:  Lacks foundation and the same
22  objections as before.
23      THE WITNESS:  I wouldn't be able to support it.
24  We'd just take directive from the board.
25      Q BY MR. SAFARIAN:  Okay.  If the board came to you,

86

---

1  as the community association manager, and said we've
2  received these medical records, but they're disorganized,
3  so we intend to turn them away, would you agree with that
4  process?
5      MR. MALONE:  Same objections, incomplete
6  hypothetical.
7      THE WITNESS:  I don't believe I would agree, no.
8      Q BY MR. SAFARIAN:  So, as a professional in this
9  universe of association manager, the approach you would
10  recommend is to have your eyes and ears wide open when
11  presented with information regarding a disability so that
12  you can best accommodate, correct?
13      MR. MALONE:  Same objections and misstates
14  testimony.
15      THE WITNESS:  That's correct.
16      Q BY MR. SAFARIAN:  Thank you.  Frank, again, his
17  last name was very difficult for the both of us, but do you
18  know his current whereabouts?  For example, is he working
19  for another property management company?
20      A    I do, yes.
21      **Q    Where is he?**
22      A    He works for The Management Trust.
23      **Q    And can you tell me where that is located?**
24      A    Thousand Oaks I believe is the location.
25      **Q    Do you know what his position is there?**

87

---

1      MR. MALONE:  Calls for speculation.
2      THE WITNESS:  I do not believe I know his title.
3      Q BY MR. SAFARIAN:  And bear with me one second.
4  I'm going to see if I can pull it up.
5          Do you know generally what -- well, let me
6  ask you this:  How did you come to learn that Frank moved
7  on to The Management Trust?
8      MR. MALONE:  Lacks foundation.
9      THE WITNESS:  I've seen him at industry events.
10      Q BY MR. SAFARIAN:  Okay.  Are you still cordial
11  with one another?
12      MR. MALONE:  Vague.
13      THE WITNESS:  Yeah.
14      Q BY MR. SAFARIAN:  Okay.  And can you recall the
15  reason for his termination?
16      MR. MALONE:  Asked and answered, calls for a legal
17  conclusion, vague.
18      Q BY MR. SAFARIAN:  You may answer.
19      A    Unable to complete the tasks requested in a
20  timely manner.
21      **Q    And was he terminated after litigation ensued**
22  **in this case?**
23      MR. MALONE:  Calls for speculation, lacks
24  foundation, calls for a legal conclusion, asked and
25  answered.

88

---

1      Q BY MR. SAFARIAN:  You may answer.
2      A    I do not -- I do not know the timeframe.  I
3  would be guessing.
4      **Q    Were you involved in his termination?**
5      A    I --
6      MR. MALONE:  Vague, calls for a legal conclusion.
7  Excuse me, I'm sorry, Sabrina.  You can answer.
8      THE WITNESS:  Yes, I was involved.
9      Q BY MR. SAFARIAN:  Did it have anything to do with
10  Aldea or at least this incident?
11      MR. MALONE:  Vague, calls for a legal conclusion.
12      THE WITNESS:  No.
13      MR. MALONE:  Speculation.
14      Q BY MR. SAFARIAN:  I'm going to try to phonetically
15  get the spelling one more time.  Can you again one more
16  time just state his last name slowly?
17      A    Jauregui.  It starts with a J.
18      **Q    Jauregui.  Okay.**
19      A    Like J-a-u-r-i-g-y, or something along those
20  lines, if I'm guessing.
21      **Q    Okay.  Got it.  Thank you.  That was helpful,**
22  **actually.  I don't know if it's right, but it's certainly I**
23  **think the best we have right now, so thank you for that.**
24      **And is it a correct statement that the only**
25  **communication you recall having with Frank about this**

89

23  (Pages 86 to 89)

1  incident was that one email?
2     MR. MALONE:  Misstates testimony.
3     THE WITNESS:  I believe so, yes.
4     Q BY MR. SAFARIAN:  Were there any meetings within
5  PMP to discuss Garnik or the incident?
6     MR. MALONE:  Asked and answered.
7     THE WITNESS:  No.
8     MR. MALONE:  And vague.
9     Q BY MR. SAFARIAN:  Are you aware of any meetings
10 ever taking place to discuss Garnik?
11    MR. MALONE:  Same objections.
12    THE WITNESS:  Any meetings?
13    Q BY MR. SAFARIAN:  Yes.
14    A    Between the board, between PMP?
15    Q    Any at all.
16    MR. MALONE:  Vague and overbroad.
17    THE WITNESS:  I believe I recall that -- I know that
18 the board was going to have a meeting, an agenda.  I do
19 recall that.
20    Q BY MR. SAFARIAN:  So you learned that the board
21 would have a meeting.  Whether the meeting went forward or
22 not, do you know?
23    A    I do not know.
24    Q    Okay.  So, as far as meetings are concerned,
25 you're aware of one meeting that was discussed that may or

90

1  may not have taken place, that's the extent of the
2  information you have about meetings concerning Garnik or
3  the incident, correct?
4     MR. MALONE:  Misstates testimony.
5     THE WITNESS:  Yes, that's correct.
6     Q BY MR. SAFARIAN:  Okay.  Very good.  I have a
7  couple more questions, I think, and I'm going to be
8  wrapping up fairly soon.  Bear with me while I just kind of
9  scan my notes.
10    Do you know if the removal of the prior board
11 members had anything to do with this litigation?
12    MR. MALONE:  Speculation, calls for a legal
13 conclusion, vague, calls for a narrative.
14    Q BY MR. SAFARIAN:  You can answer.
15    MR. MALONE:  Lacks foundation.
16    THE WITNESS:  I do not recall.  I do not know.
17    Q BY MR. SAFARIAN:  And how often do you communicate
18 with the Aldea board?
19    MR. MALONE:  Lacks foundation, same objections,
20 vague.
21    THE WITNESS:  It can vary depending on if I'm
22 covering for a manager or subbing in as a supervisory role.
23    Q BY MR. SAFARIAN:  If you are not covering for a
24 manager, do you have regular communication with the board?
25    MR. MALONE:  Vague.

91

1     Q BY MR. SAFARIAN:  Well, let's put it this way:  If
2  you were covering for a manager, how often would you
3  communicate with the HOA community board of Aldea?
4     MR. MALONE:  Incomplete hypothetical.
5     THE WITNESS:  That could vary.  If I'm covering, it
6  could be daily, it could be weekly.
7     Q BY MR. SAFARIAN:  Okay.  With regard to this
8  community, can you estimate overall whether you've had
9  communications in the dozens, single digits, a hundred or
10 more with members of the community -- or members of the
11 board I should say?
12    MR. MALONE:  Vague, overbroad, unclear as to time.
13    THE WITNESS:  I've had many, so I would not be able
14 to put a time -- a number on that.
15    Q BY MR. SAFARIAN:  So, in other words, too many to
16 count?
17    A    Correct.
18    Q    And in those communications that are too many
19 to count, how many of those was Garnik actually raised as a
20 subject?
21    MR. MALONE:  Asked and answered, argumentative.
22    THE WITNESS:  I don't believe any.
23    Q BY MR. SAFARIAN:  Okay.  Thank you.  Aside from
24 meeting minutes, are the meetings recorded in any way, the
25 board meetings, such as audio or video recording or Zoom

92

1  recording?
2     MR. MALONE:  Calls for speculation, calls for an
3  expert opinion.
4     THE WITNESS:  Not to my knowledge.
5     Q BY MR. SAFARIAN:  Have any of the homeowners
6  within Aldea communicated with you regarding the incident?
7     MR. MALONE:  Asked and answered, calls for a legal
8  conclusion, vague.
9     THE WITNESS:  I believe there was a phone call that
10 came through when the situation occurred, a call that I
11 took because a bunch of calls were coming in.  I don't
12 recall the address of the person who called in.
13    Q BY MR. SAFARIAN:  Do you recall the gender?
14    A    Yes.  He's male.
15    Q    Do you recall what was said?
16    A    Yes.  He was very distraught and upset
17 because his son saw a Ring video of the person bleeding on
18 the front step.
19    Q    Is this the only time this person had ever
20 communicated with you?
21    A    Yes.
22    Q    Did this person mention any prior incidents?
23    MR. MALONE:  Calls for speculation, vague.
24    THE WITNESS:  No.
25    Q BY MR. SAFARIAN:  And this person you understood

93

1    to be the one whose Ring camera caught footage?
2        MR. MALONE:  Misstates testimony, vague.
3    Q BY MR. SAFARIAN:  You may answer.
4        A    That's correct.
5        **Q    And this person mentioned only the one**
6    **incident to you, correct?**
7        MR. MALONE:  Asked and answered.
8        THE WITNESS:  That's correct.
9    Q BY MR. SAFARIAN:  And since that incident, no
10   subsequent incidents have been raised by this person,
11   correct?
12       MR. MALONE:  Calls for speculation.
13   Q BY MR. SAFARIAN:  You may answer.
14       A    Not to my knowledge, no.
15       **Q    And if a homeowner wants to present concerns**
16   **to someone at PMP regarding the activities at the**
17   **community, what are the channels by which these**
18   **communications can be received within PMP?  What I'm**
19   **getting at is telephone call, email or some other means.**
20       MR. MALONE:  Incomplete hypothetical, calls for
21   expert opinion.
22       THE WITNESS:  We would have email correspondence,
23   phone call correspondence.  We have an app that somebody
24   could open up a correspondence, fax, or they could walk it
25   into one of our offices.

94

1        Q BY MR. SAFARIAN:  And is there a recordkeeping
2    protocol?  For example, if a community member sends in an
3    email, is a call log made to memorialize that someone
4    called -- or strike that.  I just jumbled emails and calls
5    together.
6        If someone makes a phone call and someone
7    within PMP receives a phone call, is a log created that a
8    call was made or received?
9        MR. MALONE:  Incomplete hypothetical, calls for
10   speculation.
11       THE WITNESS:  Typically, yes, if the person on the
12   other line is willing to give us their address and
13   information.
14       Q BY MR. SAFARIAN:  Was a recording or documentation
15   made of the one person that called you?
16       MR. MALONE:  Calls for speculation.
17       THE WITNESS:  I don't recall.
18       Q BY MR. SAFARIAN:  And is there -- do you recall if
19   the person identified himself?
20       MR. MALONE:  Vague.
21       THE WITNESS:  I don't remember.
22       Q BY MR. SAFARIAN:  You do know that this was
23   obviously a neighbor because his Ring camera caught the
24   incident, correct?
25       MR. MALONE:  Incomplete hypothetical.

95

1        THE WITNESS:  I do not know that.
2        MR. MALONE:  Lack of foundation.
3    Q BY MR. SAFARIAN:  It's a closed -- the HOA is a
4    closed, gated community, correct?
5        A    Correct.
6        **Q    Because it is a closed, gated community, if a**
7    **Ring camera captured it, it would be a Ring camera from**
8    **somebody located within the community, correct?**
9        A    That's correct, yes.
10       MR. MALONE:  Incomplete hypothetical.
11   Q BY MR. SAFARIAN:  So, when the Ring camera caught
12   this incident, did you memorialize it in any way or record
13   it such that we could have reference to it at some other
14   time?
15       MR. MALONE:  Asked and answered, vague, calls for
16   speculation, lacks foundation.
17       THE WITNESS:  I don't remember the address, so I
18   wasn't able to look that up.
19       Q BY MR. SAFARIAN:  Is there a filing system whereby
20   it would go into a general Aldea file?
21       MR. MALONE:  Calls for speculation, vague, lacks
22   foundation.  Sorry.
23       MR. SAFARIAN:  I'll withdraw the question.
24       **Q    Does Aldea keep a file of communications --**
25   **independent of your personal files or your personal emails,**

96

1    **does Aldea have in its network, whether it's a computer**
2    **system or hard files, a place where it would keep records**
3    **of communications regarding Aldea?**
4        MR. MALONE:  Vague and ambiguous, calls for
5    speculation.
6        Q BY MR. SAFARIAN:  By the way, I misspoke.  I said
7    did Aldea keep.  I have to ask the question again.  I'm
8    sorry about that, Ms. French.  It's my misstep.
9        Does PMP keep in any place any communications
10   or documentations it receives with regard to Aldea?
11       MR. MALONE:  Calls for speculation and is vague.
12       THE WITNESS:  We keep homeowner records under the
13   homeowner accounts in the software.
14       Q BY MR. SAFARIAN:  Okay.  So, aside from specific
15   homeowners, let's assume that something happens that
16   affects the community generally, right?  Let's assume, for
17   example, that a pipe burst in a common area and floods the
18   common area.  Would there be a place to keep that record in
19   Aldea file?
20       MR. MALONE:  Incomplete hypothetical, calls for
21   speculation, and it's vague.
22       THE WITNESS:  Yes.
23       Q BY MR. SAFARIAN:  Okay.  That's not a file that
24   you looked in with regard to today's proceeding, correct?
25       MR. MALONE:  Asked and answered, same objections.

97

25  (Pages 94 to 97)

1      THE WITNESS:  Correct.
2      Q BY MR. SAFARIAN:  Is there a name for that file or
3   some way that you would describe it?
4      MR. MALONE:  Same objections and calls for a
5   narrative.
6      Q BY MR. SAFARIAN:  You may answer, please.
7      A    It's titled Aldea.
8      **Q    Okay.  And what other types of documents
9   could I be expected to find in the Aldea file?**
10     MR. MALONE:  Calls for a narrative, calls for
11  speculation, same objections.
12     THE WITNESS:  I would assume a very -- a variable
13  amount of different types of documents.
14     Q BY MR. SAFARIAN:  Okay.  Do you recall when the
15  last time you looked at that file was?
16     MR. MALONE:  Lacks foundation.
17     THE WITNESS:  Maybe a month ago, two months ago.
18     Q BY MR. SAFARIAN:  And do you recall what the
19  purpose would have been?
20     A    I was covering a meeting for a manager.
21     **Q    It's an easily accessed file, right?  You can
22  just go right to your computer desktop and pull it up?**
23     MR. MALONE:  Incomplete hypothetical, assumes facts.
24     THE WITNESS:  It's a network file, so yes.
25     Q BY MR. SAFARIAN:  And who were you covering for?

98

1      A    Gail.
2      **Q    Okay.  Did this incident come up?**
3      MR. MALONE:  Vague.
4      THE WITNESS:  No.
5      MR. SAFARIAN:  Got it.  Thank you.
6      **Q    Just structurally within Aldea -- or strike
7   that.  Within PMP, you have the HOA community and then
8   there's somebody who is more closely assigned as the
9   day-to-day person for the community, correct?**
10     MR. MALONE:  Incomplete hypothetical.
11     Q BY MR. SAFARIAN:  You knew that to be Gail, right?
12     A    That's correct.
13     **Q    And what's that person's official title?**
14     A    Community association manager.
15     **Q    Okay.  And then you are above the community
16  association manager in terms of hierarchy, correct?**
17     A    That's correct.
18     **Q    Okay.  And you told me your title before, but
19  can you help me with it?  What was it again?**
20     A    Division vice president of Ventura County.
21     **Q    And the person who spends the most time
22  dealing with the board would be the person who is the
23  community association manager, correct?**
24     MR. MALONE:  Speculation.
25     THE WITNESS:  Yes.

99

1      Q BY MR. SAFARIAN:  And then if the community
2   association manager had questions or concerns on how to
3   deal with a particular issue as to a community that they
4   are managing, such as Aldea here, could they come to you
5   with questions?
6      MR. MALONE:  Incomplete hypothetical.
7      THE WITNESS:  Yes.  We have -- we have a system
8   which they can go to their supervisor, which is a senior or
9   regional manager, and then should they not be able to help
10  or not be available, then it would be me.
11     Q BY MR. SAFARIAN:  So, for Aldea, who is the
12  regional manager?
13     MR. MALONE:  Vague, calls for speculation.
14     THE WITNESS:  We have senior managers.  For that
15  would be Carrie Simmons.
16     Q BY MR. SAFARIAN:  C-a-r-e-y S-i-m-m-o-n-s?
17     A    C-a-r-r-i-e S-i-m-m-o-n-s.
18     **Q    And how long has she been the -- you called
19  her a regional manager?**
20     A    Senior manager.
21     **Q    How long has she been the senior manager?**
22     A    Just recently.  I'd say about two months.
23     **Q    And who preceded her?**
24     A    Garrett Guenot.
25     **Q    Would you spell that, please.**

100

1      A    G-a-r-r-e-t.
2      **Q    G-i-n-o-t?**
3      A    G-u-e-n-o-t.
4      **Q    Okay.  And then how long was Garrett Guenot
5   involved?**
6      MR. MALONE:  Calls for speculation.
7      Q BY MR. SAFARIAN:  Your best estimate.
8      A    He's been here for four years, so --
9      **Q    Got it.  And then before Garrett, do you
10  recall who preceded him?**
11     A    No.
12     **Q    No problem.  Do you know Garrett's current
13  professional functions, where he's at?**
14     A    Yes.  He is in our office.
15     **Q    Oh, he's still with you.  And what's his
16  function now?**
17     A    He is the general manager of an on-site
18  community.
19     **Q    Does that mean he's kind of -- I don't mean
20  this to slight him, but he's kind of taken a professional
21  step down?**
22     A    No.  He's taken a step probably horizontally.
23  It's just a different role.
24     **Q    Got it.  Okay.  And then -- so we've got the
25  community association manager, we've got the senior**

101

26 (Pages 98 to 101)

1  manager, we've got the division vice president.  Anybody
2  else within those three layers that I've missed?
3      A    No.
4      Q    Okay.  Is the senior manager and regional
5  manager the same thing?
6      MR. MALONE:  Vague, calls for speculation.
7      THE WITNESS:  No.
8      Q BY MR. SAFARIAN:  Okay.  So is that an
9  interchangeable title?
10     MR. MALONE:  Vague, calls for speculation.
11     THE WITNESS:  No.
12     Q BY MR. SAFARIAN:  Okay.  So did Aldea have, in
13 addition to a senior manager, a regional manager that was
14 separate?
15     MR. MALONE:  Vague, calls for speculation.
16     THE WITNESS:  The division did, not Aldea.
17     Q BY MR. SAFARIAN:  Can you explain what you mean by
18 that?  I'm sorry for being a little dense.
19     A    We have layers within the company for support
20 for the staff here should a situation arise.
21     Q    Okay.  I'm not a hundred percent sure I'm
22 following you, but let me try and come back to it.  We've
23 got the community manager, the senior manager, the regional
24 manager, we've got the division vice president, and then
25 what else do we have that would be in the hierarchy of

102

1  overseeing a property such as Aldea?
2      A    And then Brendan Grosh, who we spoke about
3  earlier, who's my supervisor.  He's the executive vice
4  president of the company.
5      Q    And does he get involved in the day-to-day
6  management?
7      A    No.
8      MR. MALONE:  Stop.  One second.  Speculation.  Now
9  you can answer, Sabrina.
10     THE WITNESS:  No.
11     Q BY MR. SAFARIAN:  Are you aware of anyone sort of
12 above you in the sort of hierarchy that you report to ever
13 having any information about the incidents we're here about
14 today?
15     MR. MALONE:  Incomplete hypothetical, calls for a
16 legal conclusion, vague, lacks foundation.
17     THE WITNESS:  Not to my knowledge, no.
18     Q BY MR. SAFARIAN:  Does Aldea -- strike that.
19     Does PMP have any written policies,
20 procedures or guidelines on how to accommodate somebody
21 with a disability?
22     MR. MALONE:  Asked and answered, calls for
23 speculation, calls for a legal conclusion, vague.
24     THE WITNESS:  I do not believe there's anything
25 written.

103

1      Q BY MR. SAFARIAN:  Can you tell me what the
2  nonwritten policies are, if there are any?
3      MR. MALONE:  Calls for speculation, vague, calls for
4  a narrative, calls for a legal conclusion.
5      THE WITNESS:  As discussed earlier, we request it in
6  writing so we can present to the board and get their
7  directives on how to move forward.
8      Q BY MR. SAFARIAN:  Are you aware at any time, aside
9  from this one incident, anyone ever raising any type of
10 concern or providing any evidence that Garnik was a risk of
11 harm at the association?
12     MR. MALONE:  Asked and answered, calls for an expert
13 opinion, calls for speculation, and it's vague.
14     Q BY MR. SAFARIAN:  You may answer.
15     A    No.
16     Q    Has anyone, to your knowledge, ever presented
17 to you or to the board any evidence that Garnik was ever --
18 could ever have a psychological breakdown in the future
19 consistent with what he had on the incident date?
20     MR. MALONE:  Same objections and calls for a medical
21 expert opinion, if that wasn't in there.
22     THE WITNESS:  I do not believe so.
23     Q BY MR. SAFARIAN:  Did you ever come to learn that
24 Garnik did have a psychological breakdown such that this
25 was a consequence of medication mismanagement by --

104

1      MR. MALONE:  Vague.  Sorry.  Vague, calls for an
2  expert medical opinion, lacks foundation, calls for a legal
3  conclusion.
4      THE WITNESS:  I do not believe so.
5      Q BY MR. SAFARIAN:  I guess I'll ask it differently.
6  For example, did the board ever communicate to you or seek
7  your advice about what to do as it relates to Garnik having
8  a psychotic or mental episode because of a health
9  condition?
10     MR. MALONE:  Same objections and asked and answered.
11     THE WITNESS:  No, I don't recall.
12     Q BY MR. SAFARIAN:  If the board had told you that
13 Garnik had the first and only incident and that it was
14 reported to the board that this was because a doctor
15 mismanaged his medication, what advice would you have
16 provided the HOA as to how to proceed?
17     MR. MALONE:  Same objections and incomplete
18 hypothetical.
19     THE WITNESS:  I would have still recommended the
20 association obtain legal counsel.
21     Q BY MR. SAFARIAN:  Okay.  In addition to legal
22 counsel, what other advice would you have provided?
23     MR. MALONE:  Assumes facts, lacks foundation, same
24 objections as before, calls for a narrative as well.
25     THE WITNESS:  It would have been out of our hands.

105

27  (Pages 102 to 105)

1  We would have recommended legal.
2      Q BY MR. SAFARIAN:  All right.  Let's assume that --
3  I'll stop there.
4          I'm going to take literally two minutes,
5  three minutes.  I think I'm done.  I just want to scan my
6  notes, and I don't want Ms. French to have to sit there and
7  wait while I scan my notes.  So, out of an effort to best
8  respect her time, I'm going to take a couple minutes and
9  just come back and try to wrap it up.  I think that I might
10  have asked my last question, but I may have a couple more,
11  you know how that goes, Patrick.
12      MR. MALONE:  Absolutely.  Take your time.  I have to
13  run to the restroom anyway, so thank you.
14      MR. SAFARIAN:  Be back at 11:45.
15      THE VIDEOGRAPHER:  We are off the record at 11:41
16  a.m.
17          (Break taken)
18      THE VIDEOGRAPHER:  We are on the record at 11:48
19  a.m.
20      MR. SAFARIAN:  All right.  This question is for Jay.
21  Jay, you go by code if I recall.
22      THE REPORTER:  However you prefer.
23      MR. SAFARIAN:  We've been doing them by code, so
24  let's just go by code.  I am going to wrap up today's
25  session.  My concern is, and I know, Pat, you and I can

106

1  disagree or agree to disagree on the document issue.  We'll
2  meet and confer about that further.  I don't want to be
3  disrespectful of Ms. French's time, but that's something
4  you and I have to discuss.  So, for now, we'll conclude
5  this session, and you and I will meet and confer about the
6  documents.
7          Ms. French, I want to thank you and apologize
8  to you at the same time.  I regret that you had to perceive
9  what you saw before your deposition began between counsel.
10  I hope you know that that was not directed towards you, and
11  I hope you know that I did my best to be respectful and
12  courteous to you today.  I'm very grateful for your time
13  today.  I thank you, and I know it's an imposition on your
14  time to be here.  But I want to wish you well.  We may or
15  may not see each other again during the course of this
16  case, but I do want you to know that your time, effort here
17  today were greatly appreciated.
18      THE WITNESS:  Thank you.
19      MR. SAFARIAN:  Thank you.
20          So, Patrick, I guess that does it for us.
21  I'm going to wrap it up now.
22      MR. MALONE:  I have no questions.
23      MR. SAFARIAN:  Sorry?  Yeah, I figured you didn't.
24      MR. MALONE:  I have no questions.
25      MR. SAFARIAN:  I'm sorry?

107

1      MR. MALONE:  No questions.
2      MR. SAFARIAN:  I figured.  So Pierro and you or I
3  will talk about the document issues.  That's all I have.
4      MR. MALONE:  Okay.  That's fine.  When we go off the
5  record, I have one question for you, Harry, when we get off
6  the record.
7      MR. SAFARIAN:  Let's go off.
8      MS. WRIGHTEN:  Just very quickly --
9      MR. MALONE:  I'm sorry.
10      MS. WRIGHTEN:  I just wanted to put my request for
11  the transcript and the video on record, and I'll get you
12  guys the information that you need for that.
13      MR. MALONE:  Thank you, Marie.  I think we can go
14  off now?
15      MR. SAFARIAN:  Yeah, we can go off.
16      MR. MALONE:  I just wanted to confirm that the two
17  going forward --
18      THE VIDEOGRAPHER:  Can we go off the record?
19      MR. SAFARIAN:  Yeah, let's go off the record.
20      MR. MALONE:  Yes.
21      THE VIDEOGRAPHER:  This concludes today's deposition
22  of Sabrina French.  We are off the record at 11:50 a.m.
23  (11:50 a.m.)
24
25

108

1
2  STATE OF CALIFORNIA )
3                      )  ss.
4  COUNTY OF ORANGE    )
5
6
7      I, SABRINA FRENCH, do hereby certify:
8      That I have read the foregoing deposition;
9      That I have made such changes in form and/or
10  substance to the within deposition as might be
11  necessary to render the same true and correct;
12      That, having made such changes thereon, I
13  hereby subscribe my name to the deposition.
14      I declare, under penalty of perjury, that
15  the foregoing is true and correct.
16      Executed this _____ day of _____,
17  2022, at _____, California.
18
19
20
21          _____
22              SABRINA FRENCH
23
24
25

109

28  (Pages 106 to 109)

1  STATE OF CALIFORNIA )
2                      )  ss.
3  COUNTY OF ORANGE    )
4
5        I, Jay M. Bullard, a Certified Shorthand
6  Reporter in the State of California, holding
7  Certificate No. 3455, do hereby certify that Sabrina
8  French, the witness named within the foregoing
9  deposition, was by me duly sworn; that said deposition
10 was taken Thursday, June 30, 2022, at the time and
11 place set forth on the first page hereof.
12       That upon the taking of the deposition, the
13 words of the witness were written down by me in
14 stenotype and thereafter transcribed by computer under
15 my supervision; that the foregoing is a true and
16 correct transcript of the testimony given by the
17 witness.
18       I further certify that I am neither counsel
19 for, nor in any way related to any party to said
20 action, nor in any way interested in the result or
21 outcome thereof.
22       Dated this 12th day of July, 2022, at
23 Orange, California.
24       _____
                Jay M. Bullard, CSR #3455
25

                                        110

29 (Page 110)

**A**

**a-d** 26:15
**a-l-i-c-h** 26:15
**a.m** 1:17,17 2:19
  5:2 20:15 52:25
  53:3,9,12 82:16
  82:20 106:16,19
  108:22,23
**able** 23:4 30:11
  31:24 36:3 55:12
  78:8 86:14,23
  92:13 96:18 100:9
**absolutely** 18:7
  25:2 106:12
**ACA** 38:24
**acceptable** 52:20
  52:21
**access** 64:12,13,15
  64:24 65:3,6,9,17
  65:17,20 66:17,18
  66:25 67:6,11
  75:14,22,23,25
  76:8 85:4,5
**accessed** 98:21
**accessible** 40:15
**accommodate**
  23:11 39:2 52:9
  77:9 79:4 81:13
  87:12 103:20
**accommodated**
  78:21
**accommodation**
  85:16
**accounts** 97:13
**acquainted** 32:1,5
  45:7,9
**acting** 58:6
**action** 5:24,25 10:8
  10:9 16:9 110:20
**activating** 66:6
**activation** 66:24
  67:5
**activities** 94:16
**actual** 36:5 77:18
**addition** 18:9
  102:13 105:21
**address** 5:9 40:4,25
  48:25 49:8 58:1

60:3 69:7,9 70:25
  72:21 79:5 80:14
  93:12 95:12 96:17
**addressed** 8:4
**addressing** 51:5
**adjustor** 9:24 10:5
**admin** 31:12
**admittee** 83:8
**admonition** 34:4
**admonitions** 21:23
**advance** 21:17,17
**advice** 84:12 105:7
  105:15,22
**advised** 51:15
**African** 18:9,14
**Age** 77:24
**agenda** 90:18
**agent** 39:16 40:2
**ago** 23:19 29:9 30:1
  30:4,10 44:5
  53:18 74:17,17
  98:17,17
**agree** 8:5 16:17
  71:21 73:10 87:3
  87:7 107:1
**agreed** 18:20 41:11
  73:17
**agreement** 20:5
**ahead** 21:1 32:9
  37:17 45:23 53:19
**Aldea** 1:6 2:6 8:25
  13:2,9 16:12
  20:17 21:2 31:20
  32:1,8 33:1 37:21
  40:9,12 41:8
  42:18,20,25 44:12
  45:7,11 46:10,21
  49:14 69:23,25
  72:8 76:3 89:10
  91:18 92:3 93:6
  96:20,24 97:1,3,7
  97:10,19 98:7,9
  99:6 100:4,11
  102:12,16 103:1
  103:18
**Aldea's** 32:21
**allegations** 9:9
  13:14 16:10,12

17:17 61:11
**allow** 6:3,7,8 12:25
**allowed** 9:7
**allowing** 18:16
**allows** 21:24
**altercation** 62:20
  63:5
**ambiguous** 97:4
**amend** 9:8
**Amended** 39:25
  53:6
**American** 18:9,14
**amicably** 15:15
**amount** 98:13
**AMS** 28:14 29:18
**and/or** 109:9
**Angeles** 1:2 2:2
  3:20 20:19 28:3
**Ann** 26:8
**answer** 22:3,23
  24:5 32:3,10,11
  34:14 43:8 54:25
  55:10,11 57:7,8
  60:23,24 63:13,19
  73:20 74:13 75:3
  76:14 78:24 81:6
  84:3,9 85:1,8 86:4
  86:12 88:18 89:1
  89:7 91:14 94:3
  94:13 98:6 103:9
  104:14
**answered** 36:2,11
  40:20 41:4,12
  47:3 48:9 49:10
  50:8,13,20 51:8
  55:8 56:5 59:25
  60:15,20 61:22
  63:11 66:20 67:1
  68:6,11,21 70:3
  73:8,12 74:21
  75:2,11,18 76:23
  77:4 84:25 85:19
  88:16,25 90:6
  92:21 93:7 94:7
  96:15 97:25
  103:22 104:12
  105:10
**answering** 31:11

**anti-SLAPP** 9:6
  19:6
**antithetical** 19:1
**anybody** 23:21,25
  33:23 38:2,20,24
  49:7,22 57:20
  58:6,7 75:8 83:6
  85:11 102:1
**anymore** 43:25
**anyway** 106:13
**APC** 3:5,12
**Apologies** 45:4
**apologize** 20:6
  21:17 42:1 51:24
  107:7
**app** 94:23
**apparent** 18:13
**apparently** 10:12
  16:11
**appear** 5:8 13:18
  14:16
**APPEARANCES**
  3:2
**appeared** 5:7
**appearing** 7:7
**appreciate** 24:24
  52:17
**appreciated** 107:17
**approach** 7:16 87:9
**appropriate** 5:23
  7:16 19:13
**approximate** 71:9
**approximately**
  32:19 46:9 71:6
**April** 41:7
**archived** 74:14
**area** 30:24 58:8,13
  58:18 62:22 63:7
  64:16 65:7,10,15
  67:11 97:17,18
**areas** 64:12 65:5,6
  65:16,16,20
**argument** 19:5
**argumentative**
  51:9 56:13 74:3
  74:21 75:2,11
  92:21
**aside** 23:24 38:18

39:17 51:19 61:21
  64:22 67:24 75:20
  77:1 92:23 97:14
  104:8
**asked** 5:7,15,17
  10:13,24 12:17
  15:18 22:23 25:15
  25:16,21 36:1,11
  36:25 37:8 39:8
  40:20 41:3,12
  47:3 48:9 49:10
  50:8,13,20 51:8
  55:8 56:5 58:22
  59:25 60:15,20
  61:22 63:11 66:20
  67:1 68:5,11,20
  70:2 73:8,12
  74:21 75:1,11,18
  76:23 77:4 84:25
  85:19 88:16,24
  90:6 92:21 93:7
  94:7 96:15 97:25
  103:22 104:12
  105:10 106:10
**asking** 10:12 18:1
  24:7,8 56:9 62:10
  81:7,8,9,10,19
  85:15
**aspect** 35:23,24
**assigned** 47:8 99:8
**assistant** 31:2,9
**associated** 44:25
**association** 1:6 2:6
  6:13 9:1 16:13
  20:17 21:3 28:16
  28:19,25 29:21
  30:8 35:12 40:10
  41:9 44:12 59:14
  69:23 70:1 78:2
  86:8 87:1,9 99:14
  99:16,23 100:2
  101:25 104:11
  105:20
**Association's** 44:9
**assume** 97:15,16
  98:12 106:2
**assumes** 32:9 49:15
  54:14 57:5 66:10

ELITE COURT REPORTING (949) 829-9222

66:21 74:11,11
75:17 76:2 98:23
105:23
**assurance** 7:19
**assure** 21:19
**attain** 29:5
**attend** 13:16 27:23
**attended** 32:23,25
33:4,14 84:21,23
**attention** 33:24
56:23,24 57:4
64:4 85:14
**attorney** 6:17 17:14
49:5 86:3
**attorney-client**
24:14 33:6 34:1,7
34:9 57:13
**audible** 22:24
**audio** 92:25
**authority** 67:5
**available** 59:3
70:12 100:10
**Ave** 3:14
**aware** 37:11,19
38:24 39:1 44:10
47:22 57:20,25
58:6,12,17 62:1
64:11,20 65:9,16
67:10 68:1 76:21
77:2 80:18 85:5
90:9,25 103:11
104:8

**B**

**B** 4:12 26:15
**Babaian** 3:13 21:8
**back** 17:20 26:2,18
36:13 50:24 52:19
70:8,24 71:3 72:3
73:4,25 85:3
102:22 106:9,14
**background** 26:6
**Badalich** 26:13
**bankers** 42:13
**based** 9:8 16:10,12
**basic** 21:23 31:12
**basis** 33:5
**bathroom** 52:14,17
**bear** 25:25 88:3

91:8
**bears** 16:14
**beat** 40:20 42:23
56:21 76:13
**becoming** 71:17
**began** 107:9
**beginning** 82:6
**behalf** 8:25 10:11
13:3,9 14:10,14
14:17 17:6 86:15
**behave** 6:18
**belief** 46:19
**beliefs** 12:20
**believe** 6:22,22
15:14 19:12 29:21
33:20,22 34:16,25
43:9,23 45:20,24
47:4,11 50:9
53:20 60:6 65:20
65:23 71:23 83:21
84:10 86:13 87:7
87:24 88:2 90:3
90:17 92:22 93:9
103:24 104:22
105:4
**benefit** 1:6 2:6
**Bermudez** 3:23
20:20
**best** 17:4,5 21:24
23:2,4,17 35:25
46:14,23 62:16
65:19 87:12 89:23
101:7 106:7
107:11
**beyond** 10:22
**bicycle** 38:1
**big** 65:14
**birth** 26:22
**BISGAARD** 3:18
**black** 20:1 83:16
**bleeding** 93:17
**Bleu** 27:15,18,21
**blind** 78:8
**blood** 62:21 63:6
**board** 32:23 33:1,4
33:12,14 34:15
39:2 49:7 55:14
55:22 57:16 67:9

82:22 83:4,8,12
83:14,18,23 84:1
84:6,11,23 86:1,1
86:3,16,17,18,19
86:24,25 90:14,18
90:20 91:10,18,24
92:3,11,25 99:22
104:6,17 105:6,12
105:14
**bolster** 6:15 9:5
**born** 27:2,3
**bother** 68:3
**bothering** 38:1
**boundaries** 7:11
**boxes** 42:13
**boy** 26:15
**Brandon** 50:3
**break** 16:18,19,22
23:9 52:1,14,17
53:1 81:25 82:18
106:17
**breakdown** 104:18
104:24
**breaks** 83:15
**Brendan** 103:2
**bring** 9:9,11,13
**brings** 44:11
**Brisbois** 3:18 7:24
**broken** 76:19
**broker's** 30:16
**brought** 10:8 33:23
34:2 56:22,23
57:3 64:4 81:19
85:14
**building** 64:13
**Bullard** 1:23 2:18
20:22 110:5,24
**bunch** 65:14 93:11
**Burbank** 27:6,7
**burst** 97:17
**business** 19:19

**C**

**C-a-r-e-y** 100:16
**C-a-r-r-i-e** 100:17
**C-o-l-l-e-r-d** 46:3
**cabinet** 42:10,14
**California** 1:1,6 2:1
2:6 3:6,14,20

20:18 27:6 109:2
109:17 110:1,6,23
**call** 17:21 18:17,18
35:8,9 68:8 86:11
93:9,10 94:19,23
95:3,6,7,8
**called** 10:16 25:20
53:6 93:12 95:4
95:15 100:18
**calling** 13:13
**calls** 24:2 36:1
37:16 38:10 39:4
39:5 41:3 43:15
44:2 45:23 46:12
47:16 49:2 54:23
55:8 56:4 57:6,22
60:5,22 61:6,17
61:18 62:3,18
63:1,17 64:6,19
65:22 66:9,21
67:7,16 68:4,5,15
68:20 70:2,5 72:9
73:19 74:2 75:18
76:17,23 77:4,10
77:11,22,22 78:10
78:22,23 79:17
80:22,23 85:7,18
85:18,22 88:1,16
88:23,24 89:6,11
91:12,13 93:2,2,7
93:11,23 94:12,20
95:4,9,16 96:15
96:21 97:4,11,20
98:4,10,10 100:13
101:6 102:6,10,15
103:15,22,23
104:3,3,4,12,13
104:20 105:1,2,24
**camera** 7:13,20
12:11 13:21 14:24
14:24 15:12 16:6
19:8 94:1 95:23
96:7,7,11
**capacity** 31:1 32:7
39:22
**captured** 96:7
**car** 38:1
**card** 17:19,19 18:5

18:10 67:6 85:5
**cards** 64:13 65:3,6
65:9,17 66:7,18
75:14,22,23,25
76:8 85:4
**care** 20:2
**career** 20:8
**Carrie** 100:15
**case** 1:9 2:9 5:6,25
6:13 7:3,4 8:5 9:2
9:4,5,10,11,12,14
10:1,14 11:20
12:9,9,15,16 13:4
13:6,7 15:10
16:14 19:6,11
20:7 23:10,14
30:10 39:23 54:22
55:23 56:3,11,17
67:13 75:20 76:20
78:18 80:17 84:1
84:6 88:22 107:16
**cases** 6:10 19:16
79:1
**catch** 59:19
**caught** 94:1 95:23
96:11
**caused** 12:21
**causing** 5:20
**certain** 18:10,12
43:5,17 65:6
67:11 68:24
**certainly** 40:2
89:22
**Certificate** 2:19
110:7
**certificates** 28:5
**certified** 2:18 28:14
28:15 110:5
**certify** 109:7 110:7
110:18
**cetera** 22:10
**change** 26:16
**changed** 26:19
**changes** 109:9,12
**channels** 94:17
**CHATSWORTH**
1:3 2:3
**choices** 13:20

ELITE COURT REPORTING (949) 829-9222

**Christina** 3:13 21:7
**circle** 65:14
**circles** 65:14
**circumstances**
  35:16,18 76:16
  84:1,5
**claims** 6:16
**clarification** 11:12
**class** 28:22
**classes** 28:20,21
  30:3
**clear** 56:16
**clerical** 24:20 31:11
  31:12
**client** 8:25 9:1,15
  9:17 10:11,18
  11:3,9 12:15,20
  14:10,14,17 17:6
  33:3,17,19,24
  34:22 49:1,9
  56:23
**client's** 11:9 19:11
  40:25
**clients** 36:17,22
  42:4,5 44:23,24
  48:7
**closed** 33:11,14
  96:3,4,6
**closely** 99:8
**CMCA** 28:12,13,14
  28:15 29:25
**code** 41:17,23 42:2
  106:21,23,24
**colleagues** 7:18
**college** 27:12,22,24
  28:3
**Collerd** 46:3,10,21
  46:25 47:14,23
  48:12 53:12
**come** 14:8 51:18
  52:19 70:25 76:9
  78:3 88:6 99:2
  100:4 102:22
  104:23 106:9
**comes** 16:13 74:6
  86:16
**comfortable** 22:6
  51:25

**coming** 52:16 75:6
  93:11
**comma** 14:5
**commencing** 2:19
**comment** 15:18
**commentary** 22:19
**commit** 15:18
**commitment** 12:17
**common** 13:7
  30:24 62:22 63:7
  64:16 65:5,7,10
  65:15,16 67:11
  97:17,18
**communicate** 7:21
  8:6 91:17 92:3
  105:6
**communicated**
  9:23 51:11 60:17
  93:6,20
**communicating**
  9:15
**communication**
  34:7,9 35:14,15
  60:14 62:6,11
  89:25 91:24
**communications**
  24:3,8,9,14 39:8
  51:17 92:9,18
  94:18 96:24 97:3
  97:9
**communities** 65:3
  70:22 77:8
**community** 1:6 2:6
  8:25 13:2,9 16:13
  20:17 21:3 28:16
  28:25 29:20 30:8
  31:16,20,21 32:14
  33:11 35:19,21
  36:8,17 38:25
  40:10 41:9 42:18
  44:12 45:8 46:11
  51:6 60:4,7,8
  63:24 64:12,16,21
  64:23 65:4 66:18
  66:25 67:6 68:3
  69:23,25 75:16,24
  76:3,5,7,8 78:2
  79:25 85:4,15,15

86:8 87:1 92:3,8
  92:10 94:17 95:2
  96:4,6,8 97:16
  99:7,9,14,15,23
  100:1,3 101:18,25
  102:23
**company** 23:22
  31:3 43:9,18
  49:16 71:4,6
  74:15,19 84:16
  87:19 102:19
  103:4
**Complaint** 9:5,8,11
**complete** 27:17
  88:19
**completely** 19:1
  22:4,10
**complex** 66:19
**compound** 37:4,15
  39:5 58:9 59:25
  69:6
**compromise** 19:13
**computer** 97:1
  98:22 110:14
**concern** 36:10 44:8
  50:18 104:10
  106:25
**concerned** 36:22
  43:13 90:24
**concerning** 55:5
  91:2
**concerns** 33:24
  34:11,15,16 35:11
  35:16,18 48:25
  49:9 51:5 94:15
  100:2
**conclude** 107:4
**concludes** 108:21
**conclusion** 17:24
  37:16 39:4 49:3
  54:24 55:9 56:4
  57:6,23 58:4
  60:22 61:7,18
  63:17 64:7 66:10
  67:8,16 68:5 70:5
  72:9 75:18 76:24
  77:5,10,23 78:11
  78:23 79:20 80:5

80:22 85:8,19
  86:11 88:17,24
  89:6,11 91:13
  93:8 103:16,23
  104:4 105:3
**condition** 80:19
  105:9
**conduct** 37:20,24
  37:25 59:16 61:5
**confer** 5:14 11:10
  107:2,5
**confidence** 7:10
**confirm** 53:5
  108:16
**confirmation** 38:12
**conflict** 60:3
**conflicts** 38:19
**congratulations**
  52:5
**consequence**
  104:25
**consider** 79:16
**consistent** 104:19
**consistently** 30:20
**consult** 66:23
**consulted** 67:2
**contact** 24:21 32:7
  56:2,14,18
**continue** 10:19,21
  11:4 12:3,12
  18:15
**continued** 6:24
**continues** 14:4
**contrary** 11:2
  14:11 18:22
**convenient** 82:3
**conversation** 35:23
  36:5,13,16,16
  44:8 62:23
**conversations**
  66:13
**conveyed** 50:18
**conveying** 24:14
**coordinator** 46:8
**copy** 6:2
**cordial** 88:10
**Cordon** 27:15,17
  27:21

**corporation** 1:7 2:7
**correct** 27:15,16
  28:17 30:5,6,13
  31:6,18 34:22,23
  40:13,14,15,16,19
  41:2,5 42:21,22
  44:15,17,18 45:7
  46:18,25 47:1,9
  47:12,13,24,25
  48:2,4,5 49:20,21
  53:15 54:5,9,10
  54:13,16 55:25
  56:18,19 61:12
  63:7,8 65:10,12
  66:11 69:10,20,23
  70:12 71:4,22,25
  72:1,4,8,17,21,24
  73:22 74:24 78:4
  78:6,9,12,14,17
  79:6,9,16,19,22
  79:24 80:3,6,9,11
  80:14,16 83:13,16
  83:17,23 87:12,15
  89:24 91:3,5
  92:17 94:4,6,8,11
  95:24 96:4,5,8,9
  97:24 98:1 99:9
  99:12,16,17,23
  109:11,15 110:16
**correctly** 29:23
**correspondence**
  43:2 94:22,23,24
**counsel** 3:2 5:6 8:5
  12:19 25:17 33:9
  33:9,12,15 34:2
  51:6 54:12,20,20
  55:7,14 63:4,10
  66:13 105:20,22
  107:9 110:18
**Counsels** 20:23
**count** 73:2,14 92:16
  92:19
**County** 1:2 2:2
  20:19 49:17,19
  99:20 109:4 110:3
**couple** 91:7 106:8
  106:10
**course** 26:9 44:22

113

107:15
**court** 1:1 2:1 5:9,13
6:11,12 8:14,22
9:3,4 10:10,10,13
11:13,19,19 12:13
14:8,13,17 16:5,8
16:10,11,24 17:3
19:20 20:18,21,21
20:24 22:21
**courteous** 107:12
**courtesy** 13:12
19:19 22:21
**COURTHOUSE**
1:3 2:3
**covered** 28:9
**covering** 91:22,23
92:2,5 98:20,25
**COVID** 71:13,17
71:20 72:4
**created** 95:7
**critical** 81:22
**crossover** 51:15
**crosstalk** 60:24
**CSR** 1:23 110:24
**Culinary** 27:14
**current** 46:6 47:19
47:20 82:22 87:18
101:12
**currently** 29:14
49:13 83:18

**D**

**D** 4:2
**daily** 92:6
**Dan** 83:7
**Daniel** 3:23 20:20
**dark** 13:11,17 18:1
**date** 1:16 6:23,23
20:14 23:15,18
26:21 29:6 68:25
71:8 85:10 104:19
**Dated** 110:22
**dates** 22:9
**David** 26:15
**day** 109:16 110:22
**day-to-day** 49:7
99:9 103:5
**days** 6:25 23:19
53:17 72:16,19

**deactivated** 85:4,6
**deactivating** 66:7
**deactivation** 66:24
67:6
**deaf** 78:8
**deal** 100:3
**dealing** 99:22
**decide** 8:20
**declare** 109:14
**defendant** 1:11
2:11 3:11 13:7
21:6
**Defendant's** 4:14
54:3
**defense** 9:6
**defer** 14:14
**degree** 27:14
**degrees** 28:5
**delete** 43:5
**deleted** 74:8,9,14
**demonstrating**
14:3
**denied** 76:8
**dense** 102:18
**depending** 85:20
86:2 91:21
**deponent** 20:25
53:8
**depose** 42:5
**deposed** 23:14 42:5
51:19,21
**deposition** 1:13
2:17 4:15 5:1,22
6:7,8,21,21 7:17
8:7 11:8,14 12:2
12:23,24 13:3,15
13:19 15:5 16:18
17:4,22,24 20:2
20:16 21:4,23
22:2 23:3,21 40:1
40:5 53:7 75:6
82:7,10 107:9
108:21 109:8,10
109:13 110:9,9,12
**depositions** 5:7,20
5:21 7:6 9:10,14
18:12
**describe** 28:13 98:3

**designation** 28:19
29:5,20 30:9
**designations** 28:12
**desire** 11:1,1
**desktop** 98:22
**detailed** 22:1
**details** 50:18 64:24
65:1
**determine** 67:5
80:13 85:12
**determines** 86:17
**development** 30:24
**devices** 64:15 65:9
66:7
**dialogue** 37:11
**diatribes** 42:1
**dictate** 14:9
**different** 37:10
65:15 83:14 98:13
101:23
**differently** 75:15
105:5
**difficult** 87:17
**difficulty** 6:6
**digits** 92:9
**direct** 29:17 31:22
**directed** 82:6
107:10
**directive** 86:24
**directives** 104:7
**directly** 6:12 37:12
39:2 45:9,19
**directors** 67:9 86:1
**disabilities** 77:9,19
77:20 78:3,9,14
78:19 81:14
**disability** 39:3
78:21 79:4,15
81:4 85:16 87:11
103:21
**disabled** 57:4
**disagree** 7:1 107:1
107:1
**discounted** 40:24
**discuss** 23:22 59:12
59:23 60:3,7,13
90:5,10 107:4
**discussed** 33:3 34:6

34:22 36:17 44:9
50:6,10 66:6 74:4
78:20 83:25 84:5
84:24 90:25 104:5
**discussing** 33:7
**discussion** 34:17,18
36:21 37:2 50:16
50:17
**discussions** 33:7,16
33:16
**disjointed** 58:10
86:18
**disorganized** 86:7
87:2
**disqualifying** 6:1
**disrespectful** 10:25
15:3 107:3
**distraught** 93:16
**District** 1:2 2:2
20:19
**division** 45:12,17
49:17,19 99:20
102:1,16,24
**divulge** 33:8
**doctor** 79:13
105:14
**document** 25:4,20
40:4 53:5 70:9,19
107:1 108:3
**documentation**
24:10 85:24,25
86:6 95:14
**documentations**
97:10
**documents** 10:13
24:19 25:4,7,14
25:21 40:23 41:7
43:1 53:8 54:5,8
55:1 58:22 59:3,6
59:14 75:7 86:7,9
86:17,19 98:8,13
107:6
**doing** 10:11 12:5
22:18,22 68:2
74:24 106:23
**door** 76:9
**dozens** 72:13 92:9
**draw** 12:10

**driving** 38:1
**due** 7:1
**dues** 40:24 67:12
67:20 76:19,22
**duly** 21:12 110:9
**duty** 11:3,12

**E**

**E** 4:2,12
**earlier** 44:9 74:5
103:3 104:5
**early** 71:21,22,24
**ears** 61:15 87:10
**easier** 22:22
**easily** 98:21
**education** 27:13,20
28:8
**efficient** 82:3
**effort** 81:3 106:7
107:16
**efforts** 54:21 55:5
68:14,18
**eight** 29:9,25 30:4
**eight-and-a-half**
41:21
**either** 11:12 28:2
37:12
**elected** 83:3
**electronic** 42:16,17
60:14
**electronically**
58:24 59:3
**Elite** 20:21
**email** 39:9 43:19,21
50:23,25 62:7,11
68:9,13 69:16
70:10,25 72:2,21
72:23 73:16,25
74:9,20,24 75:4,5
75:8,9 90:1 94:19
94:22 95:3
**emails** 31:12 43:2,4
43:5,5,12,17,24
44:15,20 69:14,20
70:8,14,18,24,25
71:3 72:3,7,12,20
72:24 73:5,15,24
74:17,18 95:4
96:25

emphasizing 58:3
employee 60:1,2
employees 39:24
  40:1 53:7,12
  59:16
employer 29:12
ended 63:6
enforcement 51:12
engage 68:24 85:17
engaged 78:19
engaging 58:1
English 86:6
enjoy 52:8
ensued 88:21
entail 45:14
enter 64:16
entitled 13:3
entity 39:10
episode 105:8
error 24:20
especially 19:16
ESQ 3:5,12,13,13
  3:19
estimate 22:10,13
  29:8 30:11 32:13
  44:21 45:21 46:14
  71:15,25 72:12
  73:1,2,13 77:15
  92:8 101:7
estimating 32:14
  77:16
estimation 23:17
  39:21
et 22:9
ethics 10:7
ethnics 9:20
events 22:1,8 61:16
  63:15 88:9
everybody 11:15
  12:6
Everybody's 12:12
evidence 6:15
  54:22 55:2,5,15
  55:23 56:3,10
  61:4,15 66:10
  104:10,17
exact 22:9,11 23:15
  26:19 29:6 35:14

exam 28:23
EXAMINATION
  4:6 21:14
examined 21:12
example 22:24 40:7
  40:23 43:4 45:15
  55:13 59:15,22
  65:2 66:16 68:24
  78:7 87:18 95:2
  97:17 105:6
examples 19:1
  77:21 85:21
exclude 20:4
Excuse 47:16 89:7
Executed 109:16
executive 103:3
Exhibit 54:1,3
exhibits 4:14 41:24
exist 78:9
expected 98:9
expecting 52:4
expeditiously 41:20
experience 18:8
  32:8 79:2
experiencing 80:2
expert 38:11 39:5
  57:22 58:4 68:20
  73:19 77:23 78:11
  78:23 79:17 80:22
  93:3 94:21 104:12
  104:21 105:2
expertise 58:8,13
  58:18
explain 41:23
  102:17
extend 22:20 42:6
extent 24:2 33:6
  34:2 43:10 51:14
  91:1
eye 73:5
eyes 61:14 87:10

          F
face 14:25
facility 65:24
fact 10:15,19 11:4
  14:7,13 18:9,15
  44:23 51:19,20
facts 32:9 49:15

54:14 57:5 66:10
66:21 68:9 74:11
74:11 75:17 76:2
98:23 105:23
fair 22:16 49:12
  50:15,22 51:3
  64:2 81:1 84:22
  85:2
fairly 91:8
fall 17:20 49:23
far 43:12 51:4
  71:24 90:24
fast 52:7
faulting 81:18
fax 94:24
features 65:15
  67:11
federal 6:11,13,16
  7:3,4 9:2,5,12
  10:1,9,13 12:9,15
  15:10 16:9,11,14
  19:6,11
feel 22:5,11 23:4
  32:11 42:1 43:18
  52:16 82:8,10
feeling 23:5
female 17:13
figured 107:23
  108:2
file 42:10,17 74:6
  96:20,24 97:19,23
  98:2,9,15,21,24
filed 44:12
files 39:13,16,17
  40:11,18,25 41:1
  41:2,9,10,10 42:9
  42:9,10,14,20,24
  54:9 68:16 74:4
  96:25 97:2
filing 96:19
fill 42:14
find 17:7 26:1
  69:13 70:18 74:20
  98:9
fine 17:19 22:10
  24:4 29:8 52:19
  108:4
finish 22:19 82:1

firm 3:12 17:14
  20:1
first 23:13 30:23
  31:25 32:7,18,25
  39:11,25 45:6,10
  52:4 53:6,17,23
  105:13 110:11
five 14:16 28:22
  77:17 81:25
floods 97:17
folders 43:17
following 102:22
follows 21:13
foot 32:19,21
footage 94:1
foregoing 109:8,15
  110:8,15
foremost 52:4
form 61:4 62:10
  109:9
former 26:14
forms 78:4
forth 110:11
forward 6:8 7:19
  51:25 90:21 104:7
  108:17
found 14:9 15:6
  61:12
foundation 7:25
  37:16,23 38:4,10
  39:5 43:16 48:17
  48:22 49:15 50:20
  51:8 54:14,23
  55:24 56:5 57:5
  58:25 62:4,19
  63:18 66:2,9,20
  67:16 68:4,11
  74:3,12 75:17
  76:2 77:12 79:8
  80:21,24 85:19
  86:21 88:8,24
  91:15,19 96:2,16
  96:22 98:16
  103:16 105:2,23
four 14:16 101:8
framing 70:23
Frank 34:25 35:9,9
  45:20,22 46:18,20

46:24 47:5,23
  48:6 50:18 61:25
  62:1,17 68:1,13
  69:14,16,17,20,22
  69:25 70:11,11,18
  70:18,22 71:4,6
  71:17 72:3,8,12
  73:16,24 77:2
  87:16 88:6 89:25
Frank's 62:6,10
  70:24,25 72:21
  74:5
free 32:11
French 1:14 2:17
  4:4 19:13 20:6,16
  21:4,9,11,16 26:7
  26:8,17 39:20,21
  53:4 60:25 63:20
  71:17 81:10 82:1
  82:21 97:8 106:6
  107:7 108:22
  109:7,21 110:8
French's 107:3
freshest 21:25
front 76:9 93:18
full 26:7
fully 22:4
function 101:16
functions 101:13
fundamental 10:6
funny 7:15 16:24
  16:25 17:1
further 12:25 16:23
  19:23 20:4 36:4
  107:2 110:18
future 104:18

          G
G-a-r-r-e-t 101:1
G-i-n-o-t 101:2
G-r-o-s-h 50:5
G-u-e-n-o-t 101:3
Gail 47:21,24 99:1
  99:11
gap 47:2
Garnik 33:21 37:13
  37:20 38:3,6,19
  39:3 41:8 43:21
  50:10 51:5,6

57:11 58:2 60:18
61:11 63:24 64:4
90:5,10 91:2
92:19 104:10,17
104:24 105:7,13
**Garnik's** 57:21
61:5 80:19 81:3
81:14
**Garrett** 100:24
101:4,9
**Garrett's** 101:12
**gated** 64:20,23 65:2
96:4,6
**gathered** 6:15
**gender** 17:15,19
18:5 93:13
**general** 24:13
28:24 31:10 35:22
35:24 76:4 96:20
101:17
**generally** 33:11
35:15 67:14 88:5
97:16
**germane** 48:7
**getting** 6:6 8:15
9:10 10:20 54:20
63:10 94:19
**give** 22:11 23:4
26:3 77:20 79:21
85:21 95:12
**given** 5:8,9 13:10
19:19 35:24 48:24
49:7 80:19 110:16
**giving** 13:16 17:8
17:22 21:22
**glad** 23:10
**glass** 23:9
**Glendale** 3:14
**glitched** 59:19
**go** 5:4 6:7 7:13,19
8:16,20 12:13,14
13:11,17,21 14:13
16:6 18:1 19:8,23
20:9 21:1 22:25
27:7 32:9 37:16
41:25 45:23 52:13
53:19 65:4 72:3
72:13,20 73:4

74:19 76:9 79:13
85:3 96:20 98:22
100:8 106:21,24
108:4,7,13,15,18
108:19
**God** 18:24
**goes** 14:24,24 52:7
106:11
**going** 5:22 6:8 7:10
8:9,16,18 9:9,11
10:12 12:3,7,25
13:21 16:5,6,22
18:1,3,17,18
19:23 20:9,9
21:16,22 22:8
26:5 33:5 40:7
41:16,25 51:13,16
51:23,25 52:1,12
53:25 54:1 81:24
81:25 85:3 88:4
89:14 90:18 91:7
106:4,8,24 107:21
108:17
**good** 21:5,16 29:10
29:24 51:22 53:11
69:13 91:6
**governing** 59:6,14
**grateful** 107:12
**great** 79:21
**greatly** 107:17
**Grosh** 50:3,4,7
103:2
**grounds** 86:8
**Guenot** 100:24
101:4
**guess** 22:14 29:2
32:4 40:3 43:19
61:2 65:8 70:21
70:23 73:13 74:7
105:5 107:20
**guessing** 46:13,17
80:25 89:3,20
**guidelines** 59:15
103:20
**guys** 108:12
**gym** 65:7

---

**H**

**H** 3:13 4:12

**Hakobyan** 41:8
43:22
**hand** 14:25 21:10
**handbook** 60:1,2
**handful** 77:16
**handle** 19:7 36:9
59:24
**handoff** 47:7
**hands** 105:25
**happened** 13:8
20:8 44:1 50:24
54:11 71:21 75:22
77:15
**happening** 9:4
63:16 67:13
**happens** 13:8 97:15
**happy** 6:2 19:8,9
52:5
**harass** 6:16
**hard** 6:21 97:2
**harm** 104:11
**Harry** 3:12 5:5
15:5 17:10 21:5
59:18 108:5
**head** 22:24 28:1
29:7 83:2
**heads-up** 19:20
**health** 37:3 38:9,13
38:15 57:11,21
58:2,8,14,18
105:8
**hear** 19:24 44:3
66:16 67:17
**heard** 21:18 33:16
37:9 61:14 64:3,9
66:12 67:13,18,19
67:25 75:23 76:7
79:2
**hearing** 19:5 36:22
**help** 75:8 81:19
99:19 100:9
**helpful** 89:21
**helping** 77:9 79:5
**her's** 41:15
**hereof** 110:11
**hierarchy** 99:16
102:25 103:12
**high** 27:7,8,12,20

**highest** 30:9
**highly** 21:18
**Hills** 3:6
**hired** 55:14
**hiring** 55:6 58:7
**history** 76:6
**HOA** 37:12 40:24
58:7,13 60:4
61:12 63:24 64:12
67:12,20 75:23
77:8 79:2,25 92:3
96:3 99:7 105:16
**hold** 52:15 56:20
**holding** 110:6
**homeowner** 94:15
97:12,13
**homeowners** 93:5
97:15
**homeowners'** 36:12
**homes** 76:10
**honest** 37:6
**honestly** 36:3
**hope** 8:14 107:10
107:11
**horizontally** 101:22
**hour** 51:23
**hours** 28:21,22
30:2,3,11,12
**household** 33:25
34:12 37:3 50:11
50:17 56:24 57:17
66:8,17,25 67:20
68:2 76:22 77:3
**household's** 75:14
**hs@safarianfirm...**
3:15
**hundred** 92:9
102:21
**hundreds** 72:14
**husband** 51:14,17
51:19
**hypothetical** 42:15
43:7 55:17 65:18
67:15 76:1 77:11
78:5 79:8 80:23
85:7 87:6 92:4
94:20 95:9,25
96:10 97:20 98:23

99:10 100:6
103:15 105:18
**hypothetically** 86:5
**hypotheticals** 86:10

---

**I**

**identification** 54:3
**identified** 95:19
**ignoring** 15:12
**impact** 6:12 7:3 9:4
**impacting** 19:16
**implemented** 40:9
43:11
**importance** 79:21
**important** 22:3
42:3
**imposition** 107:13
**inappropriate** 9:7
**incident** 33:7 41:7
44:10,14,23 48:8
48:12,16,20 50:6
54:11 55:5 60:18
63:16,23 64:3,5,8
67:25 68:9 70:1
73:16 74:1,16
75:10 76:7 77:1
84:14,23 89:10
90:1,5 91:3 93:6
94:6,9 95:24
96:12 99:2 104:9
104:19 105:13
**incidents** 63:22
93:22 94:10
103:13
**included** 40:5
**includes** 34:4
**including** 39:9
53:12 72:3 80:4
**incomplete** 42:15
43:7 55:17 65:18
67:15 76:1 77:11
78:5 79:7 80:23
85:7 86:10 87:5
92:4 94:20 95:9
95:25 96:10 97:20
98:23 99:10 100:6
103:15 105:17
**incredible** 12:21
**independent** 96:25

116

**individual** 39:21
**individuals** 56:25
**industry** 88:9
**inflammatory** 13:14
**information** 22:15 24:25 26:5 44:13 62:1 63:4 64:18 64:23 65:25 67:25 73:24 76:21 81:2 81:9,12,18 86:14 87:11 91:2 95:13 103:13 108:12
**informed** 12:21
**infraction** 76:18 77:2 85:6
**injected** 12:8
**inquire** 57:15
**inside** 65:14
**instructions** 48:25
**insulting** 17:4
**integrity** 23:1
**intend** 87:3
**intended** 40:3
**intention** 13:22 19:4
**intentions** 16:6
**interactive** 58:1 78:20
**interchangeable** 102:9
**interest** 11:9 15:15 19:11 30:24
**interested** 110:20
**interests** 11:2
**interfere** 6:16 7:8 7:20
**interject** 24:17 39:19
**interpose** 51:13
**interrupt** 11:8
**interrupted** 17:24
**interviewed** 48:6 48:11
**interviews** 48:15
**introduce** 20:23
**intrude** 34:8
**investigate** 85:12

**investigated** 37:13 80:20
**investigation** 37:2 48:19 57:21 80:13
**involved** 10:10 45:7 47:23 49:5 51:7 54:12,20,21 55:19 60:8 62:21 63:4,6 63:10 77:8 79:2,4 86:3 89:4,8 101:5 103:5
**Involvement** 66:5
**involving** 41:8 49:9 60:18 63:24
**irregular** 21:21
**issue** 10:14 12:14 19:21 51:18 79:5 100:3 107:1
**issues** 5:19 58:2 108:3
**items** 39:12

———————

**J**

**J** 89:17
**J-a-r** 35:5
**J-a-u-r-i-g-y** 89:19
**Jauregui** 34:25 35:5 45:20 61:25 89:17,18
**Jay** 1:23 2:18 20:22 106:20,21 110:5 110:24
**Jerome** 83:11,16
**job** 1:25 22:19,21 28:10 45:10
**jobs** 60:9
**join** 30:18
**joined** 7:5
**judge** 9:2,6
**July** 53:12 110:22
**jumbled** 95:4
**jump** 14:6
**June** 1:16 2:20 5:2 20:14 110:10
**jurisprudence** 14:11 18:23

———————

**K**

**Karayan** 3:13 21:7

**keep** 8:23,23,24 43:4 96:24 97:2,7 97:9,12,18
**kept** 58:24
**key** 69:3
**keys** 64:13 65:3,9 65:17
**kind** 16:20 91:8 101:19,20
**kinds** 7:6 13:13 59:2 77:20 79:13
**knew** 74:23 75:6,7 99:11
**know** 7:9 14:8 18:25 19:21 22:6 22:13,14 23:6,15 26:18 28:12 29:6 31:23 32:5 33:13 33:15 34:3,5,14 35:5 36:13 38:9 38:14,18 47:18,18 50:24 51:23 55:11 62:5 64:15,17 67:4,22 71:20 74:14,15 75:21,21 77:18 79:11 81:10 81:17,18,20 82:5 82:11,21 83:1,3,7 85:9 87:18,25 88:2,5 89:2,22 90:17,22,23 91:10 91:16 95:22 96:1 101:12 106:11,25 107:10,11,13,16
**knowing** 9:19 10:3 10:6 19:3 32:14 64:22
**knowledge** 36:24 37:18 39:6 43:21 65:19 66:15,22 77:6 85:10 93:4 94:14 103:17 104:16
**knowledgeable** 45:8

———————

**L**

**L-o-r-d-o-n** 31:5
**La** 27:15,17

**Lack** 96:2
**lacks** 37:16,22 38:4 38:10 39:4 43:15 48:17,22 49:15 50:20 54:14,23 55:24 56:5 57:5 58:25 62:3,18 63:18 66:2,9,20 67:15 68:4,11 74:3,12 75:17 76:1 77:11 79:8 80:21,24 85:19 86:21 88:8,23 91:15,19 96:16,21 98:16 103:16 105:2,23
**Latino** 20:1
**laugh** 17:5,11,12
**laughing** 7:15
**law** 3:5 9:8 10:6 18:25 51:12
**lawsuit** 39:10 44:11 48:7,12,16
**lawyer** 7:7 11:3,22 11:24 13:2 14:9 14:15 19:25
**lawyers** 12:14 14:16,16 23:24 34:5 37:20 38:19 43:22 56:18 61:21
**layers** 102:2,19
**learn** 23:13 66:19 80:8 81:13 88:6 104:23
**learned** 62:24 90:20
**learning** 63:9
**leave** 5:10,14,16,17 6:5 30:22 82:8
**leaving** 5:16 47:6
**left** 31:15 45:21 46:18 71:6
**legal** 14:10 21:18 37:16 39:4 49:2 54:12,19,20,24 55:8 56:4,15 57:6 57:23 58:3 60:22 61:6,18 63:4,10

63:17 64:7 66:9 67:8,16 68:5 70:5 72:9 75:18 76:23 77:4,10,23 78:11 78:22 79:20 80:4 80:22 85:8,19 86:11 88:16,24 89:6,11 91:12 93:7 103:16,23 104:4 105:2,20,21 106:1
**legally** 26:19
**let's** 5:4 8:16 15:2 32:6 86:5 92:1 97:15,16 106:2,24 108:7,19
**letters** 31:12 39:9
**Lewis** 3:18 7:23
**license** 30:16,16
**licenses** 30:15
**life** 26:10
**limit** 39:15
**limited** 21:3 39:20 39:21 54:9 86:6
**line** 12:10 95:12
**lines** 89:20
**lineup** 38:6
**link** 5:11,17
**list** 59:6 82:24
**listed** 84:7
**listen** 7:14 80:1,8
**listened** 80:19
**listening** 14:25 79:5
**lists** 53:8
**literally** 11:4 12:9 106:4
**litigation** 44:11 55:6,16 88:21 91:11
**little** 102:18
**lived** 76:8
**lives** 49:8 56:24
**LLP** 3:18
**locate** 73:22 75:8
**located** 87:23 96:8
**location** 1:19 43:6 87:24
**lockdown** 71:20

117

**log** 95:3,7
**long** 100:18,21
　101:4
**longer** 70:11
**longest** 85:5
**look** 23:16 25:10,13
　25:19 39:10,18
　40:10 41:10 70:8
　70:24 72:20 74:18
　96:18
**looked** 25:8,9,21
　39:13 42:8 72:21
　97:24 98:15
**looking** 35:2 39:17
　42:25 53:25 73:4
**Lordon** 31:4,9,15
**Los** 1:2 2:2 3:20
　20:19 28:2
**lot** 30:11 40:22
　81:18,20

**M**

**M** 1:23 2:18 110:5
　110:24
**M-i-k-a-e-l-a** 46:1
**maintaining** 60:13
**making** 5:20 13:13
**male** 93:14
**maligned** 7:24 8:10
**maligning** 8:24
**Malone** 3:5 5:16
　6:4,10,20 8:5 13:9
　15:14,17 16:3,19
　16:21 17:13 19:12
　19:17 21:1,2,2
　24:2,5,17,25 25:2
　32:2,9 33:5 34:1
　34:13,20 35:10
　36:1,11,18,23
　37:4,15,22 38:4
　38:10,16 39:4,19
　40:20 41:3,12,14
　41:18,19,23 42:15
　42:23 43:7,15
　44:2,16 45:2,4,23
　46:12 47:3,10,16
　48:9,13,17,22
　49:2,10,15,24
　50:8,13,20 51:1,8

51:13 52:3,12,17
52:21,23 53:19
54:6,14,17,23
55:8,17,20,24
56:4,12,20 57:1,5
57:12,18,22 58:3
58:9,15,19,25
59:4,10,18,21,25
60:5,10,15,20,22
61:6,17,22 62:3,8
62:13,18 63:1,11
63:17,25 64:6,14
64:19,25 65:11,18
65:22 66:2,9,14
66:20 67:1,7,15
67:21 68:4,11,15
68:20 69:6,18
70:2,5,16 71:15
72:6,9 73:8,12,18
73:21 74:2,11,21
75:1,11,17 76:1
76:12,17,23 77:4
77:10,22 78:5,10
78:15,22 79:7,17
79:20,23 80:4,10
80:15,21 81:5,15
82:14,17 84:2,8
84:13,25 85:7,18
85:22 86:10,21
87:5,13 88:1,8,12
88:16,23 89:6,11
89:13 90:2,6,8,11
90:16 91:4,12,15
91:19,25 92:4,12
92:21 93:2,7,23
94:2,7,12,20 95:9
95:16,20,25 96:2
96:10,15,21 97:4
97:11,20,25 98:4
98:10,16,23 99:3
99:10,24 100:6,13
101:6 102:6,10,15
103:8,15,22 104:3
104:12,20 105:1
105:10,17,23
106:12 107:22,24
108:1,4,9,13,16
108:20

**malone@rosema...**
　3:7
**man** 17:3,9
**manage** 43:12
**managed** 46:21
　47:15 59:9,13
**management** 23:22
　28:14,25 29:12,20
　29:21 31:4 39:24
　40:1,8,13 53:7
　58:22 59:17,24
　60:8 76:6 84:17
　87:19,22 88:7
　103:6
**manager** 28:15
　30:8 31:2,9,15,16
　31:20 34:16,21
　43:23 44:15 45:15
　45:18 46:7 47:19
　47:20 60:8 77:8
　78:2 79:25 85:15
　86:8 87:1,9 91:22
　91:24 92:2 98:20
　99:14,16,23 100:2
　100:9,12,19,20,21
　101:17,25 102:1,4
　102:5,13,13,23,23
　102:24
**managers** 45:16
　47:22 100:14
**manages** 43:19
**managing** 44:25
　100:4
**manner** 21:24
　88:20
**manuals** 40:8,13
　58:22 59:8,11,11
**Maribel** 82:25
**Marie** 3:19 5:5,6
　7:23 108:13
**marie.wrighten...**
　3:21
**mark** 54:1
**marked** 54:3
**married** 26:19
**maternity** 30:22
**matter** 13:5 19:15
　20:17 28:24

**mean** 32:4,4 34:15
　37:24 42:16
　101:19,19 102:17
**means** 94:19
**meant** 19:15
**measurements** 22:9
**medical** 38:11,13
　57:6 58:4 77:23
　78:10,23 79:17
　80:22 87:2 104:20
　105:2
**medication** 104:25
　105:15
**meet** 5:14 11:10
　107:2,5
**meeting** 33:1,12,13
　33:14 51:20 79:13
　86:2 90:18,21,21
　90:25 92:24 98:20
**meetings** 32:23
　33:4 84:20,20,23
　90:4,9,12,24 91:2
　92:24,25
**member** 33:24
　34:12 37:3 57:17
　67:6,12 75:23
　83:23 84:11 86:17
　86:19 95:2
**member's** 86:18
**members** 33:12
　49:7 75:15 76:7
　82:22 84:1,6
　91:11 92:10,10
**memorialize** 95:3
　96:12
**mental** 37:2,13
　38:9 58:8,13,18
　78:14 105:8
**mention** 93:22
**mentioned** 38:2
　52:4 63:24 94:5
**messaging** 39:9
**methods** 68:19,24
　69:11
**Mikaela** 45:24
　46:10,20 47:19,23
　48:12 53:12
**mind** 42:3

**mind's** 73:4
**mine** 10:18
**minute** 24:21 81:25
**minutes** 12:1,22
　13:13 52:13 81:24
　92:24 106:4,5,8
**misconduct** 77:3
**mismanaged**
　105:15
**mismanagement**
　104:25
**misquoted** 15:24
**missed** 67:23 102:2
**missing** 67:20
**misspoke** 97:6
**misstates** 42:23
　44:16 45:2 53:19
　54:6,15 55:20
　62:8 63:11 64:6
　69:18 73:18,18
　75:1 81:5 87:13
　90:2 91:4 94:2
**misstep** 97:8
**moment** 20:13
**month** 26:19 47:7
　98:17
**months** 41:21 83:5
　98:17 100:22
**Montrose** 3:14
**Moorpark** 27:24
**morning** 21:5,16
　51:21
**motion** 9:6 19:6
**move** 5:13 11:15
　19:15 41:19 104:7
**moved** 31:13 44:23
　44:24 88:6
**moving** 20:3
**multiple** 72:23
**mute** 7:13 11:4
　13:11,17 16:6
　18:1 19:9
**muted** 10:24
**mutual** 1:6 2:6

**N**

**N** 4:2
**name** 26:7,14,17
　27:25 29:2 46:2

118

69:7,9 70:25 74:5
74:6 82:21 83:1,7
87:17 89:16 98:2
109:13
**named** 110:8
**names** 26:9,12
**narrative** 19:18
35:10 36:1 41:25
62:18 63:1 65:22
66:2 68:15 74:2
76:17 77:11,22
85:22 91:13 98:5
98:10 104:4
105:24
**narrow** 38:25
**Nazaretyan** 1:10
2:10 20:17 21:6
33:3,7,17 34:11
37:3,14,21 50:11
50:17 56:24 57:4
57:11,17 58:2
66:7,17,25 67:19
68:1 75:14,22
76:21 77:3
**necessary** 12:20
43:18 109:11
**need** 7:19 11:10
15:9 19:17 22:13
23:8,9 24:17 26:1
52:8 65:3 108:12
**needs** 80:2,8,14,19
81:4,14
**neighbor** 38:1
95:23
**neither** 110:18
**network** 97:1 98:24
**never** 20:7 32:21
48:1 64:10 84:22
**nice** 22:19
**nod** 22:24
**non-profit** 1:6 2:6
**nonwritten** 104:2
**noon** 82:1
**normal** 26:6
**North** 1:2 2:2 20:19
**nos** 61:2,3
**note** 15:10
**notes** 91:9 106:6,7

**notice** 4:15 5:8 6:25
40:1,5 47:5 53:6
**noticed** 6:22,24
**notwithstanding**
18:8 21:20
**number** 40:7,23
41:6 43:5 92:14

---

### O

**Oaks** 29:15 87:24
**oath** 22:3
**object** 24:2 33:5
**objecting** 15:4 16:7
**objection** 11:12
37:15 41:23 55:24
60:10 81:15
**objectionable**
61:12
**objections** 5:20
24:19 37:22 38:16
41:17 42:2 48:13
48:17 49:2,10
51:1 55:18 56:5
56:12,20,21 57:12
57:18,22 58:3,9
58:15,19 59:4
60:15 61:6,17
63:25 66:14 67:1
67:7,21 76:12
78:10,15 79:7,23
80:4,10,15,21
81:5 85:23 86:22
87:5,13 90:11
91:19 97:25 98:4
98:11 104:20
105:10,17,24
**obligation** 42:7
**observations** 12:19
13:5
**observe** 8:7 13:11
13:17
**observed** 70:10
**observing** 7:8
**obstruction** 12:25
**obstructive** 14:2,4
15:3
**obtain** 29:24 68:9
105:20
**obtained** 29:11

**obviously** 34:15
40:12 95:23
**occupants** 64:12
**occurred** 36:14
41:8 62:21 76:16
93:10
**offer** 66:1
**offered** 41:15
**office** 25:23 29:15
29:16,17 34:17,19
34:22 101:14
**officer** 11:13,19,19
16:8 17:2
**offices** 94:25
**official** 49:13,14
99:13
**Oh** 18:24 69:2
101:15
**okay** 7:14 10:20
11:6 17:16 23:11
23:12,20 24:13
26:2,4 28:5,8 29:2
29:18 30:18 32:15
34:18 35:24 39:15
40:12 45:5,10
46:23 47:5,22
48:1 51:22 52:2,3
52:9,23 56:16
61:2 63:3,22
64:10 66:23 69:13
70:14,23 71:3,9
71:20,24 72:2,11
73:4,15 74:16
75:13 82:5 83:6
83:10,12,20,25
86:16,25 88:10,14
89:18,21 90:24
91:6 92:7,23
97:14,23 98:8,14
99:2,15,18 101:4
101:24 102:4,8,12
102:21 105:21
108:4
**on-site** 101:17
**once** 65:4,13,15
**open** 33:10 87:10
94:24
**operator** 20:20

**opinion** 38:11 39:5
57:6,23 58:4
68:20 73:19 77:23
78:11,23 79:18
80:22 93:3 94:21
104:13,21 105:2
**opportunity** 5:9 6:4
6:7 9:7 13:10,17
13:18 17:23
**Orange** 109:4
110:3,23
**order** 5:14 11:15
20:3 24:23
**outcome** 110:21
**Outlook** 68:16,22
**outside** 28:9 33:9
43:22 66:13
**overall** 92:8
**overbroad** 38:4
61:7 90:16 92:12
**oversee** 45:16
**overseeing** 46:10
103:1
**Oxnard** 3:6

---

### P

**Pacific** 20:15
**page** 4:6,14 53:23
53:23 110:11
**paid** 40:24
**pale** 10:22
**paradigm** 19:2
**paralegal** 24:22
**part** 49:19 66:25
**participate** 12:18
15:19 37:1,8
**participation** 8:7
**particular** 74:16,20
80:17 83:25 100:3
**particularly** 6:21
29:22 41:25
**partner** 7:23
**partners** 21:7
**party** 5:24,24 8:2
10:9 11:20 12:11
16:8,9 33:16
36:21 110:19
**Pat** 106:25
**Patrick** 3:5 21:2

**106**:11 107:20
**pay** 67:12
**paying** 76:18,22
**payment** 67:20
**PCAM** 28:14 30:7
**pedigree** 18:7
**penalty** 109:14
**pending** 6:11 10:9
20:18
**people** 43:4 68:23
78:18 79:1
**perceive** 107:8
**percent** 102:21
**period** 14:6 16:19
46:9 47:8 69:22
85:5
**perjury** 109:14
**permission** 5:12,18
9:19
**person** 11:25 15:2
39:10 43:14 68:3
77:9 78:21 80:2,8
81:11 86:6 93:12
93:17,19,22,25
94:5,10 95:11,15
95:19 99:9,21,22
**person's** 80:14
99:13
**personal** 26:5
40:18 41:1,2,10
42:10 51:17 54:9
96:25,25
**personally** 81:9,12
**personnel** 59:23
**persons** 60:8
**phone** 93:9 94:23
95:6,7
**phones** 31:11
**phonetically** 35:4
89:14
**physical** 37:2 77:24
78:19
**Pierce** 28:2,4,4
**Pierro** 3:13 21:7
108:2
**Pinero** 47:21,24
48:16
**pipe** 97:17

**place** 8:1 15:8 33:8 37:12 41:15 90:10 91:1 97:2,9,18 110:11
**Plaintiff** 1:8 2:8 3:4 21:2
**plaintiffs** 13:6,6
**plan** 11:7,8
**plans** 15:4
**play** 18:10
**please** 20:12,23 21:10 22:6 23:5 24:5 26:14,22 27:5 29:18 34:7 35:1,13,18,21 40:21 41:16 42:3 45:25 46:2 50:4 51:15 52:9 65:21 76:12 82:3,11 98:6 100:25
**plenty** 18:6
**PMP** 29:12 30:5,13 30:18,20 31:14,16 31:19,23 35:6 37:12 39:2,11,16 39:17 40:1,2,12 41:10 42:11 46:4 47:8 50:12 53:7 53:11 55:4 56:2 58:7,18,24 59:15 59:22 85:11,17 90:5,14 94:16,18 95:7 97:9 99:7 103:19
**PMP's** 25:10,13 40:25
**point** 23:3 75:14
**policies** 40:8,13 58:23 60:13 103:19 104:2
**policy** 43:3,9,13
**politely** 21:20 82:9
**pool** 65:23
**populated** 72:20
**populating** 73:5
**portfolio** 31:21,22 45:15
**position** 7:2 46:6

87:25
**possible** 41:20
**preceded** 100:23 101:10
**prefer** 106:22
**pregnant** 41:21
**preparation** 23:20 24:11
**prepared** 24:18 55:15,15
**presence** 12:21 33:8,9
**present** 3:17 5:23 6:3 13:10 14:15 21:6 86:14 94:15 104:6
**presented** 35:17 79:3 87:11 104:16
**presenting** 86:6
**presents** 79:15
**preservation** 43:4 43:13
**preserve** 54:22 55:22 56:2,10
**preserved** 55:7,15 73:17
**president** 49:17,20 99:20 102:1,24 103:4
**pressured** 22:11
**presuming** 75:21
**pretty** 26:6 54:11 65:5
**prevail** 61:3
**previous** 43:23
**previously** 78:16
**prior** 5:7,15,19 7:6 12:22 32:15 54:15 62:8 63:11,22 64:6 71:12,17 84:6 91:10 93:22
**privately** 34:6
**privilege** 5:25 33:6 34:1 57:13
**privy** 36:16
**probably** 28:2 31:8 101:22
**problem** 7:7,10

8:11,19 59:20 101:12
**problems** 5:20 7:6 12:22
**procedural** 18:25
**Procedurally** 10:15
**procedures** 40:9 58:23 60:13 103:20
**proceed** 5:22 6:5,20 6:25 15:15 18:2 19:13,14 20:2 105:16
**proceeding** 5:11,11 5:15,16 6:1,2,6,17 7:11,22 12:18 13:1,12,15 14:11 18:2 21:19 23:22 23:25 24:11 75:7 97:24
**proceedings** 12:22 14:12,17 19:22 20:4
**process** 37:1 58:1 78:20 79:5 80:7 80:12,18 82:2 85:17 87:4
**proclamation** 14:1
**produce** 25:3 39:8 40:8,17,23 75:7
**produced** 6:24 54:5
**production** 24:18 25:20 53:8
**professional** 11:3 12:7 30:8 32:7 42:6 77:8 79:3 84:17 86:8 87:8 101:13,20
**professionally** 6:18 32:6
**promise** 23:5
**properties** 59:9,13
**property** 23:21 31:21 32:16,20,22 37:21 38:3,20 44:24,25 45:19 47:9,15 48:1 49:8 49:8,18,23 59:17

59:24 61:12 62:21 63:6 64:11 87:19 103:1
**protect** 23:1 54:21 56:10
**protected** 55:7
**protective** 5:13 11:15 20:3
**protocol** 95:2
**provide** 21:24 22:12 85:25
**provided** 5:11,17 24:16 105:16,22
**provides** 84:16
**providing** 104:10
**provocation** 7:25
**prying** 26:4
**psychological** 104:18,24
**psychotic** 105:8
**pull** 38:7 40:7 88:4 98:22
**pulls** 9:13
**pure** 22:15
**purpose** 98:19
**pursue** 41:1
**purview** 49:23
**put** 15:7 16:15 19:4 19:10,24 30:12 92:1,14 108:10
**putting** 14:25

**Q**

**question** 8:4 22:5,7 27:3 34:4,6,10,15 37:6,7,10 45:3 57:8 59:18 60:25 61:8 62:10 63:19 65:8 70:21 74:8 78:25 80:25 81:6 81:11 96:23 97:7 106:10,20 108:5
**questions** 10:12 22:4,23 81:19 91:7 100:2,5 107:22,24 108:1
**quickly** 108:8
**quiet** 34:4
**quietly** 7:8

**quote** 86:17

**R**

**race** 17:19 18:4
**raise** 21:9
**raised** 7:5 27:10 34:11,18 35:21 48:25 51:5 92:19 94:10
**raising** 104:9
**ram** 12:4,4
**random** 15:8
**reach** 20:5 55:13,22 75:8
**reached** 84:11
**read** 53:22 109:8
**ready** 6:25 7:19 12:12,14 19:14
**realize** 52:3
**really** 11:5 36:13 37:5 61:9
**realtor's** 30:16
**reask** 34:10
**reason** 12:5 15:6 17:7 18:13 59:19 74:9 77:7 88:15
**recall** 22:9 31:24 32:18 33:18 35:8 35:14,15 36:6,19 36:21 44:7 46:22 50:16,19,23 56:7 63:2,9,15,22 67:2 75:4 88:14 89:25 90:17,19 91:16 93:12,13,15 95:17 95:18 98:14,18 101:10 105:11 106:21
**recalled** 75:5
**receipt** 55:1,3
**received** 30:9 43:21 69:20 75:9 87:2 94:18 95:8
**receives** 95:7 97:10
**recipient** 69:1
**recollect** 83:22
**recollection** 21:25 22:1 46:24 56:9
**recommend** 86:2

120

87:10
**recommendation**
49:4 56:14,17
**recommended** 55:6
105:19 106:1
**recommending**
58:7
**record** 5:4,5 7:12
8:9,17,18,20,25
9:2 10:16 11:10
11:11 15:7,11,14
15:19 16:5,11,15
16:20,23 18:4,11
18:17 19:5,10,12
19:25 20:10,14
39:19 52:24 53:2
82:15,19 96:12
97:18 106:15,18
108:5,6,11,18,19
108:22
**recorded** 92:24
**recording** 92:25
93:1 95:14
**recordkeeping** 95:1
**records** 25:10,11
25:12,13 39:18
72:2 87:2 97:2,12
**recreation** 65:7
**recreational** 65:24
**reference** 41:7
96:13
**referring** 24:22
25:17,17
**reflecting** 40:23
**reframe** 61:8
**refuses** 5:10,14
15:20
**regard** 45:11 51:4
58:21 79:11 92:7
97:10,24
**regarding** 23:25
33:16 35:11 39:10
42:18,20,25 43:3
43:21 44:8 48:6
48:12,16,20 50:16
56:3,10 57:21
60:13 62:11 64:4
64:23 68:9 72:8

72:10 75:9 84:14
87:11 93:6 94:16
97:3
**regards** 69:5
**regional** 46:7 100:9
100:12,19 102:4
102:13,23
**regret** 107:8
**regular** 91:24
**regularly** 10:3
17:18
**regulations** 40:9
58:23 59:5 76:19
**reject** 86:9
**related** 10:13 16:9
36:20 54:22 55:6
110:19
**relates** 51:6 57:16
59:17 61:5 66:24
73:16 74:1 105:7
**relating** 55:23
61:15
**relationship** 25:4
**remember** 27:25
29:19,22 32:10
35:22 36:4,5
45:21 57:12 59:6
95:21 96:17
**remembered** 74:25
**remotely** 1:19 2:20
**removal** 91:10
**render** 109:11
**repeat** 59:18
**rephrase** 22:6 37:7
69:19 70:17 78:25
79:14
**report** 103:12
**reported** 1:23 77:2
105:14
**reporter** 2:18 8:14
8:23 12:13 16:5
20:11,21,24 21:9
22:21 106:22
110:6
**Reporting** 20:21
**represent** 5:24 9:1
10:5,9 11:9 12:10
12:11 14:8 16:12

20:24 21:6
**representatives**
59:16
**represented** 6:15
9:20 10:4 31:7
**representing** 12:15
14:9 16:8 20:21
**represents** 6:13
**request** 10:2 16:11
24:18 39:11,15,15
39:16 79:3 85:20
85:25 104:5
108:10
**requested** 39:13
88:19
**requests** 25:4,19,23
39:7,20 40:4 53:7
70:9,20 77:18
**require** 30:2 65:6
65:20
**requirements**
18:22
**requires** 65:17 80:1
**researched** 74:15
**reserve** 16:7,15
19:9
**reserved** 17:6
**residents** 64:11
**respect** 7:1,11 8:21
8:22,22 15:1
17:25 57:16 106:8
**respectful** 107:11
**respectfully** 21:20
82:9
**responding** 22:20
**response** 22:11
44:4 70:9,19
**responses** 7:21
24:16,16,18,19,22
**responsibilities**
31:10
**responsibility**
45:11
**responsible** 45:19
46:10 69:23,25
**responsive** 43:1
**rest** 59:6
**restroom** 23:9

51:25 106:13
**result** 110:20
**retrieve** 68:17
**revealing** 84:19
**review** 24:15 40:4
54:8 86:1,2
**reviewed** 24:10
**reviewing** 24:22
86:20
**RFP** 10:13
**ridiculous** 10:20,23
**riding** 38:1
**right** 9:14 16:8,15
16:21 17:6 19:9
21:10 29:3,4
31:13,25 36:20
41:17 51:3 52:2
61:3 65:14 89:22
89:23 97:16 98:21
98:22 99:11 106:2
106:20
**Ring** 93:17 94:1
95:23 96:7,7,11
**risk** 104:10
**role** 31:14 91:22
101:23
**room** 65:7
**ROSEMAN** 3:5
**rough** 51:24
**roughly** 29:9 30:3
30:25 45:12 53:20
**rude** 8:15
**rule** 15:8
**rules** 40:9 58:23
59:5 76:19
**run** 106:13

--- **S** ---

**S** 3:13 4:12
**S-i-m-m-o-n-s**
100:16,17
**Sabrina** 1:14 2:17
4:4 20:16 21:11
26:7,8,13 32:10
40:21 51:15 56:21
57:13 76:13 81:10
89:7 103:9 108:22
109:7,21 110:7
**Safarian** 3:12,12

4:7 5:4,5 6:10,19
7:4,24 8:1,4,11,16
8:19 9:16,18,22
9:25 10:2,5,17,20
10:22 11:6,14,17
11:20,23 12:1,14
12:17 13:23,25
14:12,18,20,22
15:1,12,17,22,25
16:2,17 17:8,13
17:17 18:6,21,24
19:17 20:11,12
21:1,5,5,15 24:3,4
24:7,17,24 25:3
32:3,15 33:10
34:3,18,21 35:13
36:6,15,20,25
37:7,19,25 38:6
38:14,18 39:7,23
40:22 41:6,14,19
41:22 42:2,17,24
43:8,20 44:3,18
45:3,5,25 46:14
47:5,12,20 48:11
48:15,19,24 49:6
49:12,18 50:2,10
50:15,22 51:3,11
51:16 52:12,15,19
52:22 53:4,22
54:4,8,16,19,24
55:10,21 56:1,8
56:16,22 57:3,7
57:15,20,25 58:6
58:12,17,21 59:2
59:8,12,20,22
60:2,7,12,17,23
61:10,20,24 62:6
62:9,14,24 63:3
63:13,19 64:2,10
64:17,22 65:2,13
65:21,25 66:4,12
66:16,23 67:4,10
67:17,24 68:8,13
68:18,23 69:8,19
70:6,17 71:16
72:7,11 73:10,15
73:20,23 74:7,13
74:23 75:3,13,20

76:5,14,20 77:1,7
77:14,25 78:7,13
78:18,24 79:10,21
79:25 80:7,12,17
81:1,7,17 82:13
82:21 84:3,9,14
85:1,11,21 86:5
86:12,25 87:8,16
88:3,10,14,18
89:1,9,14 90:4,9
90:13,20 91:6,14
91:17,23 92:1,7
92:15,23 93:5,13
93:25 94:3,9,13
95:1,14,18,22
96:3,11,19,23
97:6,14,23 98:2,6
98:14,18,25 99:5
99:11 100:1,11,16
101:7 102:8,12,17
103:11,18 104:1,8
104:14,23 105:5
105:12,21 106:2
106:14,20,23
107:19,23,25
108:2,7,15,19
**Safarian's** 16:10
**safety** 35:19,20
36:8,10,17 44:9
**sauna** 65:7
**save** 43:17
**saved** 68:17 74:5,8
74:10
**saw** 38:6 53:17
72:12,20 73:5
93:17 107:9
**saying** 10:8 12:6
14:7,23 15:9 35:9
**says** 39:24,25 40:8
40:23 41:6
**scan** 91:9 106:5,7
**school** 10:7 27:7,8
27:12,21
**schools** 28:6
**scope** 21:3
**screen** 53:6 54:1
73:5
**search** 25:7 68:14

68:18,19,24,25
69:1,3 70:19
72:13 74:6,24
**searched** 68:22
69:8 72:16
**second** 12:24 25:25
26:2,3 56:20 88:3
103:8
**secondhand** 67:25
**see** 15:2 39:24
42:25 53:9,13
68:17 74:19 81:20
86:7 88:4 107:15
**seeing** 50:23
**seek** 105:6
**seen** 19:21 33:19,21
53:5,15 61:4,14
88:9
**send** 6:2
**sender** 68:25 69:7,8
72:20
**sending** 9:14
**sends** 95:2
**senior** 100:8,14,20
100:21 101:25
102:4,13,23
**sent** 68:13 69:17,17
69:20 70:10,11,18
70:18
**separate** 13:4 43:6
102:14
**September** 30:19
**serious** 79:16
**serve** 68:25
**served** 24:20,21
25:5,23
**server** 43:19
**service** 84:17
**session** 106:25
107:5
**set** 6:7,22 12:25
15:8 110:11
**setting** 15:6 19:2
**sexist** 10:16 13:13
17:11
**shake** 22:24
**share** 54:1
**shared** 81:21

**She'll** 6:17
**sheriff** 51:14
**Shorthand** 2:18
110:5
**Shortly** 29:25
**signal** 7:21
**Simi** 27:8
**Similarly** 41:6
**Simmons** 100:15
**simple** 15:16 70:23
**simply** 65:9
**single** 18:18 43:21
67:20 92:9
**sir** 18:17
**sit** 7:8 56:8 79:12
81:2 106:6
**situation** 36:14
62:20 63:5 70:13
72:10 85:3 93:10
102:20
**situations** 70:15
**slight** 101:20
**slightest** 68:2
**slowly** 35:3 89:16
**smiling** 7:15
**smirking** 7:16
**SMITH** 3:18
**smooth** 47:7
**software** 97:13
**somebody** 55:4
77:25 86:16 94:23
96:8 99:8 103:20
**son** 33:21 57:4
93:17
**soon** 44:10,14
54:11 91:8
**sorry** 27:4 28:4
38:22 44:3 47:17
59:11 76:12 89:7
96:22 97:8 102:18
105:1 107:23,25
108:9
**sort** 12:4 19:15
34:4 37:1 47:6
58:23 103:11,12
**source** 37:20
**sparks** 82:5
**speak** 7:2 12:18

13:3 17:3,6,14
23:21,24
**speaking** 13:22
15:5,22 16:2,7
19:4,18
**speaks** 19:10 29:2
86:6
**special** 81:4,14
**specialist** 29:21
**specific** 22:8 97:14
**specifically** 35:13
35:20 36:10 67:14
69:4
**speculate** 36:4
**speculation** 22:16
41:3 43:15 44:2
45:23 46:12 47:16
60:5 61:17 62:3
64:19 66:21 68:5
70:2 80:23 85:18
88:1,23 89:13
91:12 93:2,23
94:12 95:10,16
96:16,21 97:5,11
97:21 98:11 99:24
100:13 101:6
102:6,10,15 103:8
103:23 104:3,13
**speculative** 58:25
**spell** 26:14 35:1,2
45:25 50:4 100:25
**spelling** 89:15
**spends** 99:21
**spent** 13:12
**spoke** 71:16 103:2
**spouse** 24:3
**ss** 109:3 110:2
**St** 3:6
**staff** 102:20
**standing** 13:8,18
15:19
**stands** 29:19,22
57:13
**start** 12:2 32:6 37:9
39:25 51:24 52:12
79:14
**started** 12:23 17:25
20:7,14

**starts** 35:5 89:17
**state** 1:1 2:1 5:25
6:11 9:3,4,10,11
10:10 12:16 16:18
17:23 20:18,24
89:16 109:2 110:1
110:6
**stated** 19:1 42:8
65:8 78:16
**statement** 16:20,22
47:12 48:4 49:12
50:15 55:21 56:1
56:9 64:2 81:1
84:22 85:2 89:24
**stating** 62:9
**Ste** 3:6
**stenotype** 110:14
**step** 29:20 93:18
101:21,22
**stepped** 32:19,21
**stipulation** 7:12
**stop** 8:16 22:14
54:1 103:8 106:3
**store** 43:6
**strategies** 13:5
**Street** 3:19
**strike** 25:18 42:5
66:5 84:21 85:13
95:4 99:6 103:18
**structurally** 99:6
**study** 30:10
**studying** 28:23
**subbing** 91:22
**subject** 28:24 48:8
92:20
**subscribe** 109:13
**subsequent** 63:15
94:10
**substance** 24:8
36:6 84:19 109:10
**substantial** 86:14
**substantive** 10:14
**succinctly** 42:8
**suggest** 51:6
**suggested** 63:4
**suggestion** 54:12
**Suite** 3:19
**summarized** 61:20

122

**Sunday** 18:19
**Superior** 1:1 2:1
  20:18
**supervision** 110:15
**supervisor** 45:12
  49:25 100:8 103:3
**supervisory** 91:22
**support** 86:19,23
  102:19
**supposed** 12:2,23
**sure** 6:18 16:1,4
  18:3 43:10 55:5
  57:8 61:10 79:1
  102:21
**suspend** 5:21 13:19
**suspended** 11:14
  14:12 66:18
**swear** 20:9,25
**sworn** 21:12 110:9
**system** 96:19 97:2
  100:7

**T**

**T** 4:12
**T-y** 83:22
**take** 6:8 13:15
  16:17,21 17:22
  21:23 40:20 42:23
  76:12 81:25 86:24
  106:4,8,12
**taken** 2:17 6:23
  53:1 82:18 91:1
  101:20,22 106:17
  110:10
**talk** 10:25 11:21,21
  11:24,25 14:4
  17:9 79:12,12
  108:3
**talked** 11:23
**talking** 8:13,23
  15:23
**Tamara** 1:10 2:10
  20:17 21:6
**tasks** 88:19
**taught** 78:9
**telephone** 94:19
**tell** 11:4 29:18
  32:10 34:7 62:16
  69:4 71:12 73:6

75:13 79:10,14
  81:7,8 82:3 84:20
  87:23 104:1
**ten** 6:25 23:19
  53:17 72:16,19
  73:11,13
**terminated** 66:18
  67:12 71:8,10,17
  71:22 75:24 88:21
**termination** 88:15
  89:4
**terms** 24:13 42:9
  59:2 99:16
**test** 28:23
**testified** 21:12 45:6
**testifying** 20:16
  22:2,15
**testimony** 21:25
  23:4 41:15 42:23
  44:16 45:2 53:19
  54:6,15 55:20
  62:8,9 63:12 64:6
  69:18 73:18 75:1
  81:5 87:14 90:2
  91:4 94:2 110:16
**testing** 28:20
**texts** 39:9
**thank** 11:15 18:16
  18:16 22:18,22
  23:8,13 25:25
  26:16,21 27:1
  28:8 29:10 30:7
  47:14 51:22 52:2
  52:6,10,11,22
  59:21 61:2 82:13
  82:17 87:16 89:21
  89:23 92:23 99:5
  106:13 107:7,13
  107:18,19 108:13
**thereof** 110:21
**thereon** 109:12
**thing** 17:4,5,10
  51:4 71:18 102:5
**things** 9:3,9 58:24
  59:3 60:3 61:11
  79:11,13 81:21,23
**think** 7:2,15 11:11
  19:10 31:7 32:12

38:7 44:24 46:21
  47:17 60:23 65:13
  81:22 89:23 91:7
  106:5,9 108:13
**Thousand** 29:15
  87:24
**three** 14:16 30:9
  47:22 52:7 102:2
  106:5
**Thursday** 1:16
  2:19 5:2 110:10
**time** 1:16 12:24
  14:19,21 17:25
  18:18 20:15,15
  31:8,21,23 32:18
  32:25 33:23 34:16
  34:25 39:1 44:25
  46:9 52:7 53:21
  61:5 63:3 67:10
  67:11 69:20,22
  70:1 71:4 74:24
  75:15 85:5 89:15
  89:16 92:12,14
  93:19 96:14 98:15
  99:21 104:8 106:8
  106:12 107:3,8,12
  107:14,16 110:10
**timeframe** 43:10
  89:2
**timely** 88:20
**times** 5:15 18:6
  22:9 41:16 77:14
  78:14 83:14
**title** 49:13,14,16
  88:2 99:13,18
  102:9
**titled** 98:7
**today** 12:21 18:15
  20:4 21:4,7,20
  23:1 48:21 52:9
  53:9 60:19 63:23
  68:10 82:8 103:14
  107:12,13,17
**today's** 20:14 97:24
  106:24 108:21
**told** 38:19 99:18
  105:12
**top** 27:25 29:6 83:2

**trained** 78:3
**training** 27:13,20
  28:9 46:7
**transcribed** 110:14
**transcript** 6:3
  22:25 23:1 108:11
  110:16
**transferred** 31:15
  31:19
**transition** 46:7
**transpired** 21:21
  61:21
**treat** 18:10,12
**treated** 21:19 75:15
  82:9
**trial** 6:23,23
**tried** 5:14 68:17
**true** 14:15 15:24
  55:21,25 56:1,9
  109:11,15 110:15
**Trust** 87:22 88:7
**try** 12:10 35:3
  81:25 89:14
  102:22 106:9
**trying** 8:24 26:4
  32:12 39:2 41:19
  41:21 47:17
**turn** 7:13,20 16:5
  17:18 86:9 87:3
**turning** 86:19
**twice** 18:18
**two** 9:14 13:3,20
  14:16 30:3 61:2
  83:21 98:17
  100:22 106:4
  108:16
**two-month** 47:8
**Ty** 83:22
**type** 39:3 48:20
  58:1 77:2 78:20
  81:3 104:9
**types** 68:24 98:8,13
**Typically** 95:11

**U**

**ultimate** 62:22
**Um-hmm** 26:25
**unable** 86:4 88:19
**uncharacteristic**

82:7
**unclear** 92:12
**underhanded**
  19:15
**underscoring** 18:16
**understand** 22:4,5
  37:5 41:24,24
  49:6 55:3 61:9,10
  64:11 74:7 78:3
  78:13 80:1,2 81:3
  81:20 84:16
**understanding**
  6:14 46:23 70:21
  83:15
**understood** 54:4
  93:25
**undertake** 54:21
  55:4 80:13
**undertaking** 57:21
  80:18
**undertook** 81:3
**Unfortunately** 6:10
**universe** 87:9
**unprofessional**
  10:25 11:5 12:12
  17:2,12
**unusual** 21:18,21
**unwell** 23:5
**upset** 93:16
**use** 18:4 23:9 68:19
  69:3

**V**

**vague** 32:2 34:13
  34:20 36:1,18,23
  37:4,15,22 38:4
  38:10 39:5 43:15
  47:10 48:9,22
  49:15,24 54:17,23
  55:9 56:6 57:1,5
  57:18 58:10,25
  59:10,25 60:5,10
  60:20 61:7,22
  62:13 63:17 64:7
  64:14,25 65:11,18
  66:2 70:16 72:6,9
  73:21 74:2 75:17
  76:2 78:5,15,22
  79:17 81:15 84:2

123

84:8,13,25 85:7
88:12,17 89:6,11
90:8,16 91:13,20
91:25 92:12 93:8
93:23 94:2 95:20
96:15,21 97:4,11
97:21 99:3 100:13
102:6,10,15
103:16,23 104:3
104:13 105:1,1
**valley** 1:2 2:2 20:19
27:9,25
**variable** 98:12
**various** 64:12 78:4
**vary** 91:21 92:5
**Ventura** 49:17,19
99:20
**verbal** 62:14
**verbiage** 36:5,7
**verify** 24:23
**vice** 49:16,19 99:20
102:1,24 103:3
**video** 6:2 20:11,16
20:20 22:25 92:25
93:17 108:11
**Videoconference**
1:13,20
**videographer** 3:23
12:13 20:13 52:24
53:2 82:15,19
106:15,18 108:18
108:21
**Videotaped** 1:13
2:17 5:1
**violating** 15:8
**violation** 10:7
31:11 76:18
**virtually** 33:2
**vs** 1:9 2:9 20:17

**W**

**W** 3:19
**wait** 56:21 106:7
**waiting** 22:19
**walk** 75:24 78:8
94:24
**walking** 19:7
**want** 13:18,19 16:1
16:4,19,20 17:18

17:20,23,25 19:13
19:24 20:2,11
21:23 33:13,15
34:3,5,8 42:2
51:25 52:15 53:4
81:17,21 82:5,8
106:5,6 107:2,7
107:14,16
**wanted** 12:6 108:10
108:16
**wants** 19:14,24
94:15
**wasn't** 8:4 19:14
72:23 81:19 96:18
104:21
**water** 23:9
**way** 7:16,21 18:11
18:12 20:7 29:14
37:13 38:3 49:13
51:22 53:23 59:23
68:2 70:23 92:1
92:24 96:12 97:6
98:3 110:19,20
**we'll** 6:1 11:15
23:10 40:3 107:1
107:4
**we're** 5:5 7:18 8:16
8:18 12:5,7,22
15:17,17 19:14,14
20:9 48:20 54:1
60:18 63:23 68:10
82:14 103:13
**we've** 5:19,21 6:6
6:24 22:25 31:7
51:23 53:11 55:14
58:22 81:24 87:1
101:24,25 102:1
102:22,24 106:23
**week** 23:18
**weekly** 92:6
**weeks** 28:23
**well-being** 36:12
37:13
**went** 8:3 27:8 46:24
68:16 70:8,19,24
71:3 72:12,19
74:18 90:21
**wheelchair** 77:25

**whereabouts** 87:18
**white** 20:1
**wide** 87:10
**willing** 95:12
**wish** 107:14
**withdraw** 84:18
96:23
**witness** 4:4 7:21
20:9 24:6 32:12
34:14 35:11 36:3
36:12,19,24 37:5
37:18,24 38:5,12
38:17 39:6 41:5
41:20 42:16 43:17
44:17 45:24 46:13
47:4,11,17 48:10
48:14,18,23 49:4
49:11,16,25 50:9
50:14,21 51:2,10
53:20 54:7,18
55:19,25 56:7,14
57:2,14,19,24
58:5,11,16,20
59:1,5,11 60:1,6
60:11,16,21 61:8
61:19,23 62:5,20
63:2 64:1,8,15,20
65:1,12,19,23
66:3,11,15,22
67:2,9,22 68:7,12
68:16,22 69:7
70:4 72:10 73:9
73:13,22 74:4,22
75:12,19 76:3,18
76:25 77:6,13,24
78:6,12,17 79:9
79:19,24 80:6,11
80:16,25 81:6,16
85:9,20,24 86:23
87:7,15 88:2,9,13
89:8,12 90:3,7,12
90:17 91:5,16,21
92:5,13,22 93:4,9
93:24 94:8,22
95:11,17,21 96:1
96:17 97:12,22
98:1,12,17,24
99:4,25 100:7,14

102:7,11,16
103:10,17,24
104:5,22 105:4,11
105:19,25 107:18
110:8,13,17
**witness's** 17:25
**witnesses** 60:18
**woman** 18:9,14
**Woodland** 3:6
**word** 23:10 52:9
86:18
**words** 22:24 35:25
47:7 62:16 69:3
92:15 110:13
**work** 42:11
**worked** 71:4
**working** 30:23
87:18
**works** 49:7 87:22
**wouldn't** 15:21
31:23 42:3 55:12
86:23
**wrap** 106:9,24
107:21
**wrapping** 91:8
**Wrighten** 3:19 5:5
5:6,19,23 6:5,9,12
7:2,5,9,14,20,23
7:23 8:1,3,6,9,11
8:12,18,21 9:17
9:19,23 10:1,3,6
10:18,21,24 11:7
11:16,17,18,21,24
12:3,18 13:11,21
13:24 14:1,13,18
14:19,20,21,22,23
15:15,18,21,23,25
16:1,2,4,24 17:1,9
17:14,15,16 18:3
18:7,21,22,25
19:22 108:8,10
**Wrighten's** 13:4
**write** 30:10
**writing** 104:6
**writings** 50:23
55:14 59:12,23
60:12 70:9
**written** 39:8 85:24

85:25 103:19,25
110:13

**X**

**X** 4:2,12

**Y**

**yeah** 15:23 25:2
32:12 44:19 68:23
69:21,24 78:1
82:4 88:13 107:23
108:15,19
**year** 27:17 32:19
46:15,16
**years** 20:8 29:9
30:1,4,10 43:5
44:5,23 50:24
72:3 73:25 74:17
74:17 76:6 101:8
**yelling** 8:12,13,23

**Z**

**Zoom** 2:20 3:2 5:1
92:25

**0**

**1**

**1** 4:15 54:2,3
**10** 52:13
**10:00** 53:12
**10:15** 52:24
**10:20** 52:20,21
**10:23** 53:2
**10:59** 82:15
**11** 41:7
**11:10** 82:19
**11:41** 106:15
**11:45** 106:14
**11:48** 106:18
**11:50** 1:17 108:22
108:23
**12** 53:12
**12th** 110:22
**13** 41:6
**15** 30:3 40:23 52:13
**16** 40:4,7
**1988** 26:24
**19CHCV00398** 1:9

ELITE COURT REPORTING (949) 829-9222

2:9

**2**

**20** 30:3
**20-plus** 20:8
**2000** 3:6
**2008** 27:19 30:25
**2009** 27:19
**2013** 26:20 30:19
  31:17,20
**2014** 26:18
**2017** 32:13,15 45:1
  45:7
**2018** 32:13,16 45:7
**2019** 33:2 41:7
  45:13,19
**2020** 33:2 71:21,22
  71:24
**2022** 1:16 2:20 5:2
  20:15 109:17
  110:10,22
**21** 4:7
**213** 3:20
**21650** 3:6
**24177** 1:25
**25** 12:1,22 13:13

**3**

**30** 1:16 2:20 5:2
  110:10
**30th** 20:15
**3150** 3:14
**3455** 1:23 2:19
  110:7,24
**3rd** 30:19

**4**

**40** 81:24
**4000** 3:19

**5**

**50** 73:1,6,7
**54** 4:15
**5th** 3:19

**6**

**633** 3:19

**7**

**72** 28:22

**8**

**8-9-88** 26:23
**818)334-8528** 3:15
**818)839-9400** 3:7
**850-3944** 3:20

**9**

**9:00** 53:9
**9:18** 1:17 2:19 5:2
**9:36** 20:15
**90071** 3:20
**91214** 3:14
**91367** 3:6

125

EXHIBIT "M"



**Beth Corbett**

**Aldea Community Association vs. Nazaretyan**

**February 25, 2022**

**Job # : 622159**

Court Reporting - Videoconferencing - Trial Presentation - Nationwide Networking

800-843-7348 - **SOUSA.COM** - 877-843-8443

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

3

4

5    ALDEA COMMUNITY ASSOCIATION, a  )
     California non-profit mutual    )
6    benefit corporation,            )
                                     )
7              Plaintiffs,           )
                                     )
8         v.                         )  Case No. 19CHCV00398
                                     )
9    TAMARA NAZARETYAN,              )
                                     )
10             Defendants.           )
     _____)

11

12

13

14

15

16    VIDEOTAPED DEPOSITION OF BETH CORBETT

17         Taken Remotely Via Zoom

18         Friday, February 25, 2022

19

20

21

22    Reported by:
      Sheila K. Russo
23    CSR No. 11760
      Job No. 622159

24

25

2

---

1    ALSO PRESENT (via videoconference):

2        PASHA KORNEYCHUK, VIDEOGRAPHER

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

---

1         The Videotaped Deposition of Beth Corbett, taken

2    on behalf of Defendant, reported remotely via Zoom

3    Videoconference from San Pedro, California, at 9:06 a.m.

4    on Friday, February 25, 2022, by Sheila K. Russo, CSR No.

5    11760, a Certified Shorthand Reporter for the State of

6    California, pursuant to notice.

7                   *  *  *

8    APPEARANCES OF COUNSEL (via videoconference):

9    FOR PLAINTIFF:

10        ROSEMAN LAW, APC
          BY:  PATRICK MALONE, ESQ.
11        BY:  KARINA BABIKIAN, ESQ.
          21650 Oxnard Street
12        Suite 2000
          Woodland Hills, California 91367
13        818-380-6700
          malone@roseman.law
14

15   FOR DEFENDANT TAMARA NAZARETYAN:

16        THE SAFARIAN FIRM, APC
          BY:  HARRY SAFARIAN, ESQ.
17        BY:  PIERRO BABAIAN, ESQ.
          BY:  CHRISTINA KARAYAN, ESQ.
18        3150 Montrose Avenue
          Glendale, California 91214
19        818-334-8528
          hs@safarianfirm.com
20
     FOR ALDEA COMMUNITY ASSOCIATION AND BETH CORBETT IN
21   RELATED MATTER:

22        LEWIS BRISBOIS BISGAARD & SMITH LLP
          BY:  MARIE WRIGHTEN, ESQ.
23        633 West 5th Street
          Suite 4000
24        Los Angeles, California 90071
          213-580-3944
25        marie.wrighten@lewisbrisbois.com

2

---

1              I N D E X

2

3    WITNESS (via videoconference):

4    BETH CORBETT

5

6         EXAMINATION BY:            PAGE:

7         MR. SAFARIAN                6

8

9         E X H I B I T S

10   DEFENDANT'S:                    PAGE:

11   1 - Notice of Deposition with Demands for     141

12       Production of Documents, Third Amended;

13       7 pages

14   2 - Handwritten notes; 1 page           190

15

16

17

18

19

20

21

22

23

24

25

4

1    San Pedro, California; Friday, February 25, 2022
2    9:06 a.m.
3
4    THE VIDEOGRAPHER:  This is the video Number 1 in the
5    videotaped deposition of Beth Corbett, Volume I, in the
6    matter Aldea v. Nazaretyan in the Superior Court of the
7    State of California, County of Los Angeles, Chatsworth
8    Courthouse, Case Number 20STCV08773, held via Zoom with
9    all participants attending remotely on February 25, 2021
10   [sic] at the time indicated on the video screen, which is
11   approximately 9:06 a.m.  My name is Pasha Korneychuk.  I'm
12   the legal video specialist from the Sousa group located at
13   4615 First Street, Suite 200, Pleasanton, California
14   94566.  Our court reporter is Sheila Russo of the same
15   firm.
16       Will all parties present now introduce themselves
17   for the audio record.
18   MR. SAFARIAN:  Good morning.  Harry Safarian for the
19   defendant.
20   MS. KARAYAN:  Christina Karayan for defendant.
21   MR. BABAIAN:  Pierro Babaian for defendant.
22   MR. MALONE:  Patrick Malone for the plaintiff.
23   MS. WRIGHTEN:  And Marie Wrighten, and I represent
24   Ms. Corbett in a related matter.
25   THE VIDEOGRAPHER:  Thank you.  Will the court reporter

5

1    now please swear the witness.
2
3        BETH CORBETT,
4    the witness herein, having been placed
5    under oath remotely, was examined and
6    testified as follows:
7
8        EXAMINATION
9    BY MR. SAFARIAN:
10   Q   Good morning, Ms. Corbett.  My name is Harry
11   Safarian.  It's nice to meet you.
12   A   Good morning.
13   Q   I'm an attorney, and I've been hired to represent
14   Tamara Nazaretyan.  Do you know who she is?
15   A   Yes.
16   Q   We're here today for your deposition.  Have you
17   been deposed before?
18   A   No.
19   Q   Okay.  Do you have any legal training?
20   A   No.
21   Q   And what's your occupation?
22   A   Teacher.
23   Q   Okay, very good.  So I'll go through a little bit
24   of what to expect today.  There's two main things I want
25   to accomplish.  The first thing is I want to gather some

6

1    information that is relevant to the case.  I'll be asking
2    you a series of questions.  We'll probably be here for
3    several hours.  The questions will be specific to this
4    case.  You'll have counsel there with you.  He may give
5    you some instructions to not answer a question.  If that
6    happens we'll deal with it.  You'll hear objections made
7    on the record.  Unless you're instructed not to answer the
8    question, the objections are made just for preserving same
9    for time of trial.
10       The deposition will be recorded by video, as you
11   can see, as well as by a stenographer.  When the
12   deposition is concluded, you'll have a chance to go back,
13   review the transcript, and make any changes you deem
14   necessary.  I would caution you that if you make a
15   substantive change, for example, if this were an auto
16   accident case and you testify today that you've got the
17   green light, and then later on at trial you state that you
18   have the red light, someone could comment upon your change
19   as a material change, and that could raise questions
20   regarding your memory or credibility.  Do you understand
21   that?
22   A   Yes.
23   Q   Thank you very much.  The questions may at times
24   be long.  They may be confusing.  They may be ambiguous to
25   you.  I want you to please tell me if that is the case.

7

1        I told you that there were two objectives I had
2    today.  The first one was to gather information.  The
3    second objective I have today is that when you leave here,
4    I want you to leave here with a positive impression of
5    lawyers, me, and the law.  I will be respectful to you, I
6    will be polite to you, and I will try to do everything I
7    can to accommodate whatever needs you have during the
8    deposition, such as if you need to use the restroom, get
9    up to move around, take a break, I will absolutely work
10   with you to make sure the process is as pleasant as a
11   deposition can be.  Is that all right?
12   A   Yes, thank you.
13   Q   Thank you.  In that regard I trust you to please
14   tell me if there is anything you need.  For example, if
15   you're feeling fatigued, tired, thirsty, hungry, or need
16   to use the restroom, I won't know those things unless you
17   tell me.  So I'll trust you to do that, because I want you
18   at your peak performance today for yourself and because I
19   want a clean, accurate record.  Is that fair?
20   A   Yes.
21   Q   Okay.  So in that vein, again, if there's any
22   question that I ask you that is ambiguous or unclear to
23   you, just let me know.  I won't mind if you have me
24   rephrase the question, and I'll gladly rephrase it for you
25   until it is clear and straightforward.  All right?

8

1    A   Yes.

2    Q   Thank you, Ms. Corbett.  I'm going to ask you

3 some basic background questions.  Could you please state

4 and spell your full name for the record.

5    A   Beth Corbett, B-e-t-h C-o-r-b-e-t-t.

6    Q   And do you have a maiden name, or is that the

7 name you've had your whole life?

8    A   My maiden name is Flatley, F-l-a-t-l-e-y.

9    Q   Thank you very much.  When did you change from

10 Corbett to Flatley?

11   A   15 years ago.

12   Q   And do you reside with a Mr. Flatley -- I'm

13 sorry, strike that.

14       Do you reside with a Mr. Corbett?

15   A   Yes.

16   Q   What's his first name?

17   A   Thomas.

18   Q   I'm going to see if I can raise the volume on my

19 computer.  It's a little bit hard to hear you.

20       And has he ever served on the board?

21   A   No.

22   Q   And by "the board," you mean -- you understand

23 that I mean the Aldea community board that we're here

24 about today; correct?

25   A   Yes.

9

---

1    Q   Okay.  And who else do you reside with?

2    A   That's it.

3    Q   Okay.  And how long have you lived within the

4 Aldea property?

5    A   Six years.

6    Q   And you said you're a teacher.  Can you give me

7 more detail on that?  For example, where do you teach?

8    A   I teach at El Camino Real Charter High School in

9 Woodland Hills.

10   Q   I'm familiar with that school.  And what subject

11 do you teach?

12   A   English.

13   Q   And how long have you been teaching English at El

14 Camino Charter High School?

15   A   20 years.

16   Q   And where did you obtain your bachelor's degree?

17   A   Antioch University.

18   Q   Do you have any education besides a bachelor's

19 from Antioch after college?

20   A   Yes.

21   Q   What is that?

22   A   I have a master's in education at Pepperdine

23 University.

24   Q   I saw your Ohio State mug.  Are you a Buckeye?

25   A   That's my husband.

10

---

1    Q   Very good.  And then any other education post

2 high school?

3    A   No.

4    Q   Okay, very good.  And do you know Tamara

5 Nazaretyan?

6    A   Yes, I know who she is.

7    Q   Okay.  Have you ever interacted with her?

8    A   No.

9    Q   Have you ever heard her speak?

10   A   Yes.

11   Q   Have you ever spoken directly to her?

12   A   No.

13   Q   Do you know who she lives with?

14   A   Yes.

15   Q   Who is that?

16   A   Her son and her mother.

17   Q   Do you have any information regarding the state

18 of health of her son or her mother?

19       MR. MALONE:  I'm just going to interpose an objection;

20 to the extent it calls for information you learned from me

21 or anybody from my office, I'm going to object on the

22 attorney-client privilege basis and ask that you don't

23 disclose that.  But to the extent you obtained information

24 relevant to Mr. Safarian's question independent of your

25 counsel, then please answer.

11

---

1 BY MR. SAFARIAN:

2    Q   And let me say, Ms. Corbett, that at no time will

3 I ask you to provide information that your lawyers gave

4 you.  So just assume in every question that I ask you,

5 please, that there is a qualification, except as you

6 learned from your attorneys.  Okay?

7    A   Yes.

8    Q   So except as you learned from your attorneys, do

9 you have any information regarding the health or state of

10 health of Ms. Nazaretyan's son?

11   A   Can you clarify that when you say "health"?

12   Q   Well, do you know that he has any type of

13 disability, physical, mental limitations?

14   A   I'm not certain.

15   Q   Have you heard anything aside from your attorneys

16 about the young man's state of health from anyone?

17   A   I believe so.  In our board meetings, there has

18 been discussions or documents I've seen relating to her

19 claims or her status of her son.

20   Q   When did you first see documents or hear

21 information regarding the young man's health?

22   A   I believe it was approximately in 2019 to 2022,

23 when I've been on the board.

24   Q   Can you be more specific as to when during that

25 time frame you first received information regarding the

12

---

1  young man's state of health?
2      A   I believe it was probably around 2020.
3      Q   And do you recall approximately when within the
4  year of 2020 that would have been?
5      A   No, I'm sorry, I don't.
6      Q   Okay.  Can you tell me, do you recall there was a
7  lockdown because of COVID in March of 2020?
8      A   Yes.
9      Q   Do you recall if it was before or after the
10  lockdown?
11      A   I don't recall.
12      Q   Do you recall how you first learned about any
13  health issues, physical or mental, regarding the young
14  man?
15      A   Health issues, I can recall when he had a violent
16  encounter, if that's what you mean.
17      Q   No.  My question's more specific.  I understand
18  he had a violent encounter, but at some point or other,
19  you came to learn information that he had physical or
20  mental limitations that you and I would not have; correct?
21      A   Yes.
22      Q   And so what I'm trying to gather is how you first
23  came about that information.
24      A   In a board meeting, I can roughly say around
25  2020.

13

1  "observed."
2          Remember, Beth, please take a beat and allow me
3  to interpose objections.
4          Sorry, Mr. Safarian.  Please proceed.
5      MR. SAFARIAN:  No problem.
6      Q   Have you ever had -- well, let me strike that.
7          Have you ever sought information directly from
8  the family for any purpose regarding their occupancy
9  within the HOA?
10      MR. MALONE:  It's vague.
11  BY MR. SAFARIAN:
12      Q   For example, have you ever reached out to anybody
13  in the family by e-mail, text, or phone for any reason?
14      A   No.
15      Q   Have you ever asked anyone to do that for you?
16      A   No.
17      Q   So when you joined the board in 2019, fall, who
18  else was on the board at that time?
19      A   Dale Rodin.
20      Q   I'm going to ask you if you wouldn't mind to just
21  speak up, partly because I have a hearing problem, and
22  partly because on this Zoom environment, it's just a
23  little challenging.  Did you say Gayle?
24      A   Dale, D-a-l-e.
25      Q   Okay, thank you.  Dale Rodin, uh-huh.

15

1      Q   And were you on the board in 2019?
2      A   I started the board in the fall of 2019, so I'm
3  going to say September 2019.
4      Q   Thank you.  Do you know the young man's name that
5  lives with Ms. Nazaretyan?
6      A   Garnik.
7      Q   And do you know how you learned his name?
8      A   I'm going to say the board meetings.
9      Q   Do you know the name of Garnik's grandmother who
10  livers in the unit?
11      A   I can't recall.
12      Q   You understand there's an elderly woman that also
13  lives in the household?  Sorry?
14      A   Yes.
15      Q   Okay, very good.  Thank you.  When you moved in
16  six years ago, do you know if the Nazaretyan family lived
17  there at the time?
18      A   No.
19      Q   Do you know when they moved in?
20      A   No.
21      Q   Have you ever had direct interactions with them?
22      A   No.
23      Q   Have you ever observed them in the HOA community?
24      A   No.
25      MR. MALONE:  Vague -- excuse me.  Just vague as to

14

1      A   Maya, M-a-y-a.  I can't recall her last name off
2  the bat.
3      Q   Starts with a "Z," Zlotnik, I think.
4      A   Yes.
5      Q   Okay.  Was Jerome Black on the board?
6      A   There was Jerome Robbins and then Jerome Black.
7      Q   How is Maya's English proficiency?
8      MR. MALONE:  Calls for speculation.
9  BY MR. SAFARIAN:
10      Q   Just upon your observations, how did you observe
11  her English proficiency?
12      A   I would say fair.
13      Q   Thank you.  Did she ever in your observation
14  struggle understanding you in basic conversation?
15      MR. MALONE:  Calls for speculation.
16      THE WITNESS:  I can't recall.
17  BY MR. SAFARIAN:
18      Q   Okay.  When you joined the board in fall of 2019,
19  were you replacing a board member?
20      MR. MALONE:  Calls for speculation.
21      THE WITNESS:  No.
22  BY MR. SAFARIAN:
23      Q   Was there a vacancy at that time?
24      A   Yes.
25      Q   And do you know who filled your seat prior to the

16

1  vacancy, if anyone?
2      A   No, I don't know.
3      Q   When you joined the board, were you provided with
4  any documentation regarding my client or her dwelling?
5      MR. MALONE:  It's vague.
6      MR. SAFARIAN:  You may answer.
7      THE WITNESS:  At some point I was.  I'm not sure when
8  you said when I joined, if that's --
9  BY MR. SAFARIAN:
10     Q   When were you first provided documentation
11  concerning my client?
12     MR. MALONE:  Vague.
13     THE WITNESS:  Yeah, I don't recall exactly.
14  BY MR. SAFARIAN:
15     Q   Can you estimate as to whether it was before or
16  after you joined the board?
17     A   After.
18     Q   Do you recall what documentation it was?
19     MR. MALONE:  Vague.
20     THE WITNESS:  No.
21  BY MR. SAFARIAN:
22     Q   Did you maintain or file away the documentation
23  in any place?
24     A   I don't recall.
25     Q   Do you recall what the documentation said?

17

1      MR. MALONE:  Asked and answered.
2      THE WITNESS:  I don't recall.
3  BY MR. SAFARIAN:
4      Q   Do you recall who provided it to you?
5      A   I don't recall.
6      Q   Do you recall why you received it?
7      A   Because I was on the board.
8      Q   Okay.  Did you do anything with it?
9      MR. MALONE:  Vague.
10     THE WITNESS:  No.
11  BY MR. SAFARIAN:
12     Q   Sorry?  I didn't hear your response.  I'm sorry.
13  Did you do anything with the documentation?
14     A   No.
15     Q   Okay.  Have you ever undertaken any type of
16  investigation regarding Garnik's health?
17     MR. MALONE:  Vague.
18     THE WITNESS:  I don't recall.
19  BY MR. SAFARIAN:
20     Q   Do you recall the board ever undertaking any
21  investigation into Garnik's health?
22     MR. MALONE:  Vague.
23     MR. SAFARIAN:  Can you clarify that, please.
24  BY MR. SAFARIAN:
25     Q   Well, let me ask, did you ever ask anybody to

18

1  provide you with any information regarding Garnik of any
2  type?
3      MR. MALONE:  Overbroad, vague.
4      THE WITNESS:  I don't recall.
5  BY MR. SAFARIAN:
6      Q   Do you recall anybody on the board ever asking
7  anyone for any information regarding Garnik?
8      A   I don't recall.
9      MR. MALONE:  These are vague.
10  BY MR. SAFARIAN:
11     Q   Okay.  Do you recall anyone on the board ever,
12  for example, consulting anyone for a professional opinion
13  regarding Garnik, such as a psychologist or psychiatrist?
14     MR. MALONE:  Vague and compound.
15  BY MR. SAFARIAN:
16     Q   I'll break it down then.  Do you recall anyone on
17  the board consulting any professional at all concerning
18  Garnik?
19     MR. MALONE:  Vague.
20     THE WITNESS:  I don't recall.
21  BY MR. SAFARIAN:
22     Q   Do you recall anyone on the board ever discussing
23  finding a way to accommodate any disability Garnik might
24  have?
25     MR. MALONE:  Lacks foundation, and it's vague.

19

1      THE WITNESS:  I don't recall.
2  BY MR. SAFARIAN:
3      Q   As you sit here now, February 25, 2022, having
4  been on the board for approximately two and a half years,
5  do you have any type of understanding from any source,
6  aside from your lawyers, what Garnik's disabilities are?
7      MR. MALONE:  Lacks foundation, vague.
8      THE WITNESS:  I believe I've seen in your legal
9  documents discussing it.
10  BY MR. SAFARIAN:
11     Q   In the lawsuit?
12     A   Yes.
13     Q   In other words, the first time you came across
14  any information referencing Garnik's disabilities was in a
15  lawsuit that my firm filed?
16     MR. MALONE:  Misstates prior testimony, and it's
17  vague.
18     MR. SAFARIAN:  You may answer, please.
19     THE WITNESS:  I believe so.
20  BY MR. SAFARIAN:
21     Q   Prior to seeing a federal lawsuit stating that
22  Garnik had disabilities, did you have any information
23  personally from any source that he had any disabilities?
24     MR. MALONE:  Vague.
25     THE WITNESS:  No.

20

BY MR. SAFARIAN:

Q   Prior to seeing the lawsuit my firm filed stating that Garnik had disabilities, did anyone on the board in your presence ever discuss that he had any disabilities?

MR. MALONE:  Vague.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   Prior to receiving the lawsuit stating that Garnik had disabilities, did anyone on the board in your presence suggest undertaking any type of an effort to accommodate any limitations anyone in my client's household might have in terms of health?

MR. MALONE:  Lacks foundation, and it's vague.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   Have you ever observed -- well, strike that.

Does the HOA community have surveillance cameras?

MR. MALONE:  Vague, calls for speculation.

THE WITNESS:  Yes.

BY MR. SAFARIAN:

Q   And have you seen any footage from any of the surveillance cameras depicting Garnik or his mother or grandmother?

MR. MALONE:  Vague.

THE WITNESS:  No.

21

---

MR. SAFARIAN:  Now, I'll agree, Patrick, that you have a standing objection that every single question I ask is vague.

Q   Have you ever asked for any surveillance footage?

A   No.

Q   When you joined the board in the fall of 2019, did the HOA have a property management company?

A   Yes.

Q   Was that PMP?

A   Yes.

Q   Paul-Mary-Paul?

A   Yes.

Q   Have you ever spoken with anybody from PMP concerning any of my clients?  And when I say "clients," I mean Garnik, his mother, or his grandmother.

A   I don't recall.

Q   Have you ever exchanged any type of correspondence with anyone from PMP concerning any of my clients?

A   I don't recall.

Q   From the time you joined the board in the fall of 2020 until being served with the federal lawsuit, can you recall on how many occasions the board discussed anyone in the Nazaretyan household?

MR. MALONE:  This is vague.

22

---

MR. SAFARIAN:  You may answer.

THE WITNESS:  Can you repeat the question?

BY MR. SAFARIAN:

Q   Let me ask it this way.  From the time you joined the board in the fall of 2019, until being served with the federal lawsuit, do you recall anyone from the Nazaretyan household being discussed at any board meeting?

A   Yes.

Q   And what was discussed?

MR. MALONE:  Calls for a narrative.  It's vague, overbroad.

MR. SAFARIAN:  You may answer.

THE WITNESS:  I believe Tamara, Tamara, came to a board meeting to discuss her situation.

BY MR. SAFARIAN:

Q   Anything else that you recall about that?

A   No.

Q   Was she provided a translator?

A   I don't recall.

Q   Did you observe at that time that she spoke very limited English?

A   No.

MR. MALONE:  Calls for speculation.

MR. SAFARIAN:  You may answer.

MR. MALONE:  Lacks foundation.

23

---

MR. SAFARIAN:  You may answer.

THE WITNESS:  Can you rephrase it?

BY MR. SAFARIAN:

Q   Well, what were your observations about Tamara's English proficiency when she came to that one meeting?

A   Solid.

Q   Would you agree in your observations that she was proficient in spoken English?

A   Yes.

MR. MALONE:  Misstates testimony.

BY MR. SAFARIAN:

Q   Okay.  Have you ever corresponded with her?

A   No.

MR. MALONE:  Asked and answered.

Remember, Beth, please, just take a beat.

BY MR. SAFARIAN:

Q   And what was said by Tamara at that meeting, if you can recall?

MR. MALONE:  Calls for a narrative, lacks foundation.

MR. SAFARIAN:  You can answer, please.

THE WITNESS:  I can't recall specifics.

BY MR. SAFARIAN:

Q   In general terms can you recall what was discussed?

MR. MALONE:  Same objections.

24

1    THE WITNESS:  I believe paying a fine.
2    MR. SAFARIAN:  Sorry?
3    THE WITNESS:  I believe paying a fine.
4    BY MR. SAFARIAN:
5    Q   Anything else?
6    MR. MALONE:  Same objections.
7    THE WITNESS:  No.
8    BY MR. SAFARIAN:
9    Q   Have you come to learn that Garnik suffers from
10   paranoid schizophrenia?
11   MR. MALONE:  Lacks foundation, calls for speculation,
12   relevance.
13   THE WITNESS:  No.
14   BY MR. SAFARIAN:
15   Q   Until now, this moment, you have had no
16   information that Garnik suffers from mental health
17   disabilities aside from what you read in the lawsuit.  Is
18   that correct?
19   MR. MALONE:  Misstates prior testimony, and it's
20   vague, and it lacks foundation.
21   MR. SAFARIAN:  You may answer, please.
22   THE WITNESS:  Can you clarify?  You first said
23   paranoid schizophrenia and then mental health, so --
24   BY MR. SAFARIAN:
25   Q   Yeah, so I'm just going to say generally for

25

1    mental health limitations, until you received the lawsuit,
2    did you have any information that Garnik suffered from
3    mental health disabilities?
4    MR. MALONE:  Lacks foundation, asked and answered.
5    MR. SAFARIAN:  You may answer.
6    THE WITNESS:  I don't recall.
7    MR. SAFARIAN:  What?
8    THE WITNESS:  I don't recall.
9    BY MR. SAFARIAN:
10   Q   Okay.  As you sit here now --
11   MS. WRIGHTEN:  I'm sorry.  Can we take a break for
12   like five minutes, please.
13   MR. SAFARIAN:  Gosh, we just started, but that's fine.
14   Is it something that's pressing?  I'd like to finish this
15   line of questioning first.
16   MS. WRIGHTEN:  It's just that I have dogs that I hear.
17   MR. SAFARIAN:  That's fine.
18   MS. WRIGHTEN:  Sorry about that.
19   MR. SAFARIAN:  That's all right.  We'll take a
20   five-minute break.  We'll come back at 9:37.
21   THE VIDEOGRAPHER:  Okay.  Going off the record at
22   9:32.
23   (Recess held.)
24   THE VIDEOGRAPHER:  Going back on the record at 9:37.
25   ///

26

1    BY MR. SAFARIAN:
2    Q   Ms. Corbett, thank you for coming back.  As I
3    promised you earlier, my hope was that when you leave
4    today, you'll feel like you've been treated respectfully.
5    If there is anything I can do to make that happen or
6    facilitate that, please let me know.  The questions I'm
7    asking are never comfortable, because a deposition is
8    rarely comfortable.  We're not here as friends.  We're
9    just here to accomplish business, and I hope you
10   understand that.  But as we proceed, is there anything I
11   can do to help facilitate that process to make it easier
12   for you?
13   A   No.
14   Q   Okay, thank you.  Are you feeling well?
15   A   Yes.
16   Q   And there's nothing impacting your memory today,
17   such as a cold or the flu or anything like that; correct?
18   A   No.
19   Q   And you understand that you're still under oath,
20   and that is the same oath you would take in front of a
21   judge and jury; correct?
22   A   Yes.
23   Q   Okay, very good.  Now, you've listed a number of
24   board members for me.  You've listed obviously yourself.
25   You've listed Messrs. Rodin, Zlotnit, and Robbins and

27

1    Black.  Since you joined -- well, strike that.
2    From January 2019 forward, are there any other
3    people that have been on the board that you have not
4    listed?
5    A   Yes.
6    Q   Who else?
7    MR. MALONE:  Calls for speculation.
8    THE WITNESS:  There was an attorney briefly on the
9    board.  I can't remember her name.  She was there for
10   maybe three months.
11   BY MR. SAFARIAN:
12   Q   And do you recall approximately when that was?
13   A   Maybe 2021.
14   Q   Do you recall interacting with that attorney?
15   A   Yes.
16   MR. MALONE:  Vague -- it's vague.
17   BY MR. SAFARIAN:
18   Q   Do you recall interacting with that attorney at
19   board meetings?
20   MR. MALONE:  Same objection.
21   THE WITNESS:  I think she was on the board, but she
22   missed her three times, and then I think she resigned.  I
23   didn't really interact with her.
24   BY MR. SAFARIAN:
25   Q   Do you recall her attending any board meetings?

28

1    MR. MALONE:  Vague.
2    THE WITNESS:  Maybe one.
3    BY MR. SAFARIAN:
4      Q    How did you know this person was an attorney?
5      A    She was an attorney, paralegal, something like
6    that.
7      Q    Yeah, how did you come across that information?
8      A    In the board meeting.
9    MR. MALONE:  Speculation.
10   BY MR. SAFARIAN:
11     Q    You learned that at a board meeting?
12     A    Yes.
13     Q    And how did you learn that?  Who said that, or
14   who provided that information?
15   MR. MALONE:  Calls for speculation, it's vague.
16   THE WITNESS:  I believe she said that.  Again, I can't
17   recall if she was a paralegal, a legal secretary, or
18   attorney.  She was in the legal field.  But she didn't
19   stick around.
20   BY MR. SAFARIAN:
21     Q    Do you recall her name, her age, or what she
22   looked like?
23     A    No.
24   MR. MALONE:  Asked and answered.
25   ///

29

1    BY MR. SAFARIAN:
2      Q    Do you recall what unit she lives in?
3      A    No.
4      Q    Do you recall -- do you know if this person still
5    lives in the complex?
6    MR. MALONE:  Calls for speculation.
7    THE WITNESS:  No.
8    BY MR. SAFARIAN:
9      Q    How many units overall in the Aldea community?
10   MR. MALONE:  Calls for speculation.
11   THE WITNESS:  Maybe 250.
12   BY MR. SAFARIAN:
13     Q    Of those 250 units, in the six years that you've
14   been there, have there been any members or occupants of
15   the Aldea community that have violated any community
16   standards you're aware of?
17   MR. MALONE:  Vague -- sorry.  Vague, calls for
18   speculation.
19   THE WITNESS:  Can you clarify that, please.
20   BY MR. SAFARIAN:
21     Q    Well, you have certain rules and standards within
22   the community; correct?
23     A    Yes.
24     Q    And there are certain types of conduct that are
25   not acceptable.  For example, domestic abuse is not

30

1    acceptable; correct?
2    MR. MALONE:  Calls for speculation, vague.
3    BY MR. SAFARIAN:
4      Q    You'd agree with that?
5      A    Yes.
6      Q    Open containers of alcohol by the swimming pool
7    are not acceptable; correct?
8    MR. MALONE:  Calls for speculation, it's vague.
9    MR. SAFARIAN:  Okay.  Madam court reporter, if you're
10   not getting her answers, would you let me know.  I know
11   that there's cross-talk between counsel and the witness,
12   so I want to make sure that you can hear her response.
13   THE REPORTER:  Thank you.  I didn't get the last
14   response, but I have been getting the other ones.
15   MR. SAFARIAN:  Okay.  So please just jump in if you
16   don't.
17     Was your answer to the last question -- well, can
18   we have the last question read back and have the witness
19   respond with the objection to stand on the record, please.
20     (The following question was read:
21       "Q    Open containers of alcohol by
22       the swimming pool are not acceptable;
23       correct?")
24   MR. SAFARIAN:  You may answer.
25   THE WITNESS:  Correct.

31

1    BY MR. SAFARIAN:
2      Q    And I may ask you, if you could, please, to just
3    try to speak up.  It's just difficult with this remote
4    proceeding, and we want to have the court reporter take
5    everything down.
6      So of those 250 units, many of those units have
7    multiple people living in them; correct?
8    MR. MALONE:  Calls for speculation.
9    THE WITNESS:  I don't know.
10   BY MR. SAFARIAN:
11     Q    You know that some do, because my client's does.
12   My client's unit has three people.  Your unit has two
13   people.  You understand that; correct?
14     A    Yes.
15     Q    So if there's 250 units, we can surmise that
16   there's probably much more than 250 people living in the
17   complex.  You'd agree with that?
18   MR. MALONE:  Calls for speculation.
19   THE WITNESS:  Yes.
20   BY MR. SAFARIAN:
21     Q    As a board member, do you have any type of list
22   or spreadsheet or something that lists who lives at the
23   complex?
24   MR. MALONE:  Vague.
25   THE WITNESS:  I don't.

32

BY MR. SAFARIAN:

Q   Does the HOA board have access to any type of information as far as who lives within the Aldea community?

MR. MALONE:  Calls for speculation, calls for a narrative.

THE WITNESS:  I'm not sure.

BY MR. SAFARIAN:

Q   How do you keep track then of who is within the HOA community, if you do?

MR. MALONE:  Calls for a narrative, speculation, vague.

THE WITNESS:  Management company.

BY MR. SAFARIAN:

Q   Have you ever conferred with the management company as to how many people live there?

A   No.

Q   Have you ever spoken with anybody within the management company regarding any of my clients?

MR. MALONE:  Lacks foundation, vague.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   As a board member, at any time have you undertaken any effort to ensure that to the extent that any of my clients had a need for special accommodations,

33

the board actually give consideration to those needs?

MR. MALONE:  Lacks foundation, vague, calls for speculation, narrative.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   Do you recall any communication with the property management company wherein any type of consideration was given at all to at least hearing whether anybody within my client's unit had any type of need for special accommodations?

MR. MALONE:  Same objections.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   As far as you're aware, sitting here now, you have no information that anybody on the board ever investigated whether anybody in the Nazaretyan household had any type of special needs; correct?

MR. MALONE:  Same objection; calls for an expert opinion and a legal contention.

MR. SAFARIAN:  You may answer.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   As far as you sit here now, you have no information that anybody acting on behalf of Aldea, such as its management company, conducted any type of

34

investigation into whether anybody within the Nazaretyan household had any special needs; correct?

MR. MALONE:  Same objections.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   Did anybody tell you at any point that Ms. Nazaretyan presented medical evidence to the board that her son was suffering from schizophrenia?

MR. MALONE:  Same objections.

THE WITNESS:  I don't recall.

BY MR. SAFARIAN:

Q   As a school teacher, do you occasionally come across -- and I don't want you to disclose medical information about any specific student.  For example, I don't want you to tell me that John Smith in my, you know, 11th grade English class suffers from bipolar disorder.  But without revealing any specific names, as a school teacher, have you had students that have had mental disabilities?

MR. MALONE:  Incomplete hypothetical, calls for speculation, vague.

THE WITNESS:  Yeah, I don't recall.  I'm not authorized to say that.

MR. SAFARIAN:  And I'm not looking for any specific names, so I'm -- I'm not looking -- I'm sorry.

35

THE WITNESS:  I won't give you any specific names, but I won't divulge that information.

BY MR. SAFARIAN:

Q   Yeah, I'm not asking you to divulge specific names.  I'm just saying that in your 20 years of history as a school teacher, has it ever been brought to your attention that you have any students that have disabilities?

MR. MALONE:  Same objections.

THE WITNESS:  Yes.

BY MR. SAFARIAN:

Q   Okay.  And is that -- was that done routinely to help accommodate those students' disabilities?

MR. MALONE:  Calls for speculation, vague, ambiguous, calls for a narrative, lacks foundation.

THE WITNESS:  Can you restate the question, please.

BY MR. SAFARIAN:

Q   Sure.  As a school teacher, for example, is custom and practice of the school district or the charter school that you're at -- let me go back.  El Camino High School only recently became a charter school in the last few years; correct?

A   Yeah.

MR. MALONE:  Calls for speculation.

///

36

BY MR. SAFARIAN:

Q   It was part of the Los Angeles Unified School District previously; correct?

A   Yes.

MR. MALONE:  Calls for speculation.

Please take a beat, Beth.

MR. SAFARIAN:  I'm going to stop for a second. Patrick, she's worked there for 20 years.  If I ask her whether she knew whether it was part of LAUSD, I'm not quite sure what value there is in the objection.

MR. MALONE:  I'm just preserving.

MR. SAFARIAN:  I can understand that, but it's almost like to every single question, and it's making it challenging, because what's happening is you and the witness are cross-talking, and some of the objections clearly have no basis.  But I'll move on.  I just needed to sort of get that out there.

Q   Ms. Corbett, when I attended high school and graduated in 1992, I recall at that time that El Camino was a LAUSD high school.  Do you recall also that at some point previously, it was an LAUSD high school?

A   Yes.

Q   And you used to be employed by the Los Angeles Unified School District; correct?

A   Yes.

37

Q   Are you still employed by the Los Angeles Unified School District?

MR. MALONE:  Relevance, privacy.

MR. SAFARIAN:  You may answer.

THE WITNESS:  No.

BY MR. SAFARIAN:

Q   So is your employer the charter school, or, you know, what entity do you work for?

MR. MALONE:  Relevance, privacy.

MR. SAFARIAN:  You may answer.

THE WITNESS:  El Camino Real Charter High School.

BY MR. SAFARIAN:

Q   When did your employer switch from LAUSD to El Camino Charter High School?

MR. MALONE:  Speculation, lacks foundation.

MR. SAFARIAN:  You may answer.

THE WITNESS:  Maybe ten years ago.

BY MR. SAFARIAN:

Q   And when you were an LAUSD teacher, you were familiar with the Los Angeles Unified School District's policies and procedures for accommodating students with disabilities; correct?

MR. MALONE:  Incomplete hypothetical, calls for speculation, vague, relevance.

THE WITNESS:  Yes.

38

BY MR. SAFARIAN:

Q   And the Unified -- LA Unified School District took very seriously its obligation to accommodate students with disabilities, did it not?

MR. MALONE:  Same objections.

MR. SAFARIAN:  You may answer.

THE WITNESS:  Yes.

BY MR. SAFARIAN:

Q   And you were trained on how to work with or be in the environment of students with disabilities; correct?

MR. MALONE:  Same objections.

THE WITNESS:  Yes, learning disabilities.

BY MR. SAFARIAN:

Q   Okay.  You have learning disabilities, and you also had disabilities, for example, where a student might have seizures; correct?

MR. MALONE:  Incomplete hypothetical, and all the same objections as before.

THE WITNESS:  Yes.

BY MR. SAFARIAN:

Q   You had disabilities where students might have psychological issues, such as schizophrenia; correct?

MR. MALONE:  Calls for speculation, it's vague, incomplete hypothetical.

THE WITNESS:  I don't recall.

39

BY MR. SAFARIAN:

Q   When you were at the Los Angeles Unified School District, you were trained to, when you had a student with a disability, to engage in a process where that disability could be understood and accommodated; correct?

MR. MALONE:  Same objections.

THE WITNESS:  Yes.

BY MR. SAFARIAN:

Q   Did you ever do anything to understand the disability that Garnik has?

MR. MALONE:  Vague, calls for a narrative, asked and answered, lacks foundation.

MR. SAFARIAN:  You may answer.

THE WITNESS:  Can you clarify that, please.

BY MR. SAFARIAN:

Q   Well, Garnik has a very serious disability.  I don't know if you know that now, but he's disabled.  It's my understanding -- correct me if I'm wrong -- that the first time you learned that was when you read a lawsuit filed two years or so after the incident that we're here about today.  So let me start with a clean question.

Is it true that the first time you ever even heard word that Garnik had a disability was after you were served with a lawsuit?

MR. MALONE:  This has been asked and answered multiple

40

1    times.

2         MR. SAFARIAN:  You may answer.

3         THE WITNESS:  I believe so.

4    BY MR. SAFARIAN:

5         Q   So prior to that, we talked about you

6    understanding and accommodating a disability.  Do you have

7    any information that anybody who has ever served on this

8    board did anything to understand the nature of Garnik's

9    disability at any time?

10        MR. MALONE:  Asked and answered, calls for

11   speculation, it's vague, it lacks foundation.

12        THE WITNESS:  I don't recall.

13   BY MR. SAFARIAN:

14        Q   On the same token, do you have any information

15   that anyone on the board at any time -- bless you -- ever

16   tried to accommodate any disability of Garnik?

17        MR. MALONE:  Same objections.

18        THE WITNESS:  I don't recall.

19   BY MR. SAFARIAN:

20        Q   You have now read in the lawsuit that Garnik's

21   grandmother suffers or has suffered from cancer; correct?

22        MR. MALONE:  Lacks foundation.

23        THE WITNESS:  I don't recall.

24   BY MR. SAFARIAN:

25        Q   Okay.  I'm going to represent to you that the

41

1    lawsuit discusses that she has suffered or suffers from

2    cancer and that she's considered an elder within the

3    California elder abuse statutory framework.  Now, I'm

4    going to start with a clean question.

5         Are you aware of anyone on the board ever

6    conducting any attempts to understand any disability that

7    Garnik's grandmother has ever had?

8         MR. MALONE:  Same objections and relevance.

9         THE WITNESS:  I don't recall.

10   BY MR. SAFARIAN:

11        Q   Are you aware of anybody within the board ever

12   undertaking any type of investigation to understand -- I'm

13   sorry.  Let me start with a clean question.

14        Are you aware of anybody on the board or acting

15   on behalf of the board ever undertaking any effort to

16   accommodate any disability Garnik's grandmother would

17   have?

18        MR. MALONE:  Same objections, lacks foundation.

19        THE WITNESS:  I don't recall.

20   BY MR. SAFARIAN:

21        Q   Are you aware of the board ever taking any type

22   of disciplinary action against anyone within the HOA

23   community aside from Garnik and his mother and

24   grandmother?

25        MR. MALONE:  Vague, calls for speculation, lacks

42

1    foundation.

2         THE WITNESS:  I don't recall.

3    BY MR. SAFARIAN:

4         Q   So in the last six years that you have lived

5    there, are you aware, for example, of anyone being told

6    that they cannot have the same access to common area

7    facilities that other board members -- or strike that, as

8    other homeowners have because they engaged in bad conduct,

9    such as domestic violence, drinking alcohol openly,

10   driving too fast through common areas, or otherwise

11   violating rules?

12        MR. MALONE:  Asked and answered, vague, incomplete

13   hypothetical, calls for speculation, lacks foundation.

14        THE WITNESS:  I can't recall.

15   BY MR. SAFARIAN:

16        Q   Is it your understanding that the only people

17   ever in the history of this association to ever have any

18   privileges taken away from them were the members of the

19   Nazaretyan household?

20        MR. MALONE:  Lacks foundation, vague, calls for

21   speculation, incomplete hypothetical.  Did I say

22   foundation?

23        MR. SAFARIAN:  You can answer.

24        THE WITNESS:  Can you restate the question, please.

25   ///

43

1    BY MR. SAFARIAN:

2         Q   Sure.  Let me have the court reporter read it

3    back, and then if it's vague to you, I will be happy to

4    rephrase it.  Is that all right?

5         A   Yes.

6         MR. SAFARIAN:  Okay.

7         (The following question was read:

8              "Q   Is it your understanding that

9         the only people ever in the history of

10        this association to ever have any

11        privileges taken away from them were

12        the members of the Nazaretyan

13        household?")

14        MR. MALONE:  Same objections.

15        THE WITNESS:  I don't recall.

16        MR. MALONE:  Mr. Safarian, before you ask your next

17   question, I just want to advise everyone that Karina

18   Babikian from my office might be logging in.  So please

19   don't be alarmed if somebody else appears on the Zoom.

20   Okay.  I just want to let everybody know, not to interrupt

21   you, Mr. Safarian.

22        MR. SAFARIAN:  No problem at all.  Thank you.

23        Q   Are you aware that the board -- you talked about

24   the board fining Ms. Nazaretyan.  Do you recall what that

25   was about?

44

1    MR. MALONE:  Calls for speculation, lacks foundation.
2    THE WITNESS:  I don't.  I don't remember.
3    BY MR. SAFARIAN:
4        Q    Other than knowing that there was an interaction
5    between Garnik and some woman in April 2019, do you have
6    any information that Garnik has ever presented a threat to
7    the HOA community?
8        MR. MALONE:  Can you repeat the question,
9    Mr. Safarian?  I'm sorry.  It broke up on my end for two
10   words.
11   BY MR. SAFARIAN:
12       Q    Other than learning that that was an interaction
13   between Garnik and another person that lived in the HOA
14   community almost three years ago in April 2019, do you
15   have any information that Garnik has ever presented a
16   threat to the HOA community?
17       MR. MALONE:  It's vague, calls for speculation, calls
18   for a narrative, lacks foundation.
19       THE WITNESS:  I believe there was another incident
20   with the police.
21   BY MR. SAFARIAN:
22       Q    What was that incident?
23       MR. MALONE:  Calls for a narrative.
24       THE WITNESS:  Yeah, I'm not sure, but there was an
25   incident where he was detained by the police.

45

1        A    Yes.
2        Q    Okay.  What is that?
3        MR. MALONE:  Calls for a narrative, speculation.
4        MR. SAFARIAN:  You may answer.
5        THE WITNESS:  I don't think I have to answer that,
6    correct, Mr. Malone?
7        MR. MALONE:  If it came from me or anybody at my
8    office or from a discussion with your husband, because of
9    the spousal privilege --
10       THE WITNESS:  Yes.
11       MR. MALONE:  -- then you do not have to answer.
12       THE WITNESS:  Okay.
13   BY MR. SAFARIAN:
14       Q    Is the information you have that there was a
15   detention by police from your husband?
16       A    Yes.
17       Q    Okay.  And what's your husband's name again?
18       A    Thomas Corbett.
19       Q    Do you know from any source whether Garnik was
20   actually convicted of any type of crimes?
21       MR. MALONE:  Calls for speculation, it's vague.
22       THE WITNESS:  I don't recall.
23   BY MR. SAFARIAN:
24       Q    Do you know whether he has ever been charged with
25   a crime?

47

1    BY MR. SAFARIAN:
2        Q    Do you know anything about that, when it
3    occurred, where it occurred, why it occurred?
4        MR. MALONE:  Compound, calls for a narrative.
5        (Ms. Babikian joins the proceedings.)
6    BY MR. SAFARIAN:
7        Q    Other than knowing that he was detained at some
8    point by police, do you have any information about that?
9        MR. MALONE:  Calls for a narrative.
10       THE WITNESS:  Yes.
11   BY MR. SAFARIAN:
12       Q    Okay.  What is that?
13       MR. MALONE:  I'm just going to interpose an
14   attorney-client objection to the extent that you -- and,
15   Mr. Safarian, I apologize for interrupting, but obviously
16   this is something we don't want to run awry of.
17       So to the extent you learned this information
18   from counsel, please do not answer, but from any other
19   source.
20       MR. SAFARIAN:  You may answer.
21       MR. MALONE:  Or your spouse, I want to add.
22   BY MR. SAFARIAN:
23       Q    Other than from your attorneys, do you have any
24   information about this incident that you say he was
25   detained by police?

46

1        MR. MALONE:  Same objections and relevance.
2        THE WITNESS:  I don't recall.
3    BY MR. SAFARIAN:
4        Q    Have you ever seen police at the property
5    interacting with any member of my client's household?
6        MR. MALONE:  Vague.
7        THE WITNESS:  No.
8    BY MR. SAFARIAN:
9        Q    Once you learned that there was possibly a
10   detention by police, did you undertake any investigation
11   as a board member to determine what that was about?
12       MR. MALONE:  Calls for speculation, it's vague,
13   incomplete hypothetical, calls for a narrative.
14       THE WITNESS:  Yeah, I don't recall.
15   BY MR. SAFARIAN:
16       Q    Is it a fair statement that -- well, strike that.
17       Do you know where your home is relative to the
18   Nazaretyan home?
19       MR. MALONE:  Vague.
20       THE WITNESS:  Generally, yes.
21   BY MR. SAFARIAN:
22       Q    How far from your dwelling is their dwelling?
23       MR. MALONE:  Vague.
24       THE WITNESS:  I mean, it's not super close, but it's
25   not super far away.  It's on the other side of the pool

48

1    area.

2    BY MR. SAFARIAN:

3        Q    Would you say it's more than 100 meters away?

4        A    I don't know meters.

5        Q    Is it more than a football field away?  That's

6    100 yards.

7        A    Possibly.

8        Q    Can you see their dwelling from your dwelling?

9        A    No.

10       Q    Have you ever heard any disruption coming from

11   their dwelling?

12       MR. MALONE:  It's vague, lacks foundation.

13       THE WITNESS:  Yeah, I don't know exactly where they

14   live.  I know the approximate area.

15   BY MR. SAFARIAN:

16       Q    So it's a fair statement that you cannot state

17   that you have ever heard any disruptive conduct coming

18   from their unit such as fighting or any altercations;

19   correct?

20       MR. MALONE:  Misstates prior testimony, it's vague.

21       THE WITNESS:  Yes.

22   BY MR. SAFARIAN:

23       Q    Do you know anything about Tamara Nazaretyan's

24   employment?

25       MR. MALONE:  Calls for speculation, lacks foundation,

49

---

1    vague.

2        THE WITNESS:  No.

3    BY MR. SAFARIAN:

4        Q    Do you know if she's employed?

5        MR. MALONE:  Same objections.

6        THE WITNESS:  No.

7    BY MR. SAFARIAN:

8        Q    Do you know whether she left her job at any point

9    to give her son 24/7 supervision?

10       MR. MALONE:  Same objections.

11       THE WITNESS:  I have no idea, no.

12   BY MR. SAFARIAN:

13       Q    Do you know how many people there are in the

14   Nazaretyan household that supervise Garnik?

15       MR. MALONE:  Same objections.

16       THE WITNESS:  No.

17   BY MR. SAFARIAN:

18       Q    Have you ever investigated that?

19       MR. MALONE:  Same objections.

20       THE WITNESS:  No.

21   BY MR. SAFARIAN:

22       Q    Have you ever done any investigation to determine

23   whether Garnik is a threat to anyone within the HOA

24   community?

25       MR. MALONE:  Same objections and asked and answered.

50

---

1        MR. SAFARIAN:  You can answer, please.

2        THE WITNESS:  I don't recall.

3    BY MR. SAFARIAN:

4        Q    Have you ever heard of any investigation to

5    determine whether Garnik is a threat to anyone within the

6    HOA community?

7        MR. MALONE:  Same objections.

8        THE WITNESS:  I don't recall.

9    BY MR. SAFARIAN:

10       Q    Do you have any information that Tamara

11   Nazaretyan did anything to allow her son to have a

12   psychotic episode at the property?

13       MR. MALONE:  Same objections, asked and answered.

14       THE WITNESS:  Can you clarify that, please.

15   BY MR. SAFARIAN:

16       Q    So there's an action that the HOA's filed against

17   my client, and one of the allegations is that there was a

18   breach of the CC&Rs and that Tamara Nazaretyan, quote,

19   allowed, closed quote, her son to be a nuisance at the

20   property.  So my question to you is, what information do

21   you have that Tamara did anything to allow her son to ever

22   be a nuisance at the property?

23       MR. MALONE:  Same objections.

24       THE WITNESS:  I don't recall.

25   ///

51

---

1    BY MR. SAFARIAN:

2        Q    Do you have any information that Tamara

3    Nazaretyan had any reason to believe that her son would be

4    a nuisance at any time?

5        MR. MALONE:  Same objections and speculation.

6        THE WITNESS:  I don't recall.

7    BY MR. SAFARIAN:

8        Q    Has anyone ever indicated to you that Tamara

9    Nazaretyan ever did anything to allow her son to be a

10   nuisance at the property?

11       MR. MALONE:  Same objections.

12       THE WITNESS:  I don't recall.

13   BY MR. SAFARIAN:

14       Q    So as a -- as someone who is on the board, which

15   board is maintaining a lawsuit against my client,

16   Ms. Nazaretyan, for breaching the CC&Rs, as you sit here

17   now, do you have any information that Ms. Nazaretyan did

18   anything to violate the CC&Rs at any time?

19       MR. MALONE:  Same objection, calls for a legal

20   contention.

21       THE WITNESS:  I don't recall.

22   BY MR. SAFARIAN:

23       Q    At one point or another, the board imposed a fine

24   on her because her son, after he tried to take his own

25   life because of a psychotic breakdown, bled in common

52

---

1   areas. Did you ever learn about that?
2       MR. MALONE: Lacks foundation, same other objections.
3       THE WITNESS: I'm not sure how to answer that.
4   BY MR. SAFARIAN:
5       Q   Well, did you ever learn that Garnik tried to
6   take his own life?
7       MR. MALONE: From any source other than counsel or
8   your husband, and same objections.
9       THE WITNESS: No.
10  BY MR. SAFARIAN:
11      Q   Was it ever discussed at all at a board meeting
12  that Garnik tried to take his own life that you're aware
13  of?
14      MR. MALONE: Same objections.
15      THE WITNESS: I don't recall.
16  BY MR. SAFARIAN:
17      Q   So was it ever brought to your attention at any
18  time Garnik's mother was required to pay the board for the
19  cost of cleaning blood in a common area from when her son
20  tried to kill himself?
21      MR. MALONE: Lacks foundation, calls for speculation,
22  it's vague.
23      THE WITNESS: I don't know how to answer that, because
24  there's two different parts of your question that don't
25  make sense.

53

1   BY MR. SAFARIAN:
2       Q   Okay. Let's break it down. Are you aware that
3   Ms. Nazaretyan was fined within the HOA at some point in
4   the last three years?
5       A   Yes.
6       MR. MALONE: Lacks foundation.
7   BY MR. SAFARIAN:
8       Q   What is your understanding that fine was for?
9       MR. MALONE: Calls for a narrative.
10      THE WITNESS: I believe that she was fined because her
11  son attacked some members of our community to clean up the
12  blood.
13  BY MR. SAFARIAN:
14      Q   Because her son did what?
15      A   Attacked some -- had a violent episode with
16  members of the community and bled.
17      Q   Is it your understanding that his bleeding was a
18  result of having a confrontation with members of the
19  community?
20      MR. MALONE: Lacks objection -- or lacks foundation,
21  calls for speculation, calls for a narrative.
22      MR. SAFARIAN: You may answer.
23      THE WITNESS: There was blood. He was vicious.
24      MR. SAFARIAN: Sorry, one more time. There was blood
25  and what?

54

1       THE WITNESS: He was vicious and attacking. And she
2   cleaned up -- she had to clean up, as far as I remember.
3   This probably happened before I was on the board, but she
4   had to clean up the mess.
5   BY MR. SAFARIAN:
6       Q   Okay. What information do you have that Garnik
7   was vicious?
8       MR. MALONE: Calls for speculation, lacks foundation,
9   misstates prior testimony.
10      MR. SAFARIAN: You can answer.
11      THE WITNESS: I've seen some evidence.
12  BY MR. SAFARIAN:
13      Q   What evidence have you seen that Garnik was
14  vicious?
15      MR. MALONE: Same objections.
16      THE WITNESS: Videotapes.
17  BY MR. SAFARIAN:
18      Q   What videotapes?
19      A   A video.
20      MR. MALONE: Vague, narrative. Go ahead.
21  BY MR. SAFARIAN:
22      Q   What video have you seen?
23      A   A Ring video.
24      Q   And what does he do on the Ring video?
25      MR. MALONE: Calls for a narrative, vague.

55

1       THE WITNESS: His actions on a Ring video.
2   BY MR. SAFARIAN:
3       Q   What does he do on a Ring video that is vicious?
4       MR. MALONE: Same objections.
5       THE WITNESS: Attempting to break into someone's
6   house.
7   BY MR. SAFARIAN:
8       Q   Did you ever investigate why he was doing the
9   actions that you saw?
10      MR. MALONE: Asked and answered.
11      THE WITNESS: I wasn't on the board then.
12  BY MR. SAFARIAN:
13      Q   You're on the board now, and you've been on the
14  board now for a couple years. So as a board member who
15  has a fiduciary obligation to my clients, I want to
16  understand, did you ever investigate what transpired that
17  caused Garnik to have a mental breakdown on that one day?
18      MR. MALONE: Asked and answered, lacks foundation, and
19  is harassing at this point.
20      MR. MALONE: You may answer.
21      THE WITNESS: Can you repeat that, please.
22      MR. SAFARIAN: Madam court reporter, would you mind
23  reading the question, please.
24      (The following question was read:
25      "Q   You're on the board now, and

56

1     you've been on the board now for a
2     couple years.  So as a board member who
3     has a fiduciary obligation to my
4     clients, I want to understand, did you
5     ever investigate what transpired that
6     caused Garnik to have a mental
7     breakdown on that one day?"
8          THE WITNESS:  I don't recall.
9     BY MR. SAFARIAN:
10         Q   Did it ever occur to you, or did you ever learn
11    that Garnik was not trying to break into a unit, but he
12    was out seeking help because he was having a mental
13    breakdown and was trying to commit suicide?
14         MR. MALONE:  Same objections.
15         THE WITNESS:  I don't recall.
16    BY MR. SAFARIAN:
17         Q   Is it possible that what was happening was Garnik
18    wasn't trying to break into a unit but was desperately
19    looking for help, as he was having a mental breakdown?
20         MR. MALONE:  Same objections and calls for
21    speculation.
22         THE WITNESS:  I don't recall.
23    BY MR. SAFARIAN:
24         Q   At this point in time, you'd have to speculate as
25    to what Garnik was doing on the Ring video; correct?

                                                          57

1          MR. MALONE:  Calls for speculation, same objections.
2          MR. SAFARIAN:  You may answer.
3          THE WITNESS:  I can only tell you what my eyes saw.
4     BY MR. SAFARIAN:
5          Q   Your eyes saw him go up to a door of a neighbor
6     at the property and knock on the door; correct?
7          MR. MALONE:  Misstates prior testimony.
8     BY MR. SAFARIAN:
9          Q   What did your eyes see?
10         MR. MALONE:  Calls for a narrative.
11         THE WITNESS:  A bloody man.
12    BY MR. SAFARIAN:
13         Q   Your eyes saw a bloody man?
14         A   Trying to open a door, trying to push open a
15    door.
16         Q   And do you know that that bloody man had just
17    tried to kill himself?
18         MR. MALONE:  Lacks foundation, calls for speculation,
19    argumentative.
20         MR. SAFARIAN:  You may answer.
21         THE WITNESS:  I do not know.
22    BY MR. SAFARIAN:
23         Q   Did you ever investigate as to why something so
24    out of the ordinary would occur with a neighbor who
25    otherwise in all the years that you've lived there and

                                                          58

1     they've lived there you have never even heard a peep from?
2          MR. MALONE:  Misstates prior testimony, asked and
3     answered, calls for speculation, harassing, argumentative.
4          MR. SAFARIAN:  You may answer.
5          THE WITNESS:  I've only lived here for five years.
6          MR. SAFARIAN:  I thought you said six, but maybe I'm
7     wrong.
8          THE WITNESS:  Not six yet.
9     BY MR. SAFARIAN:
10         Q   Okay.  You've lived there now for five years, and
11    you've lived there since 2017; correct?
12         A   Yes.
13         Q   And having moved there in 2017 --
14         A   2016.
15         Q   -- you've never so much as seen my clients in
16    common areas; correct?
17         MR. MALONE:  Calls for speculation, misstates her
18    prior testimony.
19         MR. SAFARIAN:  As far as you know.
20         THE WITNESS:  I was only on the board for two years,
21    so I don't interact with a lot of the neighbors.
22    BY MR. SAFARIAN:
23         Q   In all the time that you've lived there, in all
24    the five years, have you so much as seen my clients at the
25    property?

                                                          59

1          MR. MALONE:  Calls for speculation, same objections.
2          THE WITNESS:  No.
3          MR. MALONE:  Mr. Safarian, just, I'm not trying to
4     interrupt your questioning.  I apologize.  When you're
5     done with this line of questioning, can we please take a
6     brief bathroom break.
7          MR. SAFARIAN:  Yes, we can.  If you want to take one
8     now, why don't we go ahead.
9          MR. MALONE:  Okay.  That's fine.  Thank you very much.
10         MR. SAFARIAN:  Of course.  That's no problem.  We'll
11    come back at 10:20.
12         MR. MALONE:  Okay, perfect.  Thank you.
13         THE VIDEOGRAPHER:  Okay.  Going off the record at
14    10:15.
15         (Recess held.)
16         THE VIDEOGRAPHER:  Going back on the record at 10:23.
17         MR. SAFARIAN:  Thank you.
18         Q   We're back on the record.  Ms. Corbett, a
19    reminder that your testimony remains under oath, and if
20    there's anything I can do to accommodate the proceeding
21    such that you are more comfortable, please let me know.
22    Okay?
23         A   Okay.
24         Q   Thank you.  I want to go back to the Ring
25    video -- strike that.

                                                          60

1      During the deposition have you been reading any
2  notes, text messages, or e-mails from anybody?
3      A   No.
4      Q   There are points during the proceeding where it
5  looks like you might be reading something.  Are there any
6  documents in front of you?
7      A   No.  I'm taking some personal notes.
8      Q   Is there anybody present with you today?
9      A   No.
10      Q   What is your husband's occupation?
11      A   He's a musician.
12      Q   And does he tour as a musician, or is he usually
13  at home?
14      A   It depends.  Pre-COVID, yes.
15      Q   That day that you saw Garnik bloody and tried to
16  push open a door, can you describe his body position as he
17  was trying to push open the door on the video?
18      MR. MALONE:  Misstates prior testimony, calls for
19  expert opinion.
20      MR. SAFARIAN:  You may answer.
21      THE WITNESS:  He wasn't trying to push open the door.
22  He was trying to break down the door.
23      BY MR. SAFARIAN:
24      Q   Your testimony earlier, verbatim, was that he was
25  trying to push open a door.  How do you know what was in

61

1  his mind at that moment?
2      MR. MALONE:  Calls for speculation, vague,
3  argumentative, asked and answered.
4      BY MR. SAFARIAN:
5      Q   You may answer.  How do you know that he was
6  trying to break down the door?
7      MR. MALONE:  Same objections, calls for a narrative.
8      THE WITNESS:  Because I saw the video.
9      BY MR. SAFARIAN:
10      Q   Okay.  What do you see on the video that causes
11  you to believe that he's trying to break down the door?
12      MR. MALONE:  Same objections.
13      THE WITNESS:  The video was showing threatening
14  behavior.
15      BY MR. SAFARIAN:
16      Q   Okay.  You're giving me very general responses.
17  Was he kicking the door?
18      MR. MALONE:  Same objections.
19      THE WITNESS:  Yeah, I can't recall kicking the door.
20  He was trying to break down the door.  He was trying to
21  get inside the unit.  He was threatening.
22      BY MR. SAFARIAN:
23      Q   All right.  See, now you're giving me general
24  statements, and that's not helpful, because those are your
25  opinions, or those are your observations based upon your

62

1  own perceptions.  I want to know objectively, did he punch
2  the door?
3      MR. MALONE:  Same objections, and the video speaks for
4  itself.
5      THE WITNESS:  Yeah.
6      BY MR. SAFARIAN:
7      Q   I don't have the video in front of me.  Did he
8  punch the door?
9      A   I don't recall the exact actions, but when I saw
10  the video, it was threatening and I believe presented a
11  danger to the community.  That's what I recall from the
12  video.
13      Q   That's fine.  And as a board member, what
14  investigation did you undertake to determine why Garnik,
15  who in all those years you've lived there has never done
16  anything to cause harm to anybody, engaged in those
17  activities?
18      MR. MALONE:  Same objections and lacks foundation and
19  asked and answered and is harassing.
20      MR. SAFARIAN:  Go ahead.
21      THE WITNESS:  Yeah, I don't -- I don't know what to
22  say.
23      MR. SAFARIAN:  You can just tell me the answer to the
24  question.
25      THE WITNESS:  Can you repeat the question?

63

1      MR. MALONE:  Argumentative.
2      BY MR. SAFARIAN:
3      Q   Are you aware that Garnik's mother came into the
4  board and presented medical information that he had a
5  psychotic episode because doctors had mismanaged his
6  medication?
7      MR. MALONE:  Lacks foundation, calls for speculation,
8  vague.
9      THE WITNESS:  Yeah, I don't recall the specifics.
10      BY MR. SAFARIAN:
11      Q   I'm not asking you if you recall specifics.  I'm
12  asking you, do you know that Garnik's mother came into the
13  board and presented medical information that he had a
14  psychotic episode because doctors mismanaged his
15  medication?
16      MR. MALONE:  Same objections and is argumentative.
17      THE WITNESS:  To be specific, I remember her coming
18  into the board and discussing her fine.
19      BY MR. SAFARIAN:
20      Q   Okay.  So my question is a yes-or-no question.
21  Do you remember Tamara Nazaretyan ever coming into a board
22  meeting and presenting medical evidence that her son had
23  suffered a psychotic episode because of mismanagement of
24  medication by his doctors?
25      MR. MALONE:  This is harassing.  It's asked and

64

1    answered.

2        MR. SAFARIAN:  I think your objections are harassing,

3    Patrick.

4        THE WITNESS:  I don't recall.

5    BY MR. SAFARIAN:

6        Q   Has anybody on the board ever told you that

7    Ms. Nazaretyan came into the board and presented medical

8    evidence that her son in April 2019 had an isolated

9    psychotic episode because doctors mismanaged his

10   medication?

11       MR. MALONE:  Same objections.

12       THE WITNESS:  I don't recall.

13       MR. MALONE:  And it lacks foundation.

14   BY MR. SAFARIAN:

15       Q   When you see the things you claim to have seen on

16   this Ring video, at no point -- as a board member, at any

17   point do you have any sort of thought that maybe this

18   person was having a mental episode?

19       MR. MALONE:  Incomplete hypothetical, calls for

20   speculation, vague, ambiguous, asked and answered, lacks

21   foundation, harassing.

22       MR. SAFARIAN:  You can keep all the objections,

23   Patrick.  You don't have to state them.  You preserve all

24   objections, every single one.

25       THE WITNESS:  When I saw the Ring video, I wasn't a

65

1    board member.

2    BY MR. SAFARIAN:

3        Q   I'm not asking what you were, but you've been a

4    board member for most of the time you've been on the

5    board.  I'm sorry.  You've been a board member for most of

6    the time since this incident; right?

7        A   No, no.

8        Q   This incident was April 2019.  When did you

9    become a board member again?

10       A   Fall 2019, yes.

11       Q   So with the exception of just a few months since

12   the incident, you have been a board member the entire

13   time.  As a board member, when you saw what you saw, since

14   the incident at any point did it occur to you, this looks

15   like somebody who is having a psychotic episode?

16       MR. MALONE:  It's vague.  It calls for expert opinion.

17   It's argumentative.  It's asked and answered.

18       MR. SAFARIAN:  You can preserve your objections.

19       THE WITNESS:  I don't recall.

20   BY MR. SAFARIAN:

21       Q   Did you care?

22       MR. MALONE:  Argumentative.

23   BY MR. SAFARIAN:

24       Q   Honestly, did you care one way or another what

25   was happening?

66

1        MR. MALONE:  This is harassing, Mr. Safarian.

2        MR. SAFARIAN:  So are your objections.  And if they

3    continue, I'll suspend this deposition like I did the last

4    one.

5        MR. MALONE:  This is harassing, and this is

6    argumentative.

7    BY MR. SAFARIAN:

8        Q   Did you care at all why this person was having

9    this episode?

10       MR. MALONE:  Mr. Safarian, this is harassing conduct.

11       MR. SAFARIAN:  I'm asking a question, and I'm entitled

12   to a response.  You stated your objection, Mr. Malone.

13   And if they continue, I will stop the deposition and get a

14   court order.

15       MR. MALONE:  You can do that if you'd like, but you

16   are harassing the witness.

17       MR. SAFARIAN:  I'm not harassing the witness.  I'm

18   asking the witness a question, and I'm entitled to an

19   answer.

20       MR. MALONE:  She's given you an answer.  You've asked

21   multiple times.

22       MR. SAFARIAN:  No, she hasn't.  And now you're

23   coaching the witness.

24       MS. WRIGHTEN:  I just want -- this is Marie Wrighten.

25       MR. SAFARIAN:  Marie, you have no right to speak at

67

1    all.  You're an observer only.  Two lawyers cannot

2    represent.  You are not a party to this case.

3        MS. WRIGHTEN:  I am not a party to this case, and

4    that's what I was actually going to say, is that while I

5    am not counsel in this case, I do think that it's

6    important just to establish the record that some of the

7    tone of the questions and the sort of pace that you're

8    starting to pick up, Mr. Safarian, is making me

9    uncomfortable in the harassing sense.  And I just want to

10   note that when you start to ask a witness whether she

11   cares about something with this regard --

12       MR. SAFARIAN:  Thank you.  This deposition is

13   suspended, Ms. Lewis.  I'll go into court and seek an

14   order compelling the witness to come back without your

15   intervention, because you are not entitled to be here.

16   You're not --

17       MS. WRIGHTEN:  I'm not -- okay.

18       MR. SAFARIAN:  This deposition is suspended.  We'll

19   proceed with a court order for this one as well as the

20   last one.  We'll seek sanctions as well.

21       MS. WRIGHTEN:  Okay.  I just want to make sure that on

22   the record is that I wasn't making an objection.

23       MR. SAFARIAN:  There is a video.

24       MS. WRIGHTEN:  I wasn't -- why are you talking over

25   me?  I haven't said anything.

68

1    MR. SAFARIAN:  There is a video.

2    MS. WRIGHTEN:  I haven't said anything at all, and you

3    don't even want me to make any record.  All I was

4    saying --

5    MR. SAFARIAN:  You are not allowed to make a record

6    because you're not --

7    MS. WRIGHTEN:  I'm a person.  I'm a person, Harry.

8    MR. SAFARIAN:  No.  You are an observer, and I gave

9    you the courtesy of sending you a link to this deposition.

10   MS. WRIGHTEN:  And I represent -- I am an attorney

11   representing this witness in a related case, and

12   actually -- and I'm an officer of the court, and it's

13   actually pretty disrespectful the way that you are talking

14   to me right now.  So thank you.

15       I'm going to add that the tone of Mr. Safarian

16   just talking to me for literally just making two sentences

17   on the record.  I haven't said anything on the record the

18   entire morning.

19   MR. SAFARIAN:  You were given --

20   MS. WRIGHTEN:  Thank you.  Thank you, Mr. Safarian.

21   MR. SAFARIAN:  You were given the courtesy --

22   THE WITNESS:  Mr. Safarian, you're making me feel very

23   unsafe.

24   MR. SAFARIAN:  Well, we're going to proceed with the

25   deposition.  I'm not anywhere near you're.  So your

69

1    feeling unsafe to me, sorry, is not meritorious.

2    MS. WRIGHTEN:  That is so disrespectful, so minimizing

3    to a woman who just said something to you about how your

4    tone, your conversation with her is making her feel.

5    MR. SAFARIAN:  Would you like me to proceed or not?

6    MS. WRIGHTEN:  The idea that you are going to tell

7    her -- with all of the questions that you just had, that

8    you just asked about somebody being sensitive and

9    investigations and accommodations and all of those things,

10   and now a woman has said something to you, and you just

11   absolutely disregarded it.

12   MR. SAFARIAN:  I'm going to move on with the

13   deposition.  Thank you.

14   Q   Ms. Corbett, did you have any concern about what

15   was happening to my client psychologically when you saw

16   the Ring video?

17   MR. MALONE:  Asked and answered, relevance, harassing.

18   THE WITNESS:  Yeah, I'm not going to answer that.

19   BY MR. SAFARIAN:

20   Q   Okay.  I'm entitled to an answer to that

21   question.  As a board member, at any point when you saw

22   the video sometime before being on the board, as a board

23   member, did you stop and make any inquiry as to why this

24   person was having a reaction or engaging in conduct that

25   was not typical of what you knew of that household?

70

1    MR. MALONE:  Same objection, misstates prior

2    testimony, lacks foundation as well.

3    MR. SAFARIAN:  You may --

4    THE WITNESS:  I don't recall.

5    BY MR. SAFARIAN:

6    Q   When you were working at LAUSD or at the charter

7    school, did you undertake training regarding

8    identification of psychological disabilities?

9    MR. MALONE:  Asked and answered, harassing.

10   THE WITNESS:  I specifically stated learning

11   disabilities, so I answered that.

12   BY MR. SAFARIAN:

13   Q   I understand you said learning disabilities.  My

14   question is specific.  Did you undertake any training

15   regarding identifying psychological disabilities?

16   A   I don't recall.

17   MR. MALONE:  Same objection, and it calls for expert

18   opinion.

19   BY MR. SAFARIAN:

20   Q   Did you receive any written materials regarding

21   identifying psychological disabilities?

22   A   I don't recall.

23   MR. MALONE:  Same objections.

24       Please take a beat, Beth.

25   ///

71

1    BY MR. SAFARIAN:

2    Q   Have you had any classroom training regarding

3    accommodating students with disabilities?

4    MR. MALONE:  Same objections and relevance.

5    THE WITNESS:  I don't recall.

6    BY MR. SAFARIAN:

7    Q   Do you have any information that Tamara

8    Nazaretyan in any way could have foreseen the April 2019

9    event that we're here about today?

10   MR. MALONE:  Calls for speculation, lacks foundation,

11   is vague.

12   MR. SAFARIAN:  You may answer.

13   THE WITNESS:  I don't have any info or knowledge on

14   that.

15   BY MR. SAFARIAN:

16   Q   Well, the board is maintaining a lawsuit against

17   my client, and you are a member of the board; correct?

18   A   Yes.

19   Q   And part of that lawsuit is that my client

20   allowed a nuisance to occur.  Are you aware of that?

21   MR. MALONE:  Calls for a legal contention.

22   THE WITNESS:  Yeah, I don't recall that.

23   BY MR. SAFARIAN:

24   Q   Okay.  Well, I'm going to represent to you that

25   that's what the lawsuit says.  So as a board member, at

72

1    this point do you have any information that Tamara
2    Nazaretyan allowed her son to engage in this type of
3    conduct?
4        MR. MALONE:  Calls for a legal contention, incomplete
5    hypothetical, lacks foundation.
6        THE WITNESS:  Yeah, I don't have knowledge of that.
7    BY MR. SAFARIAN:
8        Q   Do you have knowledge that -- to your knowledge
9    does the board as a collective body have any information
10   that Tamara Nazaretyan allowed her son to engage in any of
11   the conduct that you've complained about?
12       MR. MALONE:  Same objections, asked and answered,
13   calls for a legal contention.
14       THE WITNESS:  Yeah, I'm having an anxiety attack
15   from --
16       MR. SAFARIAN:  Then we'll take a break.
17       THE WITNESS:  Well, okay.
18       MR. SAFARIAN:  You want to pick up after lunch?
19       THE WITNESS:  I would just like to get my thoughts
20   out.  I'm having an anxiety attack.  I need to take a
21   break.
22       MR. SAFARIAN:  I will gladly accommodate you.  You
23   tell me what you need in terms of time, in terms of space,
24   in terms of pace, and I will accommodate you.
25       THE WITNESS:  I need you to be respectful.

73

1        MR. SAFARIAN:  I'm being respectful.  I just have to
2    ask questions.  That's part of my job.  I'm sorry that you
3    don't like the questions, but I have to ask them.  If
4    you'd like to take a break, I'll accommodate you.
5        THE WITNESS:  I would like to take a break.
6        MR. MALONE:  Can we take 15 minutes maybe, Harry?
7        MR. SAFARIAN:  As much time as you want, I will give
8    you.  You just let me know.
9        MR. MALONE:  Let's take 15.  Is that okay, Beth?
10       THE WITNESS:  Yes.
11       MR. SAFARIAN:  Okay.  Why don't we just come back at
12   ten of 11:00.  Okay?
13       MR. MALONE:  Okay.  That's fine.  Thank you.
14       THE VIDEOGRAPHER:  Going off the record at 10:37.
15       (Recess held.)
16       THE VIDEOGRAPHER:  Going back on the record at 10:52.
17   BY MR. SAFARIAN:
18       Q   Ms. Corbett, have you read any of the HOA
19   governing documents as far as what a board member's
20   responsibilities are?
21       MR. MALONE:  Vague, calls for speculation.
22       THE WITNESS:  Yes.
23       MR. SAFARIAN:  By the way, I mentioned to counsel
24   before we got on the record that my client is withdrawing
25   her statutory -- this doesn't concern you directly,

74

1    Ms. Corbett.  It's mostly for the record.
2        My client is withdrawing the statutory offer to
3    compromise that is now pending.
4        Q   Anyway, what is your understanding as to what
5    your duties are as a board member?
6        MR. MALONE:  Calls for speculation, calls for a
7    narrative.
8        THE WITNESS:  To uphold the CC&Rs.
9    BY MR. SAFARIAN:
10       Q   And do the CC&Rs give individual unit owners and
11   occupants certain rights?
12       MR. MALONE:  Calls for an expert opinion, calls for a
13   legal contention.
14       MR. SAFARIAN:  I'll rephrase the question.
15       Q   As a board member who is charged with the
16   responsibility of upholding the CC&Rs, do you understand
17   the CC&Rs to give unit owners and occupants rights?
18       MR. MALONE:  Calls for a narrative, lacks foundation.
19       THE WITNESS:  I mean, there are rules that the
20   community has to follow if they want to live in the
21   community.
22   BY MR. SAFARIAN:
23       Q   Well, but they also entitle, for example, people
24   who live within the community to certain privileges;
25   correct?

75

1        MR. MALONE:  Calls for speculation, calls for a
2    narrative, asked and answered.
3        THE WITNESS:  I have to check on that.
4    BY MR. SAFARIAN:
5        Q   At this moment while you sit here, do you have no
6    specific information that you can think of that the CC&Rs
7    extend privileges to members of the HOA community?
8        MR. MALONE:  This is vague, misstates prior testimony,
9    asked and answered, calls for speculation, calls for a
10   narrative.
11       THE WITNESS:  Yeah, the CC&Rs are rules that we have
12   to follow to live in the community.
13   BY MR. SAFARIAN:
14       Q   Okay.  I'm going to ask you the question again.
15   I understand what the CC&Rs are, but do the HOA's
16   governing documents extend certain privileges to the
17   people who live there?
18       MR. MALONE:  Same objections.
19       THE WITNESS:  I believe so.
20   BY MR. SAFARIAN:
21       Q   As a person who's not just a board member but as
22   a member who lives within the HOA community, you have
23   certain privileges that people outside the community do
24   not have; correct?
25       MR. MALONE:  Same objections.

76

1    THE WITNESS:  Yes.
2    BY MR. SAFARIAN:
3        Q    What are the privileges that you can think of?
4        MR. MALONE:  Same objections and narrative.
5        THE WITNESS:  Security in a gated community.
6    BY MR. SAFARIAN:
7        Q    Anything else?
8        A    That just comes off the top of my head, so I
9    can't think of anything else.
10       Q    Are you allowed to use the swimming pool?
11       A    Yes.
12       Q    Is there an entrance, a main entrance that
13   pedestrians can use to get within the community?
14       MR. MALONE:  Vague, calls for speculation, lacks
15   foundation.
16   BY MR. SAFARIAN:
17       Q    You said there's security in a gated community.
18   The community is gated so that only people who live in the
19   community can go in and out or people that residents give
20   permission to can go in and out; correct?
21       MR. MALONE:  Calls for speculation.
22       THE WITNESS:  Yes.
23       MS. WRIGHTEN:  I am going to chime in here.  Just,
24   Mr. Safarian, if you are -- it sounds like to me --
25   venturing into some of the claims about access to the gate

77

1    and things like that that are allegations in the related
2    case -- are you -- is that not what you're starting to ask
3    questions about?
4        MR. SAFARIAN:  I'm taking a deposition in the state
5    case asking questions that I believe germane to the state
6    case.
7        MS. WRIGHTEN:  Okay.  So I mean, we can -- I can talk
8    to Mr. Malone about it.  It seems like it might be outside
9    of the scope, or if you're -- I just want to make sure
10   that you're saying that this is still just in that case,
11   and I won't chime in, and that's fine.  But I'm going
12   to -- I just would -- if that does start to go down there,
13   then I might want to take a break and see how Mr. Malone
14   wants to handle it.
15       MR. SAFARIAN:  Well, I think that I'm entitled to ask
16   these questions.  The scope of discovery is very broad.
17   This is the state case.  There are equitable remedies
18   sought as against my clients, including restricting my
19   clients from using certain areas.  And I want to
20   establish, as part of the HOA's claims against my client
21   to restrict access in this state case, I want to
22   understand what that access consists of.  So I'm entitled
23   to ask those questions, and I'm certainly not going to be
24   prohibited from doing so.
25       Ms. Wrighten, I just want to be very clear.  We

78

1    extended you a courtesy of notifying you of a deposition
2    that I think you had no knowledge of until we told you.
3    We also sent you the link so that you could attend.  That
4    was a courtesy.  But I did not anticipate that you would
5    state anything on the record today.  It would be
6    Mr. Malone's obligation to do so because he's representing
7    the witness today in this proceeding.  So I understand
8    your position.  I'm going to proceed with asking my
9    questions and allow you to continue observing.  I'm not
10   going to stop that.  I want you to be able to do that.
11   But I do have a right to ask these questions.  Because
12   there is definitely overlap does not mean that I should by
13   restricted from doing so.  I've stated my offer of proof
14   as to the relevance.
15       MS. WRIGHTEN:  Thank you for that.  And that last part
16   did acknowledge that you and I as attorneys -- because
17   whether I represent Ms. Corbett here in this action
18   specifically, I am still representing her.  So in that
19   sense, whether you should have also communicated with me
20   about taking her deposition, you know, that's for a later
21   day.  But because you keep making a point to say that this
22   was just a courtesy, I'm going to note for the record that
23   it might have been an ethical obligation that you have,
24   knowing that Ms. Corbett is represented by counsel in
25   another matter where you are also appearing, that maybe

79

1    you actually should have ethically.  Putting that aside,
2    because I'm here, it doesn't matter.
3        MR. SAFARIAN:  Well --
4        MS. WRIGHTEN:  I just would like -- you keep
5    interrupting me, like I don't have -- like I am not an
6    officer of the court or an attorney or a person who is
7    just allowed to speak.  So if you could just respect that,
8    I would appreciate it.
9        Thank you for the offer of proof.  I was --
10   that's why I started this conversation, to say if I am not
11   understanding the causes of action and the scope in the
12   state case accurately, and therefore I think that you're
13   venturing into the related federal court case, then I will
14   need to have a discussion with Mr. Malone, and who will
15   continue to represent Ms. Corbett for that line of
16   questioning.  Whether you submit that it's part of
17   discovery in this case or not, I am just acknowledging
18   that if you're starting to get into the ingress and egress
19   of cars and people into the gated parts or the driving
20   parts or the various routes of egress and ingress into the
21   community, I think that fairly -- that clearly goes into
22   your claims in your causes of action against Ms. Corbett
23   in the other case.
24       Let's just note that for the record, that
25   Mr. Safarian is actually suing Ms. Corbett in the related

80

1  case, and that's why I'm here.
2      MR. SAFARIAN: Okay. Well, you've made a comment, and
3  why I interrupted you, because frankly I was offended by
4  your comment, where it seemed to me you were implying I
5  violated some kind of an ethical obligation. And I want
6  the record to be clear. I was the one that told you about
7  these proceedings, not the HOA's counsel. And I followed
8  up a second time after we sent you an e-mail informing you
9  of these proceedings and we didn't hear back from you,
10  sending you further inquiry about whether you'd be
11  attending, and also sent you a link to the proceeding.
12      So the reason I interrupted you when you made
13  commentary about me not treating you as a person or so
14  forth, I don't see the need for that. I treat you as a
15  person. I think of you as a person. You're a person.
16  But I don't want my -- any commentary made or suggestion
17  made that we violated some kind of an ethical obligation
18  when we've got in writing several notices to you notifying
19  you of these proceedings so that you can attend. I don't
20  think you're entitled to attend, but that's for another
21  day. We've let you know anyway so that you could attend.
22      Now, these are questions that are relevant to
23  this case, and I'm going to ask them in this case. If you
24  wish to do something about that, such as suspend the
25  proceedings, that's your call, but I'm entitled to ask

81

1  these questions. If you and Mr. Malone want to take a
2  break at some point and discuss those things, you are free
3  to do so. I'm not going to restrict breaks. I've been
4  very liberal with them. And I just want to proceed and
5  continue asking my questions.
6      Q    Ms. Corbett, are you aware that the one incident
7  wherein in the police were involved, that was a case of
8  self-reporting where Garnik called for help when he wasn't
9  feeling well?
10      MR. MALONE: Lacks foundation, calls for speculation,
11  vague, relevance.
12      THE WITNESS: No.
13  BY MR. SAFARIAN:
14      Q    You don't know anything about that incident. Is
15  that fair?
16      A    I do. I know the neighbors --
17      MR. MALONE: Beth, hold on one second.
18          Same objections, argumentative.
19      MR. SAFARIAN: Go ahead.
20      THE WITNESS: I know the neighbors complained and
21  alerted the neighborhood that there was screaming and
22  yelling, and then the police came. So that's all I know.
23  BY MR. SAFARIAN:
24      Q    You don't know who was screaming?
25      A    I believe residents --

82

1      MR. MALONE: Calls for speculation.
2      THE WITNESS: Okay. Inside the complex, inside the
3  unit and outside the unit, especially the young man in
4  question.
5  BY MR. SAFARIAN:
6      Q    So you heard screaming. Are you aware of other
7  people in the HOA community screaming ever in the time
8  that you lived there?
9      A    No.
10      MR. MALONE: Calls for speculation, vague, incomplete
11  hypothetical.
12  BY MR. SAFARIAN:
13      Q    Okay. Anyway, I'm going to move on. So you have
14  this incident that happens, and then the HOA, after the
15  incident happens, pursues a -- pursues the departure of
16  Garnik from the home; correct?
17      MR. MALONE: Calls for a legal contention.
18      MR. SAFARIAN: Let me rephrase it.
19      Q    After the incident the board tries to take action
20  to have Garnik removed from the home where he lives with
21  his mother; correct?
22      MR. MALONE: Calls for speculation, calls for a legal
23  contention.
24      THE WITNESS: I don't know.
25  ///

83

1  BY MR. SAFARIAN:
2      Q    Do you -- what is your understanding as to what
3  efforts the board has made to address the board's concerns
4  about Garnik?
5      MR. MALONE: Calls for speculation, lacks foundation,
6  vague, calls for a narrative.
7      THE WITNESS: Yeah, I believe they wanted to be
8  reimbursed for the damage that he had done to the
9  community.
10  BY MR. SAFARIAN:
11      Q    Done to the community the damage was that he bled
12  after he was cut, and they wanted to be reimbursed for the
13  cost of cleaning his blood; correct?
14      MR. MALONE: Lacks foundation, calls for speculation,
15  misstates prior testimony.
16  BY MR. SAFARIAN:
17      Q    Is there anything different from that that you
18  know?
19      MR. MALONE: Calls for a narrative.
20      THE WITNESS: Yeah, you would have to ask the police
21  who investigated that.
22  BY MR. SAFARIAN:
23      Q    Well, I'm asking you because you're a board
24  member, and the board is the one that asked for
25  reimbursement for damage; correct?

84

1    MR. MALONE:  Same objections.

2    THE WITNESS:  Yeah, I wasn't on the board at the time.

3    BY MR. SAFARIAN:

4    Q   I understand, but you've been on the board for

5    the vast majority of time since then.  And since that

6    time, the board has placed certain limitations on Garnik

7    and the household; correct?

8    MR. MALONE:  Lacks foundation, calls for speculation,

9    calls for a narrative.

10   MR. SAFARIAN:  You may answer.

11   THE WITNESS:  Yeah, I guess it depends.  If you're

12   going to be specific, I can answer.

13   BY MR. SAFARIAN:

14   Q   Well, since the occurrence of this incident,

15   Garnik and his mother and his grandmother have had

16   limitations as far as where they can go within the HOA

17   community --

18   MR. MALONE:  That lacks foundation, and it calls for

19   speculation and calls for a legal contention.

20   MR. SAFARIAN:  Let me finish.  Your objections can

21   stand.  I'm going to restate the question with a part that

22   I did not complete.

23   Q   Since the April 2019 incident, or following the

24   April 2019 incident, Garnik, his mother, and grandmother

25   have had restrictions placed on them as far as where they

85

1    can go within the HOA community that other members of the

2    community, such as yourself, have not had; correct?

3    A   I believe so.

4    Q   And what do you understand those restrictions to

5    be?

6    MR. MALONE:  Calls for a narrative, calls for a legal

7    contention.

8    THE WITNESS:  If they or other people don't follow the

9    rules, you're not allowed in the community area.

10   BY MR. SAFARIAN:

11   Q   What specific restrictions were placed on Garnik,

12   his mother, and grandmother?

13   MR. MALONE:  Lacks foundation, calls for speculation,

14   asked and answered.

15   THE WITNESS:  Yeah, I'd have to refer to stuff.  I'm

16   not sure.

17   BY MR. SAFARIAN:

18   Q   Well, I think you'd agree with me that if you

19   live within a community and you have rights taken away,

20   that's an important thing; correct?

21   MR. MALONE:  Incomplete hypothetical.

22   THE WITNESS:  It could be.

23   Q   Well, if you had your rights to be within the

24   community areas taken away, would that be important to

86

1    you?

2    MR. MALONE:  Incomplete hypothetical.

3    THE WITNESS:  I guess it depends on the circumstance.

4    BY MR. SAFARIAN:

5    Q   Well, if you, Beth Corbett, had the right to use

6    common areas taken away from you, would that bother you?

7    MR. MALONE:  Asked and answered, calls for

8    speculation, incomplete hypothetical.

9    BY MR. SAFARIAN:

10   Q   Let me ask it this way.  Do you appreciate the

11   privilege of having access to the common areas?

12   MR. MALONE:  Vague.

13   THE WITNESS:  Yeah, I guess.

14   BY MR. SAFARIAN:

15   Q   Are you uncertain whether you appreciate that

16   access?

17   MR. MALONE:  Asked and answered.

18   THE WITNESS:  Yeah, whether I appreciate it or not, I

19   don't understand why that would be a question.

20   BY MR. SAFARIAN:

21   Q   Well, it's a question because I want to sort of

22   understand, as someone who appreciates the value to the

23   common areas, exactly what the HOA's response was and why

24   vis-a-vis clients.  The HOA has a pending lawsuit where

25   they are trying to restrict my clients from certain common

87

1    areas.  So you understand that the entire household,

2    Garnik, his mother, and grandmother, were prevented from

3    going into common areas; correct?

4    MR. MALONE:  That lacks foundation, it's asked and

5    answered, it's argumentative at this point and harassing,

6    and it's an incomplete hypothetical.

7    MR. SAFARIAN:  You may answer.

8    THE WITNESS:  I'm not sure of all three of them.  I

9    know that somebody in the house -- maybe it was the mom, I

10   don't know -- couldn't use the pool area.

11   BY MR. SAFARIAN:

12   Q   If it's an important thing to have access to the

13   common area and you are a board member charged with

14   enforcing the privileges that homeowners have, why is it

15   you don't know who has restrictions and don't know what

16   those restrictions are?

17   MR. MALONE:  Misstates prior testimony, is

18   argumentative, it's asked and answered.  Ms. Corbett is

19   here in her individual capacity, not as a PMK for the

20   association.

21   MR. SAFARIAN:  You may answer.

22   THE WITNESS:  Yeah, I have to check my records.

23   BY MR. SAFARIAN:

24   Q   So as you sit here now, sitting on the board for

25   two and a half years, you don't know who in the household

88

1  was restricted from entering common areas; correct?
2      MR. MALONE:  Same objections, and it's been asked and
3  answered on multiple occasions.
4      MR. SAFARIAN:  You may answer.
5      THE WITNESS:  I believe one, if not more -- I don't
6  know -- are restricted from the common areas due to a
7  fine.  That's all I know.
8      MR. MALONE:  Please do not guess, Ms. Corbett.  If you
9  know, you know.
10     BY MR. SAFARIAN:
11     Q   As a board member, your understanding as you sit
12  here now, having been on the board for two and a half
13  years, is that the restriction from common areas is due to
14  a monetary fine; correct?
15     MR. MALONE:  Asked and answered.
16     THE WITNESS:  Yeah, I believe so.  It could be more,
17  but that's what I believe.
18     BY MR. SAFARIAN:
19     Q   Okay.  And have you ever investigated to
20  determine whether the restriction from entering into
21  common areas was something more than a fine?
22     MR. MALONE:  Asked and answered, harassing,
23  argumentative, calls for speculation.
24     MR. SAFARIAN:  Sorry?
25     THE WITNESS:  I don't recall.

89

1      MR. SAFARIAN:  Okay.  Thank you.  And I apologize if I
2  asked you to repeat yourself.  It's just sometimes hard
3  for me to hear.
4      Q   With regard to who is restricted, did you ever
5  undertake any investigation as to why any particular
6  individual was restricted from the home with regard to
7  common area use versus others?
8      MR. MALONE:  Same objections.
9      THE WITNESS:  That was a little wordy.  Can you
10  restate that, please.
11     MR. SAFARIAN:  I'll withdraw the question.
12     Q   Do you know what specific common areas
13  restrictions were imposed on -- let me start with a clean
14  question.
15         With regard to this restriction in terms of
16  common area use, what specific common areas were
17  restrictions placed for with regard to members of
18  Nazaretyan household?
19     MR. MALONE:  Lacks foundation, calls for a narrative,
20  calls for speculation, asked and answered.
21     THE WITNESS:  I believe the pool area.  I have to
22  check my records to see if it was anything else.  But the
23  pool area, somebody in the household -- I don't know, more
24  than one, I'm not sure -- was not allowed in the pool
25  area.

90

1      BY MR. SAFARIAN:
2      Q   And your belief is that that was because there
3  was a fine of some kind?
4      MR. MALONE:  Same objection.
5      THE WITNESS:  Yes.
6      BY MR. SAFARIAN:
7      Q   And that is a belief you have held for the last
8  two and a half years; correct?
9      MR. MALONE:  Same objections.
10     THE WITNESS:  Yeah, I have to check my records.
11     BY MR. SAFARIAN:
12     Q   Were you present when Tamara Nazaretyan came into
13  a board meeting and presented medical documentation to the
14  board at any time?
15     MR. MALONE:  Lacks foundation, assumes facts.
16     THE WITNESS:  Yeah, I already answered that.
17     MR. MALONE:  Asked and answered.
18     BY MR. SAFARIAN:
19     Q   Okay.  What was your answer?  I don't remember
20  it.
21     A   What was the question again?
22     MR. MALONE:  Asked and answered.
23     BY MR. SAFARIAN:
24     Q   Were you present at any time when Tamara
25  Nazaretyan entered into a board meeting and presented

91

1  medical documentation?
2      MR. MALONE:  Same objections.
3      THE WITNESS:  I was present when she talked to the
4  board.  I can't speak of the actual documentation she
5  presented, but she was talking to the board about a fine.
6  That's what I know.
7      BY MR. SAFARIAN:
8      Q   You have answered a question that I didn't ask,
9  so I have to re-ask the question.  Just to be clear, is it
10  your testimony that you have never been present when
11  Tamara Nazaretyan attempted to present medical
12  documentation to the board?
13     MR. MALONE:  These are all asked and answered.  Same
14  objections.  It's just harassing and lacks foundation.
15     THE WITNESS:  I'm just going to say I don't recall.
16     BY MR. SAFARIAN:
17     Q   Okay.  Did any other board member ever mention to
18  you that Tamara Nazaretyan or any member of her household
19  had any type of a mental disability?
20     MR. MALONE:  Asked and answered on multiple occasions,
21  harassing, lacks foundation.
22     THE WITNESS:  Yeah, I don't recall.
23     BY MR. SAFARIAN:
24     Q   Prior to today and prior to receiving the
25  lawsuit -- actually, I'll just withdraw that question.

92

1     You learned at some point after receiving the
2  federal lawsuit that Garnik had a mental disability;
3  correct?
4     MR. MALONE:  Misstates prior testimony, calls for
5  speculation, asked and answered, lacks foundation.
6     THE WITNESS:  I learned during the lawsuit what the
7  mental issue was going on.
8  BY MR. SAFARIAN:
9     Q   When did you first learn that he had -- that
10  Garnik had a mental issue?
11     MR. MALONE:  Lacks foundation, asked and answered,
12  vague.
13     THE WITNESS:  I believe during the lawsuit.
14  BY MR. SAFARIAN:
15     Q   There's two lawsuits.  Are we talking about the
16  federal lawsuit?
17     A   I don't know.  I'm just going to say that I
18  learned during -- there was a mental component during the
19  lawsuits to his violent behavior.
20     Q   Okay.  So let me go back and say this.  There are
21  two lawsuits.  One was filed around three years ago, and
22  one was filed months ago.  Are you able to distinguish
23  whether you learned this years ago versus months ago?
24     MR. MALONE:  This is -- I'm going to object as asked
25  and answered and harassing.  This is -- we walked this

93

1  path in detail earlier this morning.
2     MR. SAFARIAN:  I don't know, Patrick, if you're
3  gathering this, but I'm asking questions, and I feel like
4  when I ask a question, I'm getting a response to a
5  question that I have not asked.  So I need clear
6  responses.  I'm not trying to be difficult with the
7  witness.  I do take offense to the comments that the
8  witness is being harassed, but the record speaks for
9  itself, and that's why we have a video, but I just need to
10  sort of break through, because frankly I'm finding I'm
11  confronting a witness that is doing her best not to answer
12  my questions.  And it's my job as an advocate to pursue
13  this.
14     MR. MALONE:  I disagree with that.  I think
15  Ms. Corbett doesn't feel particularly well.
16     MR. SAFARIAN:  If she doesn't feel well, then I'm not
17  going to proceed with the deposition.  What we're going to
18  do is we're going to stop the deposition now and resume
19  for a second day, because I won't take a deposition when a
20  witness is not feeling well.  So, Patrick, I'll leave
21  it --
22     THE WITNESS:  I'm feeling well.  I am feeling well.
23  I'd like to continue.
24     MR. SAFARIAN:  Let me finish.
25     I will take you at your face value, Patrick, that

94

1  she's --
2     MR. MALONE:  No, I'm not -- if she's okay to proceed,
3  she's okay to proceed.  You're asking the same questions
4  over and over again, and I think that might be going into
5  a wall.
6     MR. SAFARIAN:  The record will speak for itself.
7     MR. MALONE:  I understand.  But I'm not terminating
8  the deposition.  I'm suggesting something.
9     MR. SAFARIAN:  You said she's not feeling well.  She
10  says she's feeling well.  So I'm going to ask my
11  questions.  I'm going to proceed.
12     Q   There are two lawsuits, a lawsuit in which you
13  are named as a defendant.  Before being named as a
14  defendant, did you know that Garnik had mental
15  disabilities?
16     MR. MALONE:  Lacks foundation, asked and answered,
17  argumentative and harassing and is vague.
18     THE WITNESS:  Yeah, I don't recall.
19  BY MR. SAFARIAN:
20     Q   When is the first time you actually recall
21  learning or knowing Garnik had a mental disability?
22     MR. MALONE:  Same objections.
23     MS. WRIGHTEN:  I do need to chime in here, one, to
24  clarify as another person in this deposition that we did
25  have to take a 15-minute break at some point because there

95

1  was a line of questioning that I chimed in to say that
2  I -- after Mr. Malone had objected that they were
3  harassing, to say that I also felt that they were
4  harassing and when the witness said she was starting to
5  feel unsafe.  So there was a break that we took a pause
6  for because of the feelings and dynamics and things that
7  were happening.  And so we've taken a pause for that.
8     But now, unfortunately, Mr. Safarian, I think
9  that you are going backwards.  And if we're trying to get
10  to a place that is actually, one, topics that you haven't
11  covered and to get out of that uncomfortable -- that
12  harassing dynamic, we're not doing that.  And that, I
13  think, is the paradox in what Mr. Malone was saying, what
14  we were all talking about before we took the 15-minute
15  break, and now this line of questioning where it does
16  literally feel like you're asking the same things that you
17  asked two hours ago.
18     MR. SAFARIAN:  Ms. Wrighten, you're exceeding your
19  bounds for this proceeding.  Mr. Malone is a capable
20  attorney.  And your observations about whether there is
21  harassment or not are easily refuted by video evidence.
22  That's why we're recording this deposition.  So I'm
23  comfortable with the recording.  I would urge you, if you
24  feel there is harassment, to take the video, walk it into
25  whatever judge you want, and seek your protective order.

96

1  I will disagree with you and state that almost every
2  question I've asked has been confronted with objections,
3  most not meritorious.  And when I ask the witness
4  questions, I'm getting evasive responses.
5       I'm just going to go on and ask my questions.  If
6  one of you don't like it, then Mr. Malone has the
7  privilege of suspending the deposition and seeking a
8  protective order.  I'm saying, one, in the fact that the
9  way the transcript reads, I have a witness who just
10 doesn't want to answer the question.  I also would
11 suggest -- I'm not done -- that these comments about, you
12 know, certain feelings, I will accommodate by taking
13 breaks as the witness needs.
14      If the witness feels unsafe, then we can all go
15 out and hire a discovery referee to monitor the deposition
16 and share the cost.  I'm happy to do that.  If the witness
17 feels unsafe, I would encourage you all to file a motion
18 for protective order and display this video for the judge
19 or whoever will make those determinations.  That's why the
20 video is here.  So it is what it is.  The record is clear.
21      I have a client who's been -- clients, plural,
22 who I believe are entitled to my best representation of
23 them, and I'm going to continue to do that, just as you
24 will your own.  Whether there's merit to feeling unsafe
25 when we're 50 miles apart on video --

97

1  MS. WRIGHTEN:  Stop it.  Stop it.  See, that is so --
2  that is so disrespectful.  And I can't believe that you
3  are the lawyer representing plaintiffs in discrimination
4  cases and talking about accommodations and things like
5  that and putting that on the record that disregards what a
6  woman has said.  So we are going to end this now, because
7  you keep doing that, Harry, and it is unacceptable.  And,
8  no, we're ending it.  We're done today.
9       MR. SAFARIAN:  Well, you don't have the privilege of
10 ending it, because you're not counsel --
11      MS. WRIGHTEN:  Look at her.  Look at her.
12      MR. SAFARIAN:  Okay.  We'll come back tomorrow.  Thank
13 you, Ms. Corbett.  We'll see you --
14      MS. WRIGHTEN:  No, we're not.
15      THE WITNESS:  -- safe.
16      MS. WRIGHTEN:  We can have -- what was happening here
17 is that you were speaking to a woman, and the witness, you
18 are speaking to her with such tone and the demeanor that
19 you have when you're asking the questions, and when
20 two women put on the record how that sounds, then you make
21 a point to state that you dismiss that, that those
22 observations, those characterizations, and you're even
23 saying feelings -- I hope it does show in the video,
24 because you're even saying feelings in a diminutive way.
25 And that is so improper, particularly for a lawyer who is

98

1  bringing claims that you are bringing.  And so if you
2  can't -- if you not only cannot see it, and then you
3  cannot hear it, then it's unacceptable.  And so as the
4  lawyer representing Ms. Corbett in a related matter, as
5  her attorney and an officer of the court, I'm not going to
6  allow you to treat her that way.
7       MR. SAFARIAN:  Well, you didn't allow me to finish
8  what I was saying when you cut me off and you began
9  yelling at me, okay.  I was saying whether there is
10 merit -- and then you cut me off, okay.
11      Whether there is merit or not, that's not up to
12 me.  The fact is she's made her comment.  I gave her her
13 break, and I'll give her as many breaks as she needs to
14 complete this proceeding.  If you want to adjourn and come
15 back on another day, we will.
16      MS. WRIGHTEN:  We can take a break.
17      MR. SAFARIAN:  I'll note that, Ms. Wrighten, you were
18 invited to the proceedings so that you could protect your
19 client's interest or be present, but you're not -- you
20 don't have standing to speak, but I allowed you to speak.
21 And moments ago when I was speaking in a calm and neutral
22 tone, making a statement for the record, you interrupted
23 me and you began yelling at me, and the record will show
24 that.
25      I'm ready to proceed with the witness's

99

1  deposition.  I will exceed to whatever wishes she wants in
2  terms of resuming on another day.  I offered her the
3  opportunity to come back another day.  Both she and
4  Mr. Malone stated that they do not want to do that.
5       My impression now is that everyone is feeling
6  like this is too much, we've gone through too much, and
7  the emotions are high.  So with the emotions being high,
8  my suggestion is that we suspend the proceeding for today.
9  We, as counsel, can meet and confer about appropriate
10 protocol for a second session, and then we can reconvene
11 and begin session 2.
12      MS. WRIGHTEN:  No, that wasn't my point.  I'm
13 saying --
14      MR. SAFARIAN:  Then we're stopping the deposition.
15      MS. WRIGHTEN:  Why do you cut me off?  You ask why I
16 start to yell, because you continue to cut me off.  Like,
17 it's so disrespectful, Harry.  I really don't get it.  You
18 don't cut off Mr. Malone.  You don't cut off the court
19 reporter, but you cut me off the minute I say two words.
20 It's unacceptable.
21      Now, everybody here wants to get this done.  The
22 point that I'm making is that when you say -- when you
23 actually question whether there's merit to what someone
24 has described as being harassing or unsafe, that in and of
25 itself is dismissive and disrespectful.  And if you didn't

100

1  know it before, you know it now.  And so all I'm asking
2  you to do is to actually treat that witness and what she
3  is feeling while you are asking her questions, which she
4  actually is doing a fantastic job in answering, and how
5  you keep trying to make her feel like in her head that
6  she's not, maybe that's your job.  That's fine.  It's
7  ironic since you started this proceeding by saying that
8  you were going to make her feel good about lawyers.  Every
9  time you say to her that, you know, she's not trying to
10  answer your questions, when she's taking off from work to
11  actually be here to answer your questions, it's
12  disrespectful.
13      So all I'm asking you is to take a moment to
14  appreciate what she has said, what I have said, what
15  Mr. Malone has said, in that you're treading over things
16  again.  So we can take a break, because nobody wants to
17  come here to do this again.  We can take a break.  But
18  maybe if you actually have another area that you would
19  like to get into, we can ask those questions so that maybe
20  everybody can move forward and finish all of the topics
21  that you have today instead of repeating the ones that you
22  asked literally at 9:15 this morning.
23      MR. SAFARIAN:  Are you done, Ms. Wrighten?  I don't
24  want to speak unless I know that you're done.
25      MS. WRIGHTEN:  I have finished that statement.

101

1  BY MR. SAFARIAN:
2      Q   Okay.  Ms. Corbett, would you like to take a
3  break?
4      A   Yes.
5      Q   Okay.  How much time would you like?
6      A   Five minutes.
7      MR. SAFARIAN:  Okay.  Why don't we reconvene at 11:30.
8  Thank you.
9      THE VIDEOGRAPHER:  Okay.  Going off the record at
10  11:24.
11      (Recess held.)
12      THE VIDEOGRAPHER:  Going back on the record at 11:32.
13      MR. SAFARIAN:  Okay.  This confirms that all counsel
14  are present, including Ms. Wrighten, Mr. Malone are
15  present.  The witness is present.  We'll proceed.
16      Q   Ms. Corbett, the notes that you were discussing,
17  are they -- that you're preparing, are they written or
18  electronic?  You said you're preparing notes for yourself.
19  Are they written or electronic?
20      A   They're written.
21      MR. MALONE:  Misstates testimony.
22      MR. SAFARIAN:  Sorry?
23      MR. MALONE:  I objected as misstates testimony.
24      BY MR. SAFARIAN:
25      Q   They are written down?

102

1      A   They are written doodles.
2      Q   Can we see them?
3      A   I have a whole pad full of them, so it just
4  depends what you want to look at.
5      Q   Okay.  How many pages of notes do you have?
6      A   I mean, this is my notebook for school, so I have
7  maybe doodled a couple of times and written some stuff
8  down.
9      Q   How many pages have you written down regarding or
10  during this proceeding?
11      MR. MALONE:  Vague, relevance.
12      THE WITNESS:  One.
13      MR. SAFARIAN:  Sorry?  I didn't hear.
14      THE WITNESS:  Maybe one.
15      BY MR. SAFARIAN:
16      Q   Just one page?  I need you to articulate.
17      A   Yes.
18      Q   Okay, thank you.  Have you met with a woman named
19  Ms. Lien, L-i-e-n, ever?
20      MR. MALONE:  Vague.
21      THE WITNESS:  I don't recall.
22      BY MR. SAFARIAN:
23      Q   Have you read the deposition transcript, any
24  deposition transcripts from this case?
25      A   I don't know.  Deposition transcripts, what do

103

1  you mean?
2      Q   When someone is deposed, a booklet of questions
3  and answers are assembled.  It reads like a play.  You're
4  going to get one after this proceeding, like I mentioned
5  earlier.  Have you read any testimony from anyone in this
6  case?
7      A   Not that I recall, no.
8      Q   Have you read any discovery responses with regard
9  to this case?
10      MR. MALONE:  Vague.
11      THE WITNESS:  I don't know what that means.
12      BY MR. SAFARIAN:
13      Q   So when there's litigation, parties ask each
14  other questions in writing, and then the party that
15  receives the questions has to answer those questions in a
16  verified response answering those questions.  Have you
17  seen anything that resembles that?
18      A   I don't --
19      MR. MALONE:  Assumes -- take a beat, Beth, please.
20      THE WITNESS:  Sorry.  I don't think so.
21      BY MR. SAFARIAN:
22      Q   Did you review any documents to prepare for
23  today's proceeding?
24      A   No.
25      Q   On the association's board, is there a particular

104

1    person you believe has the most information regarding the
2    events that bring us here today?
3        MR. MALONE:  Vague, calls for speculation, incomplete
4    hypothetical, lacks foundation.
5        THE WITNESS:  Yes, I believe Dale Rodin would have the
6    most knowledge.
7    BY MR. SAFARIAN:
8        Q   And what is the basis of that statement?
9        MR. MALONE:  Calls for speculation.
10   BY MR. SAFARIAN:
11       Q   Why do you believe that, is what I'm asking.
12       A   Because he's been on the board forever.  He's
13   very attuned to all the specific issues.
14       Q   And do you know where he lives in relationship to
15   my client's unit?
16       A   No, I --
17       MR. MALONE:  Calls for speculation.
18   BY MR. SAFARIAN:
19       Q   Okay.  I'm going to ask you to please restate
20   your answer, because I think there was some cross-talk.
21   I'm going to ask it again.  The objection can stand for
22   the record.
23       Do you know where Mr. Rodin lives relative to my
24   client's unit?
25       A   No.

105

1        Q   Has Mr. Rodin ever said to you that he observed
2    any conduct by any of the Nazaretyan household that he
3    found objectionable?
4        MR. MALONE:  Can you repeat the question, Harry, for
5    me?
6        MR. SAFARIAN:  Of course.
7        Q   Has Mr. Rodin ever indicated to you that he
8    personally observed with his own eyes any conduct coming
9    out of the Nazaretyan household that he found
10   objectionable?
11       MR. MALONE:  Lacks foundation.
12       THE WITNESS:  Not that I know of.
13   BY MR. SAFARIAN:
14       Q   Has anyone ever said to you that they personally
15   observed conduct coming out of the Nazaretyan household
16   that they found objectionable?
17       MR. MALONE:  It's vague, calls for speculation, lacks
18   foundation, and calls for a legal contention.
19       THE WITNESS:  Yeah, I'm not sure how to answer that.
20   BY MR. SAFARIAN:
21       Q   Well, for example, did anybody tell you they saw
22   something happen or someone -- let me start the question
23   over again.
24       You understand that my client's household, there
25   are three people, at least.  There's Garnik, his mother,

106

1    and grandmother; correct?
2        A   Yes.
3        Q   Okay.  Has anyone indicated to you that they have
4    ever seen the grandmother do anything that was in any way,
5    shape, or form improper or offensive?
6        MR. MALONE:  Relevance, calls for speculation, vague,
7    calls for a legal contention.
8        MR. SAFARIAN:  You may answer.
9        THE WITNESS:  Not that I'm aware.
10   BY MR. SAFARIAN:
11       Q   And has anyone said to you that they ever
12   observed Garnik's mother, Tamara Nazaretyan, ever do
13   anything that was objectionable or offensive in any way?
14       MR. MALONE:  Same objections.
15       THE WITNESS:  Not that I'm aware.
16   BY MR. SAFARIAN:
17       Q   Has anyone said to you that they observed with
18   their own eyes Garnik doing anything that was
19   objectionable or offensive in any way?
20       MR. MALONE:  Same objections.
21       THE WITNESS:  Yes.
22   BY MR. SAFARIAN:
23       Q   Who is that?
24       A   People in the community.
25       Q   Who would those be?

107

1        MR. MALONE:  Calls for speculation, lacks foundation.
2        THE WITNESS:  I believe Aram.  I don't know his last
3    name, A-r-a-m.
4    BY MR. SAFARIAN:
5        Q   And anyone else?
6        MR. MALONE:  Same objections.
7        THE WITNESS:  Yeah, different neighbors.  I don't know
8    their names offhand.  I'd have to look in my records.
9    BY MR. SAFARIAN:
10       Q   Where are these records?
11       A   They're with the board, and they're things that
12   I've written down and things that we've talked about at
13   board meetings.  I know it was Aram and maybe a handful of
14   people have seen him act violent.  And then there were a
15   couple of neighbors, I believe, when he was having his --
16   another incident where they heard yelling coming from out
17   of the house and screaming.
18       Q   Did you have one-on-one interaction with these
19   individuals?
20       A   Yes.
21       Q   Okay.  So let me understand.  There's Aram.  Did
22   you undertake any effort to assemble these records so that
23   they could be produced to us?
24       A   No.
25       Q   Did you see that there was a notice setting your

108

1    deposition for today?
2        A    A what?
3        Q    A notice setting your deposition for today.
4        A    You mean scheduling it?
5        Q    Written notice.  Let me show you.  Maybe this
6    will help you understand.  So prior to coming here today,
7    you have not done a search for any documents that we've
8    asked you for; correct?
9        MR. MALONE:  Misstates prior testimony.
10       THE WITNESS:  I'm not aware that you asked me for
11   documents.
12   BY MR. SAFARIAN:
13       Q    Okay, very good.  I'm going to show you
14   something.  This is a document called Notice of Deposition
15   with Demands for Production of Documents, Third Amended.
16   And there have been several versions of this document.
17       A    Okay.
18       Q    Including one that would set your deposition for
19   today.  Here we've got Beth Corbett, February 25, 2022,
20   9:00 a.m.  Were you ever shown this document?
21       A    Yes.
22       Q    Okay.  So what efforts did you take -- what did
23   you understand this document to require you to do?
24       MR. MALONE:  Mr. Safarian, I'll interject that I
25   handled the document request, my office did.

109

1        MR. SAFARIAN:  I understand.
2        Q    What did you understand this document requiring
3    you to do Ms. Corbett?
4        A    To show up today as a personal citizen, not a
5    board member.
6        Q    Did you understand this document required you to
7    do anything else?
8        A    I'm not sure.  I have to look it over again.  I'm
9    only seeing my name and a couple other board members, one
10   who's not a board member anymore.
11       Q    Okay.  And in terms of this document, aside from
12   coming in here today, did you take any actions?
13       MR. MALONE:  Asked and answered.
14       THE WITNESS:  No.
15   BY MR. SAFARIAN:
16       Q    Okay.  And did you actually physically or
17   electronically receive a copy of this document?
18       A    It's my deposition; correct?  You're making it so
19   big, I can't really see.  I just see my name on there.  So
20   are you talking about the deposition, yes.
21       Q    You've seen this document; correct?
22       A    Yes, yes.
23       Q    So this document asked for certain things such as
24   all documents that evidence, discuss, reference, or assess
25   in any way whether any member of defendant's household has

110

1    ever presented any type of nuisance.  Do you see that?
2        A    I don't know what that means.  Can you restate
3    what that means, please.
4        MR. MALONE:  I've stated on the record, Mr. Safarian,
5    that we produced -- we responded to the document request
6    with objections and said that we'd produce any documents
7    not previously produced in the association's discovery
8    responses.  And there were no further responsive documents
9    to any of these requests.
10       MR. SAFARIAN:  I think you're unfortunately engaging
11   in a speaking objection, and that's a form of coaching the
12   witness that I'd ask you to please not do.
13       The question asks for all documents that
14   evidence, discuss, reference, or assess in any way whether
15   any member of defendant's household ever presented any
16   type of nuisance to the HOA community.
17       MR. MALONE:  That wasn't a speaking objection,
18   Mr. Safarian.  I was telling you something for
19   clarification purposes.
20       MR. SAFARIAN:  Mr. Malone, I don't want to argue.  I
21   just want to get this depo done, please.
22       THE WITNESS:  Can I read it?
23       MR. SAFARIAN:  I'm sorry?
24       THE WITNESS:  I'm trying to read this again.
25       MR. SAFARIAN:  Go ahead.

111

1        THE WITNESS:  Yeah, I don't know what that
2    specifically means.  You're saying documents that I have
3    for the defendant's household, meaning Tamara's household?
4    BY MR. SAFARIAN:
5        Q    You've -- when you went to college, you said you
6    studied English; correct?
7        A    No.  I said I have a degree.
8        Q    What's your degree, undergrad degree in?
9        A    Liberal --
10       MR. MALONE:  Relevance.
11       MR. SAFARIAN:  One more time, please.
12       THE WITNESS:  Liberal studies.
13   BY MR. SAFARIAN:
14       Q    And what about your master's?
15       A    Education.
16       Q    And for 20 years, you've taught English; correct?
17       A    Yes.
18       Q    What grade levels?
19       A    All high school.
20       Q    Some honors students?
21       A    Yes.
22       Q    And you've sent off kids to Ivy League schools
23   like Harvard, Yale, Stanford?
24       A    No.
25       MR. MALONE:  Relevance, calls for speculation.

112

BY MR. SAFARIAN:

1  BY MR. SAFARIAN:
2  Q  Ms. Corbett, have some of your students from
3  El Camino gone on to prestigious universities?
4  MR. MALONE:  Calls for speculation.
5  THE WITNESS:  You'd have to define "prestigious."
6  MR. SAFARIAN:  Sorry?
7  THE WITNESS:  You'd have to define "prestigious."
8  BY MR. SAFARIAN:
9  Q  Have some of your students from El Camino High
10  School gone on to UCLA?
11  A  Yes.
12  Q  UC Berkeley?
13  A  Yes.
14  Q  University of New York, or NYU?
15  A  There's no University of New York.
16  Q  I corrected myself and said NYU.
17  A  Not that I know of.
18  Q  Okay.  Stanford?
19  MR. MALONE:  This is harassing.  There's no reason for
20  this.
21  THE WITNESS:  You're insulting my job and my
22  intelligence.
23  MR. SAFARIAN:  I'm not insulting your job,
24  Ms. Corbett.  I'm asking questions for a specific purpose.
25  MR. MALONE:  This is not likely to lead to admissible

113

1  evidence, discovery of admissible evidence.
2  MR. SAFARIAN:  That's fine.
3  THE WITNESS:  You're questioning my intelligence here.
4  MR. SAFARIAN:  I'm not questioning your intelligence.
5  I'm saying that you're very intelligent.  I think you're
6  very intelligent, and I think someone as intelligent as
7  you understands what this question means.  And if you say
8  that you don't understand it, then a jury can look at it
9  and determine whether you're being sincere in that
10  representation.
11  MR. MALONE:  This is argumentative.  The question's
12  been asked and answered.  It's been asked and answered.
13  She's given her opinion on the question.
14  MR. SAFARIAN:  Please don't interrupt my examination.
15  MR. MALONE:  I'm going to interrupt if you continue to
16  badger the witness.
17  MR. SAFARIAN:  I'm not badgering the witness.  That's
18  why we have a video.
19  MR. MALONE:  I love that we have a video,
20  Mr. Safarian.
21  MR. SAFARIAN:  May I proceed, please, or are you going
22  to stop?
23  MR. MALONE:  I will stop if you stop badgering the
24  witness.
25  MR. SAFARIAN:  Thank you.  The deposition's suspended.

114

1  We'll resume with a Volume II after we proceed with a
2  court order.  Thank you, Mr. Malone.
3  MS. WRIGHTEN:  I just want to put on the record before
4  we close that you haven't actually established that there
5  are other topics or areas, questions, lines of questioning
6  that you haven't asked.  And I will concur.  Again, the
7  witness is telling you that you are asking questions that
8  appear to be insulting her intelligence.  So you won't be
9  able to proceed with this individual deposition without
10  establishing the record that there is actually
11  additional questions that you actually have to ask her.
12  MR. SAFARIAN:  I have additional questions.
13  Sorry, did I interrupt you?  I apologize.  If I
14  did, let me know, and I'll stop.
15  MS. WRIGHTEN:  Yeah, no, I'm just saying that to sort
16  of threaten the witness that she's going to have to come
17  back, and you haven't even, you know, laid a foundation
18  for what she hasn't answered, what she's refusing to
19  answer, because she's not, and you haven't.  So, I mean,
20  you can go ahead and suspend it, but everybody has said
21  that they were here to endeavor to finish this.  You are
22  now asking questions about where she sent her kids, the
23  students to school.  So, you know, I just want to make
24  sure that the record is complete as to whatever efforts
25  you think that you might have to try and bring this

115

1  witness back.
2  MR. SAFARIAN:  Okay.  My concern is that I'm getting
3  interruption and coaching from Mr. Malone and we had at
4  the last deposition from Mr. Roseman, part one.  Part two,
5  I think I need a court to way in as to whether a lawyer
6  who is not party to this lawsuit is allowed to continue to
7  disrupt the proceedings.  Three, I'm uncomfortable with
8  your suggestion I'm, quote, threatening the witness and
9  frankly am profoundly offended by it.  You've suggested
10  I'm a misogynist.  You've suggested that I'm threatening
11  the witness.  I'm just here to ask questions.  And your
12  opinions are what they are.  I disagree with them.
13  And I'm not suggesting the witness is
14  unintelligent.  On the contrary, I'm suggesting the
15  witness is very intelligent.  And this very intelligent
16  witness is being presented with a question, and I'm laying
17  a foundation that this very intelligent witness has a
18  graduate degree and is telling me she doesn't understand
19  what question Number 1 means.  And if that is the record
20  that this witness wants to create for a jury, then that's
21  fine with me.  I'm okay with that.  But I'm giving the
22  witness an opportunity to answer the question and not find
23  herself in that position.  But that's up to her, and
24  that's up to you.  I think you know exactly why I'm going
25  down this road.

116

1     So if you want me to proceed, I'm happy to. I
2  prefer to move on with this and just get this done, like a
3  normal proceeding. Unfortunately, that's not what this
4  has been. I have basic questions I want to ask. I'm not
5  required to give you any explanation about what areas I
6  want to get into. I have a witness who's not looked for
7  documents. She has not looked at the notice. Mr. Malone
8  is telling me that --
9     THE WITNESS: I have looked at the notice.
10     MR. SAFARIAN: I'm not done, please. I'm not done.
11     Mr. Malone is telling me that he is the one that
12  handled the production. And I have no indication -- the
13  record is clear - about what efforts this witness has
14  undertaken with respect to these requests. So I'm
15  concerned that I don't have all the documents. She's
16  identified documents that I have not seen already and that
17  I don't believe have been produced. So that's my
18  position. I'd like to proceed with the deposition and get
19  it done, but, you know, that's up to you guys.
20     MS. WRIGHTEN: So I'm just going to put on the record
21  again, since you keep going back to this standing issue,
22  that I represent and defend Ms. Corbett in a lawsuit in
23  federal court filed by you on behalf of these plaintiffs.
24     MR. SAFARIAN: Correct.
25     MS. WRIGHTEN: So -- and you've started to actually

117

1  get into causes of action in that case, but we can just
2  leave that on the record. What I am more talking about is
3  what the witness has been putting on the record today and
4  what you keep deflecting. And thank you for your
5  explanation that basically explained that you are asking
6  questions that are questioning her intelligence.
7     MR. SAFARIAN: I'm not questioning her intelligence.
8     MS. WRIGHTEN: You said -- you said -- you went back
9  and you underscored what her education was, and then you
10  went to this notice to ask her then why someone with that
11  education wouldn't understand this first question. If
12  that's not questioning somebody's intelligence, I don't
13  know what is. So just so you hear yourself, you did it in
14  your line of questioning. You explained it and repeated
15  it again, and that is the essence of questioning
16  somebody's intelligence. So that's where you are. That
17  is why we've all said that that is harassing and
18  inappropriate.
19     The witness did say that she saw this notice.
20  And why you disregarded Mr. Malone as to the legal aspect
21  of discovery in producing documents objecting to RFPs to a
22  notice of deposition, in that those documents have already
23  been produced. If anybody is trying to signal anything,
24  it would be you, Mr. Safarian, in trying to make the
25  witness feel like she's not answering the questions, that

118

1  she hasn't done what she's supposed to do, and now that
2  she's not intelligent enough to understand what the nature
3  of a request is.
4     So you, Mr. Safarian, are -- again, we would all
5  like to finish this today. But I will put on the record
6  that you are walking a fine line here, not just for me,
7  but for the witness. And so I encourage you, I implore
8  you actually, to take a step back. And now that we've
9  said what it sounds like, as Mr. Malone said, I am very
10  grateful for the video as well. And every time you say
11  that, it underscores that you think there's something
12  about how you're asking it that notwithstanding that three
13  people here are observing it totally differently, that,
14  yes, we have a record of it.
15     But I am now imploring you, again, if there are
16  other questions that you'd like to ask her besides trying,
17  again, to insult her, we're happy to continue to stay.
18     MR. SAFARIAN: I'm not trying to insult this witness,
19  and I'm not trying to insult her intelligence. As I've
20  stated explicitly on the record, I think the witness is
21  very intelligent. And when the witness looks at a basic
22  request for production that is clear and succinct and
23  states to me that she doesn't know what it means --
24     THE WITNESS: Not clear.
25     MR. SAFARIAN: I'm not done.

119

1     THE WITNESS: It's not clear and succinct.
2     MR. SAFARIAN: I'm not done, please.
3     When the witness says she doesn't understand a
4  basic question, then I have to assume that the witness,
5  when she's as intelligent as she is, is not being sincere
6  with me.
7     MS. WRIGHTEN: It's not a basic question. For the
8  record --
9     MR. SAFARIAN: I'm not done.
10     MS. WRIGHTEN: You're describing something --
11     MR. SAFARIAN: You keep interrupting me. You told me
12  not to interrupt you, and now you keep interrupting me.
13     MS. WRIGHTEN: Okay. Read it into the record, Harry.
14     MR. SAFARIAN: This is the fifth time you've done it.
15     MS. WRIGHTEN: Read it into the record. You've
16  described a sentence that says -- that most lawyers might
17  not know what it means.
18     MR. SAFARIAN: You're interrupting me.
19     MS. WRIGHTEN: Because you have mischaracterized the
20  thing that's on the screen right now.
21     "All documents that evidence, discuss, reference,
22  or assess in any way whether any member of defendant's
23  household has ever presented any type of nuisance to the
24  subject HOA community and/or its members and residents."
25     MR. SAFARIAN: We're taking a break.

120

1     MS. WRIGHTEN:  I barely know what that means.

2     MR. SAFARIAN:  We're taking a break.  Now you're

3     coaching the witness.  And all of this has been coaching

4     the witness.  And we suspended the last deposition because

5     of coaching.  I'm not sure I want to proceed.  I'm going

6     to take a five-minute break and figure out what I want to

7     do here and whether I'm suspending the deposition or not.

8             Thankfully, yes, we disagree.  There's lawyers on

9     our side that find that both you and Mr. Malone are being

10    disingenuous, you in particular, Ms. Wrighten.  And you

11    have no standing to be here, but I've allowed you to be

12    here.  I'm very courteous to you by allowing you to be

13    here.  I have no interest in crossing swords with anybody.

14    I just want to ask questions.

15    MS. WRIGHTEN:  You've said that I'm lying about

16    something?

17    MR. SAFARIAN:  I'm not done.

18    MS. WRIGHTEN:  You just said I was disingenuous.

19    About what?

20    MR. SAFARIAN:  I'm not done.

21    MR. SAFARIAN:  Don't attack my integrity.  Keep going,

22    Harry.  Keep making this worse.

23    MR. SAFARIAN:  Ms. Wrighten, this deposition is

24    suspended.  Thank you very much.

25    MS. WRIGHTEN:  It's terminated.  It's over.  It's

121

1     done.  We're not coming back.

2     MR. SAFARIAN:  We're going to resume.

3     MS. WRIGHTEN:  Okay.  You can ask some more --

4     MR. SAFARIAN:  Ms. Wrighten, you are yelling.  You are

5     yelling.

6     THE WITNESS:  May I speak to Mr. Safarian for a

7     moment, please.

8     MR. SAFARIAN:  No, Ms. Corbett, I don't think that's

9     appropriate.

10    MR. MALONE:  Beth --

11    MR. SAFARIAN:  I will not continue to endure this.

12    This is unacceptable.  Ms. Wrighten, Mr. Malone is a very

13    capable attorney.  He's present, and he can speak for his

14    client.  But to have you repeatedly interrupt the

15    deposition proceedings, calling me a misogynist, say that

16    I'm insulting a witness's intelligence when that's clearly

17    not what I'm doing, coach the witness and trying to

18    interfere with the proceeding is not acceptable.  You are

19    here as an observer.  I gave you the courtesy of being

20    here as an observer.  And what I've seen here today is

21    disconcerting, to say the least.  I'm stopping right now.

22    It's 11:55.

23    MS. WRIGHTEN:  Good, because I'm a lawyer.  I'm a

24    lawyer.

25    MR. SAFARIAN:  You're interrupting me.

122

1     MS. WRIGHTEN:  You said you're stopping.

2     MR. SAFARIAN:  You're interrupting me.

3     MS. WRIGHTEN:  Oh, okay.  So you're not stopping then.

4     MR. SAFARIAN:  I'm stopping the proceedings now.

5     MS. WRIGHTEN:  Oh, okay.

6     MR. SAFARIAN:  Ms. Wrighten, I'm not done.  You've

7     interrupted me repeatedly.  I have no desire to engage

8     with you.  I have no desire to speak with you.  If you

9     have some concerns, put them in a letter to me.  You are

10    not authorized to speak at these proceedings.

11    MS. WRIGHTEN:  No.  I am an officer of the court.

12    Would you stop.  No, that's not even true.  It's not even.

13    MR. SAFARIAN:  You're yelling at me, and I'm not done.

14    MS. WRIGHTEN:  Okay.

15    MR. SAFARIAN:  I'm not done.

16    MS. WRIGHTEN:  All right.

17    MR. SAFARIAN:  You are not counsel of record in this

18    case.  This deposition is being taken in a state case.

19    The witness has a lawyer representing her in this case.

20    You are welcome to be here and observe.  But the theatrics

21    of today are unacceptable.  I don't appreciate them.  I

22    came with every intention of asking basic questions in a

23    case that I consider to be very serious.  I've had

24    incredible disruption in discovery in this case.  I don't

25    want to go through this anymore.

123

1             I don't have that much left, but unfortunately

2     the tone that has been set is unsettling.  I don't think I

3     can proceed today and get neutral, clear, candid testimony

4     from this witness because the tone that has been set, not

5     by the witness, but by you, Ms. Wrighten, not by

6     Mr. Malone, but by you.

7             Let the record reflect that Ms. Wrighten is

8     laughing out loud as I'm trying to meet and confer.

9     MR. MALONE:  I believe that this can stop.  I think

10    the issue, Harry, is that you allege she was being

11    disingenuous.  You also allege it to me, and I take issue

12    with that.  I'm not being disingenuous.  I've given you

13    every courtesy and apologized if I've interrupted

14    throughout this entire proceeding.  I'm comfortable the

15    record will reflect that.  But it's not appropriate to

16    continue to engage in this back-and-forth.

17    MR. SAFARIAN:  Agreed.

18    MR. MALONE:  If you'd like to terminate the

19    deposition, terminate the deposition.  And then if you

20    want to seek a second volume of this deposition, we will

21    seek a protective order precluding that second volume.

22    MR. SAFARIAN:  That's up to you.  The witness has

23    identified that she has documents.  I'd like to know where

24    those documents are, because I have not seen them.

25    MR. MALONE:  You have seen every single document

124

1    within the association's possession.
2        MR. SAFARIAN:  The witness has identified her own
3    documents, and I believe I'm entitled to those.  You know,
4    here's what I'm going to do.  I'm going to let everybody
5    cool off for 45 minutes, and I'm going to consider how
6    best to approach this in the most constructive way.  I am
7    going to come back at 12:45, and we can resume from there
8    or we cannot resume from there.  But at this point I think
9    it's only safest and best to put a break in the
10   proceedings and let everybody's heads cool off.
11       MS. WRIGHTEN:  All I'm going to add is that -- which
12   you should know is that as a teacher, it's going to be
13   really hard for her to take off additional time.  So
14   whatever break we need to take, we can take that.  I will
15   continue to underscore though that the witness is telling
16   you how you are treating her.
17       MR. SAFARIAN:  Why are you -- Ms. Wrighten, it's not
18   up to you to coach the witness and give her cues on what
19   to say.  The record speaks for itself.  I told you I want
20   to take 45 minutes to cool off, and now you are
21   progressing and advancing the same thing I'd like to stop.
22   I don't want to argue you with.  I don't want to argue
23   with the witness.  I don't want to argue with Mr. Malone.
24   I want to take 45 minutes so we can cool off and come
25   back, so I can ask clean and uninterrupted questions

125

1    without what I consider to be unnecessary argumentation.
2        I don't take depos like this.  This is highly
3    unusual for me.  But it is what it is.  Okay.  We all have
4    different interpretations of it.  I have questions.  I
5    respect the witness's time.  I would like her not to have
6    to come back, but I also feel like I'm being ganged up on
7    by two lawyers.  Generally speaking, when a party is
8    appearing at a deposition, only one lawyer can interpose
9    objections.  Now we have two, and a second lawyer who is
10   not even part of these proceedings is making those
11   objections.  I've been very patient about that, and I'm
12   going to continue to be.  But I still have questions to
13   ask.
14       So I'm going to come back in 45 minutes, and
15   we're going to resume.  I'm not going to argue with you
16   anymore, Mr. Malone.  I'm not going to argue with you
17   anymore, Ms. Wrighten.  I'm just going to ask my
18   questions.  You can say whatever you want on the record.
19   You can tell me I'm a bad guy.  Ms. Wrighten, you can call
20   me a misogynist again.  Do whatever you want.
21       The fact that I disagree with some of the things
22   that have been said and the fact that I disagree with some
23   of the comments the witness has made is my opinion.  And
24   that's all there is to it.  And you can call me a
25   misogynist for disagreeing with her, Ms. Wrighten.  That's

126

1    fine.  That's up to you.  But I'm done having this
2    argument.  I'm going to come back in 45 minutes.  And I
3    would encourage you all to come back with a cool head and
4    allow this proceeding to occur.  And if it doesn't, then
5    there are other methods that we can employ procedurally to
6    make sure that we get the testimony that we need.
7        So I'm signing off now, and we'll come back in 45
8    minutes.  Thank you everybody.
9        THE VIDEOGRAPHER:  Going off the record at 12:00
10   o'clock.
11       (Recess held.)
12       THE VIDEOGRAPHER:  Going back on the record at 12:52.
13       MR. SAFARIAN:  Okay.  We're back on the record.  I'm
14   going to try to move through this efficiently.
15       I'm going to ask, Ms. Corbett, if you could
16   provide to Mr. Malone the notes that you have with you
17   today so that he could e-mail them to me and the reporter
18   to attach those as an exhibit to the record.
19       Mr. Malone, do you have any objection to that?
20       MR. MALONE:  No, just only to the extent that I'm not
21   sure Ms. Corbett can do it right this second.  If she
22   wants to provide them to me after the deposition and you
23   want to leave an exhibit open, then we could certainly do
24   that.
25       MR. SAFARIAN:  Yeah, I don't want to stop the depo,

127

1    she just held up --
2    Q   Is that just the one page, Ms. Corbett, that you
3    prepared during the deposition?
4    A   Uh-huh.
5    Q   And can you hold it up just one more time?
6        MR. MALONE:  I just want to make sure there's nothing
7    other than your notes from the deposition on that page.
8        MR. SAFARIAN:  That's all.  Thank you.
9        MR. MALONE:  But, yes, I'm happy to facilitate that.
10       MR. SAFARIAN:  I appreciate that very much.  Thank
11   you.
12       MR. MALONE:  Uh-huh.
13   BY MR. SAFARIAN:
14   Q   Ms. Corbett, you had mentioned that Tamara
15   Nazaretyan went to a board meeting to discuss a fine at
16   one point.  I never asked, were you present at that
17   meeting?
18   A   Yes.
19   Q   And you were a board member at that time?
20   A   Yes, a new one.
21   Q   I'm sorry?
22   A   A new board member.
23   Q   And what -- do you recall any of the dialogue
24   that occurred despite -- let me rephrase that.
25       Aside from just the general subject matter that

128

1  she went there to discuss a fine, do you recall
2  specifically what was discussed?
3  MR. MALONE: Vague, calls for a narrative.
4  THE WITNESS: I don't. I was a new board member just
5  getting up to speed.
6  BY MR. SAFARIAN:
7  Q  For example, do you know what was said by any
8  particular person there?
9  MR. MALONE: Asked and answered.
10  THE WITNESS: I don't --
11  MR. MALONE: Remember, take a beat, Beth. I'm sorry
12  to interrupt.
13  THE WITNESS: Sorry.
14  MR. MALONE: Thank you.
15  MR. SAFARIAN: Okay. Madam court reporter, did you
16  get a response?
17  (The following answer was read:
18  "THE WITNESS: I don't --")
19  MR. SAFARIAN: Let's re-ask the question.
20  Ms. Corbett, if you could just please pause just
21  momentarily to allow any objections to be made by
22  Mr. Malone, it will be more efficient for all of us. I
23  appreciate your consideration.
24  Ms. Russo, would you please restate the question.
25  Mr. Malone's objections will stall for the record, and

129

1  we'll get a clean response.
2  (The following question was read:
3  "Q  And what -- do you recall any
4  of the dialogue that occurred
5  despite -- let me rephrase that.
6  "Aside from just the general
7  subject matter that she went there to
8  discuss a fine, do you recall
9  specifically what was discussed?")
10  THE WITNESS: No.
11  BY MR. SAFARIAN:
12  Q  Do you recall during that meeting the particular
13  incident in April 2019 that you've mentioned being
14  discussed?
15  MR. MALONE: Asked and answered.
16  MR. MALONE: You may answer.
17  THE WITNESS: Yeah, I think I answered that already.
18  BY MR. SAFARIAN:
19  Q  Okay. I don't remember. Would you please
20  indulge me whether you recall it or not.
21  A  I don't remember what was being said
22  specifically.
23  Q  Okay. Does that mean you don't recall the
24  incident being discussed?
25  A  I believe that she was there discussing a fine

130

1  related to the incident or something surrounding the
2  incident. I believe it was my first board meeting.
3  Q  Other than that you recall no discussion about
4  the incident. Is that fair?
5  A  Not that I remember.
6  Q  Okay. Do you know how many -- in terms of the
7  board has sought in this case to restrict access of Garnik
8  to different parts of the community, I guess the board
9  distributes -- or the HOA distributes access cards to
10  residents so that they can have access to certain places?
11  A  Yes.
12  Q  Okay. And do you know how many -- how is it
13  determined which units get how many cards?
14  MR. MALONE: Calls for speculation, lacks foundation.
15  MR. SAFARIAN: If you know.
16  MR. MALONE: Calls for a narrative.
17  THE WITNESS: I don't recall, but I believe each
18  person in the household, each adult perhaps gets a card.
19  I have to check on the minor children. I don't remember.
20  But I do know, like, my example, my husband and I each
21  have a card.
22  BY MR. SAFARIAN:
23  Q  Okay. And so it's to your understanding that you
24  don't have to be the homeowner. As long as you're an
25  adult that lives in the dwelling with the permission of

131

1  the homeowner, you would get a card. Is that clear -- or
2  is that --
3  MR. MALONE: Incomplete hypothetical and misstates
4  prior testimony.
5  THE WITNESS: Are you asking me if a renter would get
6  it?
7  BY MR. SAFARIAN:
8  Q  Well, renters would get them, of course; right?
9  A  Yeah.
10  Q  And if a homeowner had, for example, a cousin
11  staying with them long term, would they be entitled to an
12  access card?
13  A  No.
14  MR. MALONE: Vague and ambiguous.
15  Beth, please take a beat.
16  THE WITNESS: Sorry.
17  MR. MALONE: It's okay. I understand it's unnatural
18  to you.
19  BY MR. SAFARIAN:
20  Q  You said no, if you have a cousin that's living
21  with you. Let's say hypothetically that Beth Corbett has
22  a cousin from Ohio who decides to go to UCLA for a year
23  and comes and stays with you so that she can go to and
24  from UCLA and live with you as her aunt for a year. Would
25  that person, if that person wanted an access card, you

132

1   wanted that person to have an access card, would that be
2   something that would be allowed?
3       MR. MALONE:  Same objections.
4       THE WITNESS:  It would have to be a registered
5   resident, a resident.
6   BY MR. SAFARIAN:
7       Q   So if the person essentially registered as a
8   resident, all they have to do is just register, they would
9   have an access card?
10      MR. MALONE:  Incomplete hypothetical, misstates prior
11  testimony.
12      MR. SAFARIAN:  Let me withdraw the question.
13      Q   What does it mean to be registered?
14      MR. MALONE:  Calls for a narrative, vague.
15      THE WITNESS:  If you're an adult, you have to have a
16  car.  If you have a car, you have to have registration,
17  insurance to prove you live there.
18  BY MR. SAFARIAN:
19      Q   So let me ask you, let's say that you are an
20  adult who is retired and unable to drive.  Let's say
21  you're an 80-year-old person who doesn't own a car and
22  can't drive.  Would they not have access cards that would
23  allow them to come in and out of communal areas?
24      MR. MALONE:  Same objections.
25      THE WITNESS:  I'm sure PMP, our management company who

133

1   gives out the cards, would probably have to have their
2   address on record, I'm assuming.  I don't know for sure,
3   but I know that PMP issues the cards, because that's how I
4   got my cards.
5   BY MR. SAFARIAN:
6       Q   Okay.  And when you got your cards, did you
7   specify how many that you wanted?
8       A   Each --
9       MR. MALONE:  Calls for speculation.
10      THE WITNESS:  Yeah, I don't remember the procedure.
11  BY MR. SAFARIAN:
12      Q   Okay.  And if someone is living in or visiting
13  with your home, for example, let's say hypothetically you
14  have that niece visiting with you for a year and wants to
15  use the card to go use the swimming pool.  Is that
16  forbidden?
17      A   Yes.
18      Q   Where --
19      MR. MALONE:  Sorry, it's an incomplete hypothetical.
20      Beth, please, try to take a beat.
21      It's an incomplete hypothetical.  I didn't mean
22  to interrupt the questioning, Mr. Safarian.
23      MR. SAFARIAN:  Thank you.
24      Q   In what written place is there that prohibition?
25      MR. MALONE:  Calls for speculation, lacks foundation.

134

1       THE WITNESS:  I believe it's in the CC&Rs, who can get
2   a card.  I'm assuming, but I believe it's in there, that
3   you have to be a resident of the community to get a card.
4   BY MR. SAFARIAN:
5       Q   So assume hypothetically that this is not your
6   niece, but it's your adult daughter or son that lives with
7   you on a permanent basis.  Then they would qualify as a
8   resident of the community that could have a card; correct?
9       MR. MALONE:  Same objections.
10      THE WITNESS:  Well, now you're saying if they're a
11  resident residing with you.
12      MR. SAFARIAN:  Yes.
13      THE WITNESS:  Then you're entitled, I believe, to a
14  card.  We'd have to check with PMP about that for sure.
15  BY MR. SAFARIAN:
16      Q   As a board member, I'm just asking your
17  understanding.  As a resident of the HOA community, if
18  you're an adult and you are a resident of the community,
19  you're entitled to a card; correct?
20      MR. MALONE:  Lacks foundation, incomplete
21  hypothetical, calls for speculation.
22      THE WITNESS:  I believe so.  I'd have to check the
23  CC&Rs for sure.
24  BY MR. SAFARIAN:
25      Q   And with respect to my clients, did you ever

135

1   undertake any investigation to look at the CC&Rs to see
2   what they were entitled to with respect to access cards?
3       MR. MALONE:  Vague, ambiguous, calls for a narrative,
4   asked and answered, lacks foundation.
5       MR. SAFARIAN:  Do you understand?
6       THE WITNESS:  I don't recall off the top of my head.
7   I'm sorry.
8   BY MR. SAFARIAN:
9       Q   That's okay.  Yeah, I guess just to clarify,
10  because Mr. Malone asked or said that it was vague, what I
11  was getting at was, once you became a board member and
12  learned there were certain limitations to my client's
13  access, did you ever cross-reference the CC&Rs to
14  determine whether those limitations were within what the
15  CC&Rs permitted?
16      MR. MALONE:  Same objections.
17      THE WITNESS:  Yeah, I don't recall off the top of my
18  head.  I don't recall.
19  BY MR. SAFARIAN:
20      Q   Did you ever consult anyone, such as an HOA
21  expert, to determine, outside of your counsel, to
22  determine what the CC&Rs required of the board with
23  respect to giving association members access?
24      MR. MALONE:  Same objections.
25      THE WITNESS:  Can you repeat that, please.

136

BY MR. SAFARIAN:

1   Q   Let me rephrase the question. Are you aware of
2 any attempt by any member of the board or any agent of the
3 board, such as PMP, to consult any person with regard to
4 whether residents are entitled to access cards under any
5 given circumstances?
6

7   MR. MALONE: Same objections.
8   THE WITNESS: I'm not sure. I know that residents get
9 cards.
10   BY MR. SAFARIAN:
11   Q   Okay. But in terms of whether, for example, the
12 board members or PMP contacted a HOA expert to inquire
13 circumstances under which a card can be deactivated or
14 taken away from somebody, you're unaware of that
15 occurring; correct?
16   MR. MALONE: It's the same objections, and it calls
17 for speculation.
18   THE WITNESS: Yeah, I'm not sure. I don't remember
19 specifics. I don't remember.
20   BY MR. SAFARIAN:
21   Q   You don't remember that occurring. Is that a
22 correct statement?
23   A   No, I don't remember if it occurred or didn't
24 occur. Just, it was three years ago. I don't remember.
25   Q   So you have no -- is it a fair statement that you

137

1 have no independent recollection of anyone acting on
2 behalf of the HOA to inquire of an expert or consultant as
3 to the circumstances under which an access card can be
4 revoked or limited?
5   MR. MALONE: Same objections, and it misstates prior
6 testimony.
7   THE WITNESS: I believe that if that situation came
8 up, there were attorneys involved.
9   BY MR. SAFARIAN:
10   Q   Okay. And I don't want to know what the
11 attorneys did or said. I'm just asking you, do you have
12 an independent recollection of any board member or agent
13 of the board consulting anyone with expertise outside of
14 counsel to determine whether revocation or limitation of
15 access cards would be allowed by the CC&Rs?
16   MR. MALONE: Same objections.
17   THE WITNESS: Yeah, I don't recall. They could have.
18 Again, as a new member, I don't remember specifics. I do
19 know that we check things out with our attorneys and our
20 PMP management firm.
21   BY MR. SAFARIAN:
22   Q   So would the answer be that you do not have such
23 an independent recollection?
24   MR. MALONE: Misstates prior testimony.
25   THE WITNESS: Yeah, I don't -- I don't recall it

138

1 specifically, but our practice is to confer with PMP and
2 attorneys.
3   BY MR. SAFARIAN:
4   Q   And I don't mean to beat a dead horse, but when
5 you say you don't recall specifically, that suggests to me
6 that you may recall it. I just want to know, do you have
7 an independent recollection of any such consultation
8 occurring?
9   A   I'm just going to give you my best answer. It
10 might have. I'm not 100 percent sure.
11   Q   That's not my question, Ms. Corbett. My question
12 is, do you have an independent recollection of it
13 occurring, just yes or no?
14   A   I'd have to say I'm not sure.
15   Q   Has the board met outside of the presence of
16 counsel to discuss the two lawsuits?
17   MR. MALONE: Calls for a narrative, vague.
18   THE WITNESS: Yeah, I'm not certain about that.
19   BY MR. SAFARIAN:
20   Q   So is it fair that you have no independent
21 recollection of the board ever meeting outside the
22 presence of counsel to discuss the lawsuits?
23   MR. MALONE: It misstates prior testimony, and
24 obviously the attorney-client privilege objection to the
25 extent that you met inside the presence of counsel, which

139

1 Mr. Safarian was kind enough to include in his question,
2 but then also to the extent that you were directed by
3 counsel to discuss any particular issue.
4   MR. SAFARIAN: You may answer, please.
5   THE WITNESS: I know we met with counsel, and I'm not
6 sure independently. We only meet during board meetings.
7 And that's the best I can answer.
8   BY MR. SAFARIAN:
9   Q   How often are the board meetings?
10   MR. MALONE: Calls for speculation.
11   THE WITNESS: Once a month.
12   BY MR. SAFARIAN:
13   Q   Have any months been missed since you joined the
14 board, if you can recall?
15   A   I believe in December we don't have meetings.
16   Q   So unless there's a specially called meeting,
17 you'd be meeting 11 times per year; correct?
18   A   Correct.
19   Q   Since you've joined the board, have there been
20 any specially called meetings?
21   MR. MALONE: Calls for speculation, vague.
22   THE WITNESS: I honestly don't remember.
23   BY MR. SAFARIAN:
24   Q   Have there been any specially called meetings, if
25 this refreshes your memory, to discuss my client -- or let

140

1 me rephrase that question.
2    Are you aware of any specially called meetings to
3 discuss any member of the Nazaretyan household?
4    MR. MALONE:  Calls for speculation, asked and
5 answered.
6    THE WITNESS:  I don't remember.  I don't think so.
7 BY MR. SAFARIAN:
8    Q   Thank you.  I'm going to turn to something that
9 was controversial before we left, and I hope it won't be
10 controversial now.  And I don't intend it to be.  But I do
11 want to share with you my screen again and ask you, in
12 regards to request Number 1 here, you stated that you
13 found it to be ambiguous or you didn't understand it.  My
14 question is, did you personally undertake any
15 investigation to locate documents responsive to question
16 number or request Number 1 in what we'll mark as Exhibit 1
17 to your deposition?
18    MR. MALONE:  Asked and answered.
19    THE WITNESS:  Would you mind restating that in plain
20 language, please, Number 1, what that is asking me, in
21 your own words.
22    (Exhibit 1 was marked for
23    identification and is attached hereto.)
24 BY MR. SAFARIAN:
25    Q   You want me to reframe what question 1 asks in

141

1 plain language.  Is that what you asked?
2    A   I'd like you to restate it in your own words,
3 please.
4    Q   This is calling for you to produce any documents
5 that reflect that anybody that lived in my client's home
6 ever presented a nuisance to the HOA community, including
7 members and residents.
8    A   Any documents I have, my attorney has.
9    Q   Okay.  I may have misunderstood you earlier, but
10 my understanding was you had documents independent of what
11 had been given to your lawyer.  Did I misunderstand you?
12    A   Yes.  Those were just -- I don't know what you're
13 referring to, but I'm assuming you're referring to minutes
14 of the board meetings and anything going on in the board
15 meetings in terms of writing down notes or what was
16 discussed in the board meetings.  That's what I mean by
17 notations or I have to check my notes.  That's what I'm
18 referring to.  I don't have anything else.
19    Q   Okay.  So where are your notes that you took
20 during these board meetings?
21    A   They're probably --
22    MR. MALONE:  Asked and answered.
23    THE WITNESS:  Yeah, they're probably in the board
24 documents.
25    MR. SAFARIAN:  Okay.  And, Patrick, have we received

142

1 those?
2    MR. MALONE:  You've received everything that we've
3 received responsive to your document request previously
4 propounded.
5 BY MR. SAFARIAN:
6    Q   And, Ms. Corbett, do you know if your notes were
7 turned over for the HOA's production?
8    MR. MALONE:  I think it's vague and ambiguous as to
9 "notes," and I think that might be the confusion.  But
10 it's up to you, how you want to address that, Harry.  I'm
11 not trying to interrupt.
12 BY MR. SAFARIAN:
13    Q   Again, Ms. Corbett, you mentioned having your own
14 personal notes that you believe were part of this, made
15 part of the HOA's file.  Were you -- first of all, were
16 you personally involved in helping produce documents to
17 counsel, or was that something that was left to one of the
18 other board members?
19    A   Let me just say what you asked me first, and that
20 is when I say I have to check my notes, I'm referring to
21 what happened at the board meetings in the context of the
22 board documents.  That's where we keep everything.  That's
23 where all the -- everything is in there.  So I don't have
24 a separate set of documents or notations that I take.  My
25 notes are -- when I refer to notes, I'm talking about what

143

1 happens during the board meeting.  You're asking me for
2 specific dates and specific actions.  Those are all in the
3 board documents.  That's what I mean when I'm referring to
4 my notes.
5    Q   In any event, did you participate with -- did you
6 participate in the process of gathering documents to
7 produce in response to questions my office asked?
8    MR. MALONE:  Vague.
9    THE WITNESS:  I believe so.
10 BY MR. SAFARIAN:
11    Q   And tell me what you did in that process.
12    MR. MALONE:  Vague and calls for a narrative.
13    THE WITNESS:  Whatever we were asked to do by our
14 attorneys, we did.
15 BY MR. SAFARIAN:
16    Q   I want to know what you independently recall
17 doing.
18    MR. MALONE:  To the extent it was not directed by
19 counsel.
20    MR. SAFARIAN:  Even if it was -- let me stop.  I think
21 even if it is directed by counsel.  For example, if you
22 said to her, please look in files, please look in hard
23 drives, I'm entitled to know what she did.  I don't think
24 the fact that you define the scope prevents her from
25 telling me.  I just want to know what she did.  I don't

144

1  want to know what she was told by you.  I just want to
2  know what Ms. Corbett did to help comply with our request.
3      MR. MALONE:  I understand that, Mr. Safarian.  But
4  what I mean is that to the extent she did things that I
5  directed or that Mr. Roseman or Ms. Babikian directed, she
6  does not have to divulge what we directed.
7      MR. SAFARIAN:  Yeah, I don't want to know what you
8  directed.  I just want to know what she did.  So thank you
9  for the clarification.
10     Q   Ms. Corbett, can you tell me independently -- let
11  me rephrase that.
12         Can you tell me what your independent
13  recollection is of those steps you undertook to make sure
14  that we had the documents we asked for?
15     MR. MALONE:  Misstates prior testimony, calls for a
16  narrative, lacks foundation --
17     THE WITNESS:  Yeah, I --
18     MR. MALONE:  -- and to the extent the attorney-client
19  privilege is invoked.
20     THE WITNESS:  Yeah.
21     MR. MALONE:  You may answer.
22     THE WITNESS:  I handled documents in terms of what the
23  attorneys have asked me to do.
24  BY MR. SAFARIAN:
25     Q   Can you tell me precisely what you did in that

145

1  regard?
2      MR. MALONE:  Same objections.
3  BY MR. SAFARIAN:
4      Q   Did you photocopy something?  Did you scan
5  something?  Did you text something?
6      A   No.  It was all --
7      Q   Sorry?
8      A   No.  I did not text.  I did not photocopy.  I did
9  not scan.
10     Q   Okay.  Mechanically can you tell me what you did?
11     MR. MALONE:  Same objections and vague.
12     THE WITNESS:  I can say for sure that our board and
13  myself, whatever documents that were required, we gave to
14  our attorneys.
15  BY MR. SAFARIAN:
16     Q   I understand, but I want to know what you did to
17  search for the documents.
18     MR. MALONE:  Misstates prior testimony, lacks
19  foundation, asked and answered.
20     THE WITNESS:  The documents are the board documents.
21  That's, you know, that's all I got.
22  BY MR. SAFARIAN:
23     Q   I know, Ms. Corbett, but I want to know what Beth
24  Corbett did.  So if Beth Corbett did nothing and someone
25  else on the board did and you felt that was sufficient,

146

1  that's okay.  I just want to know what you did or didn't
2  do.  So my question is, what did you do, not the board,
3  not your colleagues, what did you, Beth Corbett, do to
4  search for and produce documents that we asked for?
5      MR. MALONE:  Same objections.
6      THE WITNESS:  That you asked for or my attorneys asked
7  for?
8  BY MR. SAFARIAN:
9      Q   My office served requests for production of
10  documents.  My question is, what did you, Beth Corbett, do
11  personally, not your colleagues on the board, but you, to
12  ensure compliance with those requests?
13     MR. MALONE:  Same objections.
14     THE WITNESS:  Yeah, I gave documents, what was ever
15  required, to my attorneys, whatever they needed.
16  BY MR. SAFARIAN:
17     Q   How -- go ahead.
18     A   No, no.  Go on.
19     Q   Okay.  I thought I cut you off.  I want to know
20  the procedure you followed to search for documents.
21     MR. MALONE:  Same objections.
22     THE WITNESS:  I don't know if I searched for
23  documents.  I probably gave them board documents.  I don't
24  recall, but I know I didn't text, scan, or photocopy or
25  whatever documents.  I don't think they were -- I think

147

1  the attorneys have the board documents.
2  BY MR. SAFARIAN:
3      Q   Did you drive over to Mr. Roseman's office and
4  hand him the documents?  Did you FedEx the documents?  I'm
5  just looking for mechanics on how the documents went from
6  your hands, if they were ever in your hands, to the
7  lawyers.
8      MR. MALONE:  Asked and answered and vague, calls for a
9  narrative, and the attorney-client privilege objection
10  stands.
11     THE WITNESS:  Yeah, I gave whatever my attorneys
12  needed.
13  BY MR. SAFARIAN:
14     Q   Okay.  Ms. Corbett, I think the concern I'm
15  having, and part of the reason why this deposition has
16  been difficult, is I just don't know if it's a
17  communication issue and I'm not being clear, but I'll try
18  to clarify it.  I know you gave documents, or you said you
19  gave documents to your attorneys.  I respect that.  My
20  question is, mechanically how did that happen?  Did you
21  drive over and hand it to them?  Did you -- did they come
22  to your house and pick them up?  Was there a courier
23  involved?  That's what I'm trying to find out.
24     A   No.
25     MR. MALONE:  Same objections, and it lacks foundation.

148

BY MR. SAFARIAN:

Q   So tell me how you gave the documents, please.

MR. MALONE:  Calls for a -- same objections and calls for a narrative.

THE WITNESS:  Yeah, I mean, if I can recall, whatever our attorneys needed, we gave to them probably over e-mail during a pandemic, probably just the board minutes, the board documents.  That's all I have.  I don't have any other private e-mails or texts or anything.  I have board documents that were given to the attorneys.

MR. SAFARIAN:  I think I'm still not getting an answer, and I'm really not trying to be difficult.

THE WITNESS:  That's the best I can do.  I'm sorry.

BY MR. SAFARIAN:

Q   Did you send the e-mails?

A   I would have to check.

Q   Do you have any independent recollection of you causing any documents to be transferred to counsel, such as by e-mail, FedEx, courier, messenger, or any other way?  Do you have any independent recollection of you actually transmitting documents in any way to counsel?

MR. MALONE:  Same objections.

THE WITNESS:  I would have to check.  Again, during a pandemic, I would have to check.

///

149

BY MR. SAFARIAN:

Q   Prior to coming here today, before this deposition, did you do any investigation or looked at whether you sent your lawyers any documents?

MR. MALONE:  Vague and the previously stated objections.

MR. SAFARIAN:  Sorry?  I don't know if I got an answer.

THE WITNESS:  I don't know what that means.

MR. MALONE:  It lacks foundation.

BY MR. SAFARIAN:

Q   In other words, did you go back and look at your e-mails to see if you had documents or that you transmitted e-mails to Mr. Malone or anybody else?  Did you look up whether you had prepared any letters in your file materials transmitting letters?  Did you do anything to refresh your memory as to whether you sent documents?

MR. MALONE:  Same objections, vague, calls for a narrative.

THE WITNESS:  I didn't refresh anything, but I can tell you, the board provided documents to our attorney.  How that -- I'm not certain.

BY MR. SAFARIAN:

Q   I know that.  I'm just asking -- it's a simple question, and I'm not trying to be argumentative.  I just

150

want to break through.  It's just a yes or no.  Prior to today's deposition, did you go back and look to see whether you have any indication in the form of e-mails or other writings that you personally transmitted the documents?

A   I have to check.

Q   Okay.  I know you have to check.  My question is, did you do that before today's deposition?

A   I don't think so.

Q   Okay.  That's all I wanted.  This is not a trick question.  I'm not trying to trick you.  I'm really trying to just get through this.

Do you know how much insurance coverage the HOA has?

MR. MALONE:  Relevance.

THE WITNESS:  Not off the top of my head, I don't.

MR. SAFARIAN:  Sorry?

THE WITNESS:  Not off the top of my head, I don't.

MR. SAFARIAN:  Okay.  Well, it's relevant because we are seeking relief -- it's a 4.1 question, so it's automatically discoverable.  Second, with regard to our answer, we're actually seeking fees and costs back against the association.  So it's certainly relevant.

Q   So my question is, first of all, do you know if there's a primary and an umbrella or just a primary?

151

MR. MALONE:  Lacks foundation, calls for speculation, calls for a narrative.

THE WITNESS:  I'm speculating.

BY MR. SAFARIAN:

Q   Have you ever been involved in reviewing the HOA's insurance coverage to determine whether it is adequate?

MR. MALONE:  Same objections and the relevance objection.

THE WITNESS:  I know that I've been exposed to documents discussed with board members, but I can't tell you the specifics.

BY MR. SAFARIAN:

Q   Do you know who the HOA's insurance carrier is?

MR. MALONE:  Asked and answered, calls for speculation, vague.

THE WITNESS:  I think it's Prendiville.

BY MR. SAFARIAN:

Q   Do you know if there's an insurance broker you work with, you, the board?

MR. MALONE:  Same objections.

THE WITNESS:  Yeah, I don't remember.

BY MR. SAFARIAN:

Q   All right.  You were asked to produce today insurance policies.  In response to this request, did you

152

1 locate any insurance policies or declarations for
2 production?
3 MR. MALONE:  Asked and answered as to all the document
4 requests.
5 THE WITNESS:  Yeah, I've given the attorneys, and the
6 board, we have given the attorneys all of that
7 information.
8 BY MR. SAFARIAN:
9 Q   Okay.  Did you give the attorneys insurance
10 policies and declarations pages?
11 MR. MALONE:  It's vague, it's ambiguous, asked and
12 answered, lacks foundation.
13 THE WITNESS:  Yeah, we, the board, gave the documents
14 over.
15 BY MR. SAFARIAN:
16 Q   My question's specific.  I know you gave
17 documents over.  You've told me that, and I appreciate you
18 telling me that.  My question is, did you turn over to the
19 HOA insurance policies and declarations?
20 MR. MALONE:  It's vague.  I think you misspoke.  You
21 said, did you turn over to the HOA?
22 MR. SAFARIAN:  Sorry, thank you.  Let me rephrase the
23 question.
24 Q   Ms. Corbett, did you turn over to counsel the
25 insurance policies and declarations?

153

1 MR. MALONE:  Vague, calls for speculation, lacks
2 foundation.
3 THE WITNESS:  I believe so.
4 BY MR. SAFARIAN:
5 Q   Thank you.  Do you independently recall that
6 being done?
7 A   I believe so.
8 MR. SAFARIAN:  Is the answer, "I believe so"?
9 THE WITNESS:  Yes.
10 MR. SAFARIAN:  Thank you.
11 THE REPORTER:  What was the objection?
12 MR. MALONE:  The same objections as before, vague,
13 lacks foundation, calls for speculation.  There might have
14 been one more.
15 BY MR. SAFARIAN:
16 Q   Okay.  I'm showing you request Numbers 9 through
17 14 here.  Just scan them with your eyes.  I want to know,
18 have you seen these requests before?
19 A   Yes.
20 MR. MALONE:  Asked and answered.
21 BY MR. SAFARIAN:
22 Q   Okay.  Same with 15 through 20, you've seen these
23 requests before?
24 A   You're going to have to give me a second.
25 MR. MALONE:  Same objection.

154

1 MR. SAFARIAN:  I'm not rushing you.  Take your time.
2 THE WITNESS:  Yes.  I believe those documents were
3 turned over.
4 BY MR. SAFARIAN:
5 Q   Okay.  My question is, have you seen request 15
6 through 20?
7 A   Yes.
8 Q   The same thing with -- I'll shrink the screen.
9 Can you see that?  Are you on a large enough screen to see
10 all the text that's up here clearly?
11 A   Most of it.
12 Q   Okay.  Let me zoom in then.
13 I've now zoomed in requests 21 through 25.  Do
14 you see that?
15 A   Yes.
16 Q   Please take a look and confirm for me whether
17 you've seen these requests before.
18 A   Yes.
19 Q   And have you turned over all responsive documents
20 that you are aware that exist in response to these
21 requests?
22 MR. MALONE:  Asked and answered.
23 THE WITNESS:  Yes.
24 BY MR. SAFARIAN:
25 Q   Thank you.  Now I'm going to scroll down to

155

1 Number 26 through 31 and ask you the same question.  Have
2 you turned over all responsive documents you have in
3 response to Numbers 26 through 31?
4 A   Yes.
5 MR. MALONE:  Asked and answered.
6 Take a beat, Beth, please.
7 BY MR. SAFARIAN:
8 Q   Number 31 is, "All documents evidencing any
9 investigation you performed of Garnik Hakobyan's
10 disability."  Is it a fair statement that you're unaware
11 of any such documents?
12 MR. MALONE:  Misstates prior testimony, lacks
13 foundation, asked and answered.
14 THE WITNESS:  Yeah, you asked me if I investigated.
15 I'm saying that all these documents were handed over to
16 the attorney that the board has done.
17 BY MR. SAFARIAN:
18 Q   Are you aware of the board conducting any
19 investigation regarding Garnik Hakobyan's disability?
20 MR. MALONE:  It's been asked and answered multiple
21 times.
22 THE WITNESS:  Yeah, I don't know if the board has done
23 that.
24 BY MR. SAFARIAN:
25 Q   And you have not seen any documents indicating

156

1  that the board has investigated Garnik's disability;
2  correct?
3      MR. MALONE:  It lacks foundation, it's been asked and
4  answered multiple times, and it's harassing.
5      MR. SAFARIAN:  You can answer, please.
6      MS. WRIGHTEN:  So, I'm sorry, I have to add, just to
7  protect the record and my client, that this is egregious
8  harassment at this point, Mr. Safarian.  It's almost 1:30,
9  and you are literally asking the same question that you
10  asked between 9:30 and 10:00 o'clock this morning.
11      MR. SAFARIAN:  Have you made your record?
12      MS. WRIGHTEN:  Yes.  She's not going to answer those
13  again.
14      MR. SAFARIAN:  Okay.  My question is specifically with
15  regard to request Number 31.  I haven't referenced 31
16  again.  And, Ms. Wrighten, you're not in a position to
17  instruct the witness not to answer.  But let's do this.
18  Let me stop the deposition and have the witness come back
19  after I get a court order on request 31, if that's what
20  you prefer.
21      MS. WRIGHTEN:  Yeah, you didn't ask her.  Just the
22  court reporter can read it back.  We've all been clear
23  that we are here for you to ask questions and get this
24  over with.  You didn't ask about documents.  You asked
25  about an investigation and whether they had conducted an

157

1  investigation.  She said earlier she didn't know.  You
2  asked her again, and you're going to keep asking her again
3  until you get the answer that you want.  And that's the
4  problem.  You didn't ask her a question about the
5  document, which it's fine, because she has told you over
6  and over again that she and the board provided all of
7  their documents.
8      And if you're going to walk through this, that's
9  fine.  You're absolutely allowed to walk through this to
10  make sure that she did that.  But you cannot ask her
11  substantive questions that you asked her earlier today.
12      MR. SAFARIAN:  I can.  But you can make your
13  objections.  I will say that I came back with a very soft
14  tone after lunch break in hopes that we can get along and
15  get along politely.  I think even Mr. Malone would suggest
16  or agree, I haven't raised my voice, I haven't come back
17  aggressively, I've been speaking in a muted tone trying to
18  methodically get through this process, to which,
19  Ms. Wrighten, you interrupted by raising your voice and,
20  again, trying to engage in exactly why we took the break,
21  a form of hostility that I didn't need.
22      I'm not going to respond in kind.  I'm just going
23  to proceed to ask the questions.  If you do it again, I am
24  going to suspend the deposition and require the witness to
25  come back, because I won't continue to work under these

158

1  circumstances.  It's not fair to me.
2      MS. WRIGHTEN:  Your patronizing tone has been exactly
3  the same the whole time.  It is so condescending and so
4  dismissive.  You added misogynist, but thank you for that.
5  This is the same thing that you have been doing the entire
6  time.  So if the court has to play the entire video to get
7  the sense that you've been doing exactly the same thing,
8  that's fine.  But I'm going to make a record.  Every time
9  you talk about how innocent you are, Mr. Safarian, I'm
10  going to make sure to underscore that here are parts that
11  every single time the witness has felt uncomfortable, she
12  has told you that, that Mr. Malone has noted over and over
13  again harassing objections.  And every time you take a
14  shot at me, I'm not going to let you.  So that's what I'm
15  doing.  I'm preserving the record.
16      And, no, I didn't come back hostile either.  I
17  actually had a really nice time over lunch.  And then when
18  I come and tell you something that I'm saying, hey, I
19  think that you're asking a substantive question, and then
20  you're going to take a dig the me again, if you could take
21  two seconds to actually respect me, then we wouldn't be
22  here.  But you keep not doing that, and that's fine.  I'll
23  keep making a record to say that you keep disrespecting
24  me.  That's fine.  I'll do it all day.
25      MR. SAFARIAN:  Thank you, Ms. Wrighten.  Thankfully we

159

1  have a video.  Again, I will speak to you in a polite
2  tone.  You've again taken the opportunity to raise your
3  voice at me.  I'd like to go back and finish my
4  examination.  You've made your record.  Is that okay with
5  you?
6      MS. WRIGHTEN:  Yeah.  I'm going to call the tone
7  patronizing, condescending, and sexist and disrespectful
8  and dismissive.  Now I'm done.
9      MR. SAFARIAN:  Okay.  Then I can proceed.  Is that
10  okay with you?
11      MS. WRIGHTEN:  Yeah, as long as you're going to ask
12  new questions, you can proceed.
13      MR. SAFARIAN:  Well, I don't think you have the
14  position to tell me one way or another what to do, because
15  you are only to be observing.  And again, you are here
16  because we gave you the courtesy of this notice.  And you
17  obstructed this proceeding, unfortunately, and have made
18  it last three times as long and made it far more -- than
19  it needed to be, but I will proceed.
20      MS. WRIGHTEN:  I'm not asking the same questions.  You
21  are.  I didn't object.  I didn't say anything.
22      MR. SAFARIAN:  Okay.  This deposition is suspended.
23      MS. WRIGHTEN:  Yeah, okay.
24      MR. SAFARIAN:  Thank you.  I'm going to move for an
25  order compelling -- a protective order restricting

160

1  Ms. Wrighten's behavior.  This is just totally out of
2  bounds.  I just want to proceed.  There have been
3  incessant personal attacks.  There's no reason for any of
4  this.  I shouldn't have to work under these circumstances.
5  I just have basic questions to ask.  We will leave the
6  deposition open, come back with session 2.
7          It's unfortunate, because I wanted to get
8  Ms. Corbett out of here.  I don't want to bring her back
9  again, but, Ms. Wrighten, you're making this impossible.
10  I have minimal time left.  But you seem to be interested
11  in only having a confrontation.  I did want to finish
12  this.
13          Now you're laughing out loud.
14      MS. WRIGHTEN:  Because it's 1:30.  Yes, I am going to
15  interrupt you because of what you're saying is absolutely,
16  completely belied by the fact that it's 1:30 in the
17  afternoon.  I actually haven't said anything.  Mr. Malone
18  has been objecting the entire time.  I actually tried to
19  come on the record to either underscore something that the
20  witness, my client, has said or to try to draw you in to
21  make a record and say, hey, you didn't make a record about
22  what you're not getting from this witness, you're going to
23  need to do that for your motion to compel.  Oh, and then
24  you go, oh, right, I'm going to do that, so I'll ask some
25  more questions.  So you're welcome that I keep reminding

161

1  you what you need to do for this thing that you keep
2  trying to seek.
3          We're here.  It's 1:30.  She is a teacher.  She
4  has taken the day off.  She doesn't want to come back.
5  And you keep disrespecting me and the witness, and I'm not
6  going to let you do that.  And so woe is you,
7  Mr. Safarian, for feeling so bad today.  Like that, how
8  you turn that around, makes it -- underscores everything
9  that you keep doing to us as women.  But you're not
10  getting it.  It's fine.
11          I am going to make the record that it's 1:30.
12  You're asking substantive questions that you asked three
13  hours ago.  She's told you that we've given -- that she
14  and the board have given you all the documents that they
15  have.  She doesn't have anything else.  And yet you keep
16  walking through this.  So you're allowed to go.  We're
17  going to terminate it.  It's fine, because I'm in favor of
18  that, because you're asking the same questions.  So go
19  ahead.
20      MR. SAFARIAN:  Okay.  This confirms --
21      MS. WRIGHTEN:  If you want to make a record of what
22  you don't have, then that's fine.  If you want to say that
23  I'm obstructing you from getting something else, because,
24  again, I'm making it so hard for you by not saying
25  anything except when you're out of line, that's fine.  But

162

1  what I'm asking you to do is tell us.  Tell us what it is,
2  Mr. Safarian, new, substantive, related to this case that
3  you would like to ask her about, and we'll stay here for
4  that, because she's taken the day off for it.  If you
5  don't have anything new, then, no, we're not going to let
6  you harass her or disrespect me anymore.  We're fine.
7      MR. SAFARIAN:  Okay.  So you're suspending the
8  deposition.
9      MS. WRIGHTEN:  No.  I said the opposite.
10      MR. SAFARIAN:  Thank you for suspending the
11  deposition.
12      MS. WRIGHTEN:  I didn't say that.  It's amazing to me.
13  It's amazing to me that you try -- okay.
14          Okay.  He's gone.  I guess Mr. Safarian has
15  turned off his video.  I don't know what he's going to do
16  now, because that would mean that we're still going to be
17  on the record.  So we'll just stay here on the record
18  until he decides he's going to come back.
19          Madam court reporter, am I mistaken?  Did he say
20  he was going off the record before he left?
21      THE REPORTER:  No.
22      MS. WRIGHTEN:  Okay.  So I think we'll stay here until
23  he either comes back -- I say we, you know, give him ten
24  minutes to cool off.  If at 1:45, because, again, his --
25  there are two icons for the Safarian -- one for The

163

1  Safarian Firm and one for Harry Safarian that are still on
2  the Zoom.  His document is still on the Zoom, so --
3      MR. MALONE:  Are the other, everybody's -- sorry,
4  we're in this type of view.  I can't see everybody at
5  once.  But I guess the other attorneys at that office are
6  also off?
7      MS. WRIGHTEN:  No.  Yeah, they're just muted.  Is it
8  Pierro.
9      MR. MALONE:  Yes?
10      MS. WRIGHTEN:  And Pasha, they're still on -- oh, no,
11  that's the videographer.
12      MR. MALONE:  It's Pierro and --
13      MS. WRIGHTEN:  Tina.
14      MR. MALONE:  I don't believe she's on anymore -- oh,
15  yeah, she is.
16      MS. WRIGHTEN:  Yeah, they're just -- their videos are
17  off and they're muted.  But they're still on the Zoom.
18  They haven't left the Zoom.  So again, he didn't go off
19  the record.  They're still on the Zoom.  We're, you know,
20  clearly here willing to answer questions so that
21  Ms. Corbett doesn't have to take another day off.  So,
22  again, let's give him ten minutes, we stay right here, so
23  that, you know, if he comes back and has some more
24  questions, he can ask them.
25      MR. MALONE:  I would just add for the record that if

164

1    Mr. Safarian or his colleagues do not return within a
2    reasonable period of time here, we have no obligation to
3    sit and wait. So we are sitting and waiting out of
4    courtesy in an effort to complete this deposition. But if
5    Mr. Safarian does not return and we log off after an
6    extended period of time, I reserve the right to oppose any
7    and all efforts to compel Ms. Corbett to sit for a further
8    volume of this deposition.
9        MR. SAFARIAN: Are you done?
10       MR. MALONE: Yes, I am done. I was just reserving a
11   right on the record.
12       MR. SAFARIAN: Before I discuss this with the witness,
13   and before you tell me that I badgered her, and before you
14   tell me that she's answered the question, can you reframe
15   for me and remind me what the witness's response was as
16   far as what she did to search for documents personally?
17       MR. MALONE: I'm not testifying, Mr. Safarian.
18       MR. SAFARIAN: Then I'm going to go back and ask the
19   question, because I don't think that was ever answered.
20   And if you want me to not ask the question or you think
21   it's been asked, maybe you can help me.
22       Let's go back -- I guess we are on the record.
23   Q   Ms. Corbett, personally what did you do to look
24   for documents in this case?
25       MR. MALONE: Asked and answered, harassing.

165

1        THE WITNESS: What did I do?
2        MR. MALONE: And attorney-client privilege to the
3    extent that that applies.
4        THE WITNESS: I gave my documents to the attorney.
5    BY MR. SAFARIAN:
6    Q   Specifically what documents did you hand over?
7    A   Whatever documents were required.
8    Q   What documents were those?
9        MR. MALONE: Asked and answered, calls for
10   speculation, harassing, attorney-client privilege.
11   BY MR. SAFARIAN:
12   Q   You may answer. What documents did you hand to
13   your attorneys?
14   A   Whatever documents they requested.
15   Q   I understand that, but you're evading my
16   question. My question is, what documents did you hand
17   over? I need specific answers. Did you hand over a
18   letter with a specific date from a particular author? Did
19   you hand over a photograph? Did you hand over a video?
20   Did you hand over an insurance policy? What specific
21   documents did you search for and hand to your attorney,
22   please.
23       MR. MALONE: All of the foregoing are same objections
24   and lacks foundation.
25       MR. SAFARIAN: Please answer the question,

166

1    Ms. Corbett.
2        THE WITNESS: There are so many documents here, that
3    whatever was required in the last however amount of time,
4    I have given to my attorneys.
5    BY MR. SAFARIAN:
6    Q   I want to know if you can name one document by a
7    specific category that you've given your attorneys.
8        MR. MALONE: Same objections.
9        THE WITNESS: Again, like as a board, we gave all this
10   information you're talking about. Insurance, I gave
11   insurance documents to the board. I gave insurance
12   documents. I don't know who specifically gave it in the
13   board, but I do know that we handed over all required
14   documents.
15   BY MR. SAFARIAN:
16   Q   And you said "we," and I want to draw a
17   delineation. I'm not looking for what the board gave.
18   I'm looking for what Beth Corbett turned over. So what
19   specific documents, if any, did you turn over?
20       MR. MALONE: Harassing, same objections.
21       MR. SAFARIAN: If you can't recall, please just tell
22   me that you can't recall. If you can, just please tell me
23   what they are.
24       THE WITNESS: I can't recall.
25   ///

167

1    BY MR. SAFARIAN:
2    Q   Okay, thank you. As you sit here now, just to be
3    clear and close the loop, can you independently recall a
4    specific document that you turned over, whether it was a
5    particular photograph, a letter, anything?
6        MR. MALONE: Asked and answered so many times.
7        THE WITNESS: I can't recall.
8    BY MR. SAFARIAN:
9    Q   Okay, thank you. One of the documents I asked
10   for, and I was focusing on Number 31, was all documents
11   evidencing any investigation you performed regarding
12   Garnik Hakobyan's disability. Is it a fair statement that
13   in the board's search, no documents responsive to that
14   request were located?
15       MR. MALONE: Lacks foundation, misstates prior
16   testimony, asked and answered.
17       THE WITNESS: Yeah, I don't recall.
18   BY MR. SAFARIAN:
19   Q   Number 32 is documents evidencing any
20   communication with any other board member regarding the
21   instant lawsuit. Have you texted with any board members
22   regarding this lawsuit?
23   A   No.
24   Q   Have you e-mailed with board members regarding
25   the lawsuit?

168

1      MR. MALONE:  Attorney-client privilege to the extent
2    that Ms. Corbett was on any e-mail communications with
3    counsel and other board members.
4      MR. SAFARIAN:  You may answer, please.
5      THE WITNESS:  I've communicated with board members
6    with our attorneys.
7    BY MR. SAFARIAN:
8      Q    Outside of counsel being on the e-mails or e-mail
9    threads, did you have e-mail communications with board
10   members regarding the lawsuit?
11     MR. MALONE:  It's been asked and answered.
12     THE WITNESS:  I don't believe so.
13     MR. SAFARIAN:  Thank you.
14     Q    Outside of communication -- well, I guess this
15   wouldn't be protected, because it would involve a third
16   party.  But do you have any documents evidencing any
17   communications with any homeowner at the HOA regarding
18   this lawsuit?
19     MR. MALONE:  Same objections.
20     THE WITNESS:  Yeah, I don't believe so.
21     MR. SAFARIAN:  Thank you.
22     Okay.  I'm going to take two minutes and look at
23   my notes, just to see if I have any follow-up.  Hopefully
24   I'm done.  Thank you.  We can go off the record.
25     THE VIDEOGRAPHER:  Going off the record at 1:42.

169

1      (Recess held.)
2      THE VIDEOGRAPHER:  Going back on the record at 1:44.
3    BY MR. SAFARIAN:
4      Q    Ms. Corbett, as a board member, are you aware
5    that there were certain limitations placed universally on
6    HOA resident access cards due to COVID?
7      MR. MALONE:  Calls for speculation, vague.
8      THE WITNESS:  Can you restate that, please,
9    limitations on cards?
10   BY MR. SAFARIAN:
11     Q    So we have these access cards that the residents
12   have; correct?
13     A    Yes.
14     Q    And these access cards allow people to come in
15   and out of the gated community; correct?
16     A    Yes.
17     Q    That includes the main entrance.  For example, if
18   I wanted to walk out as a pedestrian and walk back in, I'd
19   need my access card; correct?
20     A    Yes.
21     MR. MALONE:  Incomplete hypothetical.
22     Take a beat, Beth.
23   BY MR. SAFARIAN:
24     Q    If I wanted to go use the swimming pool or other
25   common area facility, I'd need my access card; correct?

170

1      MR. MALONE:  Incomplete hypothetical.
2      THE WITNESS:  In normal times, yes.
3    BY MR. SAFARIAN:
4      Q    And currently are these cards, are the access
5    cards restricted for the community in general in any
6    respect?
7      MR. MALONE:  Vague, calls for speculation, lacks
8    foundation.
9      THE WITNESS:  During COVID, you couldn't access the
10   common area during COVID, as far as I remember.
11   BY MR. SAFARIAN:
12     Q    Sorry, what are the dates?
13     MR. MALONE:  Calls for speculation.
14     THE WITNESS:  It's a blur.
15   BY MR. SAFARIAN:
16     Q    What are the dates where the access cards were
17   limited during COVID?
18     MR. MALONE:  Lacks foundation.
19     THE WITNESS:  Yeah, it was during -- I don't know the
20   dates.  I don't know the dates.
21   BY MR. SAFARIAN:
22     Q    Can you approximate, please.
23     A    I can tell you it was under the COVID umbrella
24   when it was really intense and there was a Department of
25   Public Health no swimming pools, not allowed in there, and

171

1    that's when we restricted access to the pool.
2      Q    5/20/21 was the access -- was it just the pool
3    that the access was restricted to?
4      MR. MALONE:  Calls for speculation.
5      THE WITNESS:  I don't remember.  It may have been the
6    whole -- the pool is just one giant area.
7    BY MR. SAFARIAN:
8      Q    Aside from the pool, do you have any independent
9    recollection of access, of HOA community cards being
10   limited in any way during COVID?
11     MR. MALONE:  Same objection, calls for speculation.
12     THE WITNESS:  Not unless you were found -- you had a
13   reason not to be, you had a reason to be restricted.
14   Everybody else during the COVID time were not allowed in
15   the pool area.  That includes the Jacuzzi, the playground
16   area, the barbecue area.  No one was allowed in there
17   during COVID.  I can't remember the dates on that, but
18   that was the worst part of COVID.
19   BY MR. SAFARIAN:
20     Q    Okay.  And was that approximately six months,
21   three months?
22     MR. MALONE:  Asked and answered, lacks foundation.
23     THE WITNESS:  Yeah, I can't remember, whenever COVID
24   was at its worst.
25     ///

172

BY MR. SAFARIAN:

1  BY MR. SAFARIAN:
2      Q   Are you aware that my client's access cards were
3  activated after all the other HOA residents' access cards
4  were activated?
5      MR. MALONE:  Lacks foundation, assumes facts not in
6  evidence.
7  BY MR. SAFARIAN:
8      Q   Let me be more specific.  Are you aware that at
9  some point after the COVID deactivation, the cards were
10 activated for all the community except my clients?
11     MR. MALONE:  Lacks foundation, asked and answered.
12     THE WITNESS:  Yeah, I believe that was not the case.
13 BY MR. SAFARIAN:
14     Q   What's that belief based upon?
15     A   That everyone's card was working after COVID was
16 lifted.
17     Q   You've testified earlier that my clients' cards
18 were not activated because there was an issue with a fine.
19 Do you recall that?
20     MR. MALONE:  Misstates prior testimony.
21     Please take a beat, Beth.
22     Misstates prior testimony, lacks foundation.
23     THE WITNESS:  Unless there was either something
24 pending, I know what happened was after COVID became open
25 and there may have been some issues with everyone's card

173

1  unique question.  Suggesting a response violates the code.
2      MR. MALONE:  I just said what her response was,
3  Mr. Safarian.
4      MR. SAFARIAN:  I don't need you to say what her
5  response is.
6      MR. MALONE:  Let's have the reporter read back the
7  last two prior questions.
8      MR. SAFARIAN:  I don't need that.  I'm just going to
9  have the last question read back.  Please don't interfere.
10     MR. MALONE:  Please have the last two questions read
11 back.
12     MR. SAFARIAN:  No.  I don't want to remind the witness
13 of testimony.  I don't want to go back and coach.  You're
14 coaching.  I want to --
15     MR. MALONE:  I'm asking the reporter to read the last
16 two questions.
17     MR. SAFARIAN:  I don't need the last two questions
18 read back.  I need the last question read back.
19     MR. MALONE:  I do, because you --
20     MR. SAFARIAN:  We're going to suspend it.  Thank you
21 very much, everybody.  This concludes the deposition.
22 We'll come back for a second session.
23     MR. MALONE:  This is the seventh time you've done this
24 today.
25     MR. SAFARIAN:  We're done.  This is the final --

175

1  working correctly, or the homeowner may not have had the
2  right card, something, something went on that there may
3  have been a hiccup for like a couple of days.  But overall
4  most people's were on unless there was an issue.
5  BY MR. SAFARIAN:
6      Q   Are you aware that my clients' cards were not
7  active for many months after the cards of the remaining
8  HOA community were activated following the lockdown?
9      MR. MALONE:  Asked and answered, lacks foundation,
10 calls for speculation, and harassing.
11     THE WITNESS:  Yeah, I'm not certain about that.
12 BY MR. SAFARIAN:
13     Q   Do you know one way or the other whether my
14 clients' access cards were reactivated months after the
15 remainder of the HOA community?
16     MR. MALONE:  Same objections.  She's answered the
17 question.  She said she was not certain.
18     MR. SAFARIAN:  Please don't make speaking objections
19 or suggest a response, Mr. Malone.  I'm trying to wrap
20 this up.  Please don't suggest a response.
21     MR. MALONE:  Mr. Safarian, please, you're asking the
22 same question over and over again.
23     MR. SAFARIAN:  Mr. Malone, I'm not asking the same
24 question.  I'm trying to get a deposition done, and the
25 interference is really impossible.  It's a specific,

174

1      MS. WRIGHTEN:  Then we can terminate the -- thank you.
2  We'll terminate it.  Ms. Corbett is done providing her
3  testimony to you.  She's not going to be taking another
4  day off.
5      MR. SAFARIAN:  That's up to the court.
6      MS. WRIGHTEN:  Okay.
7      MR. SAFARIAN:  That's up to the court.  Mr. Malone
8  continues to make speaking objections.
9      MS. WRIGHTEN:  He did not.
10     MR. SAFARIAN:  It's not up to you, Ms. Wrighten, to
11 play referee here.  You're here to observe, period.  If
12 you think it's misogynistic of me to qualify you as being
13 here to observe, that's up to you.  You've called me every
14 name in the book.  I'm done with it.
15     MR. MALONE:  I asked the reporter to read back the
16 last two questions.
17     MR. SAFARIAN:  I don't need that, because you're
18 hinting to the witness how to respond to a question.
19     MR. MALONE:  No, I'm not.
20     MR. SAFARIAN:  I'm done.  I'm done.  This deposition's
21 over.
22     MR. MALONE:  I'm just justifying my objection as asked
23 and answered.  That's all I was doing.
24     MR. SAFARIAN:  You've done what you had to do.  Okay.
25 I tried.  I've tried again.  I've tried and tried and

176

1 tried again, but you two have ganged up on me
2 relentlessly.  The witness is not responsive.
3     This is not humerus to me, Ms. Wrighten.  This is
4 unacceptable.
5     MS. WRIGHTEN:  It's not.  The only thing that I -- you
6 keep putting that on the record when you know that I find
7 what you say to be so egregious that all I can do is
8 laugh.  So if you want me to continue to put on the record
9 what you're actually doing --
10     MR. SAFARIAN:  Why don't we just suspend this.  We're
11 done.
12     MS. WRIGHTEN:  No, we're terminating it.  You have a
13 choice.
14     MR. SAFARIAN:  You have terminated it, Ms. Wrighten.
15 You said, we are terminating it.  Congratulations.  You
16 came in from another case.  You're not even part of this,
17 and you have terminated --
18     MS. WRIGHTEN:  She's my client.
19     MR. SAFARIAN:  Okay.  Then you have terminated the
20 deposition.
21     MS. WRIGHTEN:  Respect that.  Respect it.
22     MR. SAFARIAN:  You have --
23     MS. WRIGHTEN:  Yes, we said you can have today to ask
24 her question.
25     MR. SAFARIAN:  Thank you.  We're done.

177

1     MS. WRIGHTEN:  If you are not going to take that up,
2 and you're not even going to listen to me, you're so --
3     MR. SAFARIAN:  We're done.
4     MS. WRIGHTEN:  Thank you for continuing to prove my
5 point.  No, go ahead.  Walk away when I'm talking.
6     MR. SAFARIAN:  Your personal attacks --
7     MS. WRIGHTEN:  Talk over me.  Continue to do it.
8 Thank you for proving my point.
9     Yes, my witness will not be produced again.  My
10 client will not be produced again.  That's what we're
11 saying.  We're all going to agree with that because you're
12 getting into --
13     MR. SAFARIAN:  That's up to the court.
14     MS. WRIGHTEN:  -- things you've asked already.
15     MR. SAFARIAN:  That's up to the court.
16     MS. WRIGHTEN:  You just want to --
17     MR. SAFARIAN:  We also have the federal lawsuit in
18 which I intend to depose her a second time, because
19 there's certain areas I did not get into today.  So, yes,
20 she will be deposed again.
21     MS. WRIGHTEN:  Not in this case.
22     MR. SAFARIAN:  That doesn't matter.  She will be
23 deposed again.  And now I was hoping to finish this one
24 and not have her come back, but --
25     MS. WRIGHTEN:  Are you suggesting that you were trying

178

1 to ask her questions about the federal case in this one?
2     MR. SAFARIAN:  No, I'm not.
3     MS. WRIGHTEN:  Oh, it sounded like you did.
4     MR. SAFARIAN:  Ms. Wrighten --
5     MS. WRIGHTEN:  That's why you like, we're going to
6 bring her back.
7     MR. SAFARIAN:  We're going to have to ask her
8 questions --
9     MS. WRIGHTEN:  Because you're trying to ask her
10 questions.  Thank you for confirming, Mr. Safarian --
11     MR. SAFARIAN:  Ms. Wrighten --
12     MS. WRIGHTEN:  -- that you were crossing the line.
13 That's why I was here, to make sure that I was protecting
14 the witness for providing any type of testimony for the
15 federal case, because that's what you're trying to do.
16     MR. SAFARIAN:  Ms. Wrighten --
17     MS. WRIGHTEN:  You've said it.  It's okay.  It's okay.
18     MR. SAFARIAN:  I did not say that.
19     MS. WRIGHTEN:  You did.  You did.
20     MR. SAFARIAN:  Ms. Wrighten, you have a problem with
21 the truth, period.  I'm done with that.  It what it is.
22 Your professionalism is really embarrassing.  It's really
23 unfortunate.  But it is what it is.
24     MS. WRIGHTEN:  You know what, I can only laugh now, as
25 what you're saying becomes so much more.

179

1     MR. SAFARIAN:  Can we please just finish this,
2 Ms. Wrighten?
3     MS. WRIGHTEN:  It's not just insulting.  It's so
4 false.  It's so false.
5     MR. SAFARIAN:  Ms. Wrighten, can we just finish this,
6 because --
7     MS. WRIGHTEN:  I'm not going to have you disparage me.
8 No, you're right.  We can finish, because you don't get to
9 continue to treat me like this.
10     MR. SAFARIAN:  That's not up to me or you.  That's up
11 to the court.  That's up to the court.
12     MS. WRIGHTEN:  Oh, no, no, no.
13     MR. SAFARIAN:  Goodbye, everybody.  This deposition is
14 concluded.  Let's just go off the record, madam court
15 reporter.  It's over.  We'll come back for --
16     MS. WRIGHTEN:  No, we're not off the record yet,
17 because I haven't -- no, I haven't even ordered a
18 transcript yet.
19     MR. SAFARIAN:  You can order --
20     MS. WRIGHTEN:  You don't get to just talk over me.  So
21 I'm going to read it to you right now.
22     So I am not only a grown woman.  I am an officer
23 of the court that's licensed to practice -- there we go.
24 There we go.  You continue to insult.  I've asked you
25 earlier, like I think of the irony that you came in here

180

1    saying that you wanted her to have a good impression of
2    the law and lawyers, and yet you keep turning off your
3    screen, talking over me, and not listening to what the
4    witness is saying.  And that's fine.  You've laid the
5    record for yourself, Mr. Safarian.
6         He is gone now.  I think that means -- I don't
7    know what that means.  He's not muted.  His video is off
8    while I was talking.  Another lawyer in his firm has done
9    the same thing while I'm still talking.  And he just has
10   no respect for me, again, as a person, as a woman, or as a
11   professional.
12        MR. SAFARIAN:  You are correct about that part,
13   Ms. Wrighten.  Respect is earned, and you did not earn my
14   respect.  You've been confrontational, and you've been
15   disrespectful, you've been condescending, and you've been
16   misstating the record.  So you're correct.  I don't
17   respect you.  And that's not something you are entitled
18   to.  You earn it.
19        What you did here today was a circus act, and I
20   don't appreciate it.  The record speaks for itself.  I
21   wanted to finish this witness's deposition.  I came back
22   with a polite tone.  I've remained polite in my tone to
23   the witness.  I don't know what else to say here.  You
24   came into a deposition that I invited you to attend.  You
25   were not otherwise invited.  I invited you to attend as a

                                                        181

1    courtesy to you, and you came in here and you turned it
2    into a circus, and we have a vide that shows as much.
3         I don't want to continue to engage in this.  I
4    had a few more questions left, but there's nobody that
5    should ever have to work under these circumstances.  It is
6    what it is.  The record speaks for itself.  No, I did not
7    try to conduct a federal deposition, but I will be
8    conducting a federal deposition.  And I was hoping, hoping
9    that we could get through this peacefully and make it
10   easier for the witness, but that's not something that was
11   allowed of me today.
12        I want to wrap it up.  I want to move on.  This
13   is too hostile.  It's too unpleasant.  It's unnecessary.
14   So that concludes the deposition.  Ms. Wrighten, if you'd
15   like to make an order for the record, you're welcome to.
16        MS. WRIGHTEN:  I'd like to note that Mr. Safarian did
17   not turn on his video again.
18        MR. SAFARIAN:  Here I am.  The video is on.  I don't
19   know that it makes a difference.  I'm speaking into the
20   record, and now the video is on.  Would you like to order
21   a transcript so we can please wrap this up?
22        MS. WRIGHTEN:  I just want to keep adding the things
23   and the ways that you are disrespectful.
24        MR. SAFARIAN:  You don't have to, because there's a
25   video, Ms. Wrighten.  There's a vide, and the video

                                                        182

1    speaks --
2         MS. WRIGHTEN:  And you admitted it.  It's great.  It's
3    great.  I'm going to carry it around and send it all over
4    my firm that Harry Safarian doesn't respect Marie
5    Wrighten.  That's what's going to happen.
6         MR. SAFARIAN:  There's a lot of --
7         MS. WRIGHTEN:  I'm not really going to do that.
8         MR. SAFARIAN:  There's a lot of -- I don't respect
9    you, Ms. Wrighten.  Your is horrible.
10        MS. WRIGHTEN:  I'm not really going to do that.
11        MR. SAFARIAN:  You should.  I'm going to send it to
12   your colleagues.
13        MS. WRIGHTEN:  Okay, great.
14        MR. SAFARIAN:  I'm going to send it to your adjuster.
15        MS. WRIGHTEN:  Great.  You don't respect me.
16        MR. SAFARIAN:  I don't.
17        MS. WRIGHTEN:  This is great.  This is great.
18        MR. SAFARIAN:  My personal beef with you has nothing
19   to do with this transcript.  I'm trying to --
20        MS. WRIGHTEN:  Thank you for adding that, Harry, that
21   there's nothing personal about this I.  Don't know you at
22   all.  This is the first case that I've ever worked with
23   you on, and yet you insist from the minute -- it's like,
24   Harry, it's like just my person alone.  Let's just see
25   where this goes, Harry.  If you have a personal beef with

                                                        183

1    me and we've never met outside of this case, we've never
2    talked outside of this case, you don't let me talk, and
3    you don't think that I've earned your respect as a 29-year
4    lawyer that has been retained to defend the defendants in
5    the federal case and now appear here on behalf of my
6    client, who you're taking testimony from, then actually it
7    does say something more about you than that you're a
8    misogynist.  So I am going to hold on to this video and
9    this transcript because of what you just admitted --
10        MR. SAFARIAN:  That's fine.
11        MS. WRIGHTEN:  -- about how you are treating me.  And
12   I am going to make sure -- I'm going to make sure that I
13   at least walk into the room knowing that you are not going
14   to treat me with respect just on the basis of who I am.
15   That is what you just said.  And there's nobody in America
16   who gets to do that, Mr. Safarian.  So with that, thank
17   you very much for that admission on the record.
18        We can be professional, and I will continue to
19   represent my client and be professional.  I am imploring
20   you again to -- you don't have to personally respect me,
21   but I have earned my law degree, my law license, and my
22   title as a partner with Lewis Brisbois.  So that you do
23   need to respect.  And we will have further problems if
24   you're going to continue to say on the record that you're
25   not even going to respect that.

                                                        184

1    I would like a copy of the transcript with a
2    condensed electronic version.  I would like a copy of the
3    video.  I would like that video synced, please.  Thank
4    you.
5        MR. SAFARIAN:  I'll agree with you on this.  I'll take
6    the same order.  And please feel free to distribute it as
7    you wish, Ms. Wrighten.
8        That concludes this deposition.  Patrick, I guess
9    you're going to get the original sent to you.
10       Madam court reporter, would the -- or let me
11   rephrases that.  The original will come to me, I guess the
12   way we're doing it now.  Madam court reporter, does the
13   witness get a read-only copy?
14       THE REPORTER:  Yes.
15       MS. WRIGHTEN:  Harry, I'm going to finish this by
16   saying --
17       MR. SAFARIAN:  We're done.  You've said what you've
18   said.
19       MS. WRIGHTEN:  No, because I know what's going to
20   happen, because I know exactly.  I want to make sure that
21   there are people here that are seeing this.  You have done
22   this --
23       MR. SAFARIAN:  This is on video.
24       MS. WRIGHTEN:  You have done this from the start of
25   this case, and I'm learning now that it has nothing to do

185

with me.  It has nothing to do with what I bring to the
2    table.  It has nothing to do with what my law firm has
3    empowered me to do or what other people have hired me to
4    do.  And you continue to do that.  And you've just
5    admitted on the record that this is personal for you,
6    though we've never met.
7        And so I am just saying that I am imploring you
8    as an officer of the court, as another person, to let that
9    go and just let us do our jobs without any disparagement,
10   without any disrespect in talking over each other or
11   talking down to anyone.  I'll just say, if we could both
12   do that and manage to just preserve the record and defend
13   or prosecute on behalf of our clients, then we he can
14   proceed as we were hired to do.  And so I am happy to just
15   leave this behind us today, because it really touches on
16   so many things that I personally find so offensive, but
17   I'm going to put this behind me today, and I'm going to
18   implore you to do the same.
19       And we have more to do in both defending and
20   prosecuting on behalf of our clients.  If we can do that
21   just as lawyers who have been charged to do these things,
22   then I think that that is all that we can expect to have,
23   because we're not going to be friends.  But we can at
24   least go on with doing our jobs for our clients as we're
25   being paid to do.

186

1        MR. SAFARIAN:  Are you done?
2        MS. WRIGHTEN:  Every time you say that and don't
3    acknowledge what I say, it adds insult to injury.  I just
4    want to let you know that, that you don't even have the
5    audacity to listen to me, to respond to what I said, and
6    to even take anything to heart of what I'm saying, to even
7    say, you know, thank you for what you said, I might
8    disagree with that, no, because you're not even -- it's
9    like I don't even talk to you.
10       And you keep saying -- you kept saying things
11   like that about how I don't get to speak here.  I am not
12   sure how an officer of the court whose client is actually
13   testifying somewhere doesn't get to speak.  But you only
14   say that to me, Harry.  And so, again, thank you for
15   confirming that you completely dismiss me, even when I
16   articulate something for you and ask you for something,
17   for us to leave it here, to leave it here and to move on
18   and to treat each other as lawyers.  That's all I asked
19   you to do, and all you could say is, "Are you done?"
20       MR. SAFARIAN:  Ms. Wrighten, let me ask it
21   differently.  Are you through speaking, because I'm being
22   very conscious not to speak over you and interrupt you, as
23   you've asked me to do.
24       MS. WRIGHTEN:  Thanks, Harry.
25       MR. SAFARIAN:  Are you through speaking so that I

187

don't interrupt you?  I want to make sure you get out
2    whatever you need to so I can proceed and say what I need
3    to say.
4        MS. WRIGHTEN:  Are you through dismissing me?
5        MR. SAFARIAN:  Okay.  This is concluded.  Thank you,
6    everybody, for your time.  Everybody have a good day.
7    We've made our positions on the record clear.  Thank you
8    all.
9        MS. WRIGHTEN:  Thank you.
10       MR. SAFARIAN:  That concludes this deposition.
11   Actually, one last thing.  I think, Mr. Malone, we were
12   going to figure out how to get the transcript to your
13   client.
14       Madam court reporter --
15       THE VIDEOGRAPHER:  I'm sorry to interrupt, Counsel.
16   Am I okay to formally conclude this video deposition then,
17   if everyone's in agreement.
18       MR. SAFARIAN:  Yes.  Well, let's do this.  Let's just
19   get that part of the thing on the record.
20       Madam court reporter, do you need an e-mail
21   address for the witness or from Mr. Malone, or what do you
22   need?
23       MR. MALONE:  I will put my e-mail address in the chat,
24   and I prefer that the read-only come to me, and I will
25   provide it to Ms. Corbett.  And then for her to review and

188

1  verify, I would say two weeks would be sufficient time for
2  that, with a trial date in June.  Is that agreeable?
3      MR. SAFARIAN:  Yeah.  The trial date's in June.
4  That's agreeable.  We are and do plan on filing a summary
5  judgment motion, but I guess we'll deal with that part as
6  we deal with that part, or a summary adjudication motion.
7      I appreciate your time, Ms. Corbett.  I'm sorry
8  this deposition was unlike any I've ever attended.  I
9  certainly didn't intend it that way.  I wish you well,
10  and, you know, have a nice weekend, if you can.
11      MR. MALONE:  Just on the record, Beth, so I'm going to
12  get a transcript.  I'm going to e-mail it to you.  You'll
13  be able to review it for its accuracy and make sure that
14  the court reporter captured your answers entirely
15  accurately, make any corrections necessary, and then
16  you'll sign the transcript under penalty of perjury.  And
17  I will -- you can send it back to me, and then I will
18  provide it to Mr. Safarian, okay.  But we can discuss that
19  further.  I just want to make sure you understand, because
20  I don't think we discussed it in the beginning.
21      THE WITNESS:  I do.  And I just want to state that I
22  feel extremely unsafe and discriminated against during
23  this deposition from you, Mr. Safarian.
24      MR. SAFARIAN:  I'm sorry you feel that way.
25      Are we done?

189

---

1      THE REPORTER:  Mr. Malone, will you be ordering a copy
2  of the transcript?
3      MR. MALONE:  Not right now, but I will send you my
4  e-mail address, and if you could respond to that, I might.
5  I just have to consult with my people over here.  So I'm
6  not going to order right now, but I very well might.
7      THE VIDEOGRAPHER:  I am still on video record, Sheila.
8  I don't know if you want me to conclude.
9      THE REPORTER:  Mr. Malone, I will need your client's
10  e-mail address instead of yours.  If you're not ordering a
11  copy, I can't send you a copy.  Or she can come to our
12  office.
13      MR. MALONE:  Can I have your e-mail address, and then
14  I will e-mail you her address.
15      THE REPORTER:  That would be great.  I will put it in
16  the chat when we go off the record.
17      MR. MALONE:  Okay, wonderful, perfect.
18      THE VIDEOGRAPHER:  If we're ready to go off the
19  record, I can do so.  This concludes the video deposition
20  of Beth Corbett, Volume I, going off the record at 2:06
21  p.m.
22      (The deposition session concluded at
23      2:07 p.m.)
24      (Exhibit 2 was marked for
25      identification and is attached hereto.)

190

---

1           SIGNATURE AND ERRATA SHEET
2             (To be signed by Deponent)
3
4      I declare under penalty of perjury, under the
5  laws of the State of California, that the foregoing
6  testimony is true and correct, with the exception of the
7  following changes:
8
9  Page    Line      Description
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20
21  Executed on the___day of_____, 20__.
22
23
24                _____
25                       Beth Corbett

191

---

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2
3      I, the undersigned Certified Shorthand Reporter in and
4  for the State of California, do hereby certify:
5      That the foregoing proceedings were taken before me at
6  the time and place therein set forth, at which time the
7  witness was put under oath by me; that the testimony of
8  the witness and all objections made at the time of the
9  proceedings were recorded stenographically by me and were
10  thereafter transcribed under my direction; that the
11  foregoing is a true record of the testimony and of all
12  objections made at the time of the proceedings.
13      I further certify that I am a disinterested person and
14  am in no way interested in the outcome of said action, or
15  connected with or related to any of the parties in said
16  action, or to their respective counsel.
17      The dismantling, unsealing, or unbinding of the
18  original transcript will render the reporter's certificate
19  null and void.
20      In witness whereof, I have subscribed my name on March
21  10, 2022.
22
23
24                _____
                       SHEILA K. RUSSO
25

192

---

EXHIBIT "N"

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

ALDEA COMMUNITY ASSOCIATION, a )
California nonprofit mutual    )
benefit corporation,          )
                              )
                    Plaintiff, )
                              )
                              )
        vs                    ) No.
                              ) 19CHCV00398
                              )
TAMARA NAZARETYAN,            )
                              )
                              )
                    Defendants.)
_____)


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DALE RODIN


Date and Time:      Tuesday, March 1, 2022
                    9:01 a.m. - 1:24 p.m.

Location:           Remotely
                    (Via Videoconference)

Reported by:        Kimberly Kaldenbach
                    CSR No. 6719, RMR, CRR

Job No. 23291

1

```
 1      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2   FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE
 3
 4   ALDEA COMMUNITY ASSOCIATION, a   )
 5   California nonprofit mutual      )
     benefit corporation,            )
 6                                   )
             Plaintiff, )
 7                                   )
                                     )
 8       vs               ) No. 19CHCV00398
                                     )
 9   TAMARA NAZARETYAN,              )
                                     )
10                                   )
                                     )
11           Defendants.)
     _____)
12
13
14      Videotaped deposition of DALE RODIN taken via Zoom
15   videoconference in California, commencing at 9:01 a.m.,
16   Tuesday, March 1, 2022, before KIMBERLY KALDENBACH,
17   Certified Shorthand Reporter for the State of
18   California, Certificate Number 6719.
19
20
21
22
23
24
25
                                                          2
```

```
 1                    I N D E X
 2
 3
 4   WITNESS:  DALE RODIN
 5
 6   EXAMINATION BY                        PAGE
 7
     Mr. Safarian                          6
 8
 9
10
11
12
13
14
15
                 E X H I B I T S
16
17   EXHIBIT NO.                          PAGE
18
       (None)
19
20
21
22
23
24
25
                                                          4
```

```
 1   APPEARANCES:
 2
 3
     For Plaintiff: ROSEMAN LAW APC
 4         BY: STEVEN A. ROSEMAN, ESQ.
           BY: PATRICK MALONE, ESQ.
 5         21650 Oxnard Street, Suite 2000
           Woodland Hills, CA 91367
 6         (818) 380-6700
           roseman@roseman.law
 7
 8
     For Plaintiff: LEWIS BRISBOIS BISGAARD & SMITH, LLP
 9   (Federal)    BY: LILLIAN HARWELL, ESQ.
           633 West 5th Street, Suite 4000
10         Los Angeles, CA 90071
           (213) 250-1800
11         Lillian.Harwell@lewisbrisbois.com
12
13
     For Defendant: THE SAFARIAN FIRM, APC
14         BY:  HARRY A. SAFARIAN, ESQ.
           BY:  PIERRO H. BABAIAN, ESQ.
15         BY:  CHRISTINA KARAYAN, ESQ.
           3150 Montrose Avenue
16         Glendale, CA 91214
           (818) 334-8528
17         hs@safarianfirm.com
           pb@safarianfirm.com
18         ck@safarianfirm.com
19
20
21   Also Present:
22      Daniel Bermudez - Videographer
23
24
25
                                                          3
```

```
 1        Videotaped Deposition via Zoom Videoconference
 2           Tuesday, March 1, 2022; 9:01 a.m.
 3                    ****
 4      THE VIDEOGRAPHER:  We are now on the record.
 5   Today's date is March 1st, 2022, and the time is
 6   9:01 a.m. Pacific time.  This is the video deposition
 7   of Dale Rodin testifying in the matter of Aldea
 8   Community Association, et al. Versus Tamara Nazaretyan.
 9   The video operator is Daniel Bermudez representing
10   Elite Court Reporting.  The court reporter is
11   Kim Kaldenbach.
12        Counsel, please introduce yourself and state
13   who you represent after which the court reporter will
14   swear the deponent.
15      MR. SAFARIAN:  Roseman, why don't you and your
16   colleague go first since you are the plaintiffs.
17      MR. ROSEMAN:  Steven Roseman for Roseman Law
18   representing Plaintiff.
19      MR. MALONE:  Patrick Malone for the Plaintiff.
20      MR. SAFARIAN:  Lillian.
21      MS. HARWELL:  Lillian Harwell for the HOA in the
22   federal case.
23      MR. SAFARIAN:  Good morning, I'm Harry Safarian
24   and I'm here with colleague Tina Karayan today.  She's
25   my partner.
                                                          5
```

1    THE REPORTER:  Please raise your right hand.  In
2   the cause now pending, do you swear to tell the truth,
3   the whole truth and nothing but the truth, so help you
4   God?
5    THE WITNESS:  I do.
6
7             DALE RODIN,
8   having first been duly sworn, was examined and
9        testified as follows:
10
11            EXAMINATION
12  BY MR. SAFARIAN:
13    Q.  Good morning, Mr. Rodin, and thank you for
14  your time today.  As I mentioned off the record my name
15  is Harry Safarian and I'm a lawyer and I'm here to take
16  your deposition today.  How you are you feeling?
17    A.  Fine.
18    Q.  Very good.  Thank you for answering my
19  question in audible succinct verbal responses.  That's
20  what we're going to ask of you today for the
21  deposition.  The deposition is a formal legal
22  proceeding.  The court reporter takes down what is said
23  by each person and if you continue doing what you've
24  done so far, we should get along just fine.  It is
25  important to take turns speaking and alternating

6

1   to review what is called a "read only" copy of the
2   deposition and to make changes.  If you make material
3   changes for reasons that should be obvious, those
4   changes can be commented upon at the time of trial or
5   other proceeding and that could negatively impact your
6   credibility.  Do you understand that?
7    A.  Yes.
8    Q.  An example would be if this were a car
9   accident case and you said the light you had at the
10  time of the incident was red and at trial you testified
11  it was green, someone could testify that your memory
12  was not good at the time of the deposition or you were
13  not being truthful, so that's why I emphasize that you
14  please stop and let me know if you have any questions
15  about what I'm asking you.
16    During the course of the deposition, you
17  might feel tired or fatigued.  I want you to feel
18  comfortable.  I'm not here to make this job difficult
19  for you, I'm just here to get information, so if
20  there's anything that I can do to make the process more
21  comfortable for you, I would ask you to please tell me.
22  Is that all right?
23    A.  Yes.
24    Q.  So, if you need a drink of water, to use the
25  restroom or just to take a break and clear your head,

8

1   because the court reporter, as you can imagine, can
2   only take down one person at a time.  Would that be all
3   right with you?
4    A.  Yes.
5    Q.  Thank you.  As I mentioned, I'm going to ask
6   you a series of questions.  You took an oath.  That
7   oath is the same oath you would take in front of a
8   judge and jury if you were testifying at trial.  Do you
9   understand that?
10    A.  Yes.
11    Q.  And the reason I emphasize that is not
12  because I believe you'll be untruthful, but I emphasize
13  it because at times I may ask you a question that is
14  ambiguous to you.  If I ask you a question that is
15  ambiguous to you, I would leave it to you to please let
16  me know so that I can reframe the question so it is not
17  ambiguous to you.  If you answer the question, we'll
18  all assume that you understood the question clearly; is
19  that fair?
20    A.  Yes.
21    Q.  Thank you, Mr. Rodin.  At the conclusion of
22  the deposition, you are going to receive a booklet.
23  The booklet will have all the questions and answers
24  that were included.  Because we're in the Covid area,
25  that booklet will be electronic.  You'll have a chance

7

1   no questions asked, the only thing I would say is if
2   I'm in the middle of an important question or short
3   line of questions, I usually like to get through those
4   if possible, but I will accommodate you to the best of
5   my ability.
6    Have you taken any medication of any type or
7   is there any reason that you cannot give me your best,
8   most complete testimony here today?
9    A.  No.
10    Q.  Thank you.  Mr. Rodin, may I please ask for
11  your date of birth.
12    A.  October 14th, 1951.
13    Q.  And where were you born?
14    A.  In San Francisco, California.
15    Q.  Okay.  And, Mr. Rodin, where do you reside?
16    A.  In Porter Ranch, California.
17    Q.  Do you live within the Aldea community?
18    A.  Yes.
19    Q.  And what is your address there, please?
20    A.  11310 Paseo El Sol.
21    Q.  Thank you.  And who do you reside with?
22    A.  My wife.
23    Q.  How long have you and your wife lived there?
24    A.  About five years -- six years, sorry.  Six
25  years.

9

1    Q.  So, what is your move-in date approximately?
2    A.  February 2015.
3    Q.  Okay, thank you.  So, you are moving actually
4  just about seven years, congratulations.  That
5  approximately seven-year period that you've lived
6  there, had your wife lived there with you the entire
7  time?
8    A.  Yes.
9    Q.  And you have lived there the entire time?
10    A.  Yes.
11    Q.  Has anyone there lived with you more than a
12  short passing guest, such as visitors for the holidays?
13    A.  No.
14    Q.  Do you have any children?
15    A.  Yes.
16    Q.  And do they visit for long periods of time?
17    A.  No.
18    Q.  Do you have any information that any of your
19  children has had contact with anyone from the
20  Nazaretyan household?
21    A.  No.
22    Q.  Do you have information that anyone from your
23  household has had direct physical contact with anyone
24  from the Nazaretyan household?
25    A.  No.

10

1    Can I have your level of education, beginning
2  with high school, please, where you attended.
3    A.  -- high school.
4  (Reporter clarification due to Zoom videoconference
5              audio malfunction.)
6    THE WITNESS:  Inglewood.
7  BY MR. SAFARIAN:
8    Q.  And when did you graduate?
9    A.  1969.
10    Q.  And then did you attend college after that?
11    A.  I did.
12    Q.  Where did you attend, please?
13    A.  Cal State Long Beach.
14    Q.  What did you study, please.
15    A.  Psychology.
16    Q.  And did you obtain a Bachelor of Arts in
17  psychology?
18    A.  Yes.
19    Q.  What year, please?
20    A.  1974.
21    Q.  And did you obtain any licenses as a
22  psychologist?
23    A.  No.
24    Q.  After studying psychology and completing your
25  B.A. in 1974, did you obtain any further education?

12

1    Q.  Have you ever been in the same room as Garnik
2  Nazaretyan?
3    A.  No.
4    Q.  Have you ever been within sight of Garnik
5  Nazaretyan?
6    A.  No.
7    Q.  As you sit here now, do you have any
8  independent recollection of ever having seen with your
9  own eyes Garnik?
10    A.  No.
11    Q.  Do you know what Garnik's permanent residence
12  address is?
13    A.  The same as Tamara's.
14    Q.  Do you know how long that has been his
15  permanent residence or address?
16    A.  I do not.
17    Q.  Do you have a time in mind, whether it was
18  before -- well, strike that.
19      Do you know if it was before or after the
20  April 20, '19 incident that that became Garnik's
21  permanent residential address?
22    A.  No.
23    Q.  Thank you.  I'm going to ask you just a few
24  background questions, Mr. Rodin, and if I go too fast,
25  please stop me and I'll try to slow down, okay.

11

1    A.  Yes.
2    Q.  Can you please tell me what that was?
3    A.  I attended the University of Southern
4  California and received a master's in counseling -- in
5  the counseling program there.
6    Q.  And when you say "counseling program," could
7  you be more specific as to what type of counseling?
8    A.  It is a -- it is called counseling education.
9    Q.  And is there any particular occupation that
10  that prepares you for?
11    A.  To be a therapist.
12    Q.  And are you a therapist?
13    A.  No.
14    Q.  Did you ever work as a therapist?
15    A.  No.
16    Q.  You have training as a therapist?
17    A.  No.
18    Q.  Did you -- well, you studied psychology --
19  let me rephrase that.
20      You have training in psychology through the
21  master's program and through your undergraduate
22  education; correct?
23    A.  Yes.
24    Q.  Do you have any information if Garnik
25  Nazaretyan has any psychological impairments or

13

4  (Pages 10 to 13)

1 disabilities?
2    A.  Can you repeat the question?
3    Q.  Of course.  Do you have any information that
4 Garnik Nazaretyan has any psychological impairments or
5 disabilities?
6    MR. ROSEMAN:  I need to caution you, any
7 discussions you've had with your attorney or the law
8 firm, whether it is our law firm or Lillian's law firm,
9 those are attorney/client privileged communications.
10 By MR. SAFARIAN:
11    Q.  And, Mr. Roseman makes a valid objection,
12 Mr. Rodin.  I only want what you know from your own
13 personal experiences.  If it is something that you only
14 learned about from your lawyer, please tell me that
15 that is the case and that we won't push any further.  I
16 don't want any information that you gathered from your
17 lawyer.
18       So to be clear, aside from any
19 attorney/client information, do you have any
20 information that Garnik suffers or has suffered from
21 any psychological impairment or disability?
22    A.  Only what I discussed with my attorney.
23    Q.  Thank you.  Are you retired, Mr. Rodin?
24    A.  No.
25    Q.  Are you employed?

14

1    A.  Yes.
2    Q.  How are you employed and what capacity,
3 please?
4    A.  I am a -- I do business development for a
5 construction company here in the San Fernando Valley.
6    Q.  By business development, do you mean that you
7 sort of work at getting them sales and projects?
8    A.  Yes.
9    Q.  What company is that?
10    A.  Cannon Constructors.  C-a-n-n-o-n
11 Constructors in Encino.
12    Q.  And what types of projects does Cannon
13 specialize in, if any?
14    A.  Tenant improvements, interior office
15 remodels, interior office build-outs, building
16 renovation.
17    Q.  Thank you.  How long have you been with
18 Cannon?
19    A.  Since 2000 and -- since 2000.
20    Q.  Have you ever worked in the field of
21 psychology or providing anybody with counseling or
22 therapy?
23    A.  No.
24    Q.  Did you study what paranoid schizophrenia is
25 while you were in college?

15

1    A.  I don't recall.
2    Q.  Have you ever studied paranoid schizophrenia?
3    A.  I don't recall.
4    Q.  Were you ever at any board meetings where
5 Tamara Nazaretyan presented with documentation that her
6 son has psychological impairments?
7    A.  Can you repeat the question?
8    Q.  Of course.  Have you ever attended any board
9 meetings where Tamara Nazaretyan presented any
10 documentation verifying that her son has psychological
11 impairments?
12    A.  Not to my knowledge.
13    Q.  Have you ever received from Tamara Nazaretyan
14 any writings from any doctors expressing that her son
15 has psychological impairments?
16    A.  No.
17    Q.  Have you attended any board meetings where
18 Tamara Nazaretyan attended?
19    A.  Yes.
20    Q.  How many?
21    A.  I believe one.
22    Q.  Can you approximate when that was?
23    A.  I don't recall.
24    Q.  Can you tell me what year it was in?
25    A.  I believe it was 2019.

16

1    Q.  Can you recall at the time who the other
2 board members were?
3    A.  Yes.
4    Q.  Would you please tell me who they are?
5    A.  Myself, Maya Zlotnik, Beth Corbett, Daniel --
6 David Daniels and, um, I can't remember the last guy's
7 name.  He's not on the board anymore.
8    Q.  Is that Jerome Black?
9    A.  Oh, yes, Jerome Black.
10    Q.  Thank you.  And when did David Daniels, if
11 you know, join or leave the board?
12    A.  I don't recall.  He did move, though.  He
13 moved out of the community.
14    Q.  Did you ever discuss with any of these board
15 members any psychological impairments or disabilities
16 that Garnik Nazaretyan has or was believed to have?
17    A.  Not to my knowledge, no.
18    Q.  Do you recall being served with a federal
19 lawsuit?
20    A.  Yes.
21    Q.  When you received the federal lawsuit, did
22 you see noted in the federal lawsuit that Garnik had
23 psychological disabilities?
24    A.  Can you repeat the question?
25    Q.  Sure.  Did you read the federal lawsuit?

17

5 (Pages 14 to 17)

ELITE COURT REPORTING (949) 829-9222

1      A.  I glanced at it, yes.
2      Q.  And when you glanced at it, did you note in
3  there that there was an allegation that Garnik had been
4  disabled (sic) against because of psychological
5  disabilities?
6      MR. ROSEMAN:  I'm going to object, the document
7  speaks for itself.
8  BY MR. SAFARIAN:
9      Q.  You may answer, please.
10     A.  I don't recall.
11     Q.  Do you recall seeing anywhere in the lawsuit
12 any reference to Garnik having any type of a mental
13 disability?
14     A.  Rephrase the question.  In which lawsuit?
15     Q.  In the federal lawsuit.
16     MR. ROSEMAN:  Counsel, I'm going to give you a
17 little leeway now, but I'm going to object as not
18 likely to lead to the discovery of admissible evidence
19 in this lawsuit.  If you want to ask him questions in
20 the federal case, you have the prerogative to do that.
21     The focus of this deposition relates to this
22 case only.  I'll give you a little more leeway and then
23 I'm going to instruct him not to answer any further
24 questions that is not likely to lead to the discovery
25 of admissible evidence because this case leads to the

18

1  injunction and the actions associated with that.
2  BY MR. SAFARIAN:
3      Q.  Mr. Rodin, you understand that Garnik
4  Nazaretyan has a psychological impairment now; right?
5      MR. ROSEMAN:  This has no relevance or bearing and
6  I'm not taking the deposition.  To answer your
7  question, I'm telling you this case is focussed on the
8  scope of the Complaint and these questions will lead --
9  likely lead to the discovery of admissible evidence he
10 will answering in this case.  The questions --
11     MR. SAFARIAN:  Mr. Roseman --
12     MR. ROSEMAN:  Let me finish, Mr. -- Counsel, let
13 me speak.  Harry, anything outside the scope of this
14 case that's likely -- that will not lead to the
15 discovery of admissible evidence, he's not going to be
16 responding in this deposition.  This isn't a fishing
17 expedition for another lawsuit in the federal system.
18 This is relating to the injunction and the issues
19 associated with it.
20     MR. SAFARIAN:  Are you done, Mr. Roseman?
21     MR. ROSEMAN:  I'm done, thank you.
22 BY MR. SAFARIAN:
23     Q.  Mr. Rodin, are you aware that the state
24 lawsuit in which you are a board member of Aldea -- let
25 me start with a clean question.

19

1      You are aware that there is a pending state
2  lawsuit by Aldea; correct?
3      A.  Yes.
4      Q.  Are you aware that state lawsuit includes an
5  allegation that Tamara Nazaretyan violated her duties
6  to the HOA by allowing her son to be a nuisance at the
7  property?
8      A.  Yes.
9      Q.  And you understand that for her to allow
10 someone to be a nuisance, that would mean that she
11 would have the ability to predict his certain
12 behaviors; in other words, "allowing" is something that
13 someone consciously does to permit certain behavior to
14 occur.  You understand that?
15     MR. ROSEMAN:  Objection, calls for legal opinion
16 and legal guidance and advice from counsel.  And any
17 questions related to legal interpretation, Dale, you do
18 not need to answer.  Go ahead, if you can.
19 BY MR. SAFARIAN:
20     Q.  Mr. Rodin, I'm not trying to be funny here,
21 but have you ever walked a dog on a leash?
22     A.  Yes.
23     Q.  And you understand that when you walk a dog
24 on a leash you can allow the dog to go into certain
25 places and not others; correct?

20

1      A.  Yes.
2      Q.  Okay --
3      MR. ROSEMAN:  I hope, Harry, you are not equating
4  this gentleman's --
5      MR. SAFARIAN:  Mr. Roseman, please.
6      MR. ROSEMAN:  -- as an animal on a leash from his
7  mother.  I hope that's not what you're imputing --
8      MR. SAFARIAN:  Mr. Roseman.  Mr. Roseman, you can
9  make code objections.  I'm trying to establish
10 something and lay the foundation for the relevance of
11 my questions because you are implying that I'm going
12 into federal areas, he's not going.  I'm staying strictly
13 within the state case but if you can't understand why
14 or how I'm doing that, then I suggest you go back and
15 read the state lawsuit against.
16 BY MR. SAFARIAN:
17     Q.  Mr. Rodin, are you aware that the state
18 lawsuit seeks certain equitable remedies that would
19 restrict Garnik Nazaretyan's ability to be at the
20 property or have freedom at the property?
21     MR. ROSEMAN:  Objection, compound.
22 BY MR. SAFARIAN:
23     Q.  You may answer.
24     A.  Yes.
25     Q.  Okay.  And I'm not sure if you understand

21

6 (Pages 18 to 21)

1 this, but I will say that it is my position that
2 Garnik's mental impairment is a factor in determining
3 whether you can have that relief.
4     That's the relevance of my questions,
5 Mr. Roseman.  That's why it is not a fishing
6 expedition.  That's why it is relevant and that's why
7 I'm going to ask these questions and that's why you're
8 not going to interrupt them again.
9     MR. ROSEMAN:  Well, I will state one thing, Harry,
10 for the record, relevance is not a test in depositions;
11 it is likely to lead to the discovery of admissible
12 evidence.
13     MR. SAFARIAN:  That's right.
14     MR. ROSEMAN:  And his state of mind has no bearing
15 on the underlying state action because the question is,
16 did he create a nuisance as set forth in the Complaint.
17 The action was brought against the owner of the unit
18 and her son is an invitee onto the property.
19     MR. SAFARIAN:  He's not an invitee.  Now you are
20 making a speaking objection again.
21     MR. ROSEMAN:  Of course he's an invitee, that's
22 the essence of the lawsuit, Harry..
23     MR. SAFARIAN:  He lives in the house.  He's a
24 resident.
25     MR. ROSEMAN:  I suggest that you study the law

22

1 sit back quietly and let me conduct my discovery.
2     MR. ROSEMAN:  I'll make an one objection.  First
3 of all, there's no evidence that it would be at the
4 association's expense; and, second of all, it's not a
5 protective order, Harry.  I suggest you verify what the
6 basis is.  A protective order would be a motion I would
7 bring to protect my client.
8     MR. SAFARIAN:  Thank you, Mr. Roseman.  Are you
9 done?  May I resume with my questions?
10     MR. ROSEMAN:  Please continue, Harry.
11     MR. SAFARIAN:  Thank you.
12 BY MR. SAFARIAN:
13     Q.  Mr. Rodin, I apologize for crossing swords
14 with Mr. Roseman.  It has nothing to do with you and
15 not meant to be disrespectful to you.  As I stated, I'm
16 just here to ask questions for my client.
17     Going back to asking about these questions,
18 you understand that the association is seeking
19 equitable remedies against my client because you've
20 read the lawsuit and you are part of the board;
21 correct?
22     A.  Yes.
23     Q.  Okay.  And that lawsuit alleges in part that
24 my client allowed a nuisance to occur.  What
25 information do you have that Tamara Nazaretyan allowed

24

1 yourself, Harry, to understand what an invitee is --
2     MR. SAFARIAN:  Mr. Roseman, I'm giving you five
3 minutes and I'll suspend this deposition like I did the
4 other one.  You are making speaking and coaching
5 objections.  As I told you previously, you suggested
6 that I study the law.
7     I'll remind you of the law, there's 14
8 recognized objections that you can make at a
9 deposition.  14.  I can list them for you if you would
10 like, but you've made very few of them so far, so I'm
11 not going to engage in crossing swords with you.
12     I'm asking politely questions of this
13 witness.  I've laid a foundation.  You are right, the
14 scope is not relevance, the scope is calculated to lead
15 to the discovery of admissible evidence, but I've made
16 a showing that it is beyond that, that it is actually
17 relevant.
18     So, you are not going to interrupt, this is
19 too important.  I'm going to move on with my questions.
20 If you want to stop the deposition, go ahead.  If you
21 are going to make speaking objections, go ahead.  I've
22 already begun preparing another motion for protective
23 order and the request for a discovery referee at the
24 association's expense.  You've cost this association
25 enough money and enough problems.  I would suggest you

23

1 a nuisance to occur?
2     A.  Well, I don't understand the question.
3     Q.  Well, you have alleged as a board -- you are
4 a board member, so the lawsuit that was filed on behalf
5 of the HOA says that Tamara Nazaretyan allowed a
6 nuisance to occur.
7     Can you tell me whether Tamara Nazaretyan had
8 any ability to foresee the events of April 2019 that
9 formed the basis of your preliminary injunction?
10     MR. ROSEMAN:  Objection, calls for legal opinion.
11 BY MR. SAFARIAN:
12     Q.  You may answer.
13     A.  Can you repeat the question?
14     Q.  Sure.  What I'm getting at, Mr. Rodin, is do
15 you have any information that Tamara Nazaretyan could
16 have foreseen the events involving her son in April of
17 2019?
18     MR. ROSEMAN:  Objection, calls for speculation.
19     THE WITNESS:  I don't know.
20 BY MR. SAFARIAN:
21     Q.  Do you have any information that Garnik
22 Nazaretyan, prior to the events of April 2019, had ever
23 had a psychological episode in which he lost control of
24 himself?
25     A.  I do not.

25

7 (Pages 22 to 25)

1     MR. ROSEMAN:  Objection, lacks foundation.
2  BY MR. SAFARIAN:
3     **Q.  As you sit here now, aside from what counsel**
4  **has told you, have you come to learn from any source**
5  **that Garnik Nazaretyan had a psychological breakdown in**
6  **April of 2019, a one-time incident because doctors**
7  **mismanaged his medication one time?**
8     MR. ROSEMAN:  Objection, compound, calls for
9  speculation, assumes facts not in evidence.
10     Any other objections, Lillian, you would
11  like to throw in there too?
12     MR. SAFARIAN:  Lillian is not permitted to make
13  objections.  Sorry, Lillian, I don't mean to be
14  disrespectful, but she's part of the federal case and
15  only one lawyer can make objections here today.
16     MR. ROSEMAN:  First of all, that's not correct.
17  This is relevant.  It is her client, and if she wishes
18  to make objections, Lillian, you can make objections.
19  Go ahead.
20     MR. SAFARIAN:  I'm not going to permit that.
21  Even -- sorry, Lillian, I don't mean to be
22  disrespectful to you.  I like and respect you; I think
23  you are a fine attorney, but she is not appearing in
24  this case.  She is in the federal case.  She can make
25  objections in the federal case and you can not,

26

1  Mr. Roseman.  She's not counsel in this case, you are
2  here to defend this deposition.  I'm going to move on.
3     The objections have been made.  Can I have
4  the court reporter please read back the question with
5  the objections having been stated.
6     THE REPORTER:  Yes.
7     MR. SAFARIAN:  Thank you, Madam Court Reporter.
8     THE REPORTER:  "Question:  As you sit here now,
9  aside from what counsel has told you, have you come to
10  learn from any source that Garnik Nazaretyan had a
11  psychological breakdown in April of 2019, a one-time
12  incident because doctors mismanaged his medication one
13  time?"
14     MR. ROSEMAN:  Same objection.
15     THE WITNESS:  Well, it seems you are asking me two
16  things.
17  BY MR. SAFARIAN:
18     **Q.  I'll break it down.  You are aware that**
19  **Garnik had an incident in April of 2019 at the**
20  **property; correct?**
21     A.  Yes.
22     **Q.  You did not personally see that incident;**
23  **correct?**
24     A.  I did not see the incident, no.
25     **Q.  And did you speak with -- there was a lady**

27

1  named Miss Lien, who is a nurse who was involved in the
2  incident.  Do you recall that?
3     A.  Yes.
4     **Q.  Did you speak with her about the incident?**
5     A.  Yes.
6     **Q.  Did you speak with her after her deposition?**
7     A.  No.
8     **Q.  Would it be important to you to know that**
9  **Miss Lien testified that she would have liked to have**
10  **known before filing her restraining order application**
11  **that Garnik Nazaretyan was suffering from psychological**
12  **issues?**
13     A.  Repeat the question, please.
14     **Q.  I'll have the court reporter read it back.**
15  **Thank you for asking me to repeat it, Mr. Rodin, I**
16  **appreciate that you are paying close attention to the**
17  **questions and I thank you for that.**
18     THE REPORTER:  "Question:  Would it be important
19  to you to know that Miss Lien testified that she would
20  have liked to have known before filing her restraining
21  order application that Garnik Nazaretyan was suffering
22  from psychological issues?"
23     THE WITNESS:  No.
24  BY MR. SAFARIAN:
25     **Q.  Why not?**

28

1     A.  Well, I don't know if that would have changed
2  the events of the day.
3     **Q.  It would not change the events of the day,**
4  **but you understand that you are a member of the board**
5  **of directors; correct?**
6     A.  Yes.
7     **Q.  And you understand that as a member of the**
8  **board of directors, you have to comply with certain**
9  **requirements of the CC&R'S and other governing**
10  **documents; correct?**
11     A.  Yes.
12     **Q.  And as a member of the board of directors,**
13  **did you take an oath?**
14     MR. ROSEMAN:  An oath?
15     MR. SAFARIAN:  Yes.
16     MR. ROSEMAN:  Like swearing -- okay, answer the
17  question, Dale.
18     THE WITNESS:  No.
19     MR. ROSEMAN:  It would be a first if he did.
20     THE WITNESS:  I don't recall that I did.
21  BY MR. SAFARIAN:
22     **Q.  Did you commit to doing certain things as a**
23  **member of the board?**
24     MR. ROSEMAN:  Objection, vague.
25  ///

29

8 (Pages 26 to 29)

BY MR. SAFARIAN:

1  Q.  For example, did you commit to uphold the CC&R'S?

A.  Yes, to the best of my knowledge -- to the best of my ability, yes.

Q.  And do you understand that people who live within that community rely on the board to enforce the CC&R'S so that their rights as members and residents are protected; correct?

MR. ROSEMAN:  Objection, misstates the law --

(Reporter clarification.)

MR. ROSEMAN:  -- in this case, inaccurate reflection of what the governing documents say and what the legal rights and obligations are of the board of directors.

MR. SAFARIAN:  Okay, that is a speaking objection, Mr. Roseman.  It is not one of the 14 that I cautioned you about.  And that's why --

MR. ROSEMAN:  I understand but you are misleading the witness into presuming what you are stating is accurate when it is not accurate.

MR. SAFARIAN:  Mr. Roseman, the appropriate objection is, "objection, misstates the evidence."

MR. SAFARIAN:  Harry, you don't have to teach me about taking depositions --

30

MR. SAFARIAN:  Mr. Roseman, I do.

MR. ROSEMAN:  I haven't done thousands and thousands like you but I have taken enough of them.

MR. SAFARIAN:  Okay, you may have taken some depositions, Mr. Roseman, but you are not allowed to coach the witness on what the governing --

MR. ROSEMAN:  I'm not coaching the witness.  You asked a legal question misstating what the law is.  I have the right to correct that it is an inaccurate -- how about this, calls for legal opinion.  Instruct the witness not to answer any questions that require legal opinion or guidance.

MR. SAFARIAN:  Okay.  Well, if the witness declines to answer it, then we'll have to file a motion.  I'm going to move on and ask my question.  Can I please have the last question read back and I'll rephrase it.  Thank you, Madam Court Reporter.

Let me stop and I'll withdraw that.

BY MR. SAFARIAN:

Q.  Mr. Rodin, have you been a board member the entire time that you've lived at Aldea community?

A.  No.

Q.  When you began living there as a -- as a homeowner, you were not a board member; correct?

A.  Correct.

31

Q.  And when you began living there as a homeowner, you understood that when you paid your monthly dues and you were a resident, you had certain rights within the community; correct?

A.  Yes.

Q.  And those rights might include, for example, the right to access common areas or to have your neighbors not be noisy, those sorts of things; correct?

A.  Yes.

Q.  And as a person who lived within the HOA community but was not yet a member of the board, you understood that there was a board of directors that helped essentially govern the association so that everyone's rights were protected; correct?

A.  Yes.

Q.  And you understood that everyone that lived there, who either owned the property or lived there with the permission of the owner, had rights; correct?

A.  Yes.

Q.  And you, as a homeowner who is not on the board, relied on the board to protect those rights; correct?

MR. ROSEMAN:  Objection, that calls for legal opinion, calls for legal interpretation of governing documents, outside the realm of knowledge of the board

32

of directors, and anything regarding legal opinion, Dale, or guidance as a layperson I would instruct you not to answer those questions.

MR. SAFARIAN:  Mr. Roseman, he's answered the question and it was about his state of mind, it wasn't about governing documents.  I'm going to caution you one more time, Mr. Roseman.  The next speaking objection results in a suspension of the deposition.  I did it before and I will do it again.

Do not tempt me, Mr. Roseman.  This is unacceptable.  You are coaching the witness and I want the unadulterated testimony of Mr. Rodin.  He seems to be cooperating and we are getting along just fine.  Please, Mr. Roseman, confine your depositions to code objections.

I would like to have the last question and answer read back, please.

THE REPORTER:  "Question:  And you, as a homeowner who is not on the board, relied on the board to protect those rights; correct?"  And I did not get an answer.

BY MR. SAFARIAN:

Q.  You answered the question, "yes," I believe, and it is on video.  Would you confirm that that was your answer?

A.  Yes.

33

9  (Pages 30 to 33)

1    Q.  Thank you, Mr. Rodin.  Mr. Rodin, when you
2  became a board member, you understood that other
3  homeowners relied upon you to protect their rights as
4  homeowners and the rights of people who lived with
5  them; correct?
6    A.  Yes.
7    MR. ROSEMAN:  Objection, calls for legal opinion,
8  misstates the law.
9  BY MR. SAFARIAN:
10    Q.  I just want your understanding, Mr. Rodin.
11  I'm not looking for an interpretation of the law.  What
12  I'm looking at is when you got on the board of
13  directors, you knew that came with certain
14  responsibilities; correct?
15    A.  Yes.
16    Q.  And you understood that those
17  responsibilities were to have been executed neutrally;
18  correct?
19    A.  I don't understand.
20    Q.  Well, you have to be fair in executing those
21  responsibilities.  You are not there to favor one
22  person over another.  Your responsibility should be
23  executed in conforming to the requirements of the
24  CC&R'S; correct?
25    A.  Well, to the best of our ability.  We're not

34

1  of trust; correct?
2    A.  Are you asking me or telling me?
3    Q.  I'm asking you, do you agree that -- is it
4  your understanding that fiduciary is one of trust, a
5  relationship of trust?
6    A.  Yes.
7    Q.  A fiduciary owes a duty to certain people;
8  correct?
9    A.  Certain people.  It only owes a duty to the
10  stakeholders of the association.
11    Q.  What about the people who live within the
12  association; such as, for example, if you and your wife
13  live together but you own title of the property but
14  your wife lives with you and is entitled to -- well,
15  let me strike that.
16    Let's say hypothetically you and your wife
17  lived together within the community.  You are owner of
18  record.  Does your wife, living with you and having
19  permission to reside in the home that you have title
20  to, have the benefits and privileges of using common
21  areas, for example?
22    A.  If anybody is a renter, if that's what you
23  are getting at, they have to abide by all of the rules
24  and regulations that any homeowner does.
25    Q.  My question is a little bit different but you

36

1  the law.
2    Q.  Sure.  I understand you are not the law, but
3  you are there to -- you are there to listen to the
4  concerns -- essentially your constituents, the people
5  that live there; correct?
6    A.  Yes.
7    Q.  And you are there to investigate to the
8  extent that an investigation might be needed; correct?
9    A.  We're there to advise if something like that
10  comes up, yes.
11    Q.  In the time that you've lived at the HOA
12  community have you had tenants that -- well, let me
13  withdraw -- not tenants, but homeowners, but let me
14  withdraw that question.
15    You understand that being on the board of
16  directors comes with a fiduciary responsibility;
17  correct?
18    A.  Yes.
19    Q.  Do you understand what a fiduciary duty is?
20    MR. ROSEMAN:  Objection, calls for legal opinion.
21  BY MR. SAFARIAN:
22    Q.  Well, let me ask you -- I'm not asking for a
23  legal opinion, Mr. Rodin, I want your understanding of
24  what a fiduciary duty is, so let me read to you a
25  definition of a fiduciary duty.  It is a relationship

35

1  are kind of on the right track.  Not just whether they
2  are a renter but, for example, if you and your wife
3  lived together and you have title and she's living with
4  you, she's not necessarily a renter, she's someone
5  there living with you in your home with your
6  permission; correct?
7    A.  Yes, she would be my guest.
8    Q.  Okay.  Well, whether it is your guest or
9  otherwise, if she's living with you and you give her
10  full access that you are entitled to, then she would be
11  entitled to use the common areas; correct?
12    A.  Yeah, as long as she abides by all of the
13  rules.
14    Q.  Okay.  And if she -- let's say hypothetically
15  someone is in a swimming pool area and has something
16  happen to them that frightens other people, such as a
17  seizure, you have hypothetically -- I want your
18  interpretation of the CC&Rs -- you have somebody in the
19  swimming pool who suddenly for the first time ever has
20  an epileptic seizure that begins and loses control of
21  their body and that terrifies other people.
22    Under those circumstances, what protocol do
23  you believe the CC&R'S would require you to follow to
24  make sure that the rights of those people concerned by
25  that person, as well as the rights of the person who

37

10  (Pages 34 to 37)

1 **had the seizure, are protected?**
2    MR. ROSEMAN:  Objection.  Let's run through them.
3    MR. SAFARIAN:  No, no, make your objection.
4    MR. ROSEMAN:  Incomplete hypothetical, vague,
5 ambiguous, calls for legal opinion, compound.  The
6 association corporation has counsel and they would be
7 guided by that but if you can answer the question based
8 on those objections, go ahead.
9    MR. SAFARIAN:  This deposition, Mr. Roseman, is
10 suspended because you made another speaking
11 objection --
12    MR. ROSEMAN:  I stated all of the objections, and
13 clarified.  You are asking for legal interpretation of
14 a governing document.  The corporation has counsel,
15 Harry and --
16    MR. SAFARIAN:  Mr. Roseman.
17    MR. ROSEMAN:  -- it was a lengthy, incomplete
18 question.  I'm meeting and conferring.  I'm telling you
19 your question has all of those objections.
20       Dale, you can answer the question, if you
21 can.
22    MR. SAFARIAN:  We're done.  You told the witness
23 and you led the witness to answer that the association
24 has counsel.  Now the witness has been instructed that
25 the appropriate answer would be, "well, we would

38

1 consult our counsel and decide how to proceed from
2 there."  You've coached the witness again.
3    MR. ROSEMAN:  I didn't coach the witness.
4 Harry --
5    MR. SAFARIAN:  Mr. Roseman, do not speak over me.
6 Do not speak over me.
7    MR. ROSEMAN:  -- continue with the deposition,
8 Harry.
9    MR. SAFARIAN:  No.  Here is what I'm doing, I'm
10 taking a five-minute break and I'm going off the
11 record.  I'm making this clear, one more speaking
12 objection, one more, and we are through today.  One
13 more and I'm seeking a --
14    MR. ROSEMAN:  Harry, I stated the objections --
15    MR. SAFARIAN:  We're taking a five minute break.
16    MR. ROSEMAN:  If you need a break, absolutely,
17 Harry.
18    MR. SAFARIAN:  Mr. Roseman, do not speak over me.
19 We are taking a five-minute break.  If you make one
20 more speaking objection, that will be another motion
21 that I'm going to file and, yes, it is called a motion
22 for a protective order.  It is called a motion for the
23 appointment of a discovery referee at the association's
24 expense which is going to cost the association another
25 10, 20, $40,000.

39

1    I don't know why you want to keep running up
2 the tab.  You are on the wrong track, Mr. Roseman.
3 You've made a lot of bad decisions here.  I think your
4 clients are starting to figure it out, but we're going
5 to take a five-minute break here.
6    I'm going to allow the witness to go forward
7 answering my questions because he and I are getting
8 along just fine, but you are presenting a continued
9 problem in coaching witnesses.  It is not going to be
10 allowed.  What is going --
11    MR. ROSEMAN:  I hope you feel better with that
12 dissertation.  Harry, let's take our five-minute break.
13    MR. SAFARIAN:  Mr. Roseman, do not interrupt me.
14 What is at stake here is too serious.  I'm not going to
15 allow you to cheat the system.  We're done, we're
16 taking a five-minute break and we'll come back at 9:45.
17    MR. ROSEMAN:  Excuse me, are you making
18 accusations that I'm cheating the system?
19    MR. SAFARIAN:  Yes, coaching the witness is
20 cheating --
21    MR. ROSEMAN:  Your behavior is completely
22 inappropriate, Harry --
23    MR. SAFARIAN:  Coaching a witness --
24    MR. ROSEMAN:  -- I suggest you stick to the focus
25 on what you are doing in taking the deposition --

40

1    MR. SAFARIAN:  Coaching a witness --
2    MR. ROSEMAN:  I'm not coaching the witness.  I'm
3 stating objections for the record.  Your questions are
4 inappropriate and I have the right to make objections
5 on the record.  You cannot ask for information that's
6 attorney/client privileged communication on discussing
7 of legal issues.  Your question was lengthy, compound
8 and all of the objections that I stated, and I have the
9 right to state those objections.
10    MR. SAFARIAN:  You don't have the right to --
11    MR. ROSEMAN:  You may not like those objections
12 but perhaps if you ask more poignant, focussed
13 questions and shorter questions, you may be able to ask
14 those questions without objections having to be made.
15    MR. SAFARIAN:  Mr. Roseman, telling a witness in
16 the middle of a question that the answer to the
17 question is that he would consult counsel is a speaking
18 objection.  We're taking a five-minute break.  That is
19 cheating the system.  That is denying --
20    MR. ROSEMAN:  That is not cheating the system.
21    MR. SAFARIAN:  Mr. Roseman, do not interrupt me.
22    MR. ROSEMAN:  You are very inappropriate in your
23 statements to counsel, Harry --
24    MR. SAFARIAN:  Mr. Roseman, do not interrupt me.
25 Mr. Roseman, do not interrupt me.  Mr. Roseman --

41

11 (Pages 38 to 41)

1      MR. ROSEMAN:  Well, you don't give me a chance to
2  speak, so I don't know how you expect me to respond,
3  if --
4      MR. SAFARIAN:  Mr. Roseman, do not interrupt me.
5  Let's go off the record, Madam Court Reporter.  You can
6  go off the record.
7          Mr. Roseman, I've asked the court reporter
8  not to have to take this down because this is absolute
9  insanity.  It is on video --
10     MR. ROSEMAN:  Absolutely, Harry, but you've got to
11  let me respond --
12     MR. SAFARIAN:  Mr. Roseman, do not interrupt me, I
13  was in the middle of speaking.
14         Yes, when you tell a witness the answer to
15  the question is that they would consult counsel --
16     MR. ROSEMAN:  That's not what I said --
17     MR. SAFARIAN:  Mr. Roseman, I'm not through.  Do
18  not interrupt me.  This deposition is suspended, thank
19  you very much.  We're going off the record.
20     MR. ROSEMAN:  Perhaps the five-minute break will
21  do you well, and we'll resume in five minutes.  Thank
22  you, Harry.
23     MR. SAFARIAN:  I'm not sure I need a five-minute
24  break.  I think I want to suspend this deposition
25  because I've had enough of your shenanigans.  And I'll

42

1  state it on the record, Mr. Roseman, you are a
2  profoundly unethical attorney who has gotten your
3  counsel -- who has gotten your client into deep, deep
4  trouble.  I would --
5      MR. ROSEMAN:  Counsel, I caution you, you make
6  these statements -- please go back on the record --
7      MR. SAFARIAN:  These are statements of fact,
8  Mr. Roseman.
9      MR. ROSEMAN:  -- make statements of accusations in
10  front of clients of mine with unethical behavior.  I
11  caution you, Harry, be very careful what you say now.
12     MR. SAFARIAN:  These are statements of fact,
13  Mr. Roseman.  These are statements of fact.  You've
14  gotten this --
15     MR. ROSEMAN:  That is not your opinion, these are
16  your factual beliefs that I'm unethical, is that what
17  you're stating?  You understand the definition of
18  defamatory statements, they are not your opinions but
19  fact is what you contend, is that what you are saying,
20  just for clarification?
21     MR. SAFARIAN:  These are fact.  You want to file a
22  lawsuit against me, Mr. Roseman, bring it.  You want to
23  file a lawsuit against me, Mr. Roseman, bring it.  What
24  you have done here is deplorable, you ought to be
25  ashamed of yourself.  We'll take a five-minute break.

43

1      MR. ROSEMAN:  Okay.
2      THE VIDEOGRAPHER:  We are off the record at
3  9:41 a.m.
4          (A brief recess was taken.)
5      THE VIDEOGRAPHER:  We are on the record at
6  9:49 a.m.
7      MR. SAFARIAN:  All right, we're back on the
8  record.
9  BY MR. SAFARIAN:
10     Q.  Mr. Rodin, I apologize for the crosstalk
11  between counsel.  It is not typical, but it is typical
12  in this case and it is not directed towards you, so I
13  hope you don't take it that way.
14         I want to ask a more simple question, if I
15  can.  When you became a member of the board of
16  directors, what was your understanding of your duties?
17     A.  To be an impartial sounding board to help
18  everybody to -- excuse me -- to help everybody
19  understand the CC&R'S and deal with any problems that
20  might come up.
21     Q.  Have you had occasion to deal with any
22  homeowners that have disabilities?
23     MR. ROSEMAN:  Objection, calls for privacy issues.
24  You can answer the question, Dale, but I caution you
25  not to discuss any names or information specific to

44

1  individuals.
2      THE WITNESS:  Not that I'm aware of.
3  BY MR. SAFARIAN:
4      Q.  Have you ever contemplated what you would do
5  in the event that a homeowner would have, or an
6  occupant within an HOA home would have a disability
7  that would require accommodation of any type?
8      MR. ROSEMAN:  Objection, calls for speculation,
9  incomplete hypothetical, vague, ambiguous, compound and
10  leads to a legal interpretation -- calls for legal
11  interpretation.  You can answer, Dale, if you can.
12     THE WITNESS:  Can you repeat the question?
13  BY MR. SAFARIAN:
14     Q.  Sure.  Have you ever contemplated what your
15  function or obligation would be as a board member if
16  there was an occupant of the HOA that had a disability
17  that needed accommodation?
18     MR. ROSEMAN:  Same objections.
19     THE WITNESS:  No.
20  BY MR. SAFARIAN:
21     Q.  Have you reviewed the minutes of the board
22  from April 2019 forward?
23     A.  Not in a long time, no.
24     Q.  Are you aware that there are minutes that
25  confirm that my client, Miss Nazaretyan, went to the

45

12  (Pages 42 to 45)

1  board with information that her client had -- or her
2  son -- strike that.  Let me start with a clear
3  question.
4       Are you aware that there are references in
5  board minutes that Miss Nazaretyan, my client, went to
6  the board with medical information concerning her son's
7  disabilities?
8    A.  Yes, I recall that.
9    Q.  Okay.  So, is it a fair statement now -- does
10 that refresh your memory that you learned of her son's
11 disabilities before counsel became involved?
12   A.  No.  I believe counsel became involved before
13 that.
14   Q.  Okay.  But you did attend board meetings
15 where counsel was not present where this young man's
16 disabilities were discussed; correct?
17   A.  No.  They were discussed with counsel there.
18   Q.  Okay.  And was my client present when counsel
19 was there?
20   A.  No.
21   Q.  So, how --
22   A.  Garnik was not there.
23   Q.  I'm not talking about Garnik, I'm talking
24 about Miss Nazaretyan, who is the defendant in this
25 lawsuit.  You are aware that the board is suing

46

1  Miss Nazaretyan; correct?
2    A.  Yes.
3    Q.  Okay.  So, was Miss Nazaretyan present at
4  board meetings that you attended to present evidence
5  and documentation that her son had disabilities?
6    A.  Yes.
7    Q.  How many times did she present that evidence?
8    A.  I don't recall.
9    Q.  Can you recall if it was more than once?
10   A.  I don't recall.
11   Q.  You do recall that she presented evidence
12 that her son was schizophrenic?
13   A.  She presented all sorts of stuff.
14   Q.  When you say, "all sorts of stuff," tell me
15 what you recall, please.
16   A.  I recall she presented a handful of different
17 documents with -- saying that he had some sort of
18 conditions but it was very disjointed.
19   Q.  You understood that she had difficulty with
20 English?
21   A.  I don't think she had difficulty.
22   Q.  Okay.  And you don't think she had any
23 difficulty with English?
24   A.  A little bit.
25   Q.  Okay.  And when you received these documents,

47

1  did you or the board undertake any investigation such
2  as consulting a medical doctor?
3    MR. ROSEMAN:  Objection, lacks foundation.  You
4  asked about a discussion, you didn't ask about whether
5  she received documents, but go ahead.
6    MR. SAFARIAN:  You are making another speaking
7  objection, Mr. Roseman.
8    MR. ROSEMAN:  I understand, Counsel, but I'm just
9  trying to clarify your question so he understands the
10 question.  It lacks foundation.  It assumes facts not
11 in evidence, that's my objection.
12   MR. SAFARIAN:  Thank you.  Could I please have the
13 question read back.
14   THE REPORTER:  "Question:  Okay.  And when you
15 received these documents, did you or the board
16 undertake any investigation such as consulting a
17 medical doctor?"
18   THE WITNESS:  We did not.
19 BY MR. SAFARIAN:
20   Q.  Did anyone on the board, or acting on behalf
21 of the board, to your knowledge do anything to
22 investigate Garnik's disability?
23   A.  Not that I'm aware of, no.
24   Q.  Did anybody visit the family home to see what
25 the living environment was like for Garnik?

48

1    A.  Not that I know of.
2    Q.  Did anyone consult with Miss Nazaretyan to
3  inquire whether Garnik lived with her permanently or
4  was just a visitor?
5    A.  Not that I recall.
6    Q.  As of, let's say, mid May 2019, a month after
7  the incident, did you know whether Garnik was a visitor
8  or permanent resident in Miss Nazaretyan's home?
9    A.  I don't recall.
10   Q.  Did you ever do anything to investigate as of
11 that time whether he was a visitor or a resident?
12   A.  I did not personally do anything.
13   Q.  Did anyone do anything on your behalf or at
14 your instruction?
15   MR. ROSEMAN:  Objection, calls for attorney/client
16 privileged communication.
17 BY MR. SAFARIAN:
18   Q.  I don't want anything from your lawyers,
19 Mr. Rodin, but anybody on your behalf, such as another
20 board member, a consultant that was hired or some other
21 third party.
22   A.  Not that I know of, no.
23   Q.  Thank you, Mr. Rodin.  Did you read the
24 medical documentation that Miss Nazaretyan submitted?
25   A.  At the time I believe I did.

49

13  (Pages 46 to 49)

1    Q.   And is that medical documentation still part
2  of the HOA's files?
3    A.   If it was submitted, I'm sure it is.
4    Q.   Do you have any recollection of what those
5  documents said?
6    A.   No.  It was also turned over to our counsel.
7    Q.   Okay.  And after reading the documents, did
8  you take any action in response to the documents aside
9  from just handing them to counsel?
10   A.   No, not that I recall.
11   Q.   After reading the documents, did you have a
12 meeting with Garnik at any point?
13   A.   No, we did not.
14   Q.   After reading the documents, did you consult
15 any of Garnik's physicians?
16   A.   I did not.
17   Q.   After reading the documents, was any effort
18 undertaken to determine whether Garnik presented any
19 type of a future threat to the community?
20   A.   Not that I recall.
21   Q.   Thank you, Mr. Rodin.
22        After reading the documents, the association
23 filed this lawsuit stating that Miss Nazaretyan allowed
24 a nuisance to occur.  Now, I want to go back to that
25 line of questioning because that seems to be the basis

50

1  for the HOA's breach -- I'm not asking for your
2  opinion, I'm just making comment of my own thinking on
3  it.  So, I'll start with a fresh question.
4        Do you have any information that
5  Miss Nazaretyan could have done anything to have
6  prevented the incident?
7    MR. ROSEMAN:  Objection, calls for speculation,
8  ambiguous, lacks foundation, incomplete hypothetical.
9  BY MR. SAFARIAN:
10   Q.   I'll withdraw.  Let me ask it this way:  I
11 don't want you to guess, Mr. Rodin.  I want to know, do
12 you have any facts that you are aware of, actual facts
13 without guessing or speculating, that this incident was
14 something that Miss Nazaretyan could have reasonably
15 foreseen would take place?
16   MR. ROSEMAN:  Objection, calls for legal opinion,
17 incomplete hypothetical, vague, ambiguous, assumes
18 facts not in evidence and -- go ahead.
19 BY MR. SAFARIAN:
20   Q.   Mr. Rodin, do you require the question to be
21 read back or is it still fresh in your mind?
22   A.   No, please read it back.
23   Q.   Okay, we will, thank you.  And the objections
24 will stand, so they don't need to be repeated.
25        Madam Court Reporter, would you please be

51

1  kind enough to read back the question.
2    THE REPORTER:  "Question:  Do you have any facts
3  that you are aware of, actual facts without guessing or
4  speculating, that this incident was something that Miss
5  Nazaretyan could have reasonably foreseen would take
6  place?"
7    THE WITNESS:  No.
8  BY MR. SAFARIAN:
9    Q.   Do you have any facts, without guessing or
10 speculating, that it is foreseeable that Garnik will
11 have another episode at anyplace in the community?
12   MR. ROSEMAN:  Objection, calls for legal opinion,
13 calls for speculation, vague, ambiguous, assumes facts
14 not in evidence.
15 BY MR. SAFARIAN:
16   Q.   You may answer, Mr. Rodin.
17   A.   I don't know.
18   Q.   Okay.  For example, since this incident have
19 you seen Garnik strike anyone?
20   A.   I have not personally seen him strike anyone.
21   Q.   Have you heard of that occurring, aside from
22 counsel?
23   A.   No, I have not.
24   Q.   Since this incident, has anyone -- aside from
25 the preliminary discussions with Miss Lien, has anyone

52

1  come into the HOA board meetings to lodge a complaint
2  about Garnik?
3    A.   Please repeat the question.
4    Q.   Sure, I understand this incident happened in
5  April '19 and there were some discussions preliminarily
6  about it, including with Miss Lien, who was the one
7  person who he had physical contact with.  Since that
8  one incident of physical contact, has anyone else come
9  forward to the HOA community and presented any type of
10 a complaint as to Mr. Garnik?
11   MR. ROSEMAN:  Objection, vague and ambiguous,
12 overbroad and calls for speculation.
13 BY MR. SAFARIAN:
14   Q.   You may answer, Mr. Rodin.
15   A.   Not that I know of.
16   Q.   Since April 2019, Mr. Rodin, can you tell me
17 what your position within the board has been aside from
18 a board member?
19   A.   I'm the president of the board.
20   Q.   And how long have you been the president?
21   A.   Since I joined the board.
22   Q.   And what are the other positions, please?
23   A.   I don't understand, what --
24   Q.   Sure.  You know, if we have -- in the United
25 States we have the president, the vice president and we

53

14  (Pages 50 to 53)

1  have, you know, all of these other positions.  Among
2  the board of directors there is the president.  There
3  would somebody be -- there would be somebody I guess
4  who would be a secretary or a treasurer and that kind
5  of stuff?
6      A.  That's correct.  There is a board -- there is
7  a president, a vice president, secretary and treasurer
8  and the rest would be just members at large.
9      Q.  And who -- After April 2019, who was the vice
10  president -- well, let me strike that.
11          When you joined, who was the vice president?
12      A.  When I joined, I don't recall.
13      Q.  Who is the vice president now?
14      A.  I believe Maya is, Maya Zlotnik.
15      Q.  Have you ever spoken with Maya regarding
16  Garnik?
17      A.  Only within the confines of counsel.
18      Q.  Have you ever spoken with Maya with my client
19  present?
20      A.  No.
21      Q.  And was there anybody ever present when
22  Mr. Roseman was speaking to the board who is not --
23  such as my client, her son or a representative of my
24  client?
25      A.  You have to please repeat the question.

54

1      Q.  Sure.  I guess what I'm trying to get at is,
2  there are meetings that Mr. Roseman may attend or
3  someone in the office may attend where the
4  communication is privileged; for example, you have a
5  closed meeting, it is just Mr. Roseman and the board
6  members.
7          Alternatively, if you have a meeting with
8  Mr. Roseman, like you are doing here now with other
9  people present, there is no privilege in that open
10  discussions.  What I'm trying to get at is, was there
11  any type of a meeting you had with Mr. Roseman or
12  someone from his firm or some other law firm, maybe it
13  was another lawyer that you worked with -- was there
14  any type of a meeting with counsel present where
15  someone who is not on the board was also present?
16      A.  Yes.
17      Q.  And how many times did that happen?
18      A.  Well, at least once.  We had a town hall
19  meeting.
20      Q.  What is a "town hall meeting"?
21      A.  We called a special meeting of the HOA
22  because of this incident.  Many, many homeowners were
23  up in arms that an incident like this occurred and they
24  were very concerned about what we were going to do
25  about it, so we called a town hall meeting and about 40

55

1  people showed up and Mr. Roseman was a guest.
2      Q.  All right.  And I want to read to you
3  something.  Bear with me one second.  Miss Lien
4  attended that meeting too; correct?
5      A.  I don't recall.
6      Q.  I'm going to show you something.  I'm going
7  to log in on another computer so that I can share a
8  document with you.
9          What I'm showing you is a transcript or
10  testimony from Miss Lien.  Do you remember Miss Lien
11  was the lady, the one lady that Mr. Roseman -- that my
12  client had contact with, Garnik.
13          She testified, the question was asked of her,
14  "Okay, and so Mr. Roseman got a bunch of people fired
15  up and those people went to court to seek restraining
16  orders; correct?"  She answers, "Yes."  And then she's
17  asked, "And after Mr. Roseman got all these people
18  fired up to seek restraining orders, the court declined
19  them because no one other than you had any incidents
20  with Garnik; correct?"  She answered, "Yes."  You see
21  that?
22      A.  I see it, yes.
23      Q.  Okay.  She testified -- to your knowledge
24  that testimony was truthful; correct?
25      MR. ROSEMAN:  Objection, calls for speculation,

56

1  assumes facts not in evidence.  Don't guess, Dale.
2      MR. SAFARIAN:  Don't coach, Mr. Roseman.  Don't
3  coach.
4      MR. ROSEMAN:  I'm not coaching.  That's not
5  coaching, Harry, I'm just telling him not to guess.
6  BY MR. SAFARIAN:
7      Q.  Mr. Rodin, you were present at that meeting.
8  Ms. Lien says Mr. Roseman attended that meeting and got
9  the town hall fired up.  Mr. Roseman attended that
10  meeting; correct?
11      A.  Yes.
12      Q.  And Mr. Roseman -- if Miss Lien, who
13  testified under oath and is the only person who had any
14  involvement with my client speaks truthfully, she is
15  the only person who had any interaction of any physical
16  contact with Garnik; correct?
17      MR. ROSEMAN:  Objection, calls for speculation.
18  BY MR. SAFARIAN:
19      Q.  As you know as a board member, Mr. Rodin, the
20  only person that this association or Mr. Nazaretyan,
21  Garnik, this young man has had any contact with is
22  Miss Lien; correct?
23      MR. ROSEMAN:  Objection, calls for speculation,
24  vague, ambiguous.  Harry, you are testifying.  Ask the
25  question.  Go ahead and answer the question as you can,

57

15  (Pages 54 to 57)

1  Dale.
2      MR. SAFARIAN:  Mr. Roseman, I understand your
3  reason to be uncomfortable, but I'm going to ask clean
4  questions that you are not going to --
5      MR. ROSEMAN:  One thing I'm not Harry, I'm not
6  uncomfortable.
7      MR. SAFARIAN:  You are highly uncomfortable,
8  Mr. Roseman, I see it in your body language.  You are
9  nervous and you realize that you've dug a very deep
10  hole for yourself.  I'm going to continue asking these
11  questions and you will deal with the consequences
12  later, Mr. Roseman.
13      MR. ROSEMAN:  You are incredulous, Counsel.
14      MR. SAFARIAN:  That may be the case, Mr. Roseman,
15  but what you've done here, as testified by Miss Lien,
16  is highly unethical, but I'll continue.
17  BY MR. SAFARIAN:
18      **Q.  Mr. Rodin, Mr. Roseman was at that meeting;**
19  **correct?**
20      A.  Yes.
21      **Q.  And Mr. Roseman asked the homeowners to all**
22  **help go out and get restraining orders; correct?**
23      A.  I don't recall him asking all the homeowners
24  to go out and get restraining orders.
25      **Q.  He recommended restraining orders; correct?**

58

1      A.  I don't recall.
2      **Q.  Do you believe Miss Lien was not testifying**
3  **truthfully?**
4      A.  I don't know her.  I don't know.
5      **Q.  And did you submit a declaration stating that**
6  **you feared Garnik?**
7      A.  I don't recall.
8      **Q.  Did you submit a declaration saying that you**
9  **were afraid for your family?**
10      A.  Me personally, I don't recall that at all.
11      **Q.  Do you remember at any time personally being**
12  **afraid of Garnik?**
13      A.  I don't know Garnik.
14      **Q.  So, is it a fair statement you've never had**
15  **reason to fear him?**
16      A.  No, that's not true.
17      **Q.  You have reason to fear him because you heard**
18  **of one episode; correct?**
19      A.  Correct.  Correct.
20      **Q.  And you did not investigate why that episode**
21  **occurred; correct?**
22      A.  I did not personally investigate it.
23      **Q.  You don't know anyone that investigated why**
24  **that incident occurred; correct?**
25      MR. ROSEMAN:  Objection, calls for speculation.

59

1      THE WITNESS:  I would say no.
2  BY MR. SAFARIAN:
3      **Q.  Okay, and if that incident occurred because**
4  **he was given bad medication, had a psychological**
5  **reaction, would that be relevant to you as a board**
6  **member?**
7      MR. ROSEMAN:  Objection, calls for speculation,
8  assumes facts not in evidence.  Do not guess, Dale --
9  again, Dale, but answer the question.
10      MR. SAFARIAN:  It is not appropriate for you to
11  tell the witness --
12      MR. ROSEMAN:  Counsel, your question is
13  inappropriate.  You are asking him to speculate on
14  something that he knows nothing about.
15      MR. SAFARIAN:  No, I'm not.  And now you are
16  coaching again and I've asked you to please stand back
17  and stop making speaking objections.
18      MR. ROSEMAN:  I am not coaching, I'm making
19  objections.
20      MR. SAFARIAN:  Mr. Roseman --
21      MR. ROSEMAN:  Counsel, I'm entitled to state on
22  the record the way you are.  You believe that you are
23  the only one that has the right to document on the
24  record.  I'll make it clear that I have the right to do
25  the same.  This is a deposition, we have the right to

60

1  make objections.  I've stated my objections.  Continue.
2      MR. SAFARIAN:  Make your objections but make them
3  by code.  But you are just giving me more firepower for
4  the motion, so you can keep doing that.
5      May I please have the question read back
6  without the need to repeat Mr. Roseman's commentary.
7      THE REPORTER:  "Question:  Okay, and if that
8  incident occurred because he was given bad medication,
9  had a psychological reaction, would that be relevant to
10  you as a board member?"
11      MR. ROSEMAN:  Objection, calls for speculation,
12  calls for expert medical.  Go ahead.
13  BY MR. SAFARIAN:
14      **Q.  Go ahead, Mr. Rodin.**
15      A.  Yes -- you have to ask -- I don't understand
16  the question.
17      **Q.  You understand now that Garnik lives in that**
18  **home in that community, that's his home; correct?**
19      A.  To the best of my knowledge, yes.
20      **Q.  And you understand that if that's his home,**
21  **he has some rights as a person who resides there;**
22  **correct?**
23      MR. ROSEMAN:  Objection, calls for legal opinion.
24  BY MR. SAFARIAN:
25      **Q.  You may answer.**

61

1    A.  Will you please repeat the question?

2    Q.  Sure.  You understand that since Garnik lives

3  there and that is his home, that his mother pays HOA

4  dues, as someone who is on the board, as someone who

5  has been the president now since, oh, I don't know, the

6  last three or so years, you understand that he has

7  certain rights; correct?

8    MR. ROSEMAN:  Objection, calls for legal opinion.

9    THE WITNESS:  I don't know.  I don't know.

10  BY MR. SAFARIAN:

11    Q.  You don't know if, for example, if your wife

12  wanted to go use the swimming pool and she pays dues

13  and you pay dues, that she could go and use the

14  swimming pool?  Does she have the right to do that?

15    MR. ROSEMAN:  Objection, incomplete hypothetical.

16  BY MR. SAFARIAN:

17    Q.  You may answer, please.

18    Let me withdraw the question.

19    You know that people who reside in the

20  community have certain rights.  As a board member it is

21  your job to enforce those rights; correct?

22    MR. ROSEMAN:  Harry, can I clarify one thing with

23  you, please.  I have the right to do this.

24    MR. SAFARIAN:  You can do that off the record but

25  we're not going to do --

                                                    62

1    MR. ROSEMAN:  No, this deposition is not -- Harry,

2  let me state this, please.  This deposition is not the

3  person most knowledgeable for the HOA.  You are asking

4  Dale Rodin questions in his personal capacity the way

5  the deposition has been noticed.  I just want to make

6  sure that's clear.  So he's not speaking on behalf of

7  the association in this deposition.  You are taking his

8  personal deposition in this matter.  Just want to be

9  clear on the record for that.

10    MR. SAFARIAN:  Okay, you've made your point,

11  Mr. Roseman.  I don't know why that matters, but that's

12  fine, you've stated that for the record.

13  BY MR. SAFARIAN:

14    Q.  Now, I would like to get through this without

15  too many further interruptions because this should be a

16  two hour deposition.  It looks like it is going to be a

17  much longer deposition, unfortunately.

18    May I please have the question read back.

19    THE REPORTER:  "Question:  You don't know if, for

20  example, if your wife wanted to go use the swimming

21  pool and she pays dues and you pay dues that she could

22  go and use the swimming pool?  Does she have the right

23  to do that?"

24    MR. SAFARIAN:  Let me stop and ask a clear

25  question that's a little bit more succinct.

                                                    63

1  BY MR. SAFARIAN:

2    Q.  Mr. Rodin, people who live in the HOA

3  community pay for certain privileges; correct?

4    A.  Yes.

5    Q.  And people who reside with homeowners who pay

6  dues, they share some of those privileges; correct?

7    A.  Yes.

8    Q.  And as a member of the board, you want to

9  ensure that people's rights to those privileges are

10  protected; correct?

11    A.  Well --

12    MR. ROSEMAN:  Objection, vague and ambiguous.

13  BY MR. SAFARIAN:

14    Q.  You may answer, please.

15    A.  To the best of my ability, I can't control

16  any of that.

17    Q.  But you cannot control necessarily but you

18  can make decisions on behalf of the board.  You can

19  vote; correct?

20    A.  I can vote.  I can't make decisions -- I

21  can't make unilateral decisions.

22    Q.  As a board you can make a decision to, for

23  example, investigate certain things; correct?

24    A.  Please repeat that.

25    Q.  As a board, you can make a decision to

                                                    64

1  investigate something.  For example, if an incident

2  occurs, as a board, you can decide that you are going

3  to investigate that incident; correct?

4    A.  We could.

5    Q.  Okay.  And if an incident occurs, you can

6  investigate why the incident occurred; correct?

7    A.  We could, yes.

8    Q.  And when this incident with Garnik occurred,

9  did you investigate why this incident occurred?

10    A.  I did not personally.

11    Q.  Do you know if anyone on the board

12  investigated why this incident occurred?

13    A.  I do not.

14    Q.  And when Miss Nazaretyan presented medical

15  documents to the board explaining why this incident

16  occurred, did anybody on the board to your knowledge

17  take any action in response to that?

18    MR. ROSEMAN:  Objection, calls for speculation.

19  BY MR. SAFARIAN:

20    Q.  You may answer.

21    A.  Not to my knowledge.

22    Q.  When Miss Nazaretyan presented medical

23  documentation to the board of directors reflecting that

24  her son suffered from schizophrenia -- strike that.

25    As you sit here now, have I refreshed your

                                                    65

1 recollection that those medical documents stated that
2 her son had an adverse reaction because doctors
3 modified his medication?
4     MR. ROSEMAN:  Objection, calls for speculation,
5 documents speak for themselves, asked and answered.
6 BY MR. SAFARIAN:
7     Q.  You may answer.
8     A.  I'm not a doctor, so I couldn't say.
9     Q.  I'm not asking for a medical opinion, but let
10 me have the question read back.  I want a lay
11 observation.
12     THE REPORTER:  "Question:  When Miss Nazaretyan
13 presented medical documentation to the board of
14 directors reflecting that her son suffered from
15 schizophrenia -- strike that.
16     "As you sit here now, have I refreshed your
17 recollection that those medical documents stated that
18 her son had an adverse reaction because doctors
19 modified his medication?"
20     MR. ROSEMAN:  Same objection.
21     THE WITNESS:  I can't make that determination, I'm
22 not a doctor.
23 BY MR. SAFARIAN:
24     Q.  I'm not asking you to make a medical
25 determination, I'm asking you, did you read in plain

66

1 text a doctor's observation that Garnik had an adverse
2 reaction to medication?
3     MR. ROSEMAN:  Objection, assumes facts not in
4 evidence, calls for speculation, document speaks for
5 itself.
6 BY MR. SAFARIAN:
7     Q.  You may answer, Mr. Rodin.
8     A.  You have to read it back again, I don't
9 understand the question.
10     Q.  Ms. Nazaretyan presented medical
11 documentation to the board; correct?
12     A.  Yes.
13     Q.  You are not a doctor; correct?
14     A.  Correct.
15     Q.  But you did study psychology; correct?
16     A.  Correct.
17     Q.  And you did obtain a master's in the
18 counseling program at USC; correct?
19     A.  Correct.
20     Q.  And you learned as a psychology student at
21 the California State University at Long Beach what
22 schizophrenia is; correct?
23     MR. ROSEMAN:  Objection, asked and answered.  Not
24 likely to lead to the discovery of admissible evidence,
25 irrelevant.  Go ahead.

67

1 BY MR. SAFARIAN:
2     Q.  You learned that, correct, Mr. Rodin?
3     A.  I don't recall.
4     Q.  You do know -- as you sit here now, you are
5 70 years old.  In your lifetime you've heard the term
6 "schizophrenia"; correct?
7     A.  Yes.
8     Q.  And you understand schizophrenia to be a
9 medical condition; correct?
10     MR. ROSEMAN:  Objection, calls for medical
11 opinion, but answer if you can.
12     THE WITNESS:  I don't know.
13 BY MR. SAFARIAN:
14     Q.  You don't -- you don't know if schizophrenia
15 is a medical condition?
16     A.  I'm not sure what it is.
17     Q.  When you received medical documentation from
18 Miss Nazaretyan describing or using the word
19 "schizophrenia" or "paranoid schizophrenia," did you
20 look it up in a dictionary?
21     A.  I did not.
22     Q.  Did you ask someone to help you understand
23 what schizophrenia meant?
24     A.  I don't recall.
25     Q.  Did you look up in anyplace or seek any

68

1 guidance as to what it meant?
2     A.  Only within discussing this with counsel.
3     Q.  Okay.  And from that point forward and soon
4 after a lawsuit was filed against my clients; correct?
5     A.  Yes.
6     Q.  And prior to filing that lawsuit seeking
7 equitable remedies against Garnik, including to have
8 him not be present at the property, did you undertake
9 any effort to determine whether the person you were
10 trying to remove from the property had any medical
11 conditions for which he relied upon his mother?
12     MR. ROSEMAN:  Objection, attorney/client
13 communication.
14 BY MR. SAFARIAN:
15     Q.  I don't want to know anything your lawyers
16 told you, so let me start with a clean question.
17     Every question I ask you, implicit in that is
18 "other than what you learned from counsel."
19     So other than what you learned from counsel,
20 prior to filing the lawsuit seeking to have Garnik
21 removed from the property, did you undertake any
22 investigation as to whether he relied upon his mother
23 to care for him because of conditions caused by his
24 schizophrenic disorder?
25     A.  I don't recall.

69

1    Q.  Did you undertake any investigation as to
2  whether his schizophrenic disorder can be controlled by
3  medication?
4    A.  I don't recall.
5    Q.  Did you undertake any investigation to
6  determine whether the schizophrenic disorder he had
7  could be controlled such that it was almost certain
8  that he would never have another episode in the common
9  area of the property?
10    MR. ROSEMAN:  Objection, calls for legal
11  conclusion, assumes facts not in evidence, calls for
12  speculation, overbroad, vague, compound.
13    MR. SAFARIAN:  You can keep all objections that
14  are in the code, Mr. Roseman.
15    MR. ROSEMAN:  No, I'll make the objections for the
16  record, thank you.
17    MR. SAFARIAN:  You can keep every single one so
18  that you don't keep interrupting the deposition so you
19  and I don't cross swords.  You can keep every single
20  one so that way you don't even have to worry about
21  waiving.
22    MR. ROSEMAN:  Harry, the code requires that when
23  you ask a question, I state my objections for the
24  record, otherwise I lose my rights to those objections.
25    MR. SAFARIAN:  I'm saying --

70

1    MR. ROSEMAN:  I understand what you are saying and
2  I am stating objections after your question as I'm
3  entitled to do.  Please let's move forward with the
4  deposition.
5    MR. SAFARIAN:  So, you are declining my proposal,
6  that's fine, I just wanted to get that on the record so
7  that we can have that clear.
8    Can I please have the last question and
9  answer read back.
10    THE REPORTER:  "Question:  Did you undertake any
11  investigation to determine whether the schizophrenic
12  disorder he had could be controlled such that it was
13  almost certain that he would never have another episode
14  in the common area of the property?"
15    MR. ROSEMAN:  Same objections.
16    MR. SAFARIAN:  You may answer.
17    THE WITNESS:  The answer is, I don't recall.
18  BY MR. SAFARIAN:
19    Q.  As you sit here now, do you have any basis,
20  without speculating, to tell me whether the likelihood
21  of Garnik having another episode on the property would
22  be more or less than one in 100,000?
23    MR. ROSEMAN:  Objection, calls for speculation.
24  Counsel, are you serious about that question?
25    MR. SAFARIAN:  Okay, this deposition is suspended.

72

1    MR. ROSEMAN:  I understand what you are saying,
2  but I'm telling you I will make the necessary
3  objections as I deem necessary when you ask a question
4  that warrants it.
5    MR. SAFARIAN:  I just want to be clear --
6    MR. ROSEMAN:  Why don't you just focus on asking
7  your questions and I'll make objections that I'm
8  legally entitled to make, thank you.
9    MR. SAFARIAN:  I'm just making a comment on the
10  record, Mr. Roseman, but I've extended you the courtesy
11  and opportunity to stipulate that every single possible
12  objection is preserved so that you don't have to
13  continue making them.
14    I believe the manner in which you are making
15  them is designed to coach the witness.  You are
16  declining my proposal even though you could stipulate
17  to it and we can move on and you can preserve all
18  objections.
19    MR. ROSEMAN:  Counsel, I've specifically just
20  stated an objection to the last question and now you
21  are telling me even when I'm stating the objections
22  only I'm still coaching the witness?
23    MR. SAFARIAN:  I'm telling you, Mr. Roseman, I'm
24  giving you the opportunity to preserve all objections
25  to --

71

1  Thank you, everyone, for your time.
2    MR. ROSEMAN:  Counsel, I'm making --
3    MR. SAFARIAN:  Mr. Roseman, the deposition is
4  suspended.  I'm asking serious questions about a
5  serious event, Mr. Roseman --
6    MR. ROSEMAN:  I completely understand the serious
7  nature of the --
8    MR. SAFARIAN:  Mr. Roseman, there's no reason to
9  talk any further, Mr. Roseman.  I'm done with you.
10  You've caused enough problems.  This deposition is
11  suspended.  Thank you.  We'll be in --
12    MR. ROSEMAN:  On what basis are you suspending
13  this?
14    MR. SAFARIAN:  Mr. Roseman, you are interrupting
15  the proceedings --
16    MR. ROSEMAN:  I'm stating objections for the
17  record and I have the right to state objections.
18    MR. SAFARIAN:  No, "Are you serious about your
19  question," is not an appropriate objection --
20    MR. ROSEMAN:  I understand that, but --
21    MR. SAFARIAN:  -- it is cuing a response -- it
22  cues a specific type of response from the witness.
23    MR. ROSEMAN:  I'm making clear that --
24    MR. SAFARIAN:  Mr. Roseman, this deposition is
25  over.  We'll go and get a court order requiring

73

19 (Pages 70 to 73)

1   Mr. Rodin to come back with a discovery referee and we
2   have --
3       MR. ROSEMAN:  I suggest we meet and confer --
4       MR. SAFARIAN:  Mr. Roseman, I suggest you shut up
5   and stop this.
6       MR. ROSEMAN:  I have the right to speak on the
7   record.
8       MR. SAFARIAN:  You don't have the right to
9   obstruct the proceedings.
10      MR. ROSEMAN:  I'm absolutely not obstructing the
11  proceedings.  I'm just making clear --
12      MR. SAFARIAN:  Mr. Roseman, we're through.  We are
13  through.  We are through.  You have obstructed enough.
14  We have nothing --
15      MR. ROSEMAN:  I have absolutely not obstructed.  I
16  have only made objections --
17      MR. ROSEMAN:  It is done.
18      MR. ROSEMAN:  -- you are asking for speculation
19  on --
20      MR. SAFARIAN:  There is a point to my question,
21  Mr. Roseman --
22      MR. ROSEMAN:  Well, then ask questions that are --
23      MR. SAFARIAN:  I will ask my questions.  You can
24  make your objections.  I will ask my questions and you
25  can make your objections.

74

1       MR. ROSEMAN:  And I am --
2       MR. SAFARIAN:  Your comments are unwelcome.  You
3   will close your mouth except to make code objections.
4   I'm going to ask my question again, and you are not
5   going to interfere.  I'm laying this down.  That is how
6   this is going to go.
7   BY MR. SAFARIAN:
8       **Q.  Mr. Rodin, based upon the information you**
9   **have, without speculating, can you tell me whether the**
10  **likelihood of Garnik having another episode in the**
11  **incident is more or less than 1 in 100,000?**
12      MR. ROSEMAN:  Objection, calls for speculation,
13  vague, ambiguous, incomplete hypothetical, overbroad.
14  BY MR. SAFARIAN:
15      **Q.  You may answer.**
16      A.  I can't answer that.
17      **Q.  Based upon the information you have now,**
18  **without speculating, can you tell me whether the**
19  **likelihood of Garnik having another episode at anyplace**
20  **in the community is more or less than 1 in 1 million?**
21      MR. ROSEMAN:  Objection, calls for speculation,
22  vague, ambiguous.
23  BY MR. SAFARIAN:
24      **Q.  You may answer.**
25      A.  I can't answer that.

75

1       **Q.  Based upon the information you have now,**
2   **without speculating, can you tell me whether the**
3   **likelihood of Garnik having any type of an episode in**
4   **the community is more or less than any other member of**
5   **the community?**
6       MR. ROSEMAN:  Objection, vague, ambiguous, calls
7   for speculation.
8       THE WITNESS:  I can't answer that.
9   BY MR. SAFARIAN:
10      **Q.  Based upon the information you have now,**
11  **without speculating, do you have any information that**
12  **Garnik is likely to have any type of another episode**
13  **within the community?**
14      MR. ROSEMAN:  Objection, calls for speculation.
15      THE WITNESS:  I can't answer that.
16  BY MR. SAFARIAN:
17      **Q.  Based upon the information you have now,**
18  **without speculating, do you have any information that**
19  **there is a need to restrain or restrict any type of**
20  **presence of Garnik in any community common area of the**
21  **community?**
22      MR. ROSEMAN:  Objection, vague, ambiguous,
23  overbroad, calls for speculation.
24      THE WITNESS:  Please repeat the question?
25  ///

76

1   BY MR. SAFARIAN:
2       **Q.  Based upon the information you are aware of,**
3   **do you have any information that there is any type of a**
4   **need to restrict Garnik's presence at anyplace in the**
5   **common areas?**
6       MR. ROSEMAN:  Same objections.
7       THE WITNESS:  I can't answer that.
8   BY MR. SAFARIAN:
9       **Q.  Okay.  We're going to take a ten-minute**
10  **break, Mr. Rodin, only because I think that everyone,**
11  **except for you -- you have maintained your composure**
12  **perfectly -- and Miss Harwell, who we haven't heard a**
13  **word from who has been very nice, we can take ten**
14  **minutes --**
15      MR. ROSEMAN:  Well, you instructed her not to
16  talk, Harry, that's why --
17      MR. SAFARIAN:  I respect Miss Harwell very much
18  and I was just making a joke for the record,
19  Mr. Roseman.  I wasn't inviting your commentary.
20      MR. ROSEMAN:  Oh, okay.
21      MR. SAFARIAN:  I'm going to take a ten-minute
22  break.  Why don't we come back, and we'll make it a
23  round number -- we'll come back at 10:40.  We'll take a
24  13-minute break.  Everyone can stretch their arms and
25  legs and hopefully we can come back and get through

77

20  (Pages 74 to 77)

1 this peacefully, thank you.
2     THE VIDEOGRAPHER:  We are off the record at
3 10:27 a.m.
4         (A brief recess was taken.)
5     THE VIDEOGRAPHER:  We are on the record at
6 10:44 a.m.
7 BY MR. SAFARIAN:
8     **Q.  Mr. Rodin, I just want your understanding as**
9 **a board member.  I don't want legal opinions or**
10 **anything you've been told by Mr. Roseman, but what is**
11 **your understanding of what the board or the HOA is**
12 **trying to accomplish by its existing lawsuit?**
13     MR. ROSEMAN:  Objection, calls for legal
14 conclusion.
15 BY MR. SAFARIAN:
16     **Q.  You may answer, please.**
17     A.  Please restate the question.
18     **Q.  Of course.  You are aware, as we've**
19 **established, that the -- we're hear today because the**
20 **board filed a lawsuit against my client; correct?**
21     A.  Yes.
22     **Q.  Against the mother of Garnik; correct?**
23     A.  Yes.
24     **Q.  And you are aware that Garnik's mother did**
25 **not destroy any property at the HOA or harm anybody;**

78

1 correct?
2     MR. ROSEMAN:  Objection, calls for speculation.
3 You can answer.
4 BY MR. SAFARIAN:
5     **Q.  You may answer.**
6     A.  Not that I know of.
7     **Q.  Okay.  And at one point she was assessed a**
8 **fine because Garnik had bled in the common areas.  Do**
9 **you recall that?**
10     A.  Yes.
11     **Q.  And she paid that in full; correct?**
12     A.  Yes.  Yes, she did.
13     **Q.  Are you aware that since this incident**
14 **Miss Nazaretyan, my client, left her job as a grocery**
15 **clerk?**
16     A.  I don't know anything about that.
17     **Q.  And are you aware that she left her job as a**
18 **grocery clerk to maintain 24/7 supervision over Garnik?**
19     MR. ROSEMAN:  Objection, calls for speculation.
20     THE WITNESS:  No, I'm not aware of that.  Not to
21 my knowledge.
22 BY MR. SAFARIAN:
23     **Q.  As a board member, now that I've informed you**
24 **that she has left her job as a clerk to maintain 24/7**
25 **supervision over Garnik, does that influence your**

79

1 **opinion at all as to what limitations have to be placed**
2 **on anyone in that household?**
3     MR. ROSEMAN:  Objection, vague, ambiguous,
4 overbroad, calls for speculation, incomplete
5 hypothetical.
6 BY MR. SAFARIAN:
7     **Q.  You may answer.**
8     A.  No, it does not.
9     **Q.  So, what is your current opinion as to**
10 **what limitations must be imposed on Garnik?**
11     A.  I believe he should be -- if he's going to
12 stay on the property, he needs to be contained in the
13 unit just the way we have in the injunction right now
14 because there was another incident that happened.
15     **Q.  And what other incident was that?**
16     A.  A couple of months ago we were notified at
17 the front gate, somebody called L.A. Fire Department,
18 called L.A. police approximately six o'clock one
19 evening.  There was a disturbance by the front gate and
20 we came to find out -- come to find out it was Garnik
21 and L.A. Fire Department --
22         (Reporter Clarification.)
23     A.  The L.A. Fire Department took him away in an
24 ambulance.
25     **Q.  And aside from counsel, how did you learn**

80

1 **about that?**
2     A.  From the guard at the front gate.
3     **Q.  And did you come to learn that that was**
4 **because Garnik or his mother self reported that he was**
5 **having a mental episode?**
6     A.  I do not know.
7     **Q.  Do you have any information as to why that**
8 **happened?**
9     A.  No, I do not.
10     **Q.  Let's assume -- do you have any information**
11 **that he harmed anybody?**
12     A.  I do not know.
13     **Q.  All you know is that he was taken away in an**
14 **ambulance; correct?**
15     A.  Correct.  I know that the fire department was
16 there and the police department was also there.  There
17 were several -- several police cars and an ambulance.
18     **Q.  Okay.  But you don't know that in that**
19 **incident Garnik raised a finger or harmed or threatened**
20 **anyone; correct?**
21     A.  Correct.
22     **Q.  Okay.  All you know is that he was taken away**
23 **in an ambulance; correct?**
24     A.  Correct.
25     **Q.  And as a layperson, your understanding is**

81

21 (Pages 78 to 81)

1 that when someone is taken away in an ambulance, there
2 is a medical issue usually; correct?
3     MR. ROSEMAN:  Objection, calls for speculation,
4 incomplete hypothetical, vague, ambiguous.
5 BY MR. SAFARIAN:
6     Q.  Well, what do you believe ambulances are for,
7 Mr. Rodin?
8     MR. ROSEMAN:  Oh, counsel, objection.
9     MR. SAFARIAN:  Mr. Roseman, stop it.
10    MR. ROSEMAN:  Your question is -- go ahead,
11 answer, Dale.
12 BY MR. SAFARIAN:
13    Q.  Mr. Rodin, what do you believe ambulances are
14 for?  I'm not trying to be condescending but
15 Mr. Roseman is making certain objections and I need to
16 navigate around them so that we can get through this,
17 and that's why I'm asking questions that on a
18 superficial surface seems silly.
19        What do you believe an ambulance is for?
20    A.  To transport someone that needs medical
21 attention to the hospital.
22    Q.  Did you inquire whether Garnik needed medical
23 attention?
24    A.  I did not.
25    Q.  So, as you sit here now, you have one

82

1 incident that occurred in April 2019 and then after
2 when we came back from our break you recalled this
3 incident where Garnik was taken away by ambulance to
4 the hospital; correct?
5     A.  I don't know where they took him, but he was
6 taken off-site.
7     Q.  Before the break you had testified -- we
8 talked about the April 2019 incident and you recalled
9 no other incidents; correct?
10    A.  Correct.
11    Q.  And then after the break we came back and you
12 recall an incident where Garnik was taken away by
13 ambulance to an unknown location; correct?
14    A.  Yes.
15    Q.  Did you or anyone on the board investigate
16 what happened in that incident?
17    A.  We did not.  We did it through counsel.
18    Q.  All right.
19    A.  We notified Roseman.
20    Q.  Okay, you notified Roseman but did you
21 receive any information from any third party, such as a
22 medical record, a statement from a police officer or a
23 statement from a fireman, about what happened?
24    A.  No, we did not.
25    Q.  As a board member, do you believe it would be

83

1 prudent to investigate what transpired for the benefit
2 and protection of the community?
3     MR. ROSEMAN:  Objection, calls for legal opinion.
4     THE WITNESS:  The answer is we tried to, counsel.
5 BY MR. SAFARIAN:
6     Q.  Sorry?
7     A.  We notified counsel.
8     Q.  I understand you notified counsel but as a
9 board member, for example, did anyone knock on
10 Miss Nazaretyan's door and say, "Tamara, we understand
11 your son was taken away in an ambulance.  First and
12 foremost, is there anything we can do to help?"  Did
13 any conversation like that happen that you are aware
14 of?
15    A.  Not that I know of.
16    Q.  Did anyone knock on the family's door and say
17 or call them and say, "Tamara, our condolences, it
18 sounds like son had a health problem"?  Did anything
19 like that happen?
20    A.  Not that I know of.
21    Q.  Have you ever had in your life observed
22 people taken away in an ambulance because of any
23 serious health issues in the past?
24    MR. ROSEMAN:  Objection, vague, ambiguous,
25 overbroad.

84

1 BY MR. SAFARIAN:
2     Q.  You may answer.
3     A.  Repeat your question.
4     Q.  Well, you understand that people are taken
5 away in ambulances because they have heart attacks, for
6 example; correct?
7     A.  Or other issues, yes.
8     Q.  Yeah, examples would be heart attacks.
9 That's one; correct?
10    A.  Yes.
11    Q.  Or strokes; correct?
12    A.  Yes.
13    Q.  Or a fall from a high place that might result
14 in a catastrophic injury; correct?
15    A.  I don't know.  Correct.  For a number of
16 reasons.
17    Q.  Yeah, there is many reasons why an ambulance
18 would come and take somebody to the hospital; correct?
19    A.  Yes.
20    Q.  Okay.  So, here you have a young man who
21 lives within your community to whom you owe a fiduciary
22 responsibility; correct?
23    MR. ROSEMAN:  Objection, calls for legal opinion.
24 BY MR. SAFARIAN:
25    Q.  You may answer.

85

22  (Pages 82 to 85)

1    A.  I'm not sure what I personally owe.

2    Q.  As a board member you have no understanding

3 that you owe a fiduciary responsibility to members of

4 the community and the people that reside there?

5    MR. ROSEMAN:  Objection, vague, ambiguous,

6 overbroad, calls for legal opinion.

7 BY MR. SAFARIAN:

8    Q.  You may answer, please.

9    A.  I can't answer that.

10    Q.  You do owe them a duty, though; correct?

11    MR. ROSEMAN:  Objection, calls for legal opinion.

12 BY MR. SAFARIAN:

13    Q.  You may answer.

14    A.  I don't know.

15    Q.  Do you know or not whether you owe people who

16 live within the residential community at Aldea any type

17 of duty at all?  It is just "yes" or "no" whether you

18 owe a duty.

19    MR. ROSEMAN:  Objection, vague, ambiguous.

20    THE WITNESS:  Only within the confines of the --

21 of my duties as a board member.

22 BY MR. SAFARIAN:

23    Q.  What are those duties in your own best words?

24    MR. ROSEMAN:  Objection, calls for legal opinion.

25    THE WITNESS:  Just to uphold the CC&R'S and the

86

---

1 rules and regulations of the Aldea community.

2 BY MR. SAFARIAN:

3    Q.  Okay.  And when this incident with the

4 ambulance happened, did anyone express any sympathy or

5 remorse to anyone within the Nazaretyan household that

6 you are aware of?

7    A.  No.

8    Q.  Did anyone inquire of any person, whether it

9 is a fire department paramedic, someone from the

10 Nazaretyan household about what transpired?

11    MR. ROSEMAN:  Objection, calls for speculation.

12 BY MR. SAFARIAN:

13    Q.  To your knowledge.

14    A.  Not that I know of.

15    Q.  Did you interview the security guard?

16    A.  I did not interview him, I spoke to him.

17    Q.  What did he say to you?

18    A.  He told me that an ambulance is onsite and

19 there is several LAPD cruisers onsite and fire

20 department was called and it was just outside the gate

21 where he was letting -- where he -- outside the guard

22 gate on Rinaldi.

23    Q.  Do you know whether Garnik had been stabbed

24 by gang members on the street in that incident?

25    A.  No, I don't know that.

87

---

1    Q.  Okay.  Do you know that he was -- whether he

2 was attacked by individuals on the street outside the

3 complex?

4    A.  No, I don't know.  This happened inside the

5 complex.

6    Q.  Okay.  Do you know that he was attacked by

7 somebody inside the complex?

8    A.  I do not.

9    Q.  Okay.  Let's assume that that was the case,

10 we can't rule that out hypothetically, would that

11 formulate a basis for you to keep Garnik away from

12 common areas?

13    MR. ROSEMAN:  Objection, calls for speculation,

14 incomplete hypothetical.

15 BY MR. SAFARIAN:

16    Q.  Pursuant to your understanding of the CC&R'S,

17 if Garnik was the victim of an attack would that

18 justify excluding him from common areas?

19    MR. ROSEMAN:  Objection, calls for legal opinion,

20 vague, ambiguous, incomplete hypothetical.

21 BY MR. SAFARIAN:

22    Q.  You may answer.

23    A.  I don't know.

24    Q.  As you sit here now, the only incident

25 wherein you are aware of wherein Garnik had any

88

---

1 interaction with any other person that is in any way

2 objectionable to the board, was the single April 2019

3 incident; correct?

4    MR. ROSEMAN:  Objection, vague, ambiguous, calls

5 for speculation.

6 BY MR. SAFARIAN:

7    Q.  Am I correct?

8    A.  Please state the question again.

9    Q.  As far as you know -- we know that there was

10 this more recent incident but you don't know anything

11 about that except for he was taken away in an ambulance

12 and there were some cruisers there; correct?

13    MR. ROSEMAN:  Objection, vague and ambiguous,

14 misstates testimony.

15 BY MR. SAFARIAN:

16    Q.  Am I correct?

17    A.  You are correct there were police cruisers

18 there.

19    Q.  Yes, and he was taken away in an ambulance;

20 correct?

21    A.  Yes.

22    Q.  But you don't have any more details about

23 that incident; correct?

24    A.  No.

25    Q.  Am I correct?

89

23  (Pages 86 to 89)

1    A.  Yes.
2    Q.  Okay, thank you.  And so the only incident
3  you are aware of in all the years that you've lived
4  there where Garnik had any interaction with another
5  person, was the one-time incident in April 2019;
6  correct?
7    A.  Yes.
8    Q.  Okay.  Are you aware that the entire
9  Nazaretyan household had their access cards for the
10  entire HOA community deactivated?
11    A.  Yes, I do.  Yes, I am aware.
12    Q.  I'm sorry?
13    A.  Yes.
14    Q.  Are you aware that living with Garnik and his
15  mother is Garnik's grandmother who is an elderly woman?
16    A.  I don't know that.
17    MR. ROSEMAN:  Objection, calls for speculation.
18  BY MR. SAFARIAN:
19    Q.  Have you ever inquired as to who lives in the
20  household?
21    A.  No, not that I recall.
22    Q.  Have you ever inquired as far as what
23  protocols the household has with regard to protecting
24  Garnik?
25    A.  No, not that I recall.

90

1    Q.  Have you ever inquired as to whether any of
2  the protocols that are being exercised by the family
3  are adequate to protect the HOA community from any
4  possible conceivable risk by Garnik?
5    MR. ROSEMAN:  Objection, vague, ambiguous,
6  overbroad, calls for a legal conclusion.
7    THE WITNESS:  Please repeat the question.
8  BY MR. SAFARIAN:
9    Q.  Have you ever made any inquiry as to the
10  types of protocol the family has in place to ensure
11  that Garnik does not ever present a problem for the HOA
12  community in the future?
13    A.  No.
14    Q.  At this point do you know whether the
15  protocols exercised by the family are sufficient to
16  ensure that Garnik does not have any future incidents
17  with any person within the community in the future?
18    MR. ROSEMAN:  Objection, calls for speculation,
19  vague, ambiguous, overbroad, compound.
20  BY MR. SAFARIAN:
21    Q.  You may answer.
22    A.  I don't know.
23    Q.  As you sit here now, do you have any
24  information that the protocol the family has in place
25  is not sufficient to ensure against future harm of

91

1  people living in the HOA community?
2    A.  I don't know.
3    Q.  When was the family's access cards
4  deactivated?
5    A.  I don't recall specifically.
6    Q.  When were they reactivated?
7    A.  They were reactivated when everybody else in
8  the community's cards were reactivated because of the
9  Covid.  Everybody's cards were deactivated for the pool
10  areas a couple of years ago when the Covid first hit.
11  Nobody had access to the pool areas.
12    Q.  Are you aware that my clients' cards were
13  deactivated such that they couldn't use any part of the
14  common areas and, in fact, if they were on the street,
15  they could not use the cards to enter through any
16  pedestrian ingress?
17    A.  Yes.
18    Q.  And why was that done?
19    A.  It was done because we -- to make sure that
20  the community was safe and that he might not -- he
21  couldn't be wandering around.
22    Q.  So, let me ask you hypothetically, if Garnik
23  decided to leave the community for a walk, he wouldn't
24  need the access card to get out; correct?
25    A.  You do not need an access card to get out.

92

1    Q.  Okay.  Have you ever seen Garnik wandering
2  around?
3    A.  I have not.
4    Q.  So the deactivation or the restrictions
5  placed on this family were broader than the
6  deactivation or restrictions placed on the community at
7  large; correct?
8    A.  It was different.
9    Q.  Well, they had more restrictions placed on
10  them than anyone else in the community; correct?
11    A.  Not everyone -- no, that's not true.  Other
12  people had other restrictions.  Other homeowners had
13  similar restrictions that they couldn't use the cards
14  for various reasons.
15    Q.  Okay.  Was there any other homeowner who was
16  restricted from using the access cards to enter the
17  building or enter the community from the street?
18    A.  At what time?
19    Q.  Since April 2019.
20    A.  Yes, there's been several other people whose
21  cards have been deactivated.
22    Q.  And why were they deactivated?
23    MR. ROSEMAN:  Objection, calls for privacy rights.
24  BY MR. SAFARIAN:
25    Q.  You may answer.

93

24  (Pages 90 to 93)

1    A.  Well, for various infractions.  That, and
2  they received a violation warning or something and they
3  didn't comply.
4    Q.  Like not paying dues?
5    A.  That's one thing.
6    Q.  What other types of violations?
7    A.  There's all types of violations here
8  regarding installation of unauthorized construction to
9  your unit, putting -- violating the rule about trash
10  cans, violating the rules about security camera
11  installations, violating the rules against satellite
12  dish units, et cetera.
13    Q.  All right.  So, let me ask you, those types
14  of violations, you have no evidence that my clients
15  ever committed those; correct?
16    A.  Correct.
17    Q.  You have no indication that my clients ever
18  committed -- let's say Tamara Nazaretyan.  You have no
19  information that Tamara Nazaretyan ever committed any
20  type of violation at the community; correct?
21    A.  Not that I know of.
22    Q.  And you have no information that her elderly
23  mother, Garnik's grandmother, ever committed any type
24  of violation; correct?
25    A.  Not that I know of.

94

1    Q.   And in terms of Garnik, he engaged -- he was
2  involved in that one incident as a result of his
3  paranoid schizophrenic disorder.
4        Do you have any basis to dispute that the
5  incident was a result of a paranoid schizophrenic
6  episode?
7    MR. ROSEMAN:  Objection, vague, ambiguous,
8  overbroad, calls for speculation, assumes facts not in
9  evidence and all of the others that you say I can
10  include as well because there are many more.
11    MR. SAFARIAN:  Well, we haven't entered a
12  stipulation as to the others, so why don't you go ahead
13  and list them because you declined my stipulation.  Go
14  ahead, Mr. Roseman, I'm giving you an opportunity to
15  state all of your objections so I can move on.
16        Are you done, Mr. Roseman?  May I proceed
17  with the question.
18    MR. ROSEMAN:  Harry, please continue with your
19  deposition.
20    MR. SAFARIAN:  Okay, thank you.
21  BY MR. SAFARIAN:
22    Q.   Do you have any reason to dispute that the
23  specific incident that Garnik was involved in was
24  anything other than a response to medication and a
25  medical disability?

95

1    MR. ROSEMAN:  Objection, vague, ambiguous,
2  compound, calls for speculation, assumes facts not in
3  evidence.
4  BY MR. SAFARIAN:
5    Q.   Let me break it down.  Do you have any reason
6  to dispute that the April 2019 incident was as a result
7  of anything other than a disability?
8    MR. ROSEMAN:  Objection, calls for speculation.
9  BY MR. SAFARIAN:
10    Q.   You may answer, Mr. Rodin.
11    A.  I don't know.
12    Q.   Do you have any reason to dispute that
13  Garnik's one-time incident was as a result of anything
14  other than his medication?
15    MR. ROSEMAN:  Objection, misstates testimony,
16  vague, ambiguous, overbroad, incomplete hypothetical,
17  calls for speculation.
18  BY MR. SAFARIAN:
19    Q.   You may answer.
20    A.  I don't know.
21    Q.   As you sit here now, what information do you
22  have about what the cause of the April 2019 incident
23  was?
24    MR. ROSEMAN:  Objection, calls for legal --
25  attorney/client privilege.

96

1  BY MR. SAFARIAN:
2    Q.   You may answer.
3    A.  What was the question again?
4    Q.   What information do you have as to what the
5  cause of the one-time April 2019 incident was?
6    A.  I'm not sure.
7    Q.   So, you have no evidence that Garnik engaged
8  in any type of deliberate activity at all to cause
9  anyone at that HOA at this point; correct?
10    MR. ROSEMAN:  Objection, misstates testimony,
11  calls for speculation --
12    MR. SAFARIAN:  Counsel --
13    MR. ROSEMAN:  Counsel, can I finish my objections?
14    MR. SAFARIAN:  No, I'm withdrawing the question,
15  Mr. Roseman.
16    MR. ROSEMAN:  Okay.
17  BY MR. SAFARIAN:
18    Q.   Do you know, without speculating, whether
19  Garnik's April 2019 incident --
20    (Reporter clarification due to Zoom videoconference
21          audio malfunction.)
22  BY MR. SAFARIAN:
23    Q.   Mr. Rodin, do you have any information that
24  the April 2019 incident was a result of any deliberate
25  conduct by the part of Garnik as opposed to an adverse

97

1  response to medication treating his paranoid
2  schizophrenic disorder?
3      MR. ROSEMAN:  Objection, calls for speculation,
4  attorney/client privilege, assumes facts not in
5  evidence, vague, ambiguous, compound, incomplete
6  hypothetical.  Forget the last objection.
7  BY MR. SAFARIAN:
8      Q.  You may answer.
9      A.  I don't know.
10     Q.  Sir, based on the information you have, it is
11 clear you have no information that the April 2019
12 incident was a result of any intentional conduct by
13 Garnik; correct?
14     MR. ROSEMAN:  Asked and answered, same objections.
15 You want me to state them again?  Should I run through
16 them?  Vague, ambiguous, calls for speculation,
17 compound.
18 BY MR. SAFARIAN:
19     Q.  Do you have the question fresh in your mind,
20 Mr. Rodin?
21     A.  No, please repeat.
22     Q.  Thank you, Mr. Rodin.
23        Mr. Rodin, as you sit here now, do you have
24 any information in the April 2019 incident was the
25 result of any intentional conduct by Garnik?

98

1      MR. ROSEMAN:  Same objections.
2      THE WITNESS:  I do not.
3  BY MR. SAFARIAN:
4      Q.  I'm sorry?
5      A.  I said, I do not.
6      Q.  Okay.  Do you have any information that any
7  member of the Nazaretyan household engaged in any
8  intentional conduct for which their access cards for
9  the entire community were suspended?
10     MR. ROSEMAN:  Objection, vague, ambiguous,
11 compound, overbroad.
12     THE WITNESS:  I don't recall.
13 BY MR. SAFARIAN:
14     Q.  Okay.  Thank you.  So, there were exceptions
15 in the community when somebody put up an illegal
16 satellite dish, for example, that they would have a
17 restriction placed on them that was broader than the
18 overall community; correct?
19     A.  Well, each incident is -- each incident is
20 treated separately.
21     Q.  Okay.  But, generally speaking, if a
22 homeowner or occupant of the dwelling is complying with
23 the rules, then their access cards are usable.  They
24 all have usable access cards except for this brief
25 period during Covid; correct?

99

1      MR. ROSEMAN:  Objection, vague and ambiguous,
2  overbroad, compound.
3      MR. SAFARIAN:  I'm going to withdraw the question.
4  That wasn't a clean question.
5  BY MR. SAFARIAN:
6      Q.  Let's start with the Covid time.  When I
7  deposed Miss Corbett, she said the Covid restrictions
8  were only for a very short period of time when Covid
9  first started and it was sort of a scary thing.  I
10 don't know if those were her words exactly, but is that
11 consistent with your recollection?
12     A.  That's not clear, please restate that.
13     Q.  Sure.  When I was talking to Miss Corbett,
14 she mentioned something about the duration of the Covid
15 restriction, and she caused me to believe that it was
16 for a short period of time when Covid first became
17 known to us.
18        Do you recall what your belief is as to the
19 duration of that restriction?
20     A.  You mean the timeframe, how long was the pool
21 disabled?
22     Q.  There you go.  You would be a great lawyer.
23 That is a better question than I asked.  Go ahead.
24     A.  Well, the answer is close to a couple of
25 years.

100

1      Q.  Okay.  So, do you have documentation as to
2  when those restrictions were in place?
3      A.  Yes, absolutely.
4      Q.  Okay.  How can -- I haven't seen that.  Can
5  you describe for me what that is?
6      A.  We -- we filed the Department of Public
7  Health's guidelines.  We posted the bulletins at the
8  entrances to the pool stating the pool is closed and
9  this is why, and we have -- we have dates that we did
10 it and we -- as the restrictions were lifted, we issued
11 and posted proper signage as requested by the
12 Los Angeles Department of Health.  That's what we did.
13     Q.  Okay.  Now, do you have a particular
14 memorandum, for example, within the HOA board of
15 directors that says when the dates were?
16     A.  I'm sure PMP has it.
17     Q.  Would that have been written instruction by
18 the board to PMP discussing those restrictions?
19     A.  Yes.
20     Q.  Would it have been like an email, or what
21 form would that have taken?
22     MR. ROSEMAN:  I'm going to object, attorney/client
23 privileged communication.  Any knowledge you've
24 obtained or members have obtained from our law firm is
25 privileged communication.

101

26 (Pages 98 to 101)

1    MR. SAFARIAN:  Yeah, we know that.
2  BY MR. SAFARIAN:
3    **Q.  So, what I'm asking you is, did someone from**
4  **the board send an email to someone within PMP saying,**
5  **all right, please reactivate cards, or something to**
6  **that effect?**
7    A.  Actually what we did was, we had Roseman
8  involved in that because they were assisting various
9  communities how to handle this Covid business and
10  access to swimming pools being opened, so it was all
11  done through Roseman's office actually.
12    **Q.  Okay.  So, my position is that PMP is not a**
13  **party to this case, PMP is a management company.  If**
14  **PMP is given an instruction as to what to activate and**
15  **deactivate, then that is not an attorney/client**
16  **communication.**
17    MR. ROSEMAN:  I will clarify for the record, PMP
18  is an agent on behalf of the association so if there's
19  direct communication with the agent on behalf of the
20  association, that privilege would extend.
21    MR. SAFARIAN:  Let me finish.  It is also not an
22  attorney/client communication because it is not
23  rendering or giving legal advice, it is engaging in a
24  ministerial act of instructing PMP as to when to
25  activate or deactivate a card.

                                                        102

1  BY MR. SAFARIAN:
2    **Q.  So what I'm trying to get at is, what**
3  **communications were there wherein PMP has told activate**
4  **or deactivate something.  That is a ministerial act.**
5  **That is a formality that is not a legal communication**
6  **by nature or by definition, so I'm trying to get at,**
7  **how can I find the exact dates where they were**
8  **activated versus deactivated?**
9    A.  That's the question you are asking me?
10    **Q.  Yes, please.**
11    A.  So, wait, state the question.  You want to
12  know what mechanism activated the cards or not?
13    **Q.  Yes.**
14    A.  It was done by a combination of monitoring
15  the Los Angeles Health Department's guidelines as to
16  when the pools could be open.
17    **Q.  I guess what I'm getting at is, somebody had**
18  **to give an instruction to activate or deactivate those**
19  **cards; correct?**
20    A.  Yes.
21    **Q.  And those were instructions -- did someone**
22  **from the board communicate with PMP in writing by**
23  **email, fax transmission or written letter or some other**
24  **writing, you know, text messages, SMS, whatever it may**
25  **be, "Hey, please reactivate our cards"?**

                                                        103

1    A.  The answer -- I believe we did it in
2  executive session at one of our board meetings where we
3  were -- where we double checked that the pools could be
4  opened and we instructed PMP at that meeting to
5  activate the cards.
6    **Q.  Aside from the pools, what other common area**
7  **accesses or privileges do these cards entitle someone**
8  **to?**
9    A.  The only access is the pool, the pool area
10  and the manned gate, the front gate -- the manned
11  gates, the entrance to the facility -- to the
12  community, I mean.
13    **Q.  Okay.  So, these cards, 50 percent of their**
14  **use is the gate, 50 percent of their use is the pool;**
15  **correct?  They have two uses?**
16    A.  Well, they have either/or, yes.
17    **Q.  Either/or, yes.  And, so, with regard to the**
18  **manned gate, as you called it, the --**
19    A.  The pedestrian gate.
20    **Q.  Yes.  Because the only other way to get in or**
21  **out the community is by car; correct?**
22    A.  Say that again?
23    **Q.  If you are not using this pedestrian gate,**
24  **the only other way in or out is by car; correct?**
25    A.  Correct, through the gates.

                                                        104

1    **Q.  And the -- that is a gated area that you**
2  **would use a transponder for; correct?**
3    A.  Correct.
4    **Q.  And the transponder you would have to have in**
5  **a car to go in or out; correct?**
6    A.  Correct.
7    **Q.  So, if you don't have access using your card,**
8  **then -- and you don't have a car, then you don't have**
9  **any way of getting back in unless you either wait for**
10  **somebody to let you in at the gated car entrance or the**
11  **manned gate; correct?**
12    A.  That is correct.
13    **Q.  Okay.  And if you don't have an access card,**
14  **getting in through the gated car area requires you to**
15  **come into an area that is designed for vehicle traffic;**
16  **correct?**
17    A.  I don't understand your question.
18    **Q.  Well, the entrance to the gated area where**
19  **the cars come in and out with a transponder, that is**
20  **designed for cars to go in and out of; correct?**
21    A.  Correct.
22    **Q.  And that is not designed for foot traffic;**
23  **correct?**
24    A.  Correct.
25    **Q.  And you can understand as a board member how**

                                                        105

                            27 (Pages 102 to 105)

1 mixing foot traffic with car traffic could impose risks
2 to pedestrians; correct?
3    A. Yes.
4    Q. Okay. So, for a period of several years the
5 Nazaretyan household had their access to the front gate
6 suspended; correct?
7    MR. ROSEMAN: Objection, misstates testimony.
8 BY MR. SAFARIAN:
9    Q. After April 2019, soon after, the family's
10 access to the front gate was suspended; correct?
11   A. Correct.
12   Q. And it was only reactivated after the federal
13 lawsuit was filed; correct?
14   A. I don't recall.
15   Q. Well, do you know approximately when the gate
16 access was reactivated?
17   A. I don't recall exactly.
18   Q. Did the family do anything intentional at all
19 to have their access to the gate revoked? Any one of
20 the family.
21   MR. ROSEMAN: Objection, calls for speculation.
22   THE WITNESS: I don't know.
23 BY MR. SAFARIAN:
24   Q. Did the grandmother pose a threat as far as
25 you know to anyone in the community?

                                                            106

1 assailant, and he wanted to get into the community
2 property while his access card was suspended, there
3 would be no way for him to get into the community as
4 far as you know mechanically without waiting for
5 someone to let him in; correct?
6    MR. ROSEMAN: Objection, vague, ambiguous,
7 overbroad, calls for speculation, incomplete
8 hypothetical. Did I miss any, Lillian?
9    MS. HARWELL: No, I think you're fine.
10   THE WITNESS: You have to restate the question.
11 BY MR. SAFARIAN:
12   Q. Sure, and we'll stipulate that the objections
13 stand.
14      Madam Court Reporter, would you please
15 reframe -- or restate the question.
16   THE REPORTER: "Question: If Garnik were outside
17 the common area and he were subjected to an unsafe
18 condition, let's say an assailant, and he wanted to get
19 into the community property while his access card was
20 suspended, there would be no way for him to get into
21 the community as far as you know mechanically without
22 waiting for someone to let him in; correct?"
23   THE WITNESS: Yes, correct.
24 BY MR. SAFARIAN:
25   Q. Did that ever concern you that this person

                                                            108

1    MR. ROSEMAN: Objection, vague, ambiguous, calls
2 for speculation.
3    THE WITNESS: Can you repeat that?
4 BY MR. SAFARIAN:
5    Q. Sure. Did Garnik's grandmother, the elderly
6 grandmother, pose a threat to anyone in the community?
7    A. Not to my knowledge.
8    Q. Did Garnik's mother to your knowledge pose a
9 threat to anyone in the community?
10   A. Not to my knowledge.
11   Q. And do you have anything in writing from
12 anyone in the Nazaretyan household authorizing you to
13 terminate or suspend their access to the pedestrian
14 acces sway?
15   A. Please repeat that.
16   Q. Did anyone within the Nazaretyan household
17 give any permission to the HOA board or anyone else to
18 suspend their access cards as far as they would be
19 useful for the front gate entrance?
20   A. Not to my knowledge.
21   Q. Did the Nazaretyan family ever consent to any
22 suspension of access cards as far as you know?
23   A. Not to my knowledge.
24   Q. If Garnik were outside the common area and he
25 were subjected to an unsafe condition, let's say an

                                                            107

1 lived in the community, had a mental disability and you
2 had suspended the entire family's access to the
3 property from outside?
4    MR. ROSEMAN: Objection, calls for speculation,
5 calls for expert opinion, vague, ambiguous, overbroad,
6 compound.
7       You can answer the question, Dale, and then,
8 Counsel, I'm going to ask for a five-minute break,
9 please.
10   MR. SAFARIAN: I will give you a longer break than
11 five minutes, I'll give you a ten-minute break, how is
12 that?
13   MR. ROSEMAN: Yeah, I'm just telling you, I
14 unfortunately have to take a break from 11:45 for a
15 lunch break of at least 45 minutes but let him answer
16 this question and then we can take a quick five-minute
17 break that's all I need.
18   MR. SAFARIAN: No problem.
19 BY MR. SAFARIAN:
20   Q. And, Mr. Rodin, I'll have the question
21 re-read so it is fresh in your mind.
22   A. Yes, please re-read the question.
23   MR. SAFARIAN: I'll tell you, the one person here
24 is who is really earning her money today is the court
25 reporter.

                                                            109

1    THE REPORTER: "Question: Did that ever concern
2  you that this person lived in the community, had a
3  mental disability and you had suspended the entire
4  family's access to the property from outside?"
5    THE WITNESS: Not to my knowledge.
6    MR. SAFARIAN: All right, thank you. We'll take a
7  break until, why don't we do 11:30.
8    THE VIDEOGRAPHER: We are off the record at
9  11:19 a.m.
10    (A recess was taken.)
11    THE VIDEOGRAPHER: We'll go back on. We are on
12  the record at 11:31 a.m.
13  BY MR. SAFARIAN:
14    Q. Mr. Rodin, how far in distance, feet, yards,
15  whatever you are comfortable, car lengths, is the
16  Nazaretyan unit from your unit?
17    A. It is one building down probably --
18    Q. I'm sorry?
19    A. Maybe --
20  (Reporter clarification due to Zoom videoconference
21          audio malfunction.)
22    A. Oh, sorry, 2, 300 feet.
23    Q. So, in terms of proximity, they are
24  apparently not living near you as apparently the other
25  HOA board members; correct?

110

1    A. Correct.
2    Q. And since they don't live near you, you can't
3  see them, correct, from your unit?
4    A. Be more specific, see who?
5    Q. Thank you, that is a good clarification.
6    We've established and you've stated that the
7  Nazaretyans do not live near your dwelling; correct?
8    A. Correct. They lived several buildings away.
9    Q. Okay. And you -- because of those several
10  buildings away, you could not see them from any part of
11  your property, "them" being the Nazaretyan family;
12  correct?
13    A. That is correct.
14    Q. So, and what I mean by that is, if you were
15  on your front porch or looking out your bedroom window,
16  you wouldn't be able to see the Nazaretyan dwelling;
17  correct?
18    A. That is correct.
19    Q. And because you lived several hundred feet
20  away, you -- let me ask this: You could not at any
21  time see that Garnik was out roaming the common areas;
22  correct?
23    MR. ROSEMAN: Objection, vague, ambiguous.
24    THE WITNESS: I only have limited access of what I
25  can see. They live in a different building. Anybody

111

1  can wander around the common areas or he could have
2  wandered by my house and I would have never known it.
3  BY MR. SAFARIAN:
4    Q. Can you describe what he looks like?
5    A. Only from the videos I've seen, tall
6  skinny -- tall skinny young man.
7    Q. Okay. You have never laid eyes on him as far
8  as you can tell; correct?
9    A. Not that I recall. You mean in person?
10    Q. Yeah, outside the videos.
11    A. No, not that I recall.
12    Q. You could see in one of the videos that it
13  looked like he was terrified, couldn't you?
14    MR. ROSEMAN: Objection, calls for speculation.
15  BY MR. SAFARIAN:
16    Q. You can answer.
17    A. I just saw what the video shows. It shows a
18  young man running around with blood all over him.
19    Q. Did you ever, as a person who studied
20  psychology, stop and think, there is a young man
21  running around with blood all over him, that maybe
22  there was something going on as far as a mental
23  episode?
24    MR. ROSEMAN: Objection, calls for speculation,
25  calls for expert medical opinion and he's not an expert

112

1  doctor here --
2    MR. SAFARIAN: You are making a statement.
3    MR. ROSEMAN: -- vague and ambiguous.
4  BY MR. SAFARIAN:
5    Q. Mr. Rodin, did you ever stop and think at any
6  point that what you were seeing in the video was so
7  unusual that maybe the person in the video was having a
8  mental episode?
9    A. Not that I recall.
10    Q. Did you think about it in any way at all? I
11  mean, did you give the matter any consideration?
12    A. Not really. I just reacted to somebody
13  running around and terrifying the neighbors.
14    Q. Well, how many neighbors did he terrify?
15    MR. ROSEMAN: Objection, calls for speculation.
16  BY MR. SAFARIAN:
17    Q. That you know of.
18    A. That I know of?
19    Q. Yeah.
20    A. Two or three.
21    Q. Okay. And it was just on that one day over a
22  period of an hour or minutes?
23    A. I believe it was over a period of about an
24  hour.
25    Q. Okay. And Garnik lives in the Nazaretyan

113

29 (Pages 110 to 113)

1 home. That's his home, you understand that; correct?
2    A. That's what I've been told.
3    Q. You've always understood that to be the case,
4 correct, you've never known otherwise; correct.
5    A. What is your question?
6    Q. Sure. Have you ever believed that Garnik was
7 any -- that the dwelling was anything other than
8 Garnik's residence?
9    A. No.
10    Q. Okay. I'm going to share a document with
11 you. This is from your declaration that you signed.
12 See, it says in Paragraph 4, you are one of the owners
13 of a condo unit in the association. Do you see that?
14    A. Yes.
15    Q. And you state that Miss Nazaretyan lives near
16 you in the project. Do you see that?
17    A. Yes.
18    Q. But she doesn't live near you, we've
19 established; correct?
20    A. Well --
21    MR. ROSEMAN: Objection, misstates his testimony.
22 BY MR. SAFARIAN:
23    Q. I'll withdraw the question. Here it says,
24 "She frequently allows her son Garnik to stay as a
25 guest." You don't know that she frequently allows

114

1 Garnik to stay as a guest because your only information
2 is that Garnik has lived there at his home; correct?
3    A. Yes.
4    Q. Mr. Roseman prepared this declaration;
5 correct?
6    MR. ROSEMAN: Objection, calls for attorney/client
7 privileged communication, assumes facts not in
8 evidence, calls for speculation.
9    MR. SAFARIAN: I'm entitled to an answer.
10 BY MR. SAFARIAN:
11    Q. Did you type this declaration?
12    A. Are you asking me?
13    Q. Yes.
14    A. I did not.
15    Q. Did you formulate any of the words on this
16 declaration with your own letters or emails to someone?
17    A. Not that I recall.
18    Q. Did you review every line of this declaration
19 before signing it?
20    A. I reviewed -- I reviewed it before I signed
21 it.
22    Q. Well, you understand here it says that she
23 frequently allowed her son to stay as a guest. You
24 didn't know that to be true when you signed it,
25 correct, because you just told me a minute ago that

115

1 Miss Nazaretyan -- that the only information that
2 you've ever had was that this was his home; correct?
3    A. Yes.
4    Q. So, when you reviewed it, you didn't
5 review -- look, I don't think you perjured yourself, I
6 think you just skimmed through it or didn't have a
7 chance to read it.
8    MR. ROSEMAN: Counsel, are you testifying? Is
9 there a question pending here?
10    MR. SAFARIAN: Mr. Roseman, I'm asking him a
11 question on an important area. Make your objections or
12 move on.
13 BY MR. SAFARIAN:
14    Q. Mr. Rodin, I think you are an honest guy and
15 I don't think you perjured yourself. This was signed
16 under penalty of perjury, and I don't think you
17 perjured yourself. I think what happened here is that
18 someone prepared this declaration for you and you took
19 their word for it and you signed it. Am I correct or
20 am I incorrect?
21    A. I glanced through it before I signed it.
22    Q. You didn't glance through it very carefully;
23 correct?
24    A. I glanced through it.
25    Q. Did you glance through it carefully to make

116

1 sure every word and every line was accurate?
2    MR. ROSEMAN: Counsel, I'm going to object that
3 you are starting to harass the witness --
4    MR. SAFARIAN: Mr. Roseman --
5    MR. ROSEMAN -- you can ask him questions about
6 the truth of the declaration but do not threaten him.
7    MR. SAFARIAN: Mr. Roseman, you're being
8 ridiculous. You're being ridiculous, Mr. Roseman. I'm
9 going to move on.
10 BY MR. SAFARIAN:
11    Q. Mr. Rodin, I'm going to continue to speak to
12 you in a polite tone. At any point in this deposition
13 have I raised my voice to you? Mr. Rodin?
14    A. What?
15    Q. At any point in this deposition, have I
16 raised my voice to you?
17    A. No.
18    Q. Okay. You've seen that I've had arguments
19 with Mr. Roseman but you see that I'm trying to be
20 polite to you, don't you? You see that, don't you,
21 Mr. Rodin?
22    A. I see you trying to get through this
23 deposition.
24    Q. That's right, so I'm going to try to do that
25 and if there's anything that I can do help you, just

117

30 (Pages 114 to 117)

1 let me know.  Like I said, I'm here to accommodate
2 whatever you need.  We only have a few more minutes
3 left.
4      At the time you wrote this, it said that she
5 frequently allows her son Garnik to stay as a guest at
6 the project, but now we've established that that was
7 never something you believed to be true.  So, is it a
8 fair statement that when you glanced at the declaration
9 before signing it, you didn't pick that up?
10     MR. ROSEMAN:  Objection, misstates testimony.
11     THE WITNESS:  The answer is, yes, I did not pick
12 that up.
13 BY MR. SAFARIAN:
14     Q.  Okay.  Did you, outside of this -- did you
15 believe -- did you have any basis, any factual basis
16 outside of speculation, to believe that after this
17 incident Garnik would at any point in the future
18 terrorize residents?
19     MR. ROSEMAN:  Objection, calls for speculation,
20 assumes facts not in evidence, vague, ambiguous.
21 BY MR. SAFARIAN:
22     Q.  You may answer, Mr. Rodin.
23     A.  I can't answer that, I don't know.
24     Q.  Is it a fair statement that, through to the
25 present, you've never had any fact basis for believing

118

1 that Garnik would ever frighten anybody or -- let me
2 strike that.
3      Until today, you had no fact basis to believe
4 that Garnik, who had this one-time incident, would ever
5 assault anybody; correct?
6     MR. ROSEMAN:  Objection, vague, ambiguous, assumes
7 facts not in evidence, calls for speculation, calls for
8 legal conclusion.
9 BY MR. SAFARIAN:
10     Q.  Is that correct?
11     A.  No, I had no way of knowing what he was going
12 to do.
13     Q.  And because you had never seen Garnik at the
14 properties, is it a fair statement that you never had
15 any information that Miss Nazaretyan ever allowed
16 Garnik to roam common areas; correct?
17     A.  No, that is not correct.
18     Q.  Okay, what basis do you have?
19     A.  I have basis of other -- the people who live
20 around her unit when they came to the town hall meeting
21 and other instances all said that he continued -- that
22 he wandered around quite a bit before this incident.
23     Q.  Before the incident.  After the incident, my
24 question is, how much wandering did he do, if you are
25 aware of it?

119

1     A.  I don't know, not -- I didn't know if he was
2 here.
3     Q.  After the incident do you have any
4 information that he wandered?
5     A.  No, other than the incident we spoke of that
6 happened at the front gate a couple of months ago.
7     Q.  Okay, so I want to show you this language
8 here.  It says, "Court intervention is necessary due to
9 Defendant Nazaretyan's continued refusal to comply with
10 the association's governing documents whereby she
11 allows her son access to the entire project so that he
12 can frighten, physically and verbally assault and
13 otherwise terrorize residents."
14      Do you have any information that
15 Miss Nazaretyan actually refused to ask her son to stay
16 in the unit after this incident?
17     MR. ROSEMAN:  I would caution attorney/client
18 privileged communication.  Dale, don't discuss anything
19 discussed with counsel.
20 BY MR. SAFARIAN:
21     Q.  You may answer, please.
22     A.  I can't answer that.
23     Q.  You have no information that Miss Nazaretyan
24 continued to refuse to allow her son to enter common
25 areas; correct?

120

1     A.  I can't answer that, I don't know.
2     Q.  That's fine, that's my question.  You never
3 saw him after the incident or heard of him after the
4 incident roaming common areas; correct?
5     A.  That's correct.
6     Q.  And you -- it says here, "Unless the
7 temporary restraining order and other permanent relief
8 are granted by the court, the association members and
9 their families and guests will be irreparably
10 damaged."
11      When you signed this, you had no information
12 that the association would be irreparably damaged by
13 Garnik in the future; correct?
14     MR. ROSEMAN:  Objection, calls for legal
15 conclusion, attorney/client privilege.
16 BY MR. SAFARIAN:
17     Q.  You may answer, Mr. Rodin.
18     A.  No, it is not correct.  The homeowners were
19 still very concerned about the mayhem he would be running
20 loose around the community and we had to do everything
21 we could to keep him confined either off the property
22 or confined to the unit itself.
23     Q.  I understand that you had this subjective
24 fear but my question is, what information did you have
25 that unless there was permanent relief granted that

121

31  (Pages 118 to 121)

1  there would be irreparable damage to people, just -- is
2  the irreparable damage that people would just be
3  scared?
4      MR. ROSEMAN:  Objection calls for legal
5  interpretation and opinion, attorney/client privilege.
6  BY MR. SAFARIAN:
7      Q.  You can answer.  Aside from people being
8  scared, did you have any evidence that there would be
9  irreparable damage?
10     A.  No, we can't predict the future, we don't
11 know, and that was the problem.
12     Q.  So, here you are saying that there would be
13 irreparable damage, so your conclusion that there
14 would, in fact, be irreparable damage was not a
15 conclusion that you made believing it to be true, that
16 was speculation; correct?
17     A.  No.  It was discussed between us and our --
18 and Roseman, attorney/client privilege.
19     Q.  I don't want to know what Mr. Roseman told
20 you, and I can tell from reading this that this is not
21 something that a layperson would write, this is
22 something that a lawyer would write, but what I'm
23 asking you is, did you personally have any information
24 that unless Mr. Nazaretyan -- unless Garnik was
25 confined to the inside of a unit, that he would cause

122

1  irreparable damage to the community?
2      MR. ROSEMAN:  Objection, calls for legal
3  conclusion, attorney/client privilege.
4  BY MR. SAFARIAN:
5      Q.  You may answer.
6      A.  I don't know.
7      Q.  Remember I asked you earlier, can you tell me
8  even one in a million whether Garnik is likely to
9  commit any type of harm in the future and you said you
10 have no idea.  Do you remember that?
11     MR. ROSEMAN:  Objection, misstates testimony.
12 BY MR. SAFARIAN:
13     Q.  That's what you said, correct, you said you
14 didn't know even one in a million if that could occur;
15 correct?
16     A.  Yes.
17     Q.  Okay.
18     MR. SAFARIAN:  It is 1:45.  We'll take our break
19 now, thank you, Mr. Rodin.
20     MR. ROSEMAN:  We're going to be back -- it is
21 actually 11:45.
22     MR. SAFARIAN:  I'm sorry, I meant 11:45.  Why
23 don't we come back in an hour; is that fair?
24     MR. ROSEMAN:  That's fine.
25     MR. SAFARIAN:  Okay.  Mr. Rodin, does that give

123

1  you enough time to eat and sort of tend to your
2  personal needs?
3      THE WITNESS:  That is fine.
4      MR. SAFARIAN:  Thank you very much.
5      THE VIDEOGRAPHER:  We are off the record at
6  11:46 a.m.
7          (Noon break was taken.)
8      THE VIDEOGRAPHER:  We are on the record at
9  12:47 p.m.
10 BY MR. SAFARIAN:
11     Q.  Mr. Rodin, thank you for coming back with us.
12 Mr. Rodin, do you have any information that
13 Miss Nazaretyan ever disregarded her son's health
14 condition?
15     A.  Not to my knowledge.
16     Q.  Do you have any recollection of her being
17 warned that her son presented a risk to the community
18 and an imminent life-threatening risk to you?
19     A.  Please repeat the question.
20     Q.  Well, did you ever believe that there was an
21 imminent threat to your life by Garnik?
22     A.  You mean me, personally?
23     Q.  Yeah.
24     A.  Yes.
25     Q.  Did he approach you and threaten you?

124

1      A.  No.
2      Q.  Did he come to your house and threaten you?
3      A.  No.
4      Q.  Did he threaten your family?
5      A.  No.
6      Q.  He never spoke to you ever.
7      A.  He did not.
8      Q.  The only observation you ever had was him
9  having a mental episode on video; correct?
10     A.  That's correct.
11     Q.  So, what caused you to believe that there
12 was -- you know what "imminent" means, right,
13 immediate?
14     A.  I was just concerned like all the other
15 homeowners.  I didn't know what this guy could do, what
16 he was capable of doing.
17     Q.  Did you believe that -- did you warn
18 Miss Nazaretyan that Garnik posed an imminent threat to
19 your life?
20     A.  No.
21     Q.  Did you tell her that he posed an imminent
22 threat to the lives of your family members?
23     A.  No.
24     Q.  Did you tell her that he posed a threat to
25 the members, residents and guests at large of the HOA?

125

32 (Pages 122 to 125)

1   A.  Please repeat the question.
2   **Q.  Did you tell Miss Nazaretyan that Garnik**
3   **posed an imminent threat to the association members,**
4   **residents and guests at large?**
5   A.  No.
6   **Q.  Any worry that you had about Garnik was**
7   **purely based upon speculation that he might do**
8   **something; correct?**
9   A.  Yes, that's correct.
10  **Q.  Okay. I'll share with you a document.**
11      See, it says, "Defendant Nazaretyan's
12  disregard for her son's, Garnik, frightening behavior."
13  As you sit here, you have no information that she
14  disregarded anything; correct?
15  A.  Correct.
16  **Q.  And then it says, "and her continuing to**
17  **provide Garnik access to the project."  It wasn't that**
18  **she continued to provide access.  You assumed that she**
19  **was giving him access.  He actually lived at the**
20  **project as we discussed, as long as you've known;**
21  **correct?**
22  A.  Correct.
23  **Q.  And it says here, "despite being repeatedly**
24  **warned of the risks to the community at large."  You**
25  **have no information that she had been warned; correct?**

126

1   A.  Well, we discussed it after the incident when
2   she came to the hearing, we discussed in detail with
3   her.
4   **Q.  One time; correct?**
5   A.  One time in open session when everybody was
6   there including counsel.
7   **Q.  And what was discussed there in open session**
8   **with her?**
9   A.  As I recall, just talked about not knowing
10  what he's capable of doing and the homeowners that were
11  there expressed great concern for them and their
12  children and anybody else who might be around.
13  **Q.  Was anything ever done to balance the fact**
14  **that Garnik had a serious medical condition against the**
15  **worries of the association members, such as obtaining a**
16  **medical opinion?**
17  MR. ROSEMAN:  Objection, calls for speculation,
18  calls for legal conclusion, speculation.
19  BY MR. SAFARIAN:
20  **Q.  I'll withdraw.**
21      **Mr. Rodin, you said that these HOA people,**
22  **the people that lived there, were afraid.  Was anything**
23  **done to investigate whether those fears had any**
24  **scientific basis, say, in medicine?**
25  A.  I'm sorry --

127

1   MR. ROSEMAN:  Objection, calls for speculation,
2   calls for expert opinion, vague, ambiguous --
3   BY MR. SAFARIAN:
4   **Q.  To your knowledge --**
5   MR. ROSEMAN:  -- unintelligible.
6   BY MR. SAFARIAN:
7   **Q.  To your knowledge, Mr. Rodin, do you have any**
8   **information that anyone did any investigation to**
9   **determine whether any of the fears about Garnik were**
10  **well founded?**
11  A.  Not to my knowledge.
12  **Q.  To your knowledge did anyone conduct any**
13  **investigation, such that, assuming that Garnik was not**
14  **a threat, they could let the homeowners know, "hey,**
15  **we've looked into this, this is a one-time incident,**
16  **you have no reason to fear"?**
17  A.  No, we never did that.
18  **Q.  All of this association fear, as far as you**
19  **know, all of this worrying that he might be a threat,**
20  **that was all pure speculation that Garnik might act out**
21  **again; correct?**
22  A.  Um, I believe so.
23  **Q.  Okay.  So, when you signed this declaration**
24  **under penalty of perjury -- you have now acknowledged**
25  **there is only one meeting with Miss Nazaretyan where**

128

1   the issue was discussed and that was the meeting
2   where -- strike that, let me ask a clear question --
3   that was the meeting where Miss Nazaretyan presented
4   medical evidence that you said was disjointed; correct?
5   A.  Correct, and counsel was there as well.
6   **Q.  I understand.  And when that meeting**
7   **happened, she gave you medical evidence that you say**
8   **was disjointed.  Did you undertake any evidence to make**
9   **it such that the evidence was not disjointed, such as**
10  **organize it or help obtain necessary information to**
11  **clarify it?**
12  A.  I did not.
13  **Q.  Did anyone to your knowledge do that?**
14  A.  Not to my knowledge.
15  **Q.  Mr. Roseman was there in open session.  Did**
16  **Mr. Roseman ever say, "hold on a second, we have a duty**
17  **to engage in some sort of interactive process with this**
18  **young man, let's see what is going on here"?**
19  MR. ROSEMAN:  I'm going to object, attorney/client
20  privilege.  If there was any discussion that
21  happened --
22  MR. SAFARIAN:  I --
23  MR. ROSEMAN:  Harry, let me finish my objections.
24      If there was any discussion that took place
25  in that open meeting, that you can discuss, but if it

129

33  (Pages 126 to 129)

1 is any discussions that took place outside of that open
2 meeting but with the board of directors, that is
3 attorney/client privilege.
4        Harry, I repeat again, I have the right to
5 make objections --
6      MR. SAFARIAN:  You objected --
7      MR. ROSEMAN:  -- when I start speaking, you have
8 to let me finish what I have to say as with courtesy
9 and respect.  The way I respect you for an opportunity
10 to finish your questions, I expect the same
11 professional courtesy.
12     MR. SAFARIAN:  I'll return the same courtesy and
13 I'll stop there.
14 BY MR. SAFARIAN:
15     **Q.  Mr. Rodin, in the open session meeting when
16 Miss Nazaretyan was there, did Mr. Roseman say, "we
17 have an obligation to engage in an investigation to
18 find out what really went on here"?**
19     A.  I don't recall.
20     **Q.  In the open meeting session did Mr. Roseman
21 say anything like, "we have to engage in an interactive
22 process to help accommodate this person"?**
23     A.  I don't recall.
24     **Q.  Did Mr. Roseman do anything to suggest that
25 some effort should be made to get to the bottom of why**

130

1 this one-time incident happened?
2      MR. ROSEMAN:  Objection, misstates testimony.
3 BY MR. SAFARIAN:
4      **Q.  You may answer.**
5      A.  I don't recall.
6      **Q.  Was anything done to give any type of
7 consideration at all during that meeting to the needs
8 of this family who had a disabled son?**
9      A.  I don't recall.
10     **Q.  Did you, as a board member, undertake any
11 effort at any time to take into consideration the needs
12 of this disabled boy?**
13     A.  I don't believe so.
14     **Q.  Now, as somebody who has been a counselor --
15 strike that.
16        As somebody that has an M.A. in counseling
17 and somebody that has a background or bachelor's degree
18 in psychology, in retrospect do you wish you would have
19 approached it differently?**
20     MR. ROSEMAN:  Objection, argumentative.  I'm going
21 to instruct the witness not to answer.  That is a
22 personal question.
23     MR. SAFARIAN:  I'll withdraw the question.
24     MR. ROSEMAN:  Thank you.
25 ///

131

1 BY MR. SAFARIAN:
2      **Q.  As somebody who has a degree in -- a master's
3 in counseling and a bachelor's in psychology, do you
4 believe that there were any -- anything that you could
5 have undertaken to at least help understand what this
6 young man was going through?**
7      MR. ROSEMAN:  Objection, vague and ambiguous and
8 overbroad.  You're asking for expert opinion, which
9 he's not going to be testifying to.  It is not likely
10 to lead to discovery of admissible evidence.  He's
11 testifying as an individual --
12     MR. SAFARIAN:  You're making a speaking objection.
13     MR. ROSEMAN:  I understand, I'm explaining the
14 objection.
15     MR. SAFARIAN:  You're yelling right now.
16     MR. ROSEMAN:  I'm not yelling at you, Harry.  I'm
17 explaining the objection and why I believe I'm
18 instructing him not to answer the question.
19     MR. SAFARIAN:  Okay.  I'm going to ask him to
20 answer the question.
21 BY MR. SAFARIAN:
22     **Q.  Mr. Rodin, you have a fiduciary obligation to
23 the Nazaretyan household and that's an obligation you
24 took on when you became a board member.  So --**
25     MR. ROSEMAN:  Objection, misstates the --

132

1      MR. SAFARIAN:  I'm not done.  I'm making a
2 statement, not a question.
3      **Q.  That is an obligation that I believe you
4 have.**
5      MR. ROSEMAN:  Objection, misstates the law, Harry.
6      MR. SAFARIAN:  Mr. Roseman, stop arguing with me,
7 I'm taking a deposition.
8 BY MR. SAFARIAN:
9      **Q.  So, Mr. Rodin, in fulfilling the obligation
10 or doing your duties as a board member, is there
11 anything you did -- let me strike that.
12        Is there anything you are aware of anybody on
13 this board doing to take into consideration the needs
14 of this young man who had a serious disability?**
15     MR. ROSEMAN:  I'm going to object, misstates the
16 law with regard to fiduciary obligations of board
17 members; two, vague; three, ambiguous; four, calls for
18 legal conclusion; five, compound.
19 BY MR. SAFARIAN:
20     **Q.  Go ahead.**
21     A.  I can't answer that.
22     **Q.  Is it because you don't know of anything that
23 was done to help take into consideration the needs of
24 this boy with a disability?**

133

34 (Pages 130 to 133)

1    A.  Could you restate the question?

2    **Q.  Are you unable to answer my question because**

3    **you, as you sit here now, are unaware of anything that**

4    **any member of the board did to take into consideration**

5    **the special needs of this boy that had a disability?**

6    MR. ROSEMAN:  Objection, assumes facts not in

7    evidence, calls for speculation, vague and ambiguous,

8    overbroad, compound.

9    THE WITNESS:  Not that I'm aware of.

10   BY MR. SAFARIAN:

11   **Q.  When you studied counseling, was it your**

12   **objective to help people who had special needs?**

13   MR. ROSEMAN:  I'm going to object as irrelevant --

14   not only irrelevant, not likely to lead to the

15   discovery of admissible evidence.  You don't have to

16   answer that question, Dale.

17   MR. SAFARIAN:  The foundation is I'm entitled to

18   know what training and experience he had.  There's

19   nothing offensive about the question, Mr. Roseman.

20   MR. ROSEMAN:  Absolutely, there's no relevance to

21   this case or likely to lead to the discovery

22   of admissible evidence.  His personal training,

23   education has nothing to do with fiduciary duty and

24   responsibility of a board member in enforcing the

25   governing documents as part of his obligations --

134

1    MR. ROSEMAN:  Harry --

2    MR. SAFARIAN:  -- now re-extend the same courtesy

3    to me.

4    MR. ROSEMAN:  Harry --

5    MR. SAFARIAN:  Re-extend the same courtesy to me.

6    MR. ROSEMAN:  There's no need to yell.

7    MR. SAFARIAN:  Re-extend the same courtesy to me.

8    MR. ROSEMAN:  I absolutely am very courteous

9    toward you.

10   MR. SAFARIAN:  Then be quiet and let me finish my

11   statement.

12   MR. ROSEMAN:  Then you'll let me respond to you.

13   MR. SAFARIAN:  You can respond when I'm through.

14   MR. ROSEMAN:  Go right ahead, Harry.

15   MR. SAFARIAN:  Mr. Rodin has an obligation to

16   people.  He took that obligation on when he became a

17   board member.  If he brings specialized knowledge and

18   experience to the equation, I'm entitled to know.  He

19   has an obligation to uphold a certain standard of

20   conduct.  A standard applies.

21   There is a legal standard here that I'm not

22   going to get into, but that -- his experience, his

23   training and his qualifications go to that legal

24   standard.  There is nothing offensive about the

25   question.  There is nothing that invades a privacy

136

1    MR. SAFARIAN:  I --

2    MR. ROSEMAN:  I'm explaining to you -- Harry, let

3    me finish.  I've explained to you why I'm instructing

4    him not to answer the question.  He's not going to

5    testify as to his personal education, whether that

6    addresses this issue that has an association dealing

7    with their fiduciary obligations.

8    Dale, you do not have to answer that

9    question.

10   MR. SAFARIAN:  Board members bring to the table

11   their real world and real life experiences.  They have

12   obligations to the homeowners.  If Mr. Rodin has

13   specialized knowledge that helps him to understand the

14   situation, then he should apply it because that's the

15   reasonable standard of care --

16   MR. ROSEMAN:  So, you believe.

17   MR. SAFARIAN:  Hold on.  Don't cut me off.

18   MR. ROSEMAN:  Unfortunately --

19   MR. SAFARIAN:  Don't cut me off.

20   MR. ROSEMAN:  Harry, please --

21   MR. SAFARIAN:  Do not cut me off.

22   MR. ROSEMAN:  Harry --

23   MR. SAFARIAN:  Do not cut me off, I'm speaking.

24   You asked me not to cut you off and you asked me to

25   extend you a courtesy and I extended it to you --

135

1    right.

2    The only time you can ask a witness per code

3    not to answer a question is if it goes to a privacy

4    right or privilege.  There is no privacy right.

5    There's no privilege.  I've made a showing as to why

6    I'm entitled to this information.

7    If you are going to ask him not to answer

8    the question, then I'm going to seek sanctions against

9    him and you, and I don't want to seek sanctions against

10   him.  He seems like a perfectly nice man that has been

11   misguided by a bad lawyer.  So --

12   MR. ROSEMAN:  Harry, you do understand these

13   statements that you keep placing on the record are very

14   disrespectful, right.  Do you understand that?

15   MR. SAFARIAN:  You don't deserve my respect,

16   Mr. Roseman.  What you did here is scary.  You took

17   this association for a ride.  You've got several

18   lawyers attending each of these depos.  You are billing

19   the snot out of this association.  You gave them bad

20   advice and it is terrible that you've led them down

21   this path and now they all have excess exposure because

22   of you.  I'm sorry, you are not in a position to preach

23   to me --

24   MR. ROSEMAN:  I'm going to respond.  You said I

25   could have the time to respond.

137

1      MR. SAFARIAN:  Go ahead.
2      MR. ROSEMAN:  So, first of all, your disparaging
3  and disrespectful remarks only -- you know there is a
4  very good saying in life, Harry, when you have the law
5  in your favor, you pound the law.  When you have the
6  facts in your favor, you pound the facts.  When you
7  neither have the law or the facts in your favor, you
8  pound the table, and I think that's just what you're
9  doing.
10      But that aside, let me clarify something.
11  The obligation of a board of directors -- remember the
12  association sued and brought an action for an
13  injunctive release pursuant to the nuisance
14  provision --
15      MR. SAFARIAN:  Yes, is that --
16      MR. ROSEMAN:  -- the personal -- Harry, I let you
17  finish and I'm asking you for the same professional
18  courtesy.
19      MR. SAFARIAN:  I'm asking you, Mr. Roseman, is
20  that the action where the witness says he has no facts
21  to support the --
22      MR. ROSEMAN:  Harry, can I please finish?
23      MR. SAFARIAN:  I just want to ask you, is that the
24  same action -- is that the same action the witness said
25  he had no facts to support the action?

138

1      MR. ROSEMAN:  Harry --
2      MR. SAFARIAN:  That's the one, okay, go ahead.  Go
3  ahead.
4      MR. ROSEMAN:  Harry, I must tell you, your actions
5  are unfortunately a little unprofessional, but I'm not
6  going to stoop down to your low level.
7      MR. SAFARIAN:  Trust me, you've stooped far
8  beneath anyone's level here.  Go ahead.
9      MR. ROSEMAN:  You are just making a beautiful
10  record here for the courts.
11      MR. SAFARIAN:  Go ahead, Mr. Roseman.
12      MR. ROSEMAN:  I'm explaining to you very simply,
13  okay, that any personal experience, whether doctor,
14  professional, lawyer, whatever, board of directors
15  members have an obligation to enforce the governing
16  documents.  His personal experience has no bearing or
17  relevance on the fiduciary obligations and
18  responsibilities as board members.
19      I'm not letting you go into personal
20  discussion about his medical training or education that
21  has any bearing on the underlying action.  Now, this
22  was the corporation that sued, and I'm not going to
23  allow you to badger a witness and start putting
24  presumptions on --
25      MR. SAFARIAN:  I've never badgered the witness.

139

1      MR. ROSEMAN:  Let me finish.
2      -- and forcing him to testify about
3  personal education that he has that doesn't have any
4  bearing on this.  It is not likely to lead to the
5  discovery of admissible evidence on his personal side.
6  You have questions relating to this underlying action,
7  that's fine.  What you are forgetting here is --
8      MR. SAFARIAN:  Shame on you.
9      MR. ROSEMAN:  -- the federal case is not the case
10  that is being fought in this deposition.
11      MR. SAFARIAN:  I know that.
12      MR. ROSEMAN:  Then you ask questions relating to
13  the injunction and associated --
14      MR. SAFARIAN:  I am.
15      MR. ROSEMAN:  -- and associated injunction.  You
16  are not.  You are going way beyond that --
17      MR. SAFARIAN:  I am not.  I already laid my
18  foundation.
19      MR. ROSEMAN:  Harry, I'm finishing first and then
20  you may speak.  I'm telling you the focus of this is
21  the injunctive release and the nuisance issue in this
22  case.  You may have other arguments in the other case,
23  but make no mistake, as much as you contend that I've
24  taken certain liberties, you don't know the facts and
25  you don't know the law relating to associations.

140

1      MR. SAFARIAN:  I know it.
2      MR. ROSEMAN:  I recommend a little research
3  because you don't understand.
4      MR. SAFARIAN:  Oh, I know, Mr. Roseman.
5      MR. ROSEMAN:  Harry, please let me finish.
6      MR. SAFARIAN:  Oh, I know, Mr. Roseman.
7      MR. ROSEMAN:  Harry, are you going to let me
8  finish or are you going to continue being
9  disrespectful?
10      MR. SAFARIAN:  Mr. Roseman, if I didn't know the
11  facts or the law, why are you poking around here trying
12  to hire my associates away from me?
13      MR. ROSEMAN:  Excuse me?
14      MR. SAFARIAN:  You don't think I know --
15      MR. ROSEMAN:  Oh, my goodness, are you really
16  personalizing this matter.  I find that quite
17  remarkable.
18      MR. SAFARIAN:  Have you not done that?
19      MR. ROSEMAN:  I don't even know what you're
20  talking about and I find --
21      MR. SAFARIAN:  Go ahead, Mr. Roseman.
22      MR. ROSEMAN:  Wow, wow, Harry.  Boy, you really
23  have made this a very personal thing.
24      MR. SAFARIAN:  No, it is not personal.
25      MR. ROSEMAN:  Remember, Counsel, you are paid by

141

1 the insurance carrier in this case, so I suggest you
2 show the carrier this transcript and realize --
3    MR. SAFARIAN:  I'm glad to.
4    MR. ROSEMAN:  -- that this whole thing is between
5 you and me, Harry.  This is purely a deposition, so if
6 you continue to badger this witness --
7    MR. SAFARIAN:  Then let me continue my deposition.
8    MR. ROSEMAN:  -- then I will absolutely let you,
9 but I'm not letting him testify about his personal
10 education that has no bearing on the underlying course
11 of action.  So, you may resume your questioning but I'm
12 not going to let you badger this witness.
13    MR. SAFARIAN:  I'm not badgering the witness.  I
14 like the witness.  I think the witness is a nice man,
15 and I think you put the witness in a very, very
16 precarious situation.
17    MR. ROSEMAN:  Harry, I don't need you to preach to
18 me.  Why don't you just do your job and continue.  Just
19 continue your job.
20    MR. SAFARIAN:  When you make the shameful
21 statement that I'm badgering a witness when I never
22 once had a cross word with this witness and I
23 respect --
24    MR. ROSEMAN:  Harry, just continue the deposition.
25    MR. SAFARIAN:  Don't cut me off.  Don't cut me

142

1 off.
2    MR. ROSEMAN:  Okay, I'll let you go on with your
3 dissertation because it makes you feel better clearly.
4    MR. SAFARIAN:  Don't cut me off and don't
5 patronize me.  You don't have the IQ sufficient to
6 patronize me.  Mr. Roseman, I have not crossed --
7    MR. ROSEMAN:  Man, I can't wait for the court to
8 see this transcript.
9    MR. SAFARIAN:  That's fine.  You don't have --
10 Mr. Roseman, you don't have any standing to object.  It
11 is not a privacy issue, right, there's no privilege
12 here --
13    MR. ROSEMAN:  It is not likely to lead to the
14 discovery of admissible evidence.
15    MR. SAFARIAN:  I'm not done, Mr. Roseman.  The
16 objection "is not calculated," is not a valid
17 objection.  That is straight textbook.  It is not a
18 valid objection, so don't come here and preach to me
19 about the law.  Mr. Roseman, I'm not done, so don't
20 open your mouth yet.
21       The objection is not appropriate.  "Not
22 calculated" is not a valid objection.  You have an
23 action pending to try to remove a young disabled man
24 from his mother's home.  She is his sole caretaker.
25 This man has training in psychology, so I'm entitled to

143

1 understand as a board member what efforts he undertook
2 to investigate the circumstances before, at your
3 instruction, he filed a misguided lawsuit to remove a
4 disabled young man from --
5    MR. ROSEMAN:  Harry, we're terminating this depo
6 if you continue with this line of questioning.
7    MR. SAFARIAN:  We're taking five minutes.  We're
8 taking a break.
9    MR. ROSEMAN:  Ask your questions, please.
10       Where did Harry go?
11    THE WITNESS:  Where did he go?
12    MR. ROSEMAN:  I don't know.
13    MR. BABAIAN:  He said we're taking a five-minute
14 break.
15    MR. ROSEMAN:  Oh, he did, okay.  We'll be back in
16 five minutes, Dale.
17    THE VIDEOGRAPHER:  We are off the record at
18 1:06 p.m.
19       (A brief recess was taken.)
20    THE VIDEOGRAPHER:  We are on the record at
21 1:11 a.m. -- I mean, p.m., sorry, 1:11 p.m.
22 BY MR. SAFARIAN:
23    **Q.  So, I want to ask you a few other questions.**
24 **I'm going to move on.  Unfortunately I'm going to have**
25 **to file a motion to compel on the other question, which**

144

1 **I don't want to do, Mr. Rodin, but that means you are**
2 **going to have to come back for a second session if the**
3 **court grants my motion, but I'm going to move on**
4 **because I --**
5    MR. ROSEMAN:  Do you want to meet and confer to
6 discuss --
7    MR. SAFARIAN:  I don't have the ability or desire
8 to further discuss.  This has been exhausted.  I'll
9 file a motion.  I don't want to disrupt Mr. Rodin's
10 life any more than we have, but Mr. Roseman has given
11 an instruction.
12 BY MR. SAFARIAN:
13    **Q.  Mr. Rodin, I'm assuming you are following**
14 **Mr. Roseman's instruction not to answer the question**
15 **about your motivations for studying psychology or**
16 **counseling; is that a fair statement?**
17    MR. ROSEMAN:  If you want to answer it and you
18 have any bearing on this, you can answer it, Dale, as
19 you see fit.
20    THE WITNESS:  Quite simply, I have no training in
21 -- any psychological training and I've never seen any
22 clients, I just have a degree in psychology.  I never
23 was a psychologist.
24 BY MR. SAFARIAN:
25    **Q.  I understand that, Mr. Rodin.  After studying**

145

1 psychology for four years you obtained a master's
2 degree in counseling, and a master's degree in
3 counseling would have qualified you to deal with people
4 that have mental disabilities or might need some
5 counseling; correct?
6     A.  Correct, but I stopped and I did not ever
7 practice as a psychologist or a counselor.
8     Q.  I understand.  At some point you wanted to
9 help people in those fields; correct?
10     A.  Initially and then I changed my mind and I
11 went into construction after that.
12     Q.  Yes.  At that time when you wanted to help
13 them, you understood that there were people that had
14 mental disabilities who could benefit from someone like
15 you; correct?
16     A.  Oh, I don't know about that.
17     Q.  At that time when you studied psychology and
18 were getting a degree in counseling, you were motivated
19 to help people who had problems; correct?
20     A.  Yes.
21     Q.  Okay.  And in this case did you ever
22 undertake, or anyone on the board undertake, any effort
23 to identify the problems that Garnik had?
24     A.  No.
25     MR. ROSEMAN:  Objection, vague, ambiguous, calls

146

1 you tell me who within the board would have the most
2 knowledge of what transpired in that incident?
3     MR. ROSEMAN:  Objection, vague, ambiguous,
4 overbroad.
5 BY MR. SAFARIAN:
6     Q.  If it is not one person, you can tell me the
7 multiple people.
8     A.  I would say within the board we're all equal
9 and none of us knew anything more than anybody else.
10     Q.  When you were meeting as a board to discuss
11 the revocation of my client's access cards to common
12 areas including that pedestrian entrance, was Beth
13 Corbett involved in that discussion?
14     MR. ROSEMAN:  Objection, misstates testimony.  He
15 didn't say he knew --
16     MR. SAFARIAN:  Please stop saying what he knew
17 because that's a speaking objection.  Please stop.  I
18 don't know how many ways to beg you, Mr. Roseman --
19     MR. ROSEMAN:  I'll object, misstates testimony.
20     MR. SAFARIAN:  Thank you.
21 BY MR. SAFARIAN:
22     Q.  Mr. Rodin, there was a decision made by the
23 board to revoke access to the front door by the family;
24 correct?
25     A.  Yes.

148

1 for --
2 BY MR. SAFARIAN:
3     Q.  You may answer.
4     A.  Not to my knowledge.
5     Q.  Mr. Rodin, I want to ask you who you believe
6 is the person who is most knowledgeable about the
7 association's investigation into what transpired in the
8 incident.
9     A.  I'm not sure.  I couldn't -- I'm not sure.
10     Q.  Who is the association's person most
11 knowledgeable -- well, let me ask you this:  If you are
12 not sure, can you identify the people who you believe
13 would have the most infor -- if it is multiple people,
14 are there a handful of people that you believe would
15 know the most?
16     A.  Um --
17     MR. ROSEMAN:  Objection, vague as to "the most."
18 BY MR. SAFARIAN:
19     Q.  Well, most knowledge.  So, I'll rephrase it,
20 Mr. Rodin.
21         There are people who understand or have
22 information regarding the incident in April 2019;
23 correct?
24     A.  Yes.
25     Q.  So, what I'm getting at, Mr. Rodin is, can

147

1     Q.  How was that decision arrived at, was that at
2 a board meeting?
3     A.  I don't recall.
4     Q.  Was Beth Corbett involved in that decision?
5     A.  Beth -- yes, Beth Corbett was on the board.
6     Q.  And Beth Corbett testified that she believed
7 the family's access was denied because there was some
8 kind of a pending citation or violation other than
9 Garnik's incident.  Are you aware of that?
10     A.  Not to my knowledge.
11     Q.  Is there any type of outstanding violation or
12 has there ever been that you believe motivated the
13 HOA's termination of the family's access to the
14 pedestrian door?
15     A.  Can you please restate the question?
16     Q.  Sure.  It is your understanding the family's
17 access to the pedestrian door was terminated in
18 response to this incident, correct, the April 2019
19 incident?
20     A.  Well, we could -- I didn't realize that I --
21 I did not realize that the front gate access was
22 revoked.  I thought we just revoked the access to the
23 common areas initially.
24     Q.  Did my client ever tell you that she told at
25 least one member of the board that the front gate

149

1    access had been revoked?
2    A.  I don't understand, please repeat that.
3    Q.  Sure.  My client -- my understanding is my
4    client told at least one member of the board or
5    approached at least one member of the board about the
6    front gate access being revoked.  That never came to
7    your attention?
8    A.  Not to my knowledge.
9    Q.  How did you learn the front gate access was
10   revoked?
11   A.  I can't remember.  I don't recall, I mean.
12   Q.  Once you learned the front gate access was
13   revoked, what did you do in response?
14   A.  I can't recall exactly.
15   Q.  Once you learned that the front gate access
16   was revoked, did you take immediate action to reinstate
17   the front gate access?
18   A.  I don't recall.
19   Q.  Did the board as a collective body take
20   immediate action to reinstate the front gate access
21   once you became aware of the front gate access being
22   revoked?
23   A.  I believe so.  We decided in executive
24   session to reinstate the card so that they could have
25   access.

150

1    because then we're going to start arguing and I don't
2    want to argue with you, Mr. Roseman.
3    MR. ROSEMAN:  Neither do I.
4    MR. SAFARIAN:  Just state your objections.
5    MR. ROSEMAN:  I've stated my objections but you
6    are assuming facts not in evidence here.
7    BY MR. SAFARIAN:
8    Q.  Okay.  Mr. Rodin, until that federal lawsuit
9    was filed, there was no action taken to reinstate those
10   cards; isn't that the case?
11   A.  Not to my knowledge.
12   Q.  So, am I correct?
13   A.  Yes.
14   Q.  Do you use the front gate access?
15   A.  Yes, I do, sometimes.
16   Q.  It is an important thing to have for you
17   personally?
18   A.  No, I -- I actually live up at the other
19   end -- residence entrance.  It is actually closer for
20   me to use --
21   (Reporter clarification.)
22   A.  It is easier for me to use the upper
23   residence only access gates rather than the main access
24   gates.
25   Q.  I'm sorry, go ahead.

152

1    Q.  And you decided in executive session to
2    reinstate the card after we filed a federal lawsuit;
3    correct?
4    MR. ROSEMAN:  Objection, calls for speculation.
5    THE WITNESS:  I'm not sure.  I'm not sure --
6    BY MR. SAFARIAN:
7    Q.  I'm sorry?
8    A.  I'm not sure when we did it.
9    Q.  Okay.  Well, I can tell you that after we
10   filed the federal lawsuit there was a message posted by
11   PMP that said to immediately reinstate the access of
12   this family to the front gate.  Are you aware of that?
13   A.  Yes.
14   Q.  So, this family had no access to the front
15   gate for around two years and it took the federal
16   lawsuit to finally get the board to reinstate the
17   access?
18   MR. ROSEMAN:  Objection, argumentative, assumes
19   facts not in evidence.  You are testifying.  It calls
20   for speculation --
21   MR. SAFARIAN:  Please don't make a speaking
22   objection --
23   MR. ROSEMAN:  -- legal conclusion.  Ask a
24   question, Harry, but don't --
25   MR. SAFARIAN:  Please just state your objections

151

1    A.  For me personally.
2    Q.  Are there multiple access points that the
3    access card will allow someone to enter into the common
4    areas with?
5    A.  No, only one.
6    Q.  Okay.  Do you get a special one because you
7    are located in a different location?
8    A.  No.  You have to have a transponder to get
9    into the upper gates.  It has nothing to do -- there is
10   no card access at all on the upper gates.
11   Q.  That is the motor vehicle access; correct?
12   A.  Yes.
13   Q.  Okay.  All right.  So, who is the person most
14   knowledgeable within the HOA or PMP, if you know,
15   regarding the dates on which the access cards were
16   compromised in terms of access or reinstated?
17   A.  I'm not sure -- it would be PMP, but I'm not
18   sure which department in PMP specifically.
19   Q.  Have you ever discussed the issue with PMP?
20   A.  Not to my knowledge.
21   Q.  Have you ever discussed my clients with PMP?
22   A.  Not to my knowledge.
23   Q.  Have you ever consulted outside of counsel
24   any type of expert with regard to your obligations to
25   my clients as a board?

153

39 (Pages 150 to 153)

1    A.  No.
2    **Q.  Have you undertaken any investigation to**
3  **search for documents to produce at your deposition?**
4    A.  No.
5    MR. ROSEMAN:  Counsel, there are all the
6  documents --
7    MR. SAFARIAN:  No speaking objections.
8    MR. ROSEMAN:  I'm making a clear --
9    MR. SAFARIAN:  We have a record.
10    MR. ROSEMAN:  Harry, I'm making a clear record --
11    MR. SAFARIAN:  We have a record.
12    MR. ROSEMAN:  The request for production -- the
13  request for production of --
14    MR. SAFARIAN:  You are coaching.
15    MR. ROSEMAN:  Harry --
16    MR. SAFARIAN:  I keep saying you are coaching.
17  You are not allowed to make these comments.
18    MR. ROSEMAN:  Harry, I absolutely have a right to
19  make a clear record here and not misrepresent the
20  situation.  We reviewed the notice of deposition --
21    MR. SAFARIAN:  And I'm not done with this line of
22  questioning.
23    MR. ROSEMAN:  Yes, Harry --
24    MR. SAFARIAN:  Why don't you wait until I'm done.
25  Mr. Roseman, why don't you wait until I'm done in

154

1  asking these questions and then you can clarify what
2  you did so --
3    MR. ROSEMAN:  I'm clarifying that we have
4  produced --
5    MR. SAFARIAN:  Why don't you allow me to finish
6  this line of questioning before you coach the witness
7  on it?
8    MR. ROSEMAN:  I'm not coaching the witness --
9    MR. SAFARIAN:  Why don't you allow me to finish
10  this line of questioning before you coach the witness
11  on it?
12    MR. ROSEMAN:  Harry --
13    MR. SAFARIAN:  Mr. Roseman, I will allow you to
14  clarify the record if you will allow me to finish this
15  line of questioning.
16    MR. ROSEMAN:  You understand --
17    MR. SAFARIAN:  Mr. Roseman, I will allow you to
18  clarify the record what was done when I'm done with
19  this line of questioning.
20    MR. ROSEMAN:  Harry, I have the right to make the
21  record clear, and I'm telling you --
22    MR. SAFARIAN:  Mr. Roseman, I give you free reign
23  to make the record clear.  I'm asking you not to coach
24  the witness.  Do not --
25    MR. ROSEMAN:  I am not coaching the witness, I'm

155

1  clarifying documents were produced --
2    MR. SAFARIAN:  This deposition is suspended.
3  Thank you, we are done.  This deposition is suspended.
4  We're going to move for an order compelling that
5  Mr. Roseman make no further speaking objections.  We're
6  going to have to ask Mr. Rodin to come back.
7    MR. ROSEMAN:  If this transcript finds its way
8  before the court --
9    MR. SAFARIAN:  This deposition is over, thank you
10  very much.  We'll proceed by code.
11    (End of Proceedings.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

156

1  STATE OF CALIFORNIA  )
2              ) SS.
3  COUNTY OF ORANGE    )
4
5      I, DALE RODIN, do hereby certify:
6      That I have read the foregoing deposition;
7      That I have made such changes in form
8  and/or substance to the within deposition as might be
9  necessary to render the same true and correct;
10      That, having made such changes thereon, I
11  hereby subscribe my name to the deposition.
12      I declare under penalty of perjury that the
13  foregoing is true and correct.
14      Executed this _____ day of _____,
15  2022,
16  at _____ California.
17
18
19      _____
20          Dale Rodin
21
22
23
24
25

157



1   STATE OF CALIFORNIA  )
2                )   SS.
3   COUNTY OF ORANGE    )
4
5         I, Kimberly A. Kaldenbach, a Certified
6   Shorthand Reporter in the State of California, holding
7   Certificate Number 6719, do hereby certify that
8   DALE RODIN, the witness named within the foregoing
9   deposition, was by me duly sworn; that said deposition
10  was taken March 1, 2022, at the time and place set
11  forth on the first page hereof.
12        That upon the taking of the deposition, the
13  words of the witness were written down by me in
14  stenotype and thereafter transcribed by computer under
15  my supervision; that the foregoing is a true and
16  correct transcript of the testimony given by the
17  witness.
18        I further certify that I am neither counsel
19  for, nor in any way related to any party to said
20  action, nor in any way interested in the result or
21  outcome thereof.
22        Dated this Monday, March 14, 2022, at
23  Orange County, California.
24        _____
25             Kim Kaldenbach, CSR 6719

                                    158

41  (Page 158)

# EXHIBIT "O"

Aldea Community Association
Board of Directors Meeting
<u>Executive Session Meeting Minutes</u>
April 22, 2019

**CALL TO ORDER:**
The Executive Session Meeting of Aldea Community Association was held on April 22, 2019 at Porter Ranch Community School, 12450 N. Mason Avenue, Porter Ranch CA 91326.  The meeting was called to order at 6:00PM.

**DIRECTORS PRESENT:**       Dale Rodin – President
Maya Zlotnik – Vice President
James Douglas Robins – Secretary/Treasurer
Jerome Black – Member at Large

**DIRECTORS ABSENT:**       One Vacant Position

**PROPERTY MANAGEMENT PROFESSIONALS REPRESENTATIVE**:
Frank Jauregui, Senior Community Asset Manager

**GUESTS OF THE BOARD OF DIRECTORS:**
11251 Paseo Del Cielo – Homeowner Tamara Nazaretyan
Roseman Law – Steve Roseman, Esq.
LAPD Devonshire Divisioin – Detective John Goslin
Archon Protection – Tim Langan

**SECRETARY'S REPORT:**
The Board of Directors reviewed the Executive Session minutes for March 25, 2019. A motion was made by Dale Rodin and seconded by Jerome Black to approve the executive minutes. Motion carried (M/S/C 4-0)

**REVIEW OF THIRD-PARTY CONTRACTS/PROPOSALS:**
███████████████ - The Board of Directors reviewed and discussed the emergency window repairs from water intrusion along with the Est. 2729 from HOA Specialist for $2,680.00. The Board had unanimously agreed that this was an emergency and approved the repairs by HOA Specialist via email dated April 3, 2019. A motion was made by Dale Rodin and seconded by Jerome Black to ratify that emergency approval and proceed with the necessary work for this unit address with the cost for this repair to be paid from reserve funds. Motion carried (M/S/C 4-0)

**LEGAL MATTERS/PERSONNEL MATTERS:**
<u>Granite Communications</u> - The Board of Directors reviewed and discussed the ongoing activity to pursue Granite Communications. ████████████████████████████████ ████████ No motion necessary.

ATT Disconnect Directives – The Board of Directors reviewed and discussed the status of the ATT account disconnect notices for the community. PMP Management provided report that Account ███████████ received a reimbursement for $12,608.47 which notice was received on April 18, 2019 with an expected finalized receipt with 21-28 business days from said email notice. No motion necessary.

Fire Damage – ███████████████████████ – The Board of Directors reviewed and discussed the claim adjuster report from Farmers Insurance Melissa Trickey. Additionally, provided was the proposal from Powell & Associates for the engineering work to provide a scope of work for ASR and Leonard Roofing to reconstruction and reinstall roofing components which was approved by Melissa Trickey to proceed with necessary work for these units. No motion necessary.

**DELINQUENCY REPORTS:**
The Board reviewed the Delinquency Tracker.

████████████████████████████████ – The Board of Directors reviewed and discussed the current status of this file which is eligible for foreclosure action at this time. A motion was made by Dale Rodin and seconded by Jerome Black to approve the foreclosure action on this file. Approval of foreclosure action to be generally noted in Open Session. Motion carried (M/S/C 4-0)

**MEMBERS DISCIPLINE, HEARINGS & REQUESTS:**
The Board reviewed the Violation Report for April 2019.

**CALL TO HEARINGS:**
Call to Hearing – 11251 Paseo Del Cielo – April 11, 2019 Incident – The Board of Directors reviewed and discussed the actions committed by the Owner's invitee/son named Garnik Nazaretyan on the date of April 11, 2019 within the community. Mrs. Tamara Nazaretyan appeared before the board and provided medical information pertaining to Garnik Nazaretyan's management of his mental issues. Maya Zlotnik assisted Mrs. Nazaretyan with Russian to English translations. Attorney Steve Roseman gathered additional information from Mrs. Nazaretyan for the board to review. A motion was made to approve the option of filing an injunction by the Association against Mrs. Tamara Nazaretyan. A Call to Hearing will be created and sent to Mrs. Nazaretyan drafted by Roseman Law to meet onsite at the Roseman Law offices in Woodland Hills. Motion carried (M/S/C 4-0)

**PARKING VARIANCE REQUESTS:**
None Currently.

**FEE WAIVER REQUESTS:**
None Currently.

**MEETING ADJOURNMENT:**
With no further agenda items to discuss, the Executive Session was adjourned at 7:05 PM

_____
Board Member Signature

5/28/19
Date

# EXHIBIT "P"

Aldea Community Association
Board of Directors Meeting
Executive Session Meeting Minutes
May 8, 2019

**CALL TO ORDER:**
The Executive Session Meeting of Aldea Community Association was held on May 8, 2019 at the Law Offices of Roseman Law Offices – 21650 W. Oxnard Street, Suite 2000, Woodland Hills CA 91367. The meeting was called to order at 12:40 PM.

**DIRECTORS PRESENT:**            Dale Rodin – President
                                 Maya Zlotnik – Vice President
                                 Jerome Black – Member at Large

**DIRECTORS ABSENT:**            James Douglas Robins – Secretary/Treasurer
                                 (Not able to attend due to work schedule conflict)

**PROPERTY MANAGEMENT PROFESSIONALS REPRESENTATIVE:**
Frank Jauregui, Senior Community Asset Manager

**GUESTS OF THE BOARD OF DIRECTORS:**
Sean Allen, attorney – Roseman Law
Sophie Haimof, attorney – Roseman Law
Tamara Nazaretyan, Homeowner – 11251 Paseo Del Cielo

**LEGAL MATTERS/PERSONNEL MATTERS:**
Call to Hearing – 11251 Paseo Del Cielo – April 11, 2019 Incident: Board reviewed and discussed the violent, disruptive, frightening and offensive behavior with Homeowner Member Mrs. Tamara Nazaretyan pertaining to the incident that occurred on April 11, 2019 and the invitee residing at her home by the name of Garnik Hakobyan. This invitee was supposedly involved in these actions that included attempts at physical harm to individuals living inside of 11251 Paseo Del Cielo, property damage to the association common areas, supposed assault of a Homeowner Member by the name of Jennie Hai Hong Lien (20328 Paseo Del Campo) while in the common area and supposed self-inflicted wounds in an attempt to commit personal physical bodily harm to himself.

Mrs. Tamara Nazaretyan appeared by herself to discuss all these matters in person. While at the meeting, she requested a translator be provided by the HOA who might be able to speak Armenian so that she might understand. Roseman Law had previously reached out to her via a direct phone call to ask if a translator would be needed at this meeting. At that time, she had not requested a translator. Board Member Maya Zlotnik contacted someone she knew via a phone call who was able to speak Armenian to Mrs. Tamara Nazaretyan to assist with any translation matters. Person on phone was not a professional translator. Mrs. Tamara Nazaretyan appeared to understand all that was being explained regarding this incident.

A motion was made by Dale Rodin and seconded by Jerome Black to approve and adopt the *Board of Directors Resolution to Declare Invitee a Nuisance* and to levy the following actions and fines against the account for Mrs. Tamara Nazaretyan, 11251 Paseo Del Cielo:

- Approval to prepare and file complaint against Owner for the breach of the Association's CC&R's, nuisance, and all other pertinent legal remedies in accordance to the Association's CC&R's and California Civil Code
- Approval to levy an individual special assessment of $1,740.00 to reimburse the Association for damages to the Association property
- Approval to deem the invitee, Mr. Garnik Hakobyan, an immediate risk to health and safety of the Association's residents and to prohibit Mrs. Tamara Nazaretyan, Mr. Garnik Hakoyan and other Owner invitee from accessing the Association's Common Area at any time.
- Approval to deactivate any access cards or key fobs that the Owner or Owner's invitees may use to enter the Common Area's Pool.
- Approval to levy a fine of $100.00 for this offense, and this amount shall be doubled at each subsequent instance where Owner's invitee is witnessed anywhere within the boundaries of the Association community.

Motion carried (M/S/C 3-0)

**MEETING ADJOURNMENT:**
With no further agenda items to discuss, the Executive Session was adjourned at 1:46 PM

_____                    5/28/19
Board Member Signature                              Date

EXHIBIT "Q"

| SHORT TITLE: — Tamara Nazaretyan | CASE NUMBER: 19CHCV0038 |
| --- | --- |

1   Tamara Nazaretyan

2   11251 Paseo Del Cielo, Northridge, CA 91326

3   818 536 4445

4

5   Attorneys for Plaintiff

6   ALDEA COMMUNITY ASSOCIATION

7

8                    Superior Court of The State of California

9        FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

10

11   ALDEA COMMUNNITY ASSOCIATION, a                Case No. 19CHCV00398

12   California non-profit mutual benefit                Assign to Hon. Judge Melvin D. Sandvig

13   corporation                                      Dept. F47

14         Plaintiff,                                RESPONSE / OPPOSITION TO

15              vs                                   TEMPORARY RESTRAINING ORDER

16   Tamara Nazaretyan, an individual                TO SHOW CAUSE RE:

17         Defendants                                PRELIMNARY INJUNCTION

18                                                   Hearing Date : June 3, 2019

19                                                   Time: 8:30 am

20                                                   Dept: F47

21

22                          ORDER TO SHOW

23   Letter from medical doctor

24   Letter from Tamara Nazaretyan

25   Pictures

26   *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers)*:

27   This page may be used with any Judicial Council form or any other paper filed with the court.                                    Page _____

FILED
Superior Court of California
County of Los Angeles

MAY 2 8 2019

Sherri R. Carter, Executive Officer/Clerk
By _____
Kailin Keating            , Deputy

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

CRC 201, 501

# TIGRAN I. GEVORKIAN, M.D.

*Psychiatry*
**222 W. Eulalia street suite 301**
**Glendale, CA 91204**
**Phone: (323) 644-7884; FAX: (323) 644-7888**

May 20. 2019

Re:     Garnik Hakobyan
DOB    04/09/1995

Garnik Hakobyan is a 24 years old male who suffers from Schizoaffective Disorder
Bipolar type for which has been under my care for years and treated with neuroleptic
medications.
Garnik's symptoms initially started with visual, auditory hallucinations and paranoia for
which he was treated with different antipsychotic medications such as risperdal, zyprexa,
abilify, intramuscular invega sustenna, seroquel, depakote and others
He has been hospitalized numerous times in psychiatric hospitals with exacerbation of
psychotic symptoms and is currently once again hospitalized at mental unit of Northridge
hospital.
Garnik never exhibited any aggressive behavior during my evaluations. He was always
very respectful, polite and cooperative and I never observed Garnik to act in a hostile way
toward anyone. Garnik has very close relationship with mother Tamara Nazaretyan who
is very much involved in his care and after discharge will clearly benefit by going back to
her house.

If any questions please do not hesitate to contact me at the telephone number above.

Sincerely yours,

*5/20/19*

Tigran I. Gevorkian, MD

To: Judge Melvin D. Sandvig

I, Tamara Nazaretyan, would like to ask you to spend a little of your time to read this letter to help you make a fair decision.

I am a single mother who works at the grocery store. My son, Garnik Hakobyan is very kind and used to be an excellent student at school. He worked at the same grocery store that I work now for about two years at the register. He drove an uber for a year and paid taxes.  He was always on time with attending his physicians and taking his prescribed medications. He never hurt anyone and he was never dangerous to others.

Every year during spring time his conditions gets worst and he goes through exacerbation of his illness. During those times, he tells me to take him to hospital to get help.  On 03.22.2019 he got admitted to Olive View Psychiatric Hospital. On 04.09.2019 Dr Hendrick said that he wants to surprise Garnik by discharging him since the next day was his birthday. He instructed me how to taper off of Clozapine drug. I asked them to taper it off at the hospital under their supervision, but he didn't agree. I took my son home and the doctor didn't provide any other medications except instructing to taper of clozapine.  He used to take few other medications to help him cope with his condition such as Risperdone, Mirtazapine, Cogentin and Ativan, but at that time he was discharged without any of those. On 04.11.2019 Garnik attempted to do a suicide because he didn't have proper medications to take and tapering off of clozapine at home was not a smart idea. This led to his violent behavior and wanted to take away his own life.

The day of the incident he was at home with my mother. He started hearing voices that were telling him to kill himself. He went to bathroom and broke the

To: Judge Melvin D. Sandvig

toilet. The water runs in the whole house. My mom run to help him and didn't see that there was water on the floor because the floor was white. She fall on the floor due to slippery floor from water and hit his head. Then my son run outside and was having hallucinations. He thought he was seeing a Jesus in the neighbor's balcony and that Jesus was calling him to go to him. He jumped into their balcony and realized that there is no Jesus there. He didn't break anything in there. Then he cut the wire of camera thinking that someone is following him through camera. Those types of behavior are very common among people with Schizophrenia, Bipolar disorder.

He left there and knocked  another neighbor's door by thinking it is his house since all the houses are look alike. Then he sees another neighbor's garage door is open, he enters there again by thinking it is his home's garage. Once he saw someone else in the garage, he realizes that it is not his house he turns away and leaves. All the garages are also look alike. Once he  was on the street, one of the neighbor was driving her car too fast that hit my son. He fall and hit his forehead on the floor. He has a scar and you can see it in the attached photos. The driver came off of her car, wanted to help, but left without helping him.

After this incident the community would scare me with their different types of notices, emails, and phone calls. The neighbor who hit my son with her car is trying to do a restraining order against my son to make it seem like she is innocent. People who have mental health issues should have rights to be in the society so that they are not isolated and feel like animals who have to be away from people.

*Sincerely,*

05.28.19

| Form **1040** | Department of the Treasury—Internal Revenue Service (99) **U.S. Individual Income Tax Return** | **2016** | OMB No. 1545-0074 | IRS Use Only—Do not write or staple in this space. |

For the year Jan. 1–Dec. 31, 2016, or other tax year beginning _____ , 2016, ending _____ , 20 ____  **See separate instructions.**

| Your first name and initial | Last name | | Your social security number |
|---|---|---|---|
| GARNIK | HAKOBYAN | | ***–**–7205 |
| If a joint return, spouse's first name and initial | Last name | | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see instructions.   **20227 SATICOY ST**   Apt. no. **421**

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).   **Winnetka CA 91306**

▲ Make sure the SSN(s) above and on line 6c are correct.

| Foreign country name | Foreign province/state/county | Foreign postal code |

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund.  ☐ You  ☐ Spouse

**Filing Status**

Check only one box.

1. ☒ Single
2. ☐ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child

**Exemptions**

| 6a | ☒ **Yourself.** If someone can claim you as a dependent, **do not** check box 6a | . . . . . | | Boxes checked on 6a and 6b | 1 |
| b | ☐ **Spouse** . . . . . . . . . . . . . . . . . . | | | No. of children |
| c | **Dependents:** | | | | on 6c who: |

| (1) First name  Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if child under age 17 qualifying for child tax credit (see instructions) |
|---|---|---|---|
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |
| | | | ☐ |

If more than four dependents, see instructions and check here ▶ ☐

• lived with you
• did not live with you due to divorce or separation (see instructions)

Dependents on 6c not entered above

| d | Total number of exemptions claimed . . . . . . . . . . . . . . . | | Add numbers on lines above ▶ | 1 |

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . | 7 | |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . | 8a | |
| b | Tax-exempt interest. **Do not** include on line 8a . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . | 9a | |
| b | Qualified dividends . . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes . . | 10 | |
| 11 | Alimony received . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . | 12 | 346. |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . | 14 | |
| 15a | IRA distributions . 15a | | b Taxable amount | 15b | |
| 16a | Pensions and annuities 16a | | b Taxable amount | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . | 19 | |
| 20a | Social security benefits 20a | | b Taxable amount | 20b | |
| 21 | Other income. List type and amount | 21 | |
| 22 | Combine the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 346. |

**Adjusted Gross Income**

| 23 | Educator expenses . . . . . . . . . | 23 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | |
| 25 | Health savings account deduction. Attach Form 8889 . | 25 | |
| 26 | Moving expenses. Attach Form 3903 . . . . | 26 | |
| 27 | Deductible part of self-employment tax. Attach Schedule SE . | 27 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . | 28 | |
| 29 | Self-employed health insurance deduction . | 29 | |
| 30 | Penalty on early withdrawal of savings . . . . | 30 | |
| 31a | Alimony paid  b Recipient's SSN ▶ | 31a | |
| 32 | IRA deduction . . . . . . . . | 32 | |
| 33 | Student loan interest deduction . . . . | 33 | |
| 34 | Tuition and fees. Attach Form 8917 . . . . | 34 | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | |
| 36 | Add lines 23 through 35 . . . . . . . . . . . . | 36 | |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . ▶ | 37 | 346. |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.  BAA   REV 01/25/17 PRO   Form **1040** (2016)

## Olive View Psychiatric
### 14445 Olive View Drive
### Sylmar, CA 91342
### Patient Discharge Instructions

**PERSON INFORMATION**
**Name: HAKOBYAN, GARNIK**
**Current Date: 04/09/19 19:20:52**
**DOB: 04/09/1995 MRN: 100772223**

**Primary Care Provider:**
**Name:**
**Phone:**

**Date of Admission: 03/22/19 20:39:58**
**Date of Discharge:**

**HOSPITAL PHYSICIANS**
**Attending Physician: Hendrick, Victoria C**

**Discharge Diagnosis:Chronic schizoaffective disorder**

**Discharge Orders**

| Order Name | Order Details |
| --- | --- |
| Discharge Patient | 04/09/19 15:08:00 PDT |

**Medications**
**During the course of your visit, your medication list was updated with the most current information. The details of those changes are reflected below:**

**New Medications**

**LA CO OVMC OPD, 14445 Olive View Dr Sylmar, CA 913421437, (747) 210 - 3066**

**diazePAM (Valium 5 mg oral tablet)** 1 Tabs Oral Every 6 Hour Interval as needed anxiety. Refills: 0.
Last Dose:_____

**nicotine (nicotine 2 mg oral transmucosal gum)** 1 Each Chew Every 2 Hour Interval as needed nicotine withdrawal. Refills: 0.
Last Dose:_____

**Medications That Were Updated - Follow Current Instructions**

**LA CO OVMC OPD, 14445 Olive View Dr Sylmar, CA 913421437, (747) 210 - 3066**

Current **cloZAPine (cloZAPine 25 mg oral tablet)** 3 Tabs Oral once a day (in the morning). Refills: 0., On 4/10: take 50 mg in am, 75 mg in pm
On 4/12: reduce to 50 mg in am, 50 mg in pm
On 4/14: reduce to 25 mg in am, 50 mg in pm
On 4/16: reduce to 25 mg in am, 25 mg in pm
On 4/18: reduce to 25 mg in pm
On 4/20: Discontinue clozapine
Last Dose:_____
Current **cloZAPine (cloZAPine 25 mg oral tablet)** 3 Tabs Oral once a day (at bedtime). Refills: 0.,
On 4/10: take 50 mg in am, 75 mg in pm
On 4/12: reduce to 50 mg in am, 50 mg in pm
On 4/14: reduce to 25 mg in am, 50 mg in pm
On 4/16: reduce to 25 mg in am, 25 mg in pm
On 4/18: reduce to 25 mg in pm
On 4/20: Discontinue clozapine
Last Dose:_____

Current **diphenhydrAMINE (diphenhydrAMINE 25 mg oral capsule)** 1 capsules Oral Every 4 Hour Interval as needed extrapyramidal symptoms. Refills: 0.
Last Dose:_____

**No Longer Take the Following Medications**

**LORazepam (Ativan 0.5 mg oral tablet)** 1 Tabs Oral 3 times a day.
Stop Taking Reason: Physician Request

**risperiDONE (risperiDONE 1 mg oral tablet, disintegrating)** 1 Tabs Oral once a day (at bedtime).
Stop Taking Reason: Physician Request

**Follow-up Instructions**

| **With:** | **Address:** | **When:** |
|---|---|---|
| Tobacco Cessation Counseling and Support | Telephone Only 1-800-784-8669 | 04/12/19 10:15:00 |

**Comments:**

1-800-784-8669 (1-800-QUIT-NOW)

— COPY —

# NOTICE OF CERTIFICATION FOR ADDITIONAL 30 DAYS INTENSIVE TREATMENT

The authorized agency providing 30-day intensive treatment in the County of Los Angeles has evaluated the condition of:

Name _Garnik Hakobyan_

Address _11251 Paseo Del Cielo, Porter Ranch, CA 91326_

Marital Status _Single_     Date of Birth _4/9/95_   Sex _M_

We, the undersigned, allege that the above-named person is, as a result of a mental disorder or impairment by chronic alcoholism, **GRAVELY DISABLED** as defined in paragraph ( 1 ) of subdivision (h) of Section 5008 of the Welfare and Institutions Code or under section 5585.25 of the Welfare & Institutions Code.

The specific facts which form the basis for our opinion that the above-named person meets the classification indicated above are as follows:

_Pt continues to endorse auditory and visual hallucinations, and display unpredictable and aggressive behavior. Mother unwilling to take pt back home in current state. Pt unable to provide a viable plan for self care at this time._

The above-named person has been informed of this evaluation, and has been advised of the need for, but has not been able or willing to accept treatment on a voluntary basis, or to accept referral to the following services:

_Inpatient psychiatric treatment_

We, therefore, certify the above-named person to receive intensive treatment related to the mental disorder or impairment by chronic alcoholism for no more than 30 days beginning this _2_ day of _April_ 20 _19_, in the intensive treatment facility herein named _OVMC_

_4/2/19_
Date

Signature _[signature]_

Signature _[signature]_

I hereby state that I delivered a copy of this notice this day to the above-named person and that I informed him or her that unless judicial review is requested, a certification review hearing will be held within four ( 4 ) days of the date on which the person is certified for a period of intensive treatment and that an attorney or advocate will visit him or her to provide assistance in preparing for the hearing or to answer questions regarding his or her commitment or to provide other assistance  The court has been notified of this certification on this day.

Signature _[signature]_

**CONFIDENTIAL PATIENT INFORMATION**
California W&I Code Section 5328

Copies:  Person Certified-Personally delivered
Person's  Attorney/Advocate

# CERTIFICATION REVIEW HEARING

☑ **14-DAY**   ☐ **30-DAY**

**Person Certified** GARNIK   HAGOPYAN    **Holding Facility:** Olive View   **Ward:** PAK
First Name    MI    Last Name

**Date Certified:** 3/9/19    **Basis:** ☐ Danger to Others   ☐ Danger to Self   ☑ Gravely Disabled

## CERTIFICATION REVIEW RECORD

**Hearing Date:** 3/22/19    **Hearing Referee:** _____

**Advocate:** M.A.    **Patients' Rights Phone Number: 800-700-9996**

**Name and discipline of person presenting evidence supporting certification:** Dr. Mardonas

**Name(s) of person(s) participating in hearing at request of patient and/or advocate:** _____

The patient, after talking with the advocate, has decided to:

☑ **BE PRESENT AT THE CERTIFICATION REVIEW HEARING**

☐ **WAIVE HIS/HER PRESENCE AT THE HEARING WITH THE UNDERSTANDING THAT IT WILL BE HELD IN HIS/HER ABSENCE.** Reasons given for waiver: _____

After considering all the evidence presented, the Hearing Referee finds that:

☑ **THERE _IS_ PROBABLE CAUSE TO BELIEVE THAT THE PERSON, AS A RESULT OF A MENTAL DISORDER IS:**
☐ Danger To Others   ☐ Danger To Self   ☑ Gravely Disabled   ☐ Remains Gravely Disabled
The person ☐ DOES / ☑ DOES NOT request a judicial review by writ of habeas corpus.

☐ **THERE _IS NOT_ PROBABLE CAUSE TO BELIEVE THAT THE PERSON, AS A RESULT OF A MENTAL DISORDER IS: A DANGER TO SELF, A DANGER TO OTHERS OR GRAVELY DISABLED. THE PATIENT MUST BE RELEASED OR REMAIN AT THE FACILITY ON VOLUNTARY BASIS.**

The specific information relied on and reason for the decision are as follows:

Meds: Clozaril 100 am, 200 hs; Benadryl 25 am, hs; Lorazepam 0.5 tid

Dx: Schizophrenia

Pres: bib mother; not eating/drinking @ 2 days, mute, etc. paranoid; SMV: features of catatonia, long hair kept

Gxs and answers; slow in movements; @ mother: recently ↓ ADL-oq, broke windows at home, aggressive/attly to self; came in on meds — but has eye rolling with date possible. Gdc effect (was on 3 anti-psych, etc.)

Apg: pt is cooperative, plans to return to mother. There is no statement. W/U: pt has auditory/visual natural

pt: "can I go home today?" "I sleep daily, not mood"

(pt: speech was very soft)

_Signature of Hearing Referee:_ _____

Copy: Person Certified, Advocate, Hearing Referee, Treatment Record

LASC MHHR 001 Rev. 10/18
For Mandatory Use



**Olive View–UCLA**
M E D I C A L   C E N T E R

**Los Angeles County
Board of Supervisors**

**Hilda Solis**
First District

**Mark Ridley-Thomas**
Second District

**Sheila Kuehl**
Third District

**Janice Hahn**
Fourth District

**Kathryn Barger**
Fifth District

**Judith Maas, RN, NP**
Chief Executive Officer

**Rima Matevosian, MD**
Chief Medical Officer

**Bonnie Bilitch, RN**
Chief Nursing Officer

14445 Olive View Drive
Sylmar, CA 91343

Tel: (818) 364-1555

*To improve health
through leadership,
service and education*



April 9, 2019

To whom it may concern,

Please note that Mr. Garnik Hakobyan was recently hospitalized at Olive View Medical Center for the treatment of a severe decompensation of schizophrenia. He is being discharged today following a nearly 3-week stay. He has improved significantly with the resumption of long-acting injectable paliperidone (Invega Sustenna) and the discontinuation of Clozapine. While on clozapine, he continued to experience hallucinations, delusions and agitation, in addition to multiple side effects, including excessive sedation and hypersalivation. Per some reports, he may have experienced a seizure while on this medication, prior to his admission to the inpatient unit. Once clozapine was tapered off and Invega Sustenna was re-initiated, he showed great improvement, returning to his baseline and no longer being impaired by hallucinations or delusions. He is tolerating Invega Sustenna very well and denies experiencing medication side effects. Invega Sustenna appears to be more effective and well-tolerated as compared to Clozapine.

Please do not hesitate to contact me if I can provide any further information.

Sincerely,

Victoria Hendrick, M.D.
Attending Physician and Chief, Inpatient Psychiatry Service
Olive View Medical Center

Health Services
www.ladhs.org







| Invoice: 145751 | Page: 1 | Retrieved Date: 04/24/2019 |



## Invoice Details

| | |
|---|---|
| **Invoice Number** | 145751 |
| **Invoice State** | Manager Approval |
| **Association** | Aldea Community Association |
| **Vendor** | |
| **Received Date** | 04/19/2019 |
| **Invoice Date** | 04/16/2019 |
| **Due Date** | |
| **Amount** | $ 900.00 |
| **Stub Notes:** | |
| **Internal Notes:** | |

## Invoice Coding

| Code | Description | Type | Amount |
|---|---|---|---|
| 07855 | Misc General and Admin | Expense | $900.00 |

## Invoice History

**Updated By: Alan Oakes**

Date: 04/23/2019
Status: Manager Approval
Amount: $900.00

**Enter Data By: ABN Scan Team 21**

Date: 04/22/2019
Status: Unassigned
Amount: $900.00

**Enter Data By: Data Entry 19**

Date: 04/20/2019
Status: Data entry Exceptions Level 2
Amount: $900.00

**Enter Data By: Data Entry 81**

Date: 04/19/2019
Status: Data Entry Exception
Amount: $900.00

**Created By: Payables Service**

Date: 04/19/2019
Status: Pending Data Entry
Amount: $





990 W. Tenth Street, Azusa, CA  91702
phone 626.633.3500 * fax 626.633.3599

# Invoice

| Invoice Date | Customer | Invoice | Job No |
|---|---|---|---|
| 4/16/2019 | P1782 | 145751 | V-19-177026 |

| Claim No | PO |
|---|---|
| | |

## BILL TO:

PMP Management Ventura County
100 East Thousand Oaks Bouleva
Suite # 220
Thousand Oaks,, CA 91360

Attn: Frank Jauregui

## PROJECT NAME:

PMP Management Ventura County
11251 Paseo Del Cielo
Porter Ranch, CA 91326

info@alliance-enviro.com          www.alliance-enviro.com          TAX ID#: 95-4549377

| Description | Units | UOM | Unit Price | Amount |
|---|---|---|---|---|
| Biohazard remediation and disinfection application to walkway after a trauma scene had occurred. | | | | 900.00 |
| Any further questions please contact Robert McKeever | | | | |

| | | |
|---|---|---|
| | Amount Billed: | 900.00 |
| Please reference job number when making your payment | Total Tax: | 0.00 |
| | Retainage Held: | 0.00 |
| | Amount Due: | 900.00 |

Interest at the rate of 1-1/2% per month will be charged on all past due accounts. In the event of failure to pay any of the amount due in this invoice, all collection costs and/or attorney fees in the collection of any such amount will be paid by the customer.



HOA Specialists Construction Services Inc.
23638 Lyons Avenue #274
Newhall CA 91321
CSLB #1026722

# Estimate

| Date | Estimate # |
|------|-----------|
| 4/16/2019 | 2976 |

**Name / Address**

Aldea Community Association
c/o PMP
27220 Turnberry Lane Suite 150
Valencia Ca 91355

| Description | Hours | Rate | Total |
|-------------|-------|------|-------|
| 11251/11245 Paseo Del Cielo | | | |
| 1) Repair damaged stucco and paint wall complete. | 6 | 90.00 | 540.00 |
| Materials Tax Included. | | 300.00 | 300.00 |

| | Total | $840.00 |
|---|-------|---------|

| Phone # | Fax # | E-mail |
|---------|-------|--------|
| 6612880090 | 6612881603 | services@hoaconservices.com |

Signature   *Dale Rodin*   4/22/19

EXHIBIT "R"

| SHORT TITLE: — Tamara Nazaretyan | CASE NUMBER: 19CHCV0038 |
|---|---|

1  Tamara Nazaretyan

2  11251 Paseo Del Cielo, Northridge, CA 91326

3  818 536 4445

4

5  Attorneys for Plaintiff

6  ALDEA COMMUNITY ASSOCIATION

7

8             Superior Court of The State of California

9      FOR THE COUNTY OF LOS ANGELES - CHATSWORTH COURTHOUSE

10

11  ALDEA COMMUNNITY ASSOCIATION, a          Case No. 19chcv00398

12  California non-profit mutual benefit           Assign to Hon. Judge Melvin D. Sandvig

13  corporation                                    Dept. F47

14        Plaintiff,                               RESPONSE OPPOSITION TO

15            vs                                   TEMPORARY RESTRAINING ORDER

16  Tamara Nazaretyan, an individual              TO SHOW CAUSE RE: PRELIMINARY

17        Defendants                              INJUNCTION

18                                                Hearing Date : October 15, 2019

19                                                Time: 8:30 am

20                                                Dept: F47

21

22                    ORDER TO SHOW

23

24  Letter from Tamara Nazaretyan

25

26  *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, **not** line numbers)*:

27  | This page may be used with any Judicial Council form or any other paper filed with the court. | Page _____ |

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]

**ADDITIONAL PAGE**
Attach to Judicial Council Form or Other Court Paper

CRC 201, 501

FILED
Superior Court of California
County of Los Angeles

SEP 27 2019

Sherri R. Carter, Executive Officer/Clerk
By _____ , Deputy
Kailin Keating

10-21-19

I, Tamara Nazaretyan had a court date on September 13 with a Steven A. Roseman, who told me that I have to pay $40,000 and also said that on September 23 he will have a meeting with bord members to see if they can give me a discount so that they can close the case.

On September 23, I met with bord members  and said that I can pay $10,000 (payment plan) since I don't work and I have to be a caregiver to my son, I can't take a risk and go to work to pay off the amount. They were rude to me and told me they can't give me a discount and that I need to pay $38,000, If not we will go to court. They told me that I didn't close the case on time.  I told them before I hired my attorney  I asked them to close the case but they didn't let me to finish my words and told them they are not willing to talk about the past with me. At that time one of the bord members Maya said that yes, that happened.

On June 4, I called the bord member Maya and told her that I want to pay and close the case. She said ok, she will talk to Roseman. After 2 hours, she called me back and said that the Roseman will make an agreement, then will call me to meet.  I waited 5 days and no one called me back. Now they are saying I didn't agree to close the case on time.

On May 8, during one of the meeting I asked the bord members to drop the charges and I am willing to move out of my house with my son. They still didn't agree with that.

About 6 months already they have cancelled my access card that I use in the community and took away my rights from me. Me and my mom couldn't use the pool  are, couldn't exit the community because we couldn't come back.

About 6 months me and my mom live in a stress. We feel like we are separated from the community members. I am a single mother and they should not have done this to me.

POS-040

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:**       STATE BAR NO:<br>NAME: Ani Hakobyan<br>FIRM NAME:<br>STREET ADDRESS: 20227 Saticoy st<br>CITY: Winnetka                    STATE: CA    ZIP CODE: 91306<br>TELEPHONE NO.:  818 406 5888        FAX NO. :<br>E-MAIL ADDRESS:  Hakobyanani10@yahoo.com<br>ATTORNEY FOR (name):  In Pro Per | *FOR COURT USE ONLY* |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF**<br>STREET ADDRESS: 9425 Penfield Ave<br>MAILING ADDRESS: 9425 Penfield Ave<br>CITY AND ZIP CODE: Chatsworth, CA 91311<br>BRANCH NAME: Civil |

| | |
|---|---|
| Plaintiff/Petitioner: Aldea Community Assoication<br>Defendant/Respondent: Tamara Nazaretyan | CASE NUMBER:<br>19CHCV00398 |

| | |
|---|---|
| **PROOF OF SERVICE—CIVIL**<br>**Check method of service** *(only one):*<br>☐ By Personal Service    ☑ By ~~Mail~~ *E/MAIL* ☐ By Overnight Delivery<br>☐ By Messenger Service   ☐ By Fax | JUDICIAL OFFICER:<br>MELVIN S. SANDVIG<br><br>DEPARTMENT:<br>F47 |

*Do not use this form to show service of a summons and complaint or for electronic service.*
*See USE OF THIS FORM on page 3.*

1. At the time of service I was over 18 years of age **and not a party to this action**.

2. My residence or business address is:

   20227 Saticoy st, Winnetka CA 91306

3. ☐ The fax number from which I served the documents is *(complete if service was by fax):*

4. On *(date):* 05-28-2019        I served the following **documents** *(specify):*
   Response Opposition to Temporary Restraining order to show cause re: Preliminary Injunction

   ☐ The documents are listed in the *Attachment to Proof of Service–Civil (Documents Served)* (form POS-040(D)).

5. I served the documents on the **person or persons** below, as follows:
   a. Name of person served:  Steven A. Roseman, Paul S. Cooley, Farzad Rashedi

   b. ☐ *(Complete if service was by personal service, mail, overnight delivery, or messenger service.)*

      Business or residential address where person was served:

   c. ☑ *(Complete if service was by fax.)*

      Fax number where person was served:
      EMAILS ROSEMAN@ROSEMAN.LAW , COOLEY@ROSEMAN.LAW , RASHEDI@ROSEMAN.LA

      ☐ The names, addresses, and other applicable information about persons served is on the *Attachment to Proof of Service—Civil (Persons Served)* (form POS-040(P)).

6. The documents were served by the following means *(specify):*
   a. ☐ **By personal service.** I personally delivered the documents to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office, or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and eight in the evening.

Page 1 of 3

**PROOF OF SERVICE—CIVIL**<br>(Proof of Service)    Code of Civil Procedure, §§ 1011, 1013, 1013a,<br>2015.5;  Cal. Rules of Court, rule 2.306

POS-040

| CASE NAME:<br>ALDEA COMMUNITY ASSOCIATION VS TAMARA NAZARETYAN | CASE NUMBER:<br>19 CHCV00398 |
|---|---|

6.  b. ☐  **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses in item 5 and *(specify one)*:

    (1) ☐  deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (2) ☐  placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at *(city and state)*:

  c. ☐  **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses in item 5. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

  d. ☐  **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons at the addresses listed in item 5 and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below.)*

  e. ☐  **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed in item 5. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

Ani Hakobyan
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

*(If item 6d above is checked, the declaration below must be completed or a separate declaration from a messenger must be attached.)*

### DECLARATION OF MESSENGER

☐  **By personal service.** I personally delivered the envelope or package received from the declarant above to the persons at the addresses listed in item 5. (1) For a party represented by an attorney, delivery was made (a) to the attorney personally; or (b) by leaving the documents at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served, with a receptionist or an individual in charge of the office; or (c) if there was no person in the office with whom the notice or papers could be left, by leaving them in a conspicuous place in the office between the hours of nine in the morning and five in the evening. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not younger than 18 years of age between the hours of eight in the morning and six in the evening.

At the time of service, I was over 18 years of age. I am not a party to the above-referenced legal proceeding.

I served the envelope or package, as stated above, on *(date)*:

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:   05-28-2019

Ani Hakobyan
_____
(NAME OF DECLARANT)

▶ _____
(SIGNATURE OF DECLARANT)

**PROOF OF SERVICE—CIVIL**
(Proof of Service)

EXHIBIT "S"

| | |
|---|---|
| **From:** | Harry Safarian |
| **To:** | Karina Babikian |
| **Cc:** | Pierro Babaian; Christina Karayan; Steven Roseman; Patrick Malone; Joshua Nozar; Julie Ho; firm Emails |
| **Subject:** | RE: Aldea Community Association v. Nazaretyan - Depositions |
| **Date:** | Friday, June 11, 2021 10:51:51 AM |

FYI, Ms. Nazaretyan just checked, and the access cards still do not work, and have consistently not worked for over two years, and at no time until today has anyone on behalf of Aldea ever suggested they work, or would ever work. Please explain. Every minute Garnik is forced to remain in the home will cause further psychological damages. This is not how a person with a serious disability should be treated. Aldea and those who encouraged this disability discrimination should be ashamed.

---

**From:** Harry Safarian
**Sent:** Friday, June 11, 2021 10:31 AM
**To:** Karina Babikian <babikian@roseman.law>
**Cc:** Pierro Babaian <pb@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>; Steven Roseman <roseman@roseman.law>; Patrick Malone <malone@roseman.law>; Joshua Nozar <nozar@roseman.law>; Julie Ho <ho@roseman.law>; firm Emails <firm@roseman.law>
**Subject:** RE: Aldea Community Association v. Nazaretyan - Depositions

Please provide the date the access cards were "turned on," and any notice that was provided. We asked a couple of weeks ago to have them turned on and your firm declined.

---

**From:** Karina Babikian <babikian@roseman.law>
**Sent:** Friday, June 11, 2021 10:30 AM
**To:** Harry Safarian <hs@safarianfirm.com>
**Cc:** Pierro Babaian <pb@safarianfirm.com>; Christina Karayan <ck@safarianfirm.com>; Steven Roseman <roseman@roseman.law>; Patrick Malone <malone@roseman.law>; Joshua Nozar <nozar@roseman.law>; Julie Ho <ho@roseman.law>; firm Emails <firm@roseman.law>
**Subject:** Re: Aldea Community Association v. Nazaretyan - Depositions

Hi Harry,

We are in receipt of your email and disagree with a number of your contentions but will not be addressing each and every one.  Please note that your information is inaccurate and the Defendant's key card for access to common area amenities has been turned back on for some time.

This also confirms that you have yet to provide availability for your client's deposition. Please provide dates as soon as possible.

Thank you.



Karina Babikian, Esq.
Roseman Law, APC
**Corporate Office:** 21650 Oxnard Street, Suite 2000, Woodland Hills, CA 91367
**Orange County Office:** 9860 Research Drive, Suite 200, Irvine, CA 92618
**t:** 866.839.9400 | **f:** 818.380.6710 | **e:** babikian@roseman.law
**LA:** 818.380.6700 | **OC:** 949.339.2000 | **CV:** 760.760.2000 | **IE:** 951.430.2000 | **SD:** 619.494.2000
LOS ANGELES | ORANGE COUNTY | COACHELLA VALLEY | INLAND EMPIRE | SAN DIEGO | NEVADA

EXHIBIT "T"

| | |
|---|---|
| **From:** | Tamara Nazaretyan |
| **To:** | Pierro Babaian |
| **Subject:** | Fwd: Access Device Request: Pending Requirements - [#XN3987575] |
| **Date:** | Tuesday, June 29, 2021 1:57:47 PM |

Sent from my iPhone

Begin forwarded message:

> **From:** PMP Management | Ventura <care@pmpmanage.com>
> **Date:** June 14, 2021 at 1:04:47 PM PDT
> **To:** tamaranazaretyan@yahoo.com
> **Subject: Access Device Request: Pending Requirements - [#XN3987575]**

-



### Aldea Community Association
Access Device Request

Access Passes have been reactivated.

*Request Description: Please reactivate the access pass for this owner as soon as possible.*

Sincerely,


Nancy Patrick

PMP Management | Ventura on behalf of Aldea Community Association



Nothing contained in this message should be considered legal advice. This message, including any attachments, may include privileged, confidential, and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

| | |
|---|---|
| **From:** | Tamara Nazaretyan |
| **To:** | Pierro Babaian |
| **Subject:** | Fwd: - [#XN4130837] |
| **Date:** | Tuesday, June 29, 2021 3:15:10 PM |

Sent from my iPhone

Begin forwarded message:

> **From:** PMP Management | Ventura <care@pmpmanage.com>
> **Date:** June 29, 2021 at 3:13:04 PM PDT
> **To:** tamaranazaretyan@yahoo.com
> **Subject:** - [#XN4130837]

-

 

## Aldea Community Association

Thank you for your message. Gayle Pinero a community manager activated your card device.

Request Description:
*11251 Paseo Del Cielo*
*Gayle Pinero a community manager activated your card device.*

**Did you know?** Homeowners can manage their accounts online 24/7 on PMP GATEWAY. Setup payments, view balances, submit requests, and much more! To register or log in to your homeowner account now, click here.

Sincerely,

PMP Management | Ventura *On Behalf of Aldea Community Association*

 Nothing contained in this message should be considered legal advice. This message, including any attachments, may include privileged, confidential, and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

# EXHIBIT "U"

## **DECLARATION OF ARAM TOULOUMDJIAN**

I,  Aram Touloumdjian., declare and state as follows:

1.      I am a competent adult over the age of 18. I make this declaration of my own personal knowledge. If called upon to testify, I would and could competently testify to the facts herein.

2.      I previously owned and occupied with my family a townhouse at 11261 Paso Del Cielo, Porter Ranch, California 91326 ("Property"), and was a member of the Aldea Community Association ("Association"). I have since sold the property and moved to a different residence.

3.      I signed a declaration on or about May 14, 2019, which was authored by the Association's attorneys, Roseman Law, APC. I did not make any edits or revisions to the declaration, taking at face value representations of Steven Roseman, an attorney, that all contents of the declaration were true and accurate, and believed same to be true accordingly, even as to things I did not personally observe or experience.

4.      On April 11, 2019, for the first and only time, I observed Garnik Hakopyan ("Garnik") engage in conduct that was concerning to me as a homeowner and neighbor ("Incident"). While it seemed from the Incident that Garnik may have been suffering from an acute mental episode/psychological breakdown, I did not fully understand or learn of the details of why he had the episode. I did not personally observe Garnik engage physically with any person at the HOA property on the date of the Incident, or at any other time.

5.      I was aware that I resided next door to Garnik that he lived with his mother and grandmother. Aside from the Incident, Garnik and his family's occupancy was uneventful.

6.      At the time I signed the May 14 2019 declaration, I did not have available to me all of the details regarding the Incident. I have no information that Garnik's conduct was willful or deliberate. I have no information that he intentionally meant to harm anyone, or that his mother knowingly allowed the Incident to occur. I also was never informed that Garnik's mother left her job as a store clerk as of the date of the Incident so that she could watch over Garnik 24/7 and ensure no such events occurred again after the Incident.

7.      I was encouraged after the Incident by the Association's attorney, Steven Roseman, to submit a declaration in support of a court order excluding Garnik from Association property. Some

of the information in the declaration was directly from Mr. Roseman, and not based upon my personal observations. Mr. Roseman made various representations at a board meeting after the Incident, encouraging homeowners to submit declarations to file restraining orders.

8.      I took Mr. Roseman at his word that his statements were truthful, in part because I expected an attorney would be deliberate in his presentation of facts and circumstances concerning an issue as serious as removing Garnik from his home. For example, I took as accurate representations that Garnik engaged in inappropriate behavior, including but not limited to peeking into windows, roaming around common areas fully nude, and engaging in any conduct that could be perceived as violent. I did not personally see such conduct, but accepted Mr. Roseman's statements about these incidents as true.

9.      At no time did Mr. Roseman or any other attorney for the Association's disclose to me that Garnik's mother attempted to provide Garnik's medical records to the HOA Board of Directors after the incident." As a member of the Association, I would have appreciated knowing the basis of Garnik's conduct and illness to better understand his needs, the cause of the Incident, and an appropriate response to accommodate his illness.

10.     At no time before or after the Incident did I ever observe Garnik engage in conduct that differed from the typical member of the Association. He appeared to keep to himself. In fact, after the Incident, I barely saw him. Only recently have I been informed that Garnik suffered a serious health episode. It is my hope that Garnik will continue to obtain the help needed to help treat his illness. I have neither observed nor learned of any circumstances after the Incident that are cause for concern about Garnik/his conduct.

11.     Around the time of the COVID "lockdown" in early-2020, access cards of certain common areas such as the swimming pool were deactivated briefly. I assume this was to help effectuate social distancing. I understand that the access cards were re-activated within a few months. The access cards, to my knowledge, were never deactivated for entrance into and out of the Association's pedestrian access ways for any residents. I never asked that the access cards to Garnik and his family be limited.

2

I declare, under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was signed on August __12__, 2022 in the County of Los Angeles, State of California.

*Aram Touloumdjian*
Aram Touloumdjian

3

DECLARATION